**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WANDA JAMES SPEIGHT | : | |
| Plaintiff | : | Civil Action No. 07-0890 |
| v. | : | |
| CAPMARK FINANCE INC. | : | **JURY TRIAL DEMANDED** |
| Defendant | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO
EXCLUDE EVIDENCE UNKNOWN TO THE DECISION-MAKERS**

**I.   INTRODUCTION**

    **A.   DEFENDANT HAS ADMITTED THAT PLAINTIFF WAS TERMINATED
WITHOUT PRIOR WARNING BASED ON TWO SPECIFIC EVENTS**

This is a race discrimination case. By all accounts, from the day she was hired in 1998 up until a few weeks before her termination in May 2006, plaintiff was nothing short of a stellar employee. However, Ms. Speight was precipitously terminated, without prior warning, by her supervisor, Mark McCool, after he consulted his boss, Michael Lipson. The termination took place just a few weeks after Ms. Speight began officially reporting to Mr. McCool as part of a transition resulting from the sale of the Company to private investors a few months earlier.

Although not entirely clear whether Mr. McCool or Mr. Lipson ultimately made the decision to terminate Ms. Speight, it is clear that the decision was made by one or both individuals.

Capmark's official position, as set out in its answers to interrogatories, is that Ms. Speight was terminated based on only two events, which occurred over a *three day* period – a perceived

lack of cooperation in a meeting which occurred on May 23, 2006, and an e-mail she sent on May 25, 2006 in which she expressed her concerns regarding the handling of the "risk ratings" for certain loans. She was terminated the next day.

Capmark has repeatedly conceded that Ms. Speight was terminated for just these two events – the May 23 meeting and the May 25 e-mail. (See, e.g., Zurick dep. at 19-20; 83 relevant pages from Mr. Zurick's deposition are attached hereto as Exhibit A). In fact, except for these two events, *Capmark has admitted that Ms. Speight "continued to diligent perform all of the work to which she was assigned at the same level of performance that she had demonstrated previously,"* which – no one contests – was at an extraordinarily high level:

> Interrogatory No. 5
>
> Please describe in detail *each and every basis for your denial* in paragraph 19 of your Answer [to the Complaint] that "Ms. Speight continued to diligently perform all of the work to which she was assigned at the same level of performance that she had demonstrated previously."
>
> Objections and Answer: Ms. Speight displayed a poor attitude and lack of cooperation in a meeting concerning the integration of her group into Servicing. Ms. Speight also communicated with Mr. McCool in a disrespectful manner regarding her unwillingness to perform a task that was assigned to her group.[1]

(Defendant's Supplemental Answers to Interrogatories, P-3, attached hereto as Exhibit B).[2]

---

1. The task in question involved the completion of "risk ratings" for certain loan portfolios.

2. Paragraph 19 of the complaint states: "During this time period, Ms. Speight was asked if she was willing to assume a new position based upon the transition. Ms. Speight replied, in sum and substance, that she could not make a decision without knowing the job description and compensation for the position. No new job description or compensation structure was provided prior to her termination. Nevertheless, consistent with her prior outstanding and dedicated performance over the previous seven years, Ms. Speight continued to diligently perform all work to which she was assigned, at the same level of performance which she had consistently delivered."

It is clear that the meeting referred to is the May 23 meeting, and that the communication referred to is the May 25 e-mail. In light of this interrogatory response, Capmark could hardly contend that it had additional bases for believing that Ms. Speight was not being diligent. Even Mr. Lipson testified that he made the ultimate decision to terminate Ms. Speight based on the May 25 e-mail (Lipson dep. at 57, relevant pages from Mr. Lipson's deposition are attached hereto as Exhibit C). Indeed, Mr. Lipson stated that, prior to the e-mail, he had not considered whether Ms. Speight should be counseled about her performance (Lipson dep. at 56-57), and that not only had he not considered terminating Ms. Speight's employment prior to the e-mail, but that he had not even considered *any sort of intervention by human resources with Ms. Speight*. (Lipson dep. at 57-58). Finally, Mr. Lipson testified that, but for the e-mail, Ms. Speight would not have been terminated. (Lipson dep. at 58).

More importantly, Capmark claimed that Ms. Speight was terminated for her "unprofessional, uncooperative and disrespectful conduct." (See Exhibit B, Interrogatory 1.) Mr. McCool testified that the conduct manifested itself in three specific ways, and that this conduct <u>all</u> occurred either at the May 23 meeting (in which Ms. Speight (1) failed to respond to a question about her team's morale; and (2) purportedly stated that her opinion did not matter) or in the May 25 email. (McCool dep. at 36-44, relevant pages from Mr. McCool's deposition are attached hereto as Exhibit D). Mr. Lipson admitted that he was relying on Mr. McCool for reports on Ms. Speight. (Lipson dep. at 48, 49 and 51).

    B.    <u>**AFTER-ACQUIRED EVIDENCE**</u>

Despite Defendant's admission that Ms. Speight was terminated based on these two specific events – and these two events alone – which occurred in close proximity, Defendant apparently intends to introduce evidence of Ms. Speight's allegedly poor "attitude" over the

course of several weeks prior to her termination. It is clear why defendant, through Mr. Lipson, wants to expand its reasons for terminating Ms. Speight.[3] It hopes that it will be allowed to bootstrap otherwise inadmissible testimony and evidence – namely, Ms. Speight's statements to others (including, but not limited to her outside advisers, Robert Jones and Beth Wilson) which were unknown to Mr. Lipson at the time – to prove that Mr. Lipson's alleged perceptions of her "poor attitude" were correct. As set forth below, such evidence should be wholly excluded.

In addition, defendant apparently seeks to put on other after-acquired evidence as well. In particular, the e-mail sent by Ms. Speight related to her concerns regarding whether she had qualified personnel to perform risk ratings on certain loans and whether those risk ratings should be performed by the group she supervised. Defendant has argued that it should be allowed to put on evidence of how those risk ratings were in fact handled after Ms. Speight's termination. However, such evidence cannot possibly be relevant to whether defendant's basis for Ms. Speight's termination was relevant, and would force a "mini-trial" on whether, in fact, the process was ultimately successful.

**II.     ARGUMENT**

    **A.     EVIDENCE OF PLAINTIFF'S ATTITUDE, INCLUDING COMMUNICATIONS WITH MR. JONES AND MS. WILSON, MUST BE EXCLUDED PURSUANT TO FED. R. EVID. 402 AND 403 TO THE EXTENT SUCH ATTITUDE DID NOT MANIFEST ITSELF TO THE DECISION-MAKERS.**

At the time of the transition, Ms. Speight had communications (including e-mails) about how to deal with the uncertainties arising from the transition, with two individuals outside the

---

3. Despite Mr. Lipson's contrary deposition testimony, Defendant has *never* amended its answers to interrogatories to provide any additional facts to support is contention that Ms. Speight failed to diligently perform her duties.

company, Robert Jones and Beth Wilson. These communications were unknown to either Mr. McCool and Mr. Lipson at the time.

Nevertheless, defendant is expected to attempt to introduce the documents in Ms. Speight's cross-examination, as well as attempt to solicit testimony from Ms. Speight regarding her commitment — or lack thereof — to the transition generally.[4] In particular, defendant will now claim that plaintiff's musings to herself and others demonstrate that its perceptions of Ms. Speight's attitude were correct. However, to the extent that Mr. Lipson and/or Mr. McCool made the decision to terminate Ms. Speight based on her alleged attitude, the evidence regarding Ms. Speight's alleged attitude must be limited to what the decision-makers *knew*, either first-hand or based on what others reported to them.[5] Hence, even assuming that plaintiff was ambivalent about the transition, such ambivalence is simply irrelevant unless, and only to the extent, plaintiff manifested such ambivalence — through words or deeds — in a manner observed by, or known to, the decision-makers themselves.

As the Supreme Court has held, after-acquired evidence is clearly barred for purposes of liability. <u>McKennon v. Nashville Banner Publishing Co.</u>, 513 U.S. 352 at 360 (1995) ("The employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for the non-discriminatory reason.").

---

4.  Plaintiff also kept a notebook with various jottings which Defendant may seek to introduce. To the extent that defendant seeks to introduce the entries in the notebook for similar purposes, it should likewise be excluded.

5.  There is no evidence that either Mr. Lipson or Mr. McCool were advised by *any* other individuals regarding Ms. Speight's allegedly poor attitude, and therefore in this case, the evidence of her attitude should be based on what they observed directly.

As the Third Circuit has noted:

> "After-acquired evidence" in an employment discrimination case denotes evidence of the employee's or applicant's misconduct or dishonesty which the employer did not know about at the time it acted adversely to the employee or applicant, but which it discovered at some point prior to, or more typically, during subsequent legal proceedings; the employer then tries to capitalize on that evidence to diminish or preclude entirely its liability for otherwise unlawful employment discrimination.

Mardell v. Harleysville Life Ins. Co., 31 F.3d 1221 (3d Cir. 1994), *modified in part on remand*, 65 F.3d 1072 (3d Cir. 1995).

The Third Circuit has consistently resisted defendants' attempts to introduce after-acquired evidence for purposes of avoiding liability. *See, e.g.,* Bower v. National Collegiate Athletic Ass'n, 475 F.3d 524 (3d Cir. 2007) (after-acquired evidence of drug use could not be used to establish that plaintiff failed to qualify as an "otherwise qualified individual" with a disability); Mardell v. Harleysville Life Ins. Co., 65 F.3d 1072 (3d Cir. 1995) (per curiam) (substantially reaffirming it original, pre-McKennon decision, Mardell, 31 F.3d 1221 (3d Cir. 1994), as consistent with McKennon). As the Third Circuit noted in its original opinion in Mardell, establishing an iron-clad rule against such evidence:

> After-acquired evidence, simply put, is *not relevant* in establishing liability [in discrimination cases] because the sole question to be answered at that stage is whether the employer discriminated against the employee on the basis of an impermissible factor at the instant of the adverse employment action.

Mardell, 31 F.3d 1221 at 1228-1229 (emphasis added).

Defendant's only conceivable argument is that Ms. Speight's musings are not "after-acquired" evidence per se, but rather that the evidence should somehow be admitted to

demonstrate that they "correctly" perceived Ms. Speight's state of mind. However, this evidence is of limited, if any, probative value, and would be highly prejudicial, and thus inadmissible.

Courts have consistently rejected such attempts to recharacterize "after-acquired" evidence into something else in light of the Supreme Court and Third Circuit's ruling creating a per se bar against such evidence at the liability stage.

Thus, for example, in <u>Finch v. Hercules</u>, 1995 WL 785100 (D. Del. 1995), Hercules sought to introduce two studies, an audit and a corporate performance plan review, the results of which were not known until after plaintiff's termination, to counter plaintiff's assertion that his performance had been consistently excellent. Hercules contended that the evidence would demonstrate that its perceptions of plaintiff were not "mistaken and unreasonable" but rather was consistent with the vast majority of other officials' opinions at Hercules, and supported by the studies.

Granting plaintiff's motion in limine, the Court stated:

> The Court agrees that any limited probative utility of the [study] evidence would be substantially outweighed by the undue prejudice to plaintiff. Because [the decision-maker] did not consider and did not know of unflattering statistics, they are not probative of his decisionmaking process. Hercules should not be allowed to present, after the fact, further justification for its actions if that justification was completely uncontemplated at the relevant time. At issue is whether a discriminatory animus motivated Hercules in the employment decisions it made adverse to plaintiff at the time those decisions were made. Accordingly, for purposes of liability, a jury will deliberate as to whether Hercules was so motivated on the information it availed itself of at the time. Admission of the [study] evidence would serve only to feed the jury facts that are extraneous to its task, yet once presented, would be difficult to "unlearn." Consequently, the Court finds any marginal relevance this evidence may have is substantially outweighed by the dangers of confusion and prejudice.

Finch at *3, citing Fuentes v. Perkasie, 32 F.3d 759, 765 (3d Cir. 1994); Mardell v. Harleysville Life Ins. Co., 31 F.3d 1221 at 1229. *See also* Smith v. Normany Properties, Inc., 2008 WL 4443827 (W.D. Pa. 2008) (evidence of plaintiff's alleged poor attitude in 2007 could not be used to show that her supervisor correctly perceived that attitude in 2005, when adverse action occurred).

  **B. THE EVIDENCE MUST ALSO BE EXCLUDED PURSUANT TO FED. R. EVID. 404(B).**

  The evidence must also be excluded independently pursuant to Rule 404(b). Defendant is really attempting nothing more than to put on character evidence to suggest that plaintiff's conduct in the late May meetings was consistent with her general character. Courts have consistently rejected attempts to show "pattern of behavior" evidence if it was unknown to the decision-makers based on Rule 404(b). *See, e.g.,* Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507 (D.C. Cir. 1995); Zubulake v. UBS Warburg LLC, 382 F. Supp. 2d 536 (S.D.N.Y. 2005).

  Although these cases deal with situations in which defendants sought to introduce "attitude" evidence in regard to prior employers, the distinction is immaterial. In both situations, defendants are attempting to show that their "perceptions" were not only held in good-faith, but were, in fact, correct. But the jury's task is not to determine whether defendant's alleged perceptions were correct – it is to evaluate whether they were truly held, and in good-faith. Whether defendant's perceptions were real or merely a pretext for discrimination can only be evaluated based on the actual perceptions of the decision-makers based on their own knowledge.[6]

---

6. Similarly, to the extent that any other co-workers of Ms. Speight thought that she was evidencing a poor attitude, that evidence must be excluded except to the extent those

### C. THE COURT SHOULD ALSO EXCLUDE OTHER AFTER-ACQUIRED EVIDENCE.

Defendant also apparently intends to proffer evidence of events which occurred subsequent to plaintiff's termination, apparently in attempt to show that plaintiff's concerns regarding the handling of the risk ratings were misplaced. However, that evidence must be similarly excluded, as the question of whether the risk ratings were successfully handled subsequent to Ms. Speight's termination can have no bearing on whether her termination was based on her race. This is especially true because the manner, means and level of success of the risk ratings after Ms. Speight's departure could have been affected by numerous intervening events, and the jury would be faced with a "mini-trial" on the issue. In any event, Plaintiff's termination pre-dated the result of the risk ratings work, and therefore defendant could not possibly have been motivated by those result at the time it decided to terminate plaintiff.

### CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court enter an Order granting her motion to preclude after-acquired evidence as set forth herein.

Respectfully submitted,

*Michael J. Salmanson*
Michael J. Salmanson - ID. 46707
Scott B. Goldshaw - ID. 85492
Katie R. Eyer - ID. 200756
SALMANSON GOLDSHAW, P.C.
Two Penn Center
1500 J.F.K. Blvd., Suite 1230
Philadelphia, PA 19102

Date: February 3, 2009

---

thoughts were shared with the decision-makers prior to the time of Ms. Speight's termination.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WANDA JAMES SPEIGHT | : | |
| | : | |
| Plaintiff | : | Civil Action No.  07-CV-0890 |
| | : | |
| v. | : | |
| | : | |
| CAPMARK FINANCE INC. and | : | **JURY TRIAL DEMANDED** |
| WILLIAM F. ALDINGER III | | |
| | : | |
| Defendants | : | |

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2009, I caused a true and correct copy of the foregoing *Memorandum of Law in Support of Plaintiff's Motion to Exclude Evidence Unknown to the Decision-makers* to be filed via the Official Court Electronic Document Filing System, and that said document is therefore available for viewing and downloading from the ECF system.  By virtue of this filing, service of the memorandum upon the following counsel, being Electronic Case Filing Users, is complete upon counsels' receipt of the Court's e-mail notification of the Notice of Electronic Filing:

        Michael J. Eagles, Esquire
        Blank Rome LLP
        One Logan Square
        130 North 18th Street
        Philadelphia, PA  19103

        Michael Banks, Esquire
        Morgan Lewis & Bockius LLP
        1701 Market Street
        Philadelphia, PA 19103

*/s/ Michael J. Salmanson*
Michael J. Salmanson