1               IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF PENNSYLVANIA
                            ---
3    WANDA JAMES SPEIGHT           :   CIVIL ACTION

4         vs.                      :

5    CAPMARK FINANCE, INC.         :   NO. 07-0890

6    WILLIAM F. ALDINGER, III      :

7                  PHILADELPHIA, PENNSYLVANIA

8                     February 25, 2009

9            BEFORE HONORABLE J. CURTIS JOYNER, J.

10                       And a Jury

11   APPEARANCES:
     FOR THE PLAINTIFF:    SALMANSON GOLDSHAW, P.C.
12                         BY: MICHAEL SALMANSON, ESQUIRE
                           1500 JFK Boulevard, Suite 1230
13                         Philadelphia, Pennsylvania 19102

14   FOR THE DEFENDANT:    MORGAN, LEWIS & BOCKIUS, LLP
                           BY: MICHAEL L. BANKS, ESQUIRE
15                         1701 Market Street
                           Philadelphia, Pennsylvania 19103
16

17                         BLANK ROME LLP
                           BY:  MICHAEL J. EAGLES, ESQUIRE
18                         One Logan Square
                           130 North 18th Street
19                         Philadelphia, Pennsylvania 19103

20

21

22            GREGG B. WOLFE, RPR, CM
                 Official Court Reporter
23            601 Market Street, Room 1234
             Philadelphia, Pennsylvania 19106
24                  (215) 460-1511

25

1          (The Court began the proceedings at

2     9:30 a.m.)

3          THE COURT:  Good morning, lady and

4     gentlemen.  Welcome back this morning.  We're

5     ready to resume with the trial.

6          Next witness.

7          MR. GOLDSHAW:  We call Robert Jones.

8          ROBERT BENSON JONES, was duly sworn.

9                DIRECT EXAMINATION

10    BY MR. GOLDSHAW:

11    Q.  Good morning, Mr. Jones.

12    A.  Good morning.

13    Q.  We heard a lot about you yesterday, as being

14    described as a job coach.

15          Would you please explain to the jury

16    briefly what you do for a living?

17    A.  Well, I'm really a consultant.  I have 32

18    years.  I'm a lawyer, a CPA.  I was the only

19    person who worked for a big four accounting firm

20    who set up three practices in three different

21    cities.  So I'm pretty entrepreneurial, set up

22    businesses from zero to 12 people in about two

23    years at both Washington, D.C. and Philadelphia

24    for Ernst & Young.

25          So I'm an entrepreneur, a business

1    builder, and now I have my own business.

2    Q.  Would you please describe to the jury a

3    little bit about, specifically, the job coach

4    function that you perform for clients?

5    A.  My main task is consulting, usually to

6    boards of directors who are not-for-profit

7    compensation committees or for-profit

8    compensation committees.

9           In the course of my career, I've done a

10   lot of different things in benefits and

11   compensation.  I've also done performance

12   evaluation, performance metrics.

13          Quote, "job coach," close quote, is

14   sort of a title that evolved in this instance

15   through some of the things that I was doing to

16   help Mrs. Speight.

17   Q.  How did you first come to know Wanda

18   Speight?

19   A.  I was recommended by a law firm, actually

20   two law firms, and, as it evolved, Mrs. Speight

21   called me first.  She was very concerned about

22   a -- more than 50-page offer that was being

23   presented to her by her new employer, and --

24   Q.  I'm sorry, I'm going to jump in just a

25   second.

1                When you referred to her new employer,

2    could you tell us the employer and the time

3    period?

4                This is 2006, and the new employer was

5    Capmark?

6    A.  That's right.

7    Q.  She was still working at Capmark at the

8    time?

9    A.  That's correct.

10   Q.  Okay.  Please continue.

11   A.  That's correct.  In other words, as happens

12   with a change of control, she had a new employer

13   at her place of business and tremendous

14   uncertainty, of course, hits people at that

15   time.

16               But she also had this large stack of

17   papers to consider in regard to a restricted

18   stock offering, and had to make a decision,

19   "what do I do about this.  This is a significant

20   investment."

21               I was initially hired just to explain

22   that to her, to say what the pros and cons were,

23   what the downside was of investing or not

24   investing.

25   Q.  Mr. Jones, could you please just summarize

1    the advice that you gave Ms. Speight, with

2    regard to this offer to purchase stock in

3    Capmark and the result?

4    A.  Well, actually, my recollection --

5              MR. BANKS:  Objection.

6              THE COURT:  One moment.

7              MR. BANKS:  I don't understand what the

8    relevance of Mr. Jones' advice to Ms. Speight

9    was.  Ms. Speight's communications to Mr. Jones

10   were admissions of a party.

11             THE COURT:  You're objecting on

12   relevance.  You don't have to give me a speaking

13   objection.

14             MR. BANKS:  Okay.  I'm sorry, Your

15   Honor.

16             THE COURT:  Your objection is

17   overruled.  This door has been opened, and I'm

18   allowing him some leeway to explain away some of

19   what has transpired to this point.

20             MR. BANKS:  Very well.

21             THE COURT:  All right?

22             Moving along.

23   BY MR. GOLDSHAW:

24   Q.  Do you remember my question?

25   A.  I do.  I do.

1    Q.   Okay.

2    A.   And I was starting to answer that

3    Mrs. Speight actually was very interested in

4    investing, but she just wanted to know the down

5    side.

6              MR. BANKS:   Excuse me.   Your Honor,

7    now, I would object on hearsay grounds if he's

8    describing what Ms. Speight said to him.

9              THE COURT:   And, obviously, Ms. Speight

10   is here and you examined her and your

11   cross-examination was on statements that she

12   made to Mr. Jones.

13             MR. BANKS:   Right.

14             THE COURT:   Your objection is noted.

15   It is overruled.   You may have a continuing

16   objection along this line.

17             MR. BANKS:   Thank you, Your Honor.

18             THE COURT:   Anything else?

19             MR. BANKS:   No, no.

20             THE COURT:   Excellent.   Let's move

21   along.

22   BY MR. GOLDSHAW:

23   Q.   Mr. Jones, please continue, if you recall

24   the question, otherwise, I'll --

25   A.   I do.   Just to finish very quickly,

1    Mrs. Speight wanted to invest, but just wanted

2    to know the pros and cons, the tax, some of the

3    tax ramifications, how that would affect her.

4            As I recall, it was a significant

5    investment, roughly 140,000, which, to my

6    memory, was even more than her salary for a

7    year.

8            So that's a significant commitment to

9    make, and she naturally was seeking out somebody

10   who would explain some of the pros and cons,

11   what are the traps for the unwary.

12   Q.  To your knowledge, did Ms. Speight actually

13   make that significant investment in Capmark?

14   A.  My understanding is that she did.  I never

15   saw the paperwork, but I understood she was

16   going to do it.

17   Q.  Okay.  Aside from your conversations with

18   Ms. Speight regarding this investment in

19   Capmark, did your communications pertain to any

20   other matters?

21   A.  Well, as we got into that, many -- I

22   interview executives for a living.  Many of my

23   executives have been through significant change

24   and control, where it feels like the ground is

25   shifting under their feet.

1    As we became acquainted, she had some

2    questions about the best way to respond and how

3    to -- I always judged that she had tremendous

4    sincerity and tremendous commitment to the job.

5    It was more about, Bob, I just want to

6    make sure I do the right thing.  How would you

7    perceive this and what would your suggestion be?

8    That's sort of the, quote, "job coach."

9    I'm not really that, but it evolved from working

10   on a very complicated investment to -- I've been

11   through a couple of mergers where there was a

12   change of management, and what are some of the

13   things that leaders can do to make sure that

14   they send the right message.

15   Q.  Did you communicate with Ms. Speight?  We

16   know you communicated with her by e-mail.

17   Did you communicate with her, other

18   than by e-mail, regarding the job coaching as to

19   the transition?

20   A.  Well, she called me fairly frequently, I

21   would say, once or twice a week.  The phone

22   conversations were more frequent than e-mails by

23   probably three to one.

24   It was more about -- I just want to

25   make sure I'm on the right track here.  Here's

1    what happened the past couple of days.

2            I viewed that as very natural.  In

3    fact, I found her to be sincere.  I found a

4    commitment level that was high, and I was

5    impressed because I have dealt with CEOs, CFOs,

6    Number 1.

7            Number 2, of all the people I have

8    dealt with, I would have rated her very, very

9    highly, compared to all the executives that I've

10   dealt with in similar circumstances.

11           There's great uncertainty.  You have 20

12   people reporting to you.  Each one of them are

13   asking you what should we do.

14           To my way of understanding, she always

15   asked the right questions, and she always

16   responded well.  In fact, I used this word for

17   my son, "coachable."  She took my advice, and

18   she responded very well to it.

19           My favorite recollect is that after the

20   year was over and a new team was on board, she

21   asked me, what should we do now that we know our

22   results?

23           In my style, I said, well, Wanda,

24   that's what pizza was invented for.

25           She said, Bob, what do you mean?

1      I said, well, you ought to have a

2  meeting with your staff, and you ought to

3  highlight -- get a poster board and highlight

4  the things that did well, that went very well,

5  that were strengths for the group, and then

6  highlight on a separate board the things that

7  you need to work on and get everybody's

8  impression.  Have everyone contribute.  That way

9  the group will feel -- and be a part of this.

10  Everyone will have a voice.

11      And we said together that has to show

12  the genuineness of what you're feeling.  You

13  want to do the right thing and you want to tell

14  your people, let's improve on last year.

15      They happened to have had a good prior

16  year.  They happened to do very well.

17      So I said, let's enhance the strengths,

18  let's try to minimize the weaknesses for your 20

19  people and move forward.  By the way, tell

20  management what you learned, because then you're

21  giving them insight.  You're showing them two

22  things.  One, that you care.

23      And, to my recollection, she really not

24  only did care, but wanted to do the right thing

25  every time.

1          Secondly, you're giving management some

2    insight about what do the people really feel,

3    what can we do to do better?

4          My experience with corporate takeovers

5    or mergers or acquisitions is people freeze.

6    There's fear.  People say, boy, I've got a new

7    boss, what do I do now?

8          And there was a little bit of fear

9    percolating up to Wanda.  It would be very

10   unusual if there wasn't.  It would be very

11   unusual if she didn't feel some fear, too.  She

12   was more fearless than that, though.

13         She kept saying, I want to do the right

14   thing by my team; I want to help them; I want to

15   get to the right place, and I want management to

16   respect us for our strengths, but I want to work

17   them to make it even better.

18         When I use the word "coachable" from

19   sports, that's the way I viewed her, she wanted

20   to do the right thing throughout.

21   Q.  Mr. Jones, you had mentioned that you would

22   have rated Wanda very, very highly, and I wanted

23   to make sure I understood.

24         Were you talking about highly in terms

25   of her attitude or her abilities or what?

1    A.  I think it's been a couple years since she

2    and I talked about this.

3            The dominant impression I had is a

4    positive attitude.  There were two things, a

5    positive attitude and a desire to do the right

6    thing.

7            If I were rating it on a scale, I don't

8    give a ten to anybody, but I would have said,

9    she's a nine or a nine-and-a-half, just for what

10   I saw, just what I went through personally,

11   one-on-one, day after day.

12           I never saw negativity, and it would

13   have been easy to be negative about some of the

14   things that happened to us, that we don't

15   understand.

16           But she was always saying, I want to do

17   the right thing by my team; I want to convey the

18   right message to them, and I want to move

19   forward.  In other words, I love my job; I want

20   to keep going with what I'm doing, and I want to

21   do the right thing by these 20 people who are

22   depending on me.

23   Q.  Mr. Jones, at the time you were advising

24   Ms. Speight, you were being paid for your

25   services?

1    A.  I was, yes.

2    Q.  Were you being paid by Wanda Speight

3    personally to help her, or was it through

4    Capmark?

5    A.  I was being paid by Wanda Speight

6    personally.

7         MR. GOLDSHAW:  I have nothing further

8    at this point.

9         THE COURT:  Cross-examination.

10        MR. BANKS:  Thank you, Your Honor.

11                CROSS-EXAMINATION

12   BY MR. BANKS:

13   Q.  How much were you being paid by Ms. Speight?

14   Was it on an hourly basis?

15   A.  Yes.  My hourly rate is about 40 percent of

16   what it was in corporate life.

17   Q.  What was your hourly rate that you were

18   charging to Ms. Speight?

19   A.  250 an hour.

20   Q.  Your job was to help her, right?

21   A.  Yes.

22   Q.  You're being paid by Ms. Speight to be here

23   today to help her?

24   A.  No, sir.  I'm not being paid by anyone

25   today.  I'm here because I thought it was the

1    right thing to do.

2    Q.  How much would you say that Ms. Speight paid

3    you in total?

4    A.  It would have been a small engagement for

5    us, probably three to 4,000, something like

6    that, over a couple months.

7    Q.  That was over the couple months in the

8    spring of 2006?

9    A.  Right.

10   Q.  Now, you said that you believed from talking

11   to Ms. Speight that you could judge sincerity

12   and commitment on her part?

13   A.  Yes.  I interviewed dozens of executives,

14   all year, every year.

15   Q.  My question was whether you could detect

16   sincerity or commitment on her part.

17   A.  No question.

18   Q.  No question?

19   A.  No question.

20   Q.  Did you ever talk to Mr. McCool?

21   A.  Never.

22   Q.  Did you ever talk to Mr. Lipson?

23   A.  Never.

24   Q.  Did you ever talk to Linda Pickles?

25   A.  Never.

1    Q.  How many other Capmark employees have you

2    ever talked to besides Ms. Speight?

3    A.  I did some work with the predecessor to

4    Capmark before they became Capmark, but that's

5    the only time.

6    Q.  Tell me the last time you ever talked to

7    Capmark, other than Ms. Speight.

8    A.  I never have.

9    Q.  Okay.  So you're not in a position to assess

10   their sincerity or their commitment, are you?

11   A.  Actually, I'm not.  I'm not.

12   Q.  Okay.  I want to show you --

13          MR. BANKS:  Where is the Defendant's

14   Exhibit binder?

15          MR. SALMANSON:  It's up there.  I put

16   it up there for you.

17   BY MR. BANKS:

18   Q.  Turn to Tab 23.

19   A.  I got here without my reading glasses, so I

20   apologize.  It is a little fuzzy.

21   Q.  Okay.  That's an e-mail that includes an

22   e-mail that Ms. Speight sent on May 25th, 2006

23   to Mr. McCool, with copies to seven other

24   people.

25          Did Ms. Speight talk to you about that

1    before she sent the e-mail?

2    A.  No, I've not seen this.

3    Q.  Did she review it with you after she sent

4    the e-mail?

5    A.  I don't recall.

6    Q.  Did you ever talk to her about the subject

7    matter of that e-mail?

8    A.  Let me just real quickly read it.  It's

9    about a half page, and I haven't seen it before.

10   Q.  I'll note for you that in the documents that

11   we've seen, I haven't seen any e-mails from

12   Ms. Speight forwarding that to you.

13           Do you have a recollection of receiving

14   it from her?

15   A.  Just a second.  I'm halfway through.

16           MR. GOLDSHAW:  I'm sorry.  If I may

17   point out, the witness just said that it was a

18   half page, but the document is actually five

19   pages.  I just want to make sure that the

20   witness is clear.

21           MR. BANKS:  I asked about Ms. Speight's

22   e-mail --

23           THE COURT:  Counsel, counsel.  He's

24   asking him to read about this one particular

25   page.  He wants an opportunity to read this

1   page.

2           Let's proceed.  All right?

3           THE WITNESS:   This is about a specific

4   set of loans.  I don't recall any of the

5   transactions here.

6   BY MR. BANKS:

7   Q.  You don't recall Ms. Speight talking to you

8   about that either before or after she sent the

9   e-mail?

10  A.  I do not.

11  Q.  Sitting here today, then, you can't tell

12  whether she was being sincere or cooperative

13  when she wrote that e-mail, can you?

14  A.  All I can tell at the beginning is her

15  statement, "Sorry for the communications

16  breakdown.  Let me try again."

17          In my experience, you wouldn't write

18  that if you weren't trying to break through some

19  barrier to do as well as you could.

20  Q.  Unless maybe someone was trying to be

21  sarcastic.

22  A.  I don't see sarcasm in that, sir, just from

23  reading it.

24  Q.  So you believe you're an expert enough from

25  reading that first line to be able to tell what

1    Ms. Speight meant in this e-mail?

2    A.  I would not characterize myself as an expert

3    in human behavior.  I'm not a psychologist.

4            What I am saying is that, in my

5    experience interviewing hundreds of executives

6    over 32 years, when someone says "Sorry for the

7    communication breakdown, let me try again," they

8    are making an effort.

9    Q.  If they are being sincere, right?

10   A.  No, they are making an effort.  Why would

11   you do that if you weren't trying to communicate

12   better?

13   Q.  Okay.  Look at the last paragraph of that

14   e-mail, the one that begins, "Joe, please be

15   aware that if we're being told to risk rate the

16   SGP loans and Canadian portfolio, I cannot be

17   confident in the accuracy of assigned ratings,"

18   and then it continues.

19           Do you know what's referred to there?

20   A.  Again, I'm not a loan expert.  I don't know

21   the technical background behind this.

22   Q.  Do you know whether that was an accurate

23   assessment of the state of affairs at the time?

24   A.  I don't know anything about that.

25   Q.  If we look up from there, it says, the third

1  paragraph, "consequently the former PLG asset

2  management official individuals are not in a

3  position to perform an evaluation for risk

4  rating purposes."

5  　　　　　Do you have any idea what Ms. Speight

6  was talking about there?

7  A.  I don't, really.  I could conjecture, but I

8  don't know the facts.

9  Q.  Would it be correct to say that all of your

10  information about Ms. Speight's performance and

11  attitude and what she did at Capmark came from

12  Ms. Speight?

13  A.  Yes.  I mean, dealings over a couple months,

14  interactions, questions and answers and

15  interested queries.

16  Q.  You don't know what she said in meetings

17  with Mr. McCool and Mr. Lipson and others, do

18  you?

19  A.  No.  I wasn't there.  I would have no clue.

20  Q.  Did she ever tell you about a meeting she

21  had with Mr. McCool on May 23rd, 2006?

22  A.  The conversations that we had -- and, again,

23  it's over two years ago -- my dominant

24  impression is that Ms. Speight would come back

25  to me and say, I had a meeting and I don't think

1    it went as well as I would have liked.

2           Now, in my experience, there are very

3    few people who would say that, very few people

4    who would try to do better based on something

5    like that.  She spent the time.

6           She had the sincerity to say, I want to

7    do better.  Are there any steps I'm missing in

8    human resource management that I should have

9    followed?

10          We selected best practices that send a

11   clear message, because in many cases --

12          MR. BANKS:  Your Honor, I think the

13   question was whether she told him about a

14   meeting on May 23rd.

15          THE WITNESS:  No, she did not.

16   BY MR. BANKS:

17   Q.  So you don't know, even sitting here today,

18   that Ms. Speight met with Mr. McCool, Clare

19   Dooley, and Ned Finkenstaedt on May 23rd, 2006?

20   A.  There were several meetings with Mr. McCool.

21   I do recall her mentioning meetings with him,

22   but I don't recall a specific meeting with three

23   people.  It's over three years ago, sir.

24   Q.  Have you seen any e-mails from Ms. Speight

25   describing that meeting to you?

1   A.  I do not recall.

2   Q.  In preparation for today's testimony, have

3   you gone back to look at e-mails between you and

4   Ms. Speight from 2006?

5   A.  I collected all the e-mails about six months

6   ago for your counsel, at your request, within

7   three days of receiving the subpoena, but I did

8   not review them.

9   Q.  You haven't reviewed anything in preparation

10   for today?

11   A.  I have not.

12   Q.  So you don't know anything about the back

13   and forth that was in the e-mails that you may

14   have had with Ms. Speight in 2006?

15   A.  I do not.

16   Q.  Have you ever seen any e-mails between

17   Ms. Speight and Mr. McCool or Ms. Speight and

18   others in the servicing department at Capmark?

19   A.  I don't recall those.

20   Q.  Did you ever see Ms. Speight's e-mail to

21   Beth Wilson?

22   A.  No, sir.

23   Q.  Do you know who Beth Wilson is?

24   A.  I do not.

25   Q.  Ms. Speight testified that she was seeing

1    another career counselor by the name of Beth

2    Wilson, around the same time she was talking to

3    you.

4              Did you know that?

5    A.  I did not.

6    Q.  Okay.  She didn't even mention that to you

7    back in 2006?

8    A.  No.  It never came up.

9    Q.  Did you know -- and you can -- well, I'll

10   ask you, did you know that Ms. Speight wrote to

11   Ms. Wilson a few days before she transitioned

12   into Mr. McCool and Mr. Lipson's group that she

13   was somewhat "indifferent" about the company?

14   "Indifferent," that's a quote.

15   A.  For my part, sir, I never heard that in all

16   the involvement with her.  I only heard

17   commitment.

18   Q.  Did you know that she wrote in her own words

19   that the management she would be reporting to

20   didn't excite her, no vision, not good

21   communicators?

22   A.  Never heard any of that.

23   Q.  Okay.  Did you know that she wrote to

24   Ms. Wilson?

25   A.  Excuse me.  I did hear implications that

1    there were concerns from her people that

2    communications were spotty and sometimes

3    nonexistent, where areas needed to be clear.

4          And I explained to her that it's very

5    common in a situation, change of management.

6    The rumor mill is hyperactive.  The rumor mill

7    is really working 100 miles an hour.

8    Q.  I think my question was, did you know that

9    Ms. Speight wrote that to Ms. Wilson?

10   A.  I did not.  Sir, I don't know who Ms. Wilson

11   was.  I said that earlier.

12   Q.  Did you know that Ms. Speight wrote a few

13   days, before she moved into the servicing

14   department, that publicly she would continue to

15   say that she was committed to seeing the

16   transaction through?  Publicly.

17   A.  I did not, sir.

18   Q.  Would you have expected her to tell you that

19   she was working with another career counselor?

20   A.  Sir, I don't believe it's relevant today.  I

21   worked with Mrs. Speight on areas that she asked

22   me questions about.  I found her to be a very

23   willing, very committed, very dedicated

24   employee, trying to do the right thing, the best

25   thing she could do.

1    Q.  That was based on what she told you?

2    A.  No, no.  That was based on our interaction.

3    Q.  That was based on what she wrote to you and

4    what she told you and what you assessed of that,

5    correct?

6    A.  And the way I assessed it, that's correct,

7    in my professional judgment.

8                MR. BANKS:  Thank you.

9                THE COURT:  Any redirect?

10                MR. GOLDSHAW:  Briefly.

11                    REDIRECT EXAMINATION

12    BY MR. GOLDSHAW:

13    Q.  Mr. Jones, Mr. Banks read to you part of the

14    sentence that he read to Ms. Wilson.  I'd now

15    like to read to you the full sentence, including

16    the part that he left out.

17                "Publicly, I will continue to say that

18    I am committed to seeing the transition

19    through."  Here's the part he left out.  "And

20    making sure my staff is placed as optimally as

21    possible or treated fairly if they are

22    outplaced."

23                Having heard the full sentence, can you

24    now tell me if that's consistent with the tenor

25    of the conversation?

1   A.   That was the Mrs. Speight that I knew.   I

2   mean, I never heard anything other than, I want

3   to do the best for my people; I need some

4   clarity on some things because they are asking

5   me questions that I can't answer, and I want to

6   do the right thing with management.

7           And, again, I would rate her very

8   highly, compared to the top executives that I

9   have worked with in my career.  She was

10  really -- what we worked on together was to try

11  to always do the right thing, and to make sure

12  that the messages weren't misunderstood.

13  Q.   Now, did any of the documents that Mr. Banks

14  showed you during his questioning, or read to

15  you in part, cast any doubt on your earlier

16  assessment as to the level of Ms. Speight's

17  commitment to this transition and the company?

18  A.   Not even.  No, sir.

19          MR. GOLDSHAW:  I have nothing further.

20          THE COURT:  Recross.

21          MR. BANKS:  Just briefly, Your Honor.

22          THE COURT:  Yes.

23                  RECROSS-EXAMINATION

24  BY MR. BANKS:

25  Q.   You felt Ms. Speight was committed to the

1  transition?

2  A.  I felt, for several reasons, that she was

3  committed to the transition.  One, she invested

4  $140,000, which is not a small sum for anybody.

5        And, in talking through that, she

6  explained very carefully that she wanted to have

7  a stake in the future of the business.

8        Why would you do that if you weren't

9  interested in being a player, being a major

10  player/participant in what was going on.

11        The second thing was, just throughout

12  the whole transaction, she was conscientious and

13  sincere about trying to do the right thing.

14  There were a couple times that I suggested

15  things, like our group meeting.

16        And I said, Wanda, I can't think that

17  anything would be bad about that.  If you have a

18  meeting with your employees and you tell

19  management about that, what you have learned,

20  they gain something; you've shared something

21  with them, and your people have gained something

22  because they feel like they participated in a

23  process that would improve the system.

24        So I was hoping it would be a win-win.

25  Q.  You haven't seen the transcript of

1  Ms. Speight's testimony from yesterday, have

2  you?

3  A.  No, I have not.

4  Q.  You weren't in the courtroom?

5  A.  No, I was not.

6  Q.  All right.  Let me read to you just a little

7  bit, and see if this is consistent with what you

8  recall Ms. Speight telling you.

9          MR. GOLDSHAW:  I'm going to make an

10  objection.  This is way beyond the scope of

11  redirect, which involved two questions

12  concerning the documents that Mr. Banks had

13  shown him earlier.

14          MR. BANKS:  Your Honor --

15          THE COURT:  Counsel, I didn't ask for

16  any comment from you.

17          MR. BANKS:  I'm sorry, Your Honor.

18  That's correct.

19          THE COURT:  Counsel, your last question

20  was so broad, that it gave a generalization by

21  this witness.  I think this is appropriate

22  recross.

23          Your objection is noted.  It's

24  overruled.  All right?

25          Let's get to the issue, though,

1    ultimately.

2         MR. BANKS:  I just have a couple

3    questions, Your Honor.

4         THE COURT:  All right.

5    BY MR. BANKS:

6    Q.  Page 116, I asked her about the very e-mail,

7    that D-11, that you were looking at, the one to

8    Beth Wilson.

9         She said, Page 116, Line 21,

10        "A.  So that is why from an emotional

11   standpoint I had to, as I put it, calm myself

12   down.

13        "I started saying I'm going to be

14   indifferent and started taking the approach, I

15   have to be indifferent about what is happening."

16        Did she talk to you about that between

17   yesterday and today?

18   A.  Did not.

19   Q.  Okay.  One more thing about that quote that

20   he read to you, the part about being publicly.

21   Do you remember that in the e-mail in D-11?  Do

22   you have that in front of you?

23        Take a look at D-11.  Mr. Goldshaw read

24   the rest of the sentence that publicly she

25   would --

1  A.  Actually, this is first time looking at

2  D-11.  It's about a page.

3  Q.  Okay.  All right.  He read, "Publicly, I

4  will continue to say that I'm committed to

5  seeing the transition through."

6          You don't need to read it again unless

7  it will help you.  That's just what I'm asking

8  about.

9  A.  What's your question?

10 Q.  Here's my question.

11         MR. GOLDSHAW:  I'm sorry.  I have to

12 object, because I certainly read the full

13 sentence, and Mr. Banks, again, just read a part

14 of it.

15         THE COURT:  Yes, but he has a right to

16 limit his part.  You read the whole -- it's up

17 for the jury to recall.

18         Your objection, if it's in the form of

19 an objection, is overruled.  All right?

20         MR. GOLDSHAW:  Yes.

21 BY MR. BANKS:

22 Q.  Mr. Jones, I asked Ms. Speight yesterday,

23 Page 122, Line 10,

24         "Q.  Publicly, you would continue to

25 say that you were committed.  Was that different

1    from being actually committed to see the

2    transition through?"

3              And Ms. Speight answered,

4              "A.  It was different from being

5    emotionally invested in the transition to a

6    point that I got frustrated."

7              Did she discuss that answer with you

8    before today?

9    A.  Did not, no, sir.

10             MR. BANKS:  Nothing further.  Thank

11   you, Mr. Jones.

12             THE COURT:  You're done with this

13   witness now?

14             MR. GOLDSHAW:  Yes, Your Honor.

15             MR. BANKS:  Yes, Your Honor.

16             THE COURT:  Excellent.

17             You may step down now, sir, and watch

18   your step.

19             I take it this witness may be excused?

20             MR. GOLDSHAW:  Yes, Your Honor.

21             MR. BANKS:  Yes, Your Honor.

22             THE COURT:  You're excused.  Next

23   witness.

24             MR. GOLDSHAW:  Thank you, Your Honor.

25             THE COURT:  Sure.

1    MR. SALMANSON:  Your Honor, we'd like

2 to call Mr. McCool.  We understand that he was

3 supposed to be here at around 10:00.

4    THE COURT:  Well, it's around 10:00.

5 Check to see if he's here.

6    MR. BANKS:  Your Honor, we had

7 understood he would be here at 10:15, and we

8 also understood that the next witness would be

9 Mr. Lipson, who is here.

10    Mr. McCool doesn't appear to be here

11 yet.

12    THE COURT:  So what are we going to do,

13 counsel?  We have time.  Let's move it.

14    MR. SALMANSON:  Your Honor, we told

15 them yesterday afternoon, at the end of the day,

16 that we wanted Mr. McCool first thing this

17 morning.

18    MR. BANKS:  They told us last night,

19 Your Honor, after we had told Mr. McCool he

20 would follow Mr. Lipson.

21    MR. SALMANSON:  I came into chambers

22 and told you.

23    THE COURT:  Counsel, counsel, this is

24 not a bar.  This is my courtroom.

25    MR. SALMANSON:  I'm sorry, Your Honor.

1    But he claims --

2             THE COURT:  I don't want to hear he did

3    this or he did that.

4             Lady and gentlemen, we're going to take

5    our break early this morning to allow this

6    witness to get here by 10:15.  If he's not, then

7    I'll address that issue with counsel out of your

8    presence.  All right?

9             In any case, please do not talk about

10   the case among yourselves or with others.  We'll

11   call you back in as soon as this morning's break

12   is over.

13            You have at least 15 minutes.  All

14   right?  So enjoy.

15            (Recess was held at 10:00 a.m., at

16   which time the jury exited the courtroom.)

17            THE COURT:  Counsel, from this point

18   on, if there's any objections, any discussions,

19   it's between counsel and the Court.  Opposing

20   counsel does not have the right to interject

21   when counsel is speaking to the Court.  This is

22   not a bar or a playground or your offices.  This

23   is my courtroom, and you conduct yourself

24   accordingly.

25            I tell you, I will pass out sanctions,

1    hold contempt, if you can't comply with the

2    rules of conduct of this courtroom.

3             That goes for everybody.  Is that

4    understood?

5             MR. SALMANSON:  Yes, Your Honor.

6             MR. GOLDSHAW:  Yes, Your Honor.

7             MR. BANKS:  Yes, Your Honor.

8             THE COURT:  I expect nothing less.

9             We are in recess until this witness

10    gets here, and hopefully he's here at 10:15.

11             (Recess was held at 10:00 a.m.)

12             (The Court resumed the proceedings at

13    10:15 a.m.)

14             THE COURT:  Are there any other

15    witnesses that counsel made arrangements for

16    appearances to be here at a given time?

17             MR. SALMANSON:  I think we're all set

18    on the rest of the schedule.

19             THE COURT:  I don't want to "think"

20    that we're all set.  I want to make sure that we

21    don't have any other interruptions in the flow

22    of this trial.

23             Are there any other witnesses that the

24    plaintiff is going to call that require the

25    defense to have their witnesses present?

1    MR. SALMANSON:  There's

2  Mr. Hohenleitner, who, I understand, is going to

3  be here this afternoon.

4       THE COURT:  What time this afternoon?

5       MR. BANKS:  Whatever time he's

6  requested, Your Honor, by Plaintiff's counsel.

7       THE COURT:  Why don't we have him here

8  at the beginning of the afternoon, in case

9  you're done with a witness early or if there's

10  some emergency or something, so that we can

11  continue on?  I mean, if he has to sit here and

12  wait, sobeit.

13       MR. BANKS:  We'll ask him, Your Honor,

14  to come in, to make sure he's here by the time

15  we start after the lunch break.  If he has to

16  wait, we agree, sobeit.

17       THE COURT:  Very well.

18       Any others?

19       MR. GOLDSHAW:  The only notable point,

20  which is not an issue in my view, is that on

21  Monday we discussed that if we do get to our

22  expert this afternoon, I'll need to confer with

23  him to make sure he went over the documents.

24       We addressed that on Monday, and I

25  don't actually think we are going to get to him

1   today, but in the unlikely event we do, I don't

2   want Your Honor to think that I'm bringing it up

3   afterwards.

4         THE COURT:  How long is it going to be

5   that you have to go over with him about the

6   documents?

7         MR. GOLDSHAW:  I actually don't know

8   what his new calculations are right now as I'm

9   speaking.  I imagine it will be quick, but I

10   haven't actually seen his final numbers.  I have

11   to give it to opposing counsel.

12         I also, in fairness to opposing

13   counsel, if he needed a few minutes to look at

14   the numbers, I have no objection to that.

15         THE COURT:  That's my call.  But in

16   reference to you, you would only need a few

17   minutes to review the documents or go over that

18   with your witness?

19         MR. GOLDSHAW:   I've seen the

20   documents.  Depending on what he says, I

21   would --

22         THE COURT:  You have numbers, then?

23         MR. GOLDSHAW:  I do not.

24         THE COURT:  Okay.  So you don't know

25   what the numbers are?

1    MR. GOLDSHAW:  I know this morning he's

2  calculating them, as we are in court.

3    THE COURT:  Okay.

4    MR. GOLDSHAW:  And in the unlikely

5  event he comes, Your Honor talked about taking a

6  short time, maybe an hour -- I don't think it

7  would take that time -- to just meet with him to

8  make sure that I am not finding out what he has

9  to say for the first time when he's on the

10  stand.

11    THE COURT:  Okay.  Is he faxing the

12  numbers and the figures to you today, after he's

13  finished them this morning?  Can we get those

14  sent here so that the defense has those before

15  the afternoon is over, and you'll have them also

16  so that you can be ready so we can cut down any

17  other delays in this trial?

18    I tell you, the reason being, I'm not

19  going to be here next Wednesday trying this

20  case.  All right?  I have reservations.  I'm

21  going West.

22    MR. GOLDSHAW:  The way I have left it

23  with him, as of right now, if he gets the call,

24  he's going to come to court; he's going to have

25  extra copies, and I imagine that in the time it

1    takes him to explain it I can give it to

2    opposing counsel, and we can all be ready.

3          In other words, I don't know if there's

4    any more efficiency, from my perspective, to get

5    the numbers because until I understand what it

6    is that got him there -- he's not preparing a

7    full report.

8          THE COURT:  I understand that, counsel,

9    believe me, I do.

10          MR. GOLDSHAW:  Okay.

11          THE COURT:  But my concern is that the

12    defense has an adequate opportunity also to

13    review this new addition that your expert is

14    going to be testifying to.

15          MR. GOLDSHAW:  Yes, Your Honor.

16          THE COURT:  And the sooner the defense

17    gets that, the better it is for everybody, and

18    it will at least expedite this case moving along

19    at some later point.

20          MR. GOLDSHAW:  Yes.  Your Honor

21    mentioned the fax.  Can I fax it to your

22    chambers?

23          THE COURT:  Yes, you can fax it to my

24    chambers.

25          MR. GOLDSHAW:  Okay.  What I will do is

1   during the next break, I'll instruct my

2   secretary when she gets it to fax it to your

3   chambers.

4           THE COURT:  Excellent.

5           MR. GOLDSHAW:  Thank your.

6           THE COURT:  Okay.

7           MR. BANKS:  I'm sorry, just on

8   scheduling.

9           THE COURT:  Sure.

10          MR. BANKS:  My best expectation is that

11  all the testimony will finish, I believe in both

12  cases, by the close of tomorrow, or the latest,

13  Friday morning.  I just wanted to alert you.

14          Do you folks agree?

15          MR. SALMANSON:  I would be surprised if

16  it went past that.

17          MR. BANKS:  If there are changes, we'll

18  let you know by the end of the day, but that's

19  our best expectation.

20          THE COURT:  We shall see, counsel.  In

21  any case, I'm putting you on notice that I will

22  not be here next Wednesday.  All right?

23          MR. BANKS:  I hope you're going

24  somewhere good.

25          THE COURT:  It is good.

1          MR. BANKS:  Good.

2          THE COURT:  All right.  Let's bring in

3   this jury, and get this witness on the witness

4   stand.

5          MR. BANKS:  I just want to make sure

6   this is turned off, so I don't get held in

7   contempt.

8          THE COURT:  He's not in yet?

9          MR. SALMANSON:  No.

10          THE COURT:  Okay.

11          (The jury entered the courtroom at

12   10:20 a.m.)

13          THE COURT:  Okay.  You may be seated.

14          Now, next witness.

15          MR. SALMANSON:  Plaintiff calls Mark

16   McCool.

17          THE COURT:  Sir, would you please come

18   up here, and watch as you enter the well of the

19   Court?  Step around.

20          MARK EDWARD MCCOOL, was duly sworn.

21                 DIRECT EXAMINATION

22   BY MR. SALMANSON:

23   Q.  Good morning, Mr. McCool.

24   A.  Good morning.

25   Q.  Can you just tell us, you're currently

1   employed at Capmark?

2   A.  Yes, I am.

3   Q.  All right.  And how long have you been

4   there?

5   A.  A little over ten years.

6   Q.  All right.  And just so we're clear, prior

7   to 2006, it was GMAC CM, correct?

8   A.  That's correct, yes.  Even before that I was

9   with GMAC Financial, so that was a total of 20

10  years.

11  Q.  And GMAC Financial was a subsidiary of GMAC

12  CM?

13  A.  No.  That was the ultimate parent.

14  Q.  How long were you in management during that

15  time period?

16  A.  With Capmark Finance?

17  Q.  Yes, or its predecessors.

18  A.  Fifteen years.

19  Q.  I'm going to focus today on the 2006 time

20  period when GMAC CM became Capmark.

21          So, as of the spring of 2006, what was

22  your title, if you recall?

23  A.  I believe I was a senior vice-president and

24  managing director.

25  Q.  All right.  Were you a managing director of

1   a particular area?

2   A.  I believe at that time it was for client

3   relations, our surveillance group, and I think

4   our acquisitions group.

5   Q.  All right.  And to whom were you reporting

6   at the time?

7   A.  Michael Lipson.

8   Q.  How long had you been reporting to

9   Mr. Lipson, as of 2006?

10  A.  I guess, four years.  Four, five years.

11  Q.  Now, as senior vice-president, how many

12  people were working under your jurisdiction?

13  A.  At that time, I would say a few hundred.

14  Q.  All right.  Of those few hundred, how many

15  were your direct reports?

16  A.  Five or six.

17  Q.  Do you recall who they were?

18  A.  Would you like me to name them, to the best

19  of my ability?

20  Q.  Yes.

21  A.  Let's see.  Ned Finkenstaedt, Tony Perez,

22  possibly Clare Dooley, Kathy Marquardt, Madeline

23  O'Brien, and I don't recall any others right

24  now.

25  Q.  And, at some point, Ms. Speight, correct?

1   A.   That's correct, but not in 2006.

2   Q.   And Ms. O'Brien was your admin assistant; is

3   that correct?

4   A.   That's correct.  Actually, let me correct

5   that.  In '06, it was Wanda Speight as well.

6   Q.   Okay.  And you mentioned a Kathy somebody?

7   A.   Marquardt.

8   Q.   What was her position?

9   A.   She would have been a senior vice-president.

10  Q.   During your time at GMAC or Capmark,

11  approximately how many people have you

12  supervised, either directly or as a second-level

13  management level?

14  A.   In total?

15  Q.   Yes.

16  A.   I don't know.  It would be a complete guess.

17  Several hundred.

18  Q.   Okay.  And in your position as senior

19  vice-president of Client Relations, Surveillance

20  and Acquisition, did you have the authority to

21  hire and fire people?

22  A.   No.  I had the authority to make

23  recommendations, or -- that's about it, I guess.

24  Q.   And to whom would you make those

25  recommendations?

1   A.  At the time, it would have been Michael

2   Lipson.

3   Q.  Okay.  Do you recall any instances in which

4   Mr. Lipson did not accept your recommendation?

5   A.  I don't know.  I can't recall.

6   Q.  Now, prior to Ms. Speight transferring over

7   into -- do you recall that, in 2006, Ms. Speight

8   transferred, along with her group, into the

9   servicing area, correct?

10  A.  Yes, I do.

11  Q.  And part of your bailiwick was in the

12  servicing area, correct?

13  A.  Yeah.  The particulars in the servicing area

14  that I talked about, yes.

15  Q.  Now, how did you learn that Ms. Speight's

16  group was going to come over to Servicing?

17  A.  I believe Michael Lipson had told me that

18  the decision was made.

19  Q.  Did you have any discussions with

20  Mr. Lipson, prior to being told about that,

21  about whether you thought that was a good idea

22  or, you know, something that you were in favor

23  of?

24  A.  I was probably aware of it before the final

25  decision was made to transfer it over.

1  Q.  And do you recall whether anybody sought

2  your input about whether you wanted that to

3  happen or didn't want that to happen?

4  A.  No, I don't think so.

5  Q.  Is it fair to say that it wasn't your

6  decision to make?

7  A.  Correct.

8  Q.  Okay.  Do you recall that, at the time this

9  decision was made, there was a question about

10  whether the group would fall within your

11  jurisdiction or Mr. Carp's jurisdiction?

12  A.  Yeah.  I recall that discussion, yes.

13  Q.  All right.  And at the time that the group

14  came into Servicing, that decision had not yet

15  been made, correct?

16  A.  That's correct.

17  Q.  Okay.  And did you have an understanding of

18  how that decision would be ultimately made?

19  A.  Yes.

20  Q.  Okay.  And what was your understanding in

21  that regard?

22  A.  Well, my understanding would have been that

23  we would take time to understand what the

24  department did on a daily basis, and define what

25  roles would lie with Mr. Carp and what roles

1    would lie under my responsibility.

2    Q.  All right.  Now, prior to Ms. Speight

3    transferring over to the Servicing Group, had

4    you had any work-related experience with her?

5    A.  I don't believe so.

6    Q.  All right.  Did you know who she was?

7    A.  Yes.

8    Q.  Did you have a sense of what her reputation

9    was within the company?

10   A.  No.  I knew she was a senior person, senior

11   manager.

12   Q.  All right.  Is it fair to say that prior to

13   her coming over you hadn't formed any

14   impressions of her?

15   A.  That's fair.

16   Q.  Do you recall the first time you met with

17   Ms. Speight?

18   A.  I'm not sure I know what you mean by "met

19   with."

20   Q.  Okay.  Actually, let me rephrase that.

21          As part of the transition process, do

22   you recall that you met with Ms. Speight, sat

23   down with her to talk about the transition?

24   A.  Well, sure, after the decision was made, we

25   definitely sat down.

1   Q.  All right.  Is it fair to say, at least in

2   the early discussions, that you didn't sense any

3   resistance on Ms. Speight's part to having her

4   group move into Servicing?

5   A.  No, not that I recall.

6   Q.  Okay.  Now, you said that you wanted to take

7   the time to figure out the role of her group and

8   what they did.

9          Had you had any experience with the

10  Proprietary Lending Group or worked with them in

11  any way prior to the transition?

12  A.  Yes, but not in the capacity that Wanda's

13  group was working.

14  Q.  Okay.  So not on the asset management

15  function?

16  A.  That's probably a tough distinction.  I had

17  worked with being involved in the client

18  relations group, which is a group that does

19  borrower contact and correspondence.  I was

20  aware of questions that would come in from that

21  group, so I mean I was pretty familiar with it.

22  Q.  Okay.  Now, you said you needed to take the

23  time to figure out the roles that Ms. Speight's

24  group played and the types of things she did

25  before you decided whether she and her group

1    were going to be reporting to either to you or

2    to Mr. Carp, correct?

3    A.   Well, I think the idea was to understand at

4    a very granular level what the responsibilities

5    were, and then -- you know, our Services Group

6    is a large operation, so we would try to

7    leverage that operation, and the only way you

8    could really do that was by understanding the

9    workings of the group.

10   Q.   Okay.  At some point, you had enough

11   information to decide that Ms. Speight's group

12   should, as a whole, be reporting to you and not

13   to Mr. Carp, correct?

14   A.   No, I don't think so.

15   Q.   No?  Well, how did you make the decision as

16   of May 1st -- well, as of May 1st, Ms. Speight's

17   group came and began reporting into Servicing,

18   correct?

19   A.   Yes, correct.

20   Q.   Okay.  And approximately ten days later,

21   around May 12th, you actually then sat down with

22   Ms. Speight and told her that, in fact, she

23   would be reporting to you and not to Mr. Carp,

24   correct?

25   A.   I'm not sure of the time frame, but I know

1    at one point I did speak to Wanda about that,

2    yes.

3    Q.  Okay.  So, as of the date of whenever that

4    decision was made, you had gotten enough

5    information to understand what Ms. Speight's

6    group did at a granular level to know that it

7    was more appropriate for her group to be

8    reporting to you, and not to Mr. Carp, correct?

9    A.  No, I don't think so.

10   Q.  Well, how did you then make the decision and

11   tell her on May 12th that they would be

12   reporting to you and not to Mr. Carp?

13   A.  I don't recall that that's the way it

14   transpired.  We had a series of meetings, and

15   those meetings were all designed to gain an

16   understanding.

17           Mr. Carp was part of those meetings.

18   May 1st, the group would have reported to me,

19   but the idea was to gain an understanding of

20   that group, and then make the ultimate decision

21   on how we can, you know, get the most out of the

22   group and leveraging our Services operation.

23   Q.  You asked Ms. Speight, at some point,

24   whether she thought some of her personnel should

25   be reporting to Mr. Carp and not to you,

1  correct?

2  A.  We were discussing employees all along, so I

3  believe that's probably correct, yes.

4  Q.  All right.  Now, you understood that the

5  Servicing Department didn't quite have the same

6  cache or aura about it than the group that

7  Ms. Speight had previously been involved in,

8  correct?

9  A.  Well, I think that was probably my opinion.

10  I don't know if others shared that opinion or

11  not.

12  Q.  All right.  But you thought that Wanda's

13  group came from the lending side of the

14  business, which you thought carried with it, I

15  believe your words were, "a higher luster,"

16  correct?

17  A.  Yes.  Again, that was my opinion.

18  Q.  All right.  And did you have any concerns

19  that, you know, you needed to convince

20  Ms. Speight that her group, you know, could

21  still have the luster that it had when it

22  transferred over to Servicing?

23  A.  I'm sorry.  Could you repeat that for me?

24  Q.  Sure, sure.  Did you have any concerns in

25  your mind that you needed to convince

1    Ms. Speight that she would be able to carry that

2    luster with her over into Servicing?

3    A.  No.  As I would have thought about her, or

4    as I do now at least, I think anybody that takes

5    the time to understand our business sees it for

6    what it is.  It's a very intriguing and exciting

7    business.

8            So, no.  I think as Wanda would have

9    learned more about the group, she would have

10   seen it for what I do.  It's a great group.

11   Q.  Okay.  And you hoped to educate her in that

12   regard, correct?

13   A.  My responsibility, at that time, was to get

14   a smooth transition of Wanda's department into

15   Services to help the company out.

16           So my Number 1 goal was a smooth

17   transition.

18   Q.  All right.  You don't recall, in having

19   discussions with Ms. Speight, her expressing

20   concerns, at least at the front end, about her

21   and her group coming over to Servicing, do you?

22   A.  No.

23   Q.  So, as far as you knew, Ms. Speight didn't

24   have any particular concerns about moving over

25   to Servicing, did she?

1   A.  Not that she ever expressed to me.

2   Q.  And there was a difference in the way that

3   PLG and the Asset Management Group's

4   compensation structure worked, as compared to

5   Servicing, correct?

6   A.  Well, I understand there are different

7   programs.  I don't know how theirs worked versus

8   ours.

9   Q.  All right.  And did you become aware at some

10  point that her staff was expressing concerns

11  that if they came over, that they might suffer a

12  significant hit on their compensation?

13  A.  I don't recall if I ever heard that.

14         I remember in my deposition being shown

15  an exhibit, and that was the first time that I

16  had seen that, so I don't know if that's one.

17  Q.  All right.  Do you recall Ms. Speight asking

18  you to have a meeting with her staff to address

19  some of their concerns?

20  A.  I do.  Well, I don't know if it was to

21  address their concerns or for me to meet them,

22  because I did not know many of them.

23  Q.  Do you recall meeting with members of

24  Ms. Speight's staff?

25  A.  Yes, I do.

1    Q.  Do you remember some of them raising the

2    issue of, how are we going to be compensated?

3    A.  No, I don't.

4    Q.  Do you recall discussing with Ms. Speight at

5    the end of April issues related to the

6    compensation structure in Servicing, as compared

7    to on the PLG side?

8    A.  No.

9         THE COURT:  I take it you handed him

10   his deposition testimony, so that counsel knows

11   what you're handing the witness?

12        MR. SALMANSON:  Yes.  I was just about

13   to say that.

14   BY MR. SALMANSON:

15   Q.  Mr. McCool, I have handed you the

16   deposition -- you recall that I took your

17   deposition under oath in February of 2008?

18   A.  I do.

19   Q.  And I want to direct your attention to Page

20   56, at the bottom, Line 23, going on to Page 57,

21   I had asked you just before that, that --

22   whether you were aware that Ms. Speight's

23   compensation group had -- was different than the

24   compensation structure from the rest of the

25   Global Servicing area?

1          And you said, "Yes."

2          And then I asked you,

3          "Q.  And do you recall there being

4     discussions about whether the compensation

5     structure from Ms. Speight's group would need to

6     be consistent with the rest of Global Servicing

7     or not?"

8          And your answer was,

9          "A.  I do.  Going through those

10    questions were helpful.  We were on a different

11    compensation plan."

12         And then I asked,

13         "Q.  And who did you have those

14    discussions with?

15         "A.  I still don't remember having

16    those conversations, but we were under a

17    different plan than the rest of the company so

18    that there would have been a discussion of that

19    plan.  I mean, we were under a personal share

20    plan."

21         Do you recall generally that there were

22    discussions about the differences between the

23    two compensation plans?

24    A.  No, I really don't generally remember having

25    conversations.  I do remember and I do know that

54

1    there are different compensation plans.  I don't

2    remember those discussions, though.  I wouldn't

3    have been part of the compensation discussions.

4    Q.  But when I said do you recall there being

5    discussions about whether the compensation

6    structure from Ms. Speight's group would need to

7    be consistent with the rest of the Global

8    Servicing or not, you said you did.

9            You do remember there being

10   discussions, correct?  Bottom of 56 and top of

11   57.

12   A.  I see it here.  I mean, as I sit here today,

13   I understand that there are different plans, so

14   I guess I would say there probably were

15   discussions about different plans, but I don't

16   recall any.

17   Q.  And going through those discussions were

18   helpful, correct?

19   A.  I believe your questions assisted me in

20   remembering that, yes.

21   Q.  Okay.  So if Ms. Speight had raised the

22   issues of the different compensation to you or

23   to others, there was nothing wrong with that,

24   correct?

25   A.  If she raised the difference in the plans?

1   Q.  Yes.

2   A.  No, there wouldn't be anything wrong with

3   that.

4   Q.  And if her staff was concerned about that

5   and she was looking to you or to other people to

6   help address that with her staff, to put them at

7   ease, that would have been okay, right?

8   A.  Certainly, I think it's okay to understand

9   what your payment plan would be.

10  Q.  All right.  Do you think that it would have

11  been helpful for Ms. Speight to understand what

12  her payment plan would be?

13  A.  Yes, I agree.

14  Q.  And do you know, as of the time of her

15  termination, whether anybody had explained to

16  her how she was going to be compensated, having

17  moved into Servicing?

18  A.  I don't know that.

19  Q.  All right.  You never told her, right?

20  A.  No, I didn't.

21  Q.  As far as you know, Mr. Lipson never told

22  her?

23  A.  I don't know.

24  Q.  All right.  Would you agree with me that

25  knowing how you're going to be compensated would

1    be important for an employee to know?

2    A.  Would it be important?

3    Q.  Yes.

4    A.  Sure.

5    Q.  Do you think it might affect their morale?

6    A.  I don't know.

7    Q.  All right.  You understand that the majority

8    of Ms. Speight's previous compensation was in

9    bonus and not in salary?

10   A.  No, I don't know that.

11   Q.  All right.  Okay.  I have a whole bunch of

12   binders up there.  I'm going to start going

13   through some of them.

14   A.  Can I close this one?

15   Q.  You can close that.

16         I think I asked you a little bit

17   before, do you recall Ms. Speight making a

18   recommendation about her people moving around

19   between Client Relations, which was your group,

20   and Real Estate Solutions?

21         I don't think we have put that term out

22   there yet, but Mr. Carp's group was known as

23   Real Estate Solutions, correct?

24   A.  Correct.  Well, at that time it was, yes.

25   Q.  If you would look at P-6.

1  A.  (Witness complies.)

2  Q.  Now, P-6, do you recognize this document?

3  A.  Yes, I do.

4  Q.  And this was an e-mail from Ms. -- well, the

5  original e-mail was from Ms. Speight to you and

6  to Mr. Carp labeled "Preliminary

7  Recommendations."

8          And, first, she has "Client Relations,"

9  which would be your group, and she lists ten

10  people, and then "Real Estate Solutions," and

11  she lists nine people, correct?

12  A.  That's correct.

13  Q.  Okay.  Do you recall that you sought her

14  recommendation prior to the e-mail, as to which

15  members of the group would go to Client

16  Relations and which would go to Real Estate

17  Solutions?

18  A.  If I asked her to prepare this?

19  Q.  Yes.

20  A.  I don't remember.

21  Q.  Let's go back to your deposition.

22  A.  Okay.

23  Q.  Page 73.  At your deposition, I said --

24          THE COURT:  Give him a moment.

25          MR. SALMANSON:  Line 16.

1          Sorry, Your Honor.

2          THE WITNESS:  Thank you.

3   BY MR. SALMANSON:

4   Q.  "Q.  I'm showing you what has been marked as

5   P-6" --

6          THE COURT:  He still hasn't gotten

7   there yet.

8          MR. SALMANSON:  Oh, I'm sorry.

9          THE WITNESS:  I'm there, Your Honor.

10          THE COURT:  All right.

11  BY MR. SALMANSON:

12  Q.  "Q.  I'm showing you what has been marked as

13  P-6, which is an e-mail string, commencing with

14  an e-mail from Wanda to you and Mr. Carp

15  entitled, "Preliminary Recommendations" and a

16  response from you back to Wanda.

17          "Do you recall discussing with Wanda

18  prior to this e-mail seeking recommendations as

19  to what members of her team would go to Client

20  Relations and which would go to Real Estate

21  Solutions?"

22          And your answer was,

23          "A.  Yes."

24          Does that help refresh your

25  recollection that you sought her recommendation

1    in that regard?

2    A.  I remember discussing it with her.

3    April 26th would have been an earlier

4    conversation.  At that point, we would have been

5    talking about identifying employees and their

6    strengths, so I guess it does help me to

7    remember.

8    Q.  And ultimately, members of her team were

9    split between those two areas, correct?

10   A.  I believe so, yes.

11   Q.  All right.  You actually generally followed

12   Wanda's preliminary recommendations on how the

13   team was split up, correct?

14   A.  I don't remember.  I probably did.

15   Q.  All right.  You see that Ms. Speight's name

16   is on the Real Estate Solutions side, rather

17   than the Client Relations side, correct?

18   A.  I saw that, yes.

19   Q.  Okay.  At least as a preliminary

20   recommendation, you actually didn't have a

21   problem with that, did you?

22   A.  I don't know if I had a problem with it at

23   all.  I would have -- based on this, I asked for

24   her recommendation, so I was open to receiving

25   her recommendations.

1    Q.  Okay.  And ultimately, you decided that you

2    would rather have at least Ms. Speight on the

3    Client Relations team, rather than on the Real

4    Estate Solutions team, however they were split

5    up, correct?

6    A.  That's correct.

7    Q.  Okay.  You never told anybody that Wanda's

8    preliminary recommendations were inappropriate,

9    did you?

10   A.  No.

11   Q.  And you didn't have any discussions with

12   Mr. Lipson about these preliminary

13   recommendations, did you?

14   A.  I don't recall.  I have no idea.

15   Q.  Okay.  You don't recall Mr. Lipson objecting

16   to Ms. Speight's preliminary recommendations?

17   A.  No.  I don't think Mr. Lipson would have

18   been familiar with some of the names, so I don't

19   think he would have a basis for that.

20   Q.  So he wouldn't have had a basis for thinking

21   that her preliminary recommendations were

22   inappropriate?

23   A.  I think at this time we were still trying to

24   figure out what the department was doing.

25   Q.  All right.  And so, to answer my question,

61

1    you don't think that Mr. Lipson had any basis

2    for assuming that her preliminary

3    recommendations were inappropriate?

4         MR. BANKS:  Objection, Your Honor.

5    That calls for speculation.

6         THE COURT:  It does, unless there was

7    some exact statement made to that effect.

8         MR. SALMANSON:  I'll try to lay a

9    foundation, a little bit.

10        THE COURT:  Rephrase your question.

11   BY MR. SALMANSON:

12   Q.  Mr. Lipson was relying on you to tell him

13   what was going on, in terms of the transition

14   with Ms. Speight's group, correct?

15   A.  Part of my responsibility would have been

16   that, yes.

17   Q.  Okay.  Do you know if anybody else was

18   feeding Mr. Lipson that information?

19   A.  I don't know.

20   Q.  So, based on what you were telling him, you

21   hadn't told him anything that would lead him to

22   believe that Mr. Lipson could conclude that

23   Ms. Speight's preliminary recommendations were

24   inappropriate?

25   A.  Well --

1          THE WITNESS:  Could you read that back

2    to me, please?

3          (Whereupon, the court reporter read

4    back the last question.)

5          THE WITNESS:  No, I wouldn't.

6    BY MR. SALMANSON:

7    Q.  Do you recall ever telling Mr. Lipson that

8    Ms. Speight wanted to move half of the assets

9    that she was managing into Real Estate

10   Solutions?

11   A.  No.

12   Q.  To your recollection, did Ms. Speight ever

13   make the recommendation to move half of her

14   assets into Real Estate Solutions?

15   A.  Half of the assets?

16   Q.  Yes.

17   A.  I'm not sure that I understand.  Wanda's

18   group was responsible for managing a particular

19   facet of the assets, so, to move them, I'm not

20   sure I understand.

21   Q.  Okay.  Fair enough, fair enough.

22          Do you recall Ms. Speight ever

23   suggesting that the management of the assets,

24   half of the assets, should be moved into Real

25   Estate Solutions?

1   A.  I think we had that conversation, yes.

2   Q.  Okay.  And do you recall whether that was

3   her idea?

4   A.  I have no idea.

5   Q.  Was that something that was out on the table

6   as a possibility?

7   A.  I think, as we understood what the

8   department did, part of that was understanding

9   the portfolio, so it would have been part of the

10  discussions.

11  Q.  Hmm.  And whoever suggested the potential of

12  moving half the management or half of the assets

13  into Real Estate Solutions, that would have been

14  consistent with the tenor and tone of the

15  discussions that you were having, correct?

16  A.  Yes, as I sit here today, I would say it

17  would be.  I don't remember specifically having

18  those conversations, but I remember discussing

19  the assets and the management thereof, so I

20  think we would have been discussing quite a bit

21  at that time.

22  Q.  Okay.  Is it fair to say that there were a

23  lot of ideas being put out on the table?

24  A.  Yeah, I think so.

25  Q.  Were some of those ideas being put out on

1    the table by Ms. Speight?

2    A.   Certainly.

3    Q.   And do you recall discussing with

4    Ms. Speight issues related to the fact that she

5    was short-staffed?

6    A.   Do I remember discussing with her issues

7    related to her being short-staffed?

8    Q.   Yes.

9    A.   I know we were talking about personnel at

10   every one of our meetings, so part of the design

11   of all of those meetings was to identify where

12   we could bring assistance from her services

13   operation.

14   Q.   Do you recall that there had been a set of

15   assets that had been asset-managed out in Denver

16   that were being transferred, or had just before

17   she joined her group, within a couple of weeks

18   or months, been transferred into her group?

19   A.   I know there was a lot of movement back

20   then, so I don't know if I knew the exact assets

21   you were referring to at that point.

22   Q.   If I use the term "SPR" or "SPGR" from the

23   loan portfolio, does that sound familiar?

24   A.   Yes.

25   Q.   Okay.  Do you recall Ms. Speight keeping you

1    informed about how she was going to try and

2    reassign those assets?

3    A.  Not specifically, no.

4    Q.  Do you ever recall being advised that she

5    didn't believe that she had the full personnel

6    to take all of those assets in and manage them

7    within her own group?

8    A.  Do I remember her saying that?

9    Q.  Yes.

10   A.  At one point I remember getting an e-mail to

11   that effect.  I don't remember what time,

12   though.

13   Q.  Do you recall being advised that Mr. Carp

14   had offered the assistance of Mr. Lauerman who

15   worked for him and his people to assist her, at

16   least in part, with that portfolio?

17   A.  I know there was a lot of camaraderie,

18   should I say, between departments to facilitate

19   the transition, so I do recall Tony Lauerman

20   being involved.

21   Q.  If I can direct your attention to P-9.

22   A.  (Witness complies.)

23   Q.  Just take a minute to look through, and then

24   let me know when you're ready.

25   A.  Okay.

1    Q.  Now, this e-mail string relates to the

2    orphan loan portfolio, correct?

3    A.  Yes, it does.

4    Q.  And Ms. Speight had reached out to

5    Mr. Lauerman to seek his assistance in having

6    some of his people asset-manage the orphan loan

7    portfolio, correct?

8    A.  Yes.

9    Q.  And there was nothing wrong with her doing

10   that, correct?

11   A.  No.

12   Q.  Somehow on May 4th, according to this

13   e-mail, Ms. Speight writes with a CC to you and

14   to -- or sorry, she writes to you and to Mr.

15   Carp, with a CC to a Patrick Vahey and a Nathan

16   Perry in Colorado, and says, "can someone please

17   let us know what is happening with the SPG

18   loans?  Up until a few minutes ago, we were

19   under the understanding that Jackie and Julie

20   would be picking up these assets.

21          "Jackie called Nathan to tell him that

22   these loans would be going to the Salt Lake City

23   Master Servicing staff, but that will not happen

24   for awhile.  If the plans have changed, please

25   communicate the plan.  Patrick has other plans

1    for Nathan and his staff, so there's no interim

2    coverage.

3              "Patrick, please comment on

4    availability.  My concern is that these assets

5    require significant hands-on coverage."

6              Do you recall whether, in fact, up

7    until 11:21, or a few minutes before then, on

8    May 4th, that Mr. Lauerman's group was picking

9    up the Asset Management responsibilities for

10   these assets?

11   A.  No, I don't recall that.

12   Q.  Let me ask you a question.

13             Do Asset Management responsibilities

14   go hand in hand with risk ratings for those

15   assets?

16   A.  Do Asset Management responsibilities --

17   well, part of the Asset Management

18   responsibilities would do that, yes.

19   Q.  So whoever had the responsibility for Asset

20   Management would also be responsible for doing

21   the risk ratings of those assets, correct?

22   A.  Well, yes, in the terms that we are

23   discussing today, yes.  Our business uses Asset

24   Management for different things.

25   Q.  In response to that e-mail, Mr. Vahey comes

1    back and explains that he really would prefer

2    Nathan Perry not to be involved in the asset

3    management, and says, "that being said, I don't

4    want to put the company at risk by neglecting

5    the assets.  So if there's absolutely no one

6    else to handle, we'll figure out something else

7    with Nathan.  Hope this helps.  Please let me

8    know if you have any questions."

9            Would you agree with Mr. Vahey's

10   assessment, that if there isn't somebody to do

11   the risk ratings in an appropriate -- well, I

12   don't want to put words in your mouth -- that if

13   you neglect the assets, you could put the

14   companies at risk?

15   A.  So you want me to answer if we neglect

16   assets --

17   Q.  No, no, no, no, no.

18   A.  No, whether or not --

19   Q.  Sorry, let me ask it again.

20   A.  I'm sorry.

21   Q.  That's okay.  It probably won't be the first

22   time.

23           Would you agree with Mr. Vahey that if

24   the assets were neglected, that that would put

25   the company at risk?

1    A.  Well, certainly.  I guess I'm trying to

2    figure out what he means by "neglected," but,

3    yes.

4    Q.  Now, Ms. Speight then chimes in back to

5    Mr. Vahey and to you and to Mr. Carp, the CC to

6    Mr. Perry and Mr. Lauerman, and says, "Mark and

7    Mike."

8          Now, "Mark," you interpret as you, I

9    assume?

10   A.  Yes.

11   Q.  And "Mike," just because there are a lot of

12   Mikes between the lawyers and Mr. Lipson and

13   Mr. Carp, that "Mike" is Mike Carp, right?

14   A.  That's right.

15   Q.  "Mike and Mark, I have attempted to be clear

16   with you over the past 30 days that I don't have

17   staffing to pick up this portfolio."

18          Any reason to believe that that

19   statement is not correct?

20   A.  Well, as of May 4th, I think Wanda had

21   reported to me for three days, so I don't know

22   at this point if I understood what her staff was

23   doing at that time, that I could agree with

24   that, or not.

25   Q.  Had you been having conversations with

1    Ms. Speight during the month of April about what

2    her staffing issues were?

3    A.  We were having many conversations during the

4    time after the decision was made for her

5    department to move over to Servicing.

6    Q.  And some of those discussions related to

7    staffing, correct?

8    A.  They would, yes.

9    Q.  Okay.  Her next sentence says, "The

10   corporation's balance sheet is at risk if

11   there's slippage in credit quality and no one is

12   monitoring performance.  Again, please let us

13   know what is the plan."

14          Do you agree with Ms. Speight that the

15   corporation's balance sheet could be at risk if

16   there's a slippage in credit quality and no one

17   is monitoring performance?

18   A.  If that were just a factual statement --

19   Q.  Yes.

20   A.  -- I think that would be an accurate

21   statement, yes.

22   Q.  And part of monitoring the performance is

23   performing the risk ratings, correct?

24   A.  That would be part of it, yes.

25   Q.  It's a pretty strong statement on

1   Ms. Speight's part, would you agree?

2   A.   Yes.

3   Q.   And you didn't have a problem with her

4   sending this e-mail and expressing that as she

5   did, did you?

6   A.   I don't recall how I felt about it at the

7   time.   I think I would have been a little

8   surprised that she's tried to be clear with us.

9   Q.   Would you turn to Page 102 of your

10  deposition?

11  A.   I'm there.

12  Q.   Did the e-mail, in your mind, raise any

13  concerns related to her performance?

14  A.   No.

15  Q.   And do you recall whether you ever responded

16  to Ms. Speight's question, specifically about

17  these assets, when she said, "Again, please let

18  us know what is the plan"?

19  A.   If I ever responded?  No, I don't think I

20  ever physically sent her an e-mail.  I'm sure we

21  would have discussed it.

22  Q.   As you sit here today, do you have any

23  recollection of discussing what the plan was for

24  the SPG portfolio after May 4th and prior to her

25  termination?

1    A.  Specifically, as it relates to this

2    portfolio?

3    Q.  Yes.

4    A.  No.  Generally, yes.

5    Q.  Would you look at P-11?

6    A.  (Witness complies.)

7    Q.  Tell me when you have had a chance to look

8    through that.

9    A.  Okay.

10   Q.  If you would look on the first page, there's

11   an e-mail from Julie Gschwind to Ms. Speight,

12   somebody named Jackie Brome, Justin Snarponis,

13   Curt Spaugh, and Tony Lauerman.

14        Julie writes, "Wanda, I understand Mark

15   McCool's group will be handling all the orphan

16   loans and that Special Servicing will be

17   transferring them in the next week to ten days.

18        "In the meantime, I understand Nathan

19   Perry is continuing to handle these loans.  In

20   light of this, is it appropriate for us to be

21   trained?"

22        Ms. Speight forwards that e-mail, then,

23   in response to Ms. Gschwind, with a CC to you

24   and to Mr. Carp, and, among others, cc's

25   Mr. Lauerman, and he is an individual in Special

1    Servicing, correct?

2    A.  That's correct.

3    Q.  And he was reporting to Mr. Carp, correct?

4    A.  I believe so, yes.

5    Q.  And to Jackie Brome and Robert Ballard.

6         Do you know who Robert Ballard is?

7    A.  Yes, I do.

8    Q.  What was his position at the time?

9    A.  I think at the time he was Chief Credit

10   Officer.

11   Q.  And Mr. Hohenleitner, who is he?

12   A.  He worked in the Credit Department.

13   Q.  So Mr. Ballard would have been above

14   Mr. Hohenleitner?

15   A.  Yes, I believe so.

16   Q.  Wanda writes, "Thanks for the feedback,

17   Julie.  Mark/Mike," -- and I think we can agree

18   that Mark is you, and Mike is Mike Carp -- "the

19   Credit Department will be providing training the

20   risk rating process.  The next cycle will begin

21   in late May.

22         "If Julie and Jackie are not the

23   appropriate individuals to perform the risk

24   rating of the orphan SPG loans, please identify

25   the appropriate person(s)."

1          Is it fair to say that, as of May 9th,

2    you were aware that the SPG orphan loan

3    portfolio was going into Mr. Lauerman's group,

4    and that some people in his group were going to

5    be trained to do the risk rating?

6    A.  That it was going into Mr. Lauerman's group?

7    Q.  Right.

8    A.  I don't know if I do recall that.

9    Q.  And --

10   A.  I mean, it's in the e-mail, but I don't know

11   if I agreed with it at the time.

12   Q.  Okay.  You actually then respond, and is it

13   fair to say that you were put on notice that at

14   least there was a thought in that regard?

15   A.  Yes.

16   Q.  In fact, you then follow-up with Ms. Speight

17   and Mr. Carp and say, "Let's talk about this

18   tomorrow.  What times are you available?"

19   Correct?

20   A.  That's correct.

21   Q.  So you wanted to figure out whether it was

22   the right thing to do to send the SPG loan

23   portfolio over to Mr. Lauerman's group or

24   somehow handle it within your group; is that

25   fair to say?

1    A.   Yes.   Again, it was all part of the larger

2    transition.

3    Q.   All right.   Do you recall whether you ever

4    had the opportunity to discuss where those

5    orphan loans should go?

6    A.   I'm sure we did.

7    Q.   All right.   Do you recall that, except for

8    the subset loans, the vast majority of the SPG

9    portfolio actually came within Ms. Speight's

10   bailiwick?

11   A.   Do I recall that?

12   Q.   Yes.

13   A.   Yes, I do.

14   Q.   Okay.   And this was just a small subset of

15   those loans, correct?

16   A.   Yes, I believe so.

17   Q.   In the conversations about discussing

18   staffing, you learned over the course of the

19   time period from the end of March until her

20   termination that Ms. Speight had lost several

21   important individuals within her group, correct?

22   A.   I don't know the time period in which she

23   lost the individuals.   I know that some people

24   did resign from the group.

25   Q.   And do you recall any of their names?

1    A.   Two that come to mind would be Orion Hack

2    and Chuck Mathews.

3    Q.   Do you recall that Mr. Suri also left her

4    group?

5    A.   I don't know that name.

6    Q.   If I told you that he was the person who had

7    been Asset Management in the Canadian loan

8    portfolio, do you recall, even if you don't

9    recall his name, that the person who had managed

10   that portfolio also left her group?

11   A.   I believe so, yes.  I don't know what the

12   time frame of his departure was.

13   Q.   You ultimately didn't determine to whom

14   Ms. Speight would be reporting until May 12th;

15   is that correct?

16   A.   I think you said that date earlier.  I don't

17   know the exact date, but it was around that

18   time.

19   Q.   Okay.  And do you recall having a meeting

20   with Ms. Speight on that date to discuss to whom

21   she would be reporting, and generally the

22   structure of the way that you determined the

23   transition should take place?

24   A.   I think it might have been a phone call, but

25   I remember speaking with her.  I can't remember

1    if it was a meeting or a call.

2    Q.  Okay.  Do you recall that during this time

3    period Mr. Carp was based in Dallas, correct?

4    A.  He still is, yes.

5    Q.  All right.  And so if you met with

6    Ms. Speight together, you would generally --

7    when you were talking about moving the groups

8    around or how this was going to work, Mr. Carp

9    and you and Ms. Speight would be on the phone

10   calls together, correct?

11   A.  Um.

12   Q.  Let me rephrase that, because --

13   A.  Okay.

14   Q.  Mr. Carp would generally attend meetings

15   with you and Ms. Speight on the phone, correct?

16   A.  Correct, he would be on the phone.

17   Q.  Sometimes all three of you would be on the

18   phone, and sometimes you and Ms. Speight would

19   be face to face?

20   A.  That is correct.

21   Q.  And do you recall, during any of those

22   meetings among the three of you, whether

23   Ms. Speight ever said anything inappropriate

24   or -- let's start with inappropriate.

25   A.  I don't -- no, I don't think so.  Not that I

1    recall.

2    Q.  Did she ever, during those meetings, say

3    anything that you thought was insubordinate?

4    A.  No, I don't think so.

5    Q.  Okay.  Did it seem like she was engaged in

6    the discussions when you had those meetings?

7    A.  The discussions with Michael Carp?

8    Q.  Yes.

9    A.  Yes.

10   Q.  Okay.  Do you recall the May 12th meeting

11   being a very productive meeting?

12   A.  I don't remember that particular meeting,

13   but I know we had productive meetings.

14   Q.  Would you say that up until May 23rd -- and

15   we're certainly going to get to the May 23rd

16   meeting --

17   A.  I'm sure we will.

18   Q.  -- that you basically were having productive

19   dialogues with Ms. Speight and having productive

20   meetings?

21   A.  At varying productivity, I would say.

22   Q.  All right.  Now, eventually, after the

23   May 23rd meeting, you did have some concerns,

24   correct, based on what happened in that meeting?

25   A.  Yes.

1    Q.  And at the time, on May 23rd, either that

2    day or shortly thereafter, you wrote a memo to

3    the file to document those concerns, correct?

4    A.  Yes, I did.

5    Q.  If you can turn to P-30.

6    A.  (Witness complies.)

7    Q.  P-30 is the memo that you created after the

8    May 23rd meeting, correct?

9    A.  That is correct.

10   Q.  And your point in writing this memo was to

11   document all the concerns that you had about

12   Ms. Speight at that time, correct?

13   A.  I think my point was to memorialize my

14   thoughts.

15   Q.  Okay.  And your concerns?

16   A.  That would have been part of my thoughts.

17   Q.  "Background.  Integration announced, Mike

18   Lipson meets with team in Horsham, New York on

19   the phone.  Wanda and I meet, cordial, but

20   superficial meeting."

21         Would you agree with me that the first

22   time you met with Ms. Speight it was, in

23   essence, to exchange pleasantries, you didn't

24   really talk details?

25   A.  Yes, I would agree.

1   Q.  And when you describe it as a superficial

2   meeting, that's not any fault on Ms. Speight's

3   part?

4   A.  No, certainly not.

5   Q.  Okay.  It says, "Mike Carp and I meet with

6   the team in Horsham, New York on the phone, two

7   times.  Mike and I meet with Don Irwin and Sue

8   Morrow, a few employees individually.  Mike and

9   I meet with Chuck Mathews and Henry Yabroudy,"

10  Y-A-B-R-O-U-D-Y, "reviewing employees

11  individually.  Meetings with Wanda continued.

12  Discussed with Marla the team structure and

13  employee overview concerns and questions."

14          Now, who is Marla?

15  A.  That would be Marla Berger.

16  Q.  Okay.  Marla Berger had been one of the

17  people who had previously had oversight of

18  Wanda's group, correct?

19  A.  Correct.

20  Q.  Do you recall what concerns and questions

21  you discussed with Ms. Berger?

22  A.  No.  I think they would have been, you know,

23  what should I focus on first for the transition,

24  and, you know, what are the priorities within

25  the department to help me come up with an

1    appropriate plan.

2    Q.  And it says, "Meet with Wanda and Mike."

3          Wanda, of course, being Ms. Speight,

4    Mike being Mike Carp, not Mike Lipson, correct?

5    A.  That would be correct, yes.

6    Q.  -- "to identify specific tasks to be

7    assigned to Real Estate Solutions and Client

8    Services.  Very constructive meeting."

9          Do you recall that that was part of the

10   meeting in mid May, whether it's May 12th or

11   another date?

12   A.  That's the right time frame.

13   Q.  Okay.  It wasn't prior to May 1st, correct?

14   A.  No, I don't believe so.

15   Q.  And do you recall how long that meeting

16   occurred?

17   A.  The duration of the meeting?

18   Q.  Yes.

19   A.  No.  We had a lot to talk about, 45 minutes

20   to an hour, maybe.

21   Q.  The purpose of that meeting was to try and

22   get started on -- I think you used the term

23   "granular level."

24          Was it to start thinking about, on a

25   granular level, how the assignments should be

1   made and who should go where?

2   A.  Yes.

3   Q.  And would you agree with me that you

4   couldn't possibly have had a very constructive

5   meeting unless Ms. Speight was an active

6   participant in that meeting?

7   A.  Yes.

8   Q.  All right.  And she was sharing her views

9   with you about what the appropriate things to do

10  were?

11  A.  Yes.

12  Q.  Did she seem engaged?

13  A.  Yes, yes.  I remember that.

14  Q.  She seemed sincere?

15  A.  As I sit here today, yes, I would say so.

16  Q.  Can you think of anything that happened in

17  that May 12th meeting that would make you

18  question her commitment to moving forward?

19  A.  No.

20  Q.  And then it says, "You offered Wanda the

21  opportunity to continue to manage the Asset

22  Management team, discussed opportunities

23  available in Real Estate Solutions.  She

24  accepted the position."

25          Now, do you recall how the discussion

1   about opportunities and Real Estate Solutions

2   came up?

3   A.   No.   I'm trying to figure out what I meant

4   by that, but, no, I don't remember how it came

5   up.

6   Q.   Do you recall whether you discussed with

7   Ms. Speight whether maybe she could end up in

8   Real Estate Solutions, as opposed to under your

9   bailiwick?

10  A.   I think at this point we had decided that it

11  was appropriate for her to continue to manage

12  that team with me.

13  Q.   And before you had told her that decision,

14  there wouldn't have been anything wrong with her

15  discussing the possibility of being in Real

16  Estate Solutions?

17  A.   No.

18  Q.   Now, you then set up a meeting on May 23rd.

19  Well, let me stop there.

20          There's nothing in this document, which

21  I think you said was to document your thoughts,

22  to suggest that prior to May 23rd you had

23  concerns about Ms. Speight's performance?

24  A.   Well, there's nothing in this document, no.

25  Q.   And there's nothing's prior to May 23rd that

1    suggests that you were questioning her

2    commitment?

3    A.  In this document?

4    Q.  Yes.

5    A.  There's nothing in this document.

6    Q.  And there's nothing in any other document

7    you wrote to the file that suggests --

8    A.  Not to the file, no.

9    Q.  Okay.  Is there anything that you wrote to

10   anybody else?

11   A.  No, I don't believe so.

12   Q.  All right.  You didn't write down in a

13   diary?

14   A.  No, I don't recall.

15   Q.  You didn't write an e-mail to Mr. Lipson?

16   A.  No.

17   Q.  You didn't write an e-mail to Mr. Carp?

18   A.  I didn't write anything, no.

19   Q.  You didn't write to Ms. Berger?

20   A.  I don't think I wrote to anybody about my

21   concerns.

22   Q.  And did you ever have a discussion with

23   Ms. Berger, prior to May 23rd, about Wanda's

24   commitment to the transition or concerns you had

25   about Ms. Speight?

1    A.  With Ms. Berger?

2    Q.  Yes.

3    A.  No, I don't believe so.  Not with her.

4    Q.  You don't recall having any of those

5    discussions with Mr. Carp, do you?

6    A.  No, not offhand.

7    Q.  All right.  To what extent do you recall

8    having any discussions with Mr. Lipson about

9    your concerns relating to Ms. Speight prior to

10   May 23rd?

11   A.  I remember discussing with Mr. Lipson the

12   fact that I was becoming increasingly concerned

13   about her commitment.

14   Q.  Okay.  And when do you think that you had

15   that conversation?

16   A.  Mid to late May.

17   Q.  So sometime after the May 12th meeting, or

18   whenever that meeting was?

19   A.  Correct, yes.  After the May 12th meeting,

20   yes.

21   Q.  Do you know whether it was after the

22   May 23rd meeting?

23   A.  It was certainly before the May 23rd

24   meeting.

25   Q.  Okay.  What happened between May 12th and

1    May 23rd that made you say, Mr. Lipson, I have

2    some concerns about her commitment?

3    A.   Well, we were having our continual meetings,

4    our ongoing meetings, and Wanda was becoming

5    disengaged and disinterested, I would say.

6    Q.   And you're saying that occurred between

7    May 12th and May 23rd?

8    A.   Yes.

9    Q.   How many meetings do you think you had

10   between May 12th and May 23rd?

11   A.   It had to be -- I don't know.  We were

12   probably talking about almost every day at that

13   point.

14   Q.   Now, why didn't you put that down in the

15   memo?  You're writing the memo around May 23rd,

16   correct?

17   A.   Correct.

18   Q.   And this is to document your concerns about

19   Ms. Speight?

20   A.   No.  It was to document my thoughts on that

21   particular meeting that had occurred on

22   May 23rd.

23   Q.   Do you recall, prior to the May 23rd

24   meeting, Ms. Speight reaching out to you to ask

25   if there were certain things that were going to

1   be on the agenda, so that she could be prepared

2   for them at the meeting?

3   A.   I recall an e-mail to that effect.

4   Q.   All right.  If you will look at P-21.

5   A.   (Witness complies.)

6   Q.   This is an e-mail from Ms. Speight to you,

7   with a CC to Madeline O'Brien who is your admin,

8   correct?

9   A.   She was at that time, yes.

10   Q.   And it says, "Accepted Further Drill Down on

11   Integration."

12          The "Further Drill Down on Integration"

13   was the May 23rd meeting, correct?

14   A.   I don't know.  We were having many meetings

15   at that time.

16   Q.   Do you recall that the purpose of the

17   May 23rd meeting was to have a further drill

18   down on the integration?

19   A.   The purpose of the 23rd meeting was, yes.

20   Q.   All right.  And she says, Please let me know

21   the specific areas I should be prepared to

22   discuss."  Correct?

23   A.   I'm sorry?

24   Q.   She was asking you to please let her know

25   the specific areas she should be prepared to

1    discuss, correct?

2    A.  Yes.  That's in the e-mail.

3    Q.  And do you recall whether you ever responded

4    to the e-mail?

5    A.  I don't.  Yeah, I don't know if this is just

6    an automatic acceptance of the meeting plan, or

7    if it's a separate e-mail.

8    Q.  All right.  Go back to P-14.

9    A.  (Witness complies.)

10   Q.  This is an e-mail string related to a

11   certain set of loans.  And Wanda writes to you

12   on May 11th, "Subject:  FW:  Construction

13   Management Fees.  Mark, there is a construction

14   management.  Where does this go?  PLG or

15   Services?"

16           It's true, isn't it, that you would not

17   have expected Ms. Speight to not know the answer

18   to that question prior to asking it of you,

19   correct?

20   A.  I'm sorry, I was reading.

21   Q.  I'm sorry.  I forgot to say let me know when

22   you're ready.

23           Are you ready now?

24   A.  I am.  Sorry about that.

25   Q.  It says, "Mark, there's a construction

1   management.  Where does this go?  PLG or

2   Services?"

3              And you would not have expected her to

4   know the answer to that prior to asking the

5   question, correct?

6   A.   That would have been something that we were

7   trying to figure out in the transition.

8   Q.   And there was nothing wrong with her sending

9   out that e-mail to you to ask that question,

10  correct?

11  A.   No.

12  Q.   If you look at P-16.

13  A.   (Witness complies.)

14  Q.   It begins with an e-mail from Ms. Speight to

15  Clare Dooley, with a CC to you and Mr. Carp.

16             Subject is "Scheduling a demo of the

17  UWAM."  Ms. Speight writes, "Hi, Clare.  At

18  Mark's suggestion" -- I assume it's you,

19  correct?

20  A.   Yes.

21  Q.   -- "I would like to schedule a time next

22  week to show you the financial statement

23  analysis tool utilized by PLG.  The tool is

24  known as the Underwriting asset management

25  model, (UW-AM).  It is populated by the

1    underwriter analyst during the loan approval

2    process, then transferred to Asset Management

3    for tracking periodic (monthly or quarterly)

4    financial reporting and analysis.  If you could

5    e-mail a few times next week, I will set a time

6    up."

7           Ms. Dooley then responds to

8    Ms. Speight, and Ms. Speight then responds to

9    Ms. Dooley.

10          This e-mail was basically her following

11   up to your instructions, correct?

12   A.  Yes.

13   Q.  And you asked her to do it, in part, so that

14   you could understand her group's functions and

15   figure out how you could leverage the Servicing

16   Department to assist her in that function,

17   correct?

18   A.  Yes.

19   Q.  Do you recall that, in fact, that was one of

20   the things that you discussed in the meeting,

21   which I'll represent to you occurred on

22   May 12th?

23   A.  Yes.  That probably came up in the meeting.

24   Q.  Okay.  So if she started sending the e-mail

25   on May 12th at 3:24, she was doing almost an

1  immediate follow-up to your meeting, correct, as

2  you requested?

3  A.  Same day, yes.

4  Q.  If you could turn to P-17.

5  A.  (Witness complies.)

6  Q.  That same day, 3:47 in the afternoon, she

7  forwards to you --

8  A.  I'm sorry, you don't want me to read all of

9  these?

10  Q.  No, no, sorry.  We're just going to focus on

11  the first page.

12  A.  I'm ready then.

13  Q.  Okay.  She forwards to you and to Mr. Carp a

14  pretty big attachment -- that we have decided

15  that you don't want to read right now, right?

16  A.  Yes.

17  Q.  It says, "Asset Manager Job Functions Doc.

18  As we discussed, please see attached."

19          And what is attached is a document

20  labeled "Asset Management:  Primary Job

21  Functions."

22          It goes through and it talks about

23  "Asset Surveillance," "Performing Monitoring

24  Activities," "Special Request Activities," Loan

25  Maturity Activities,"

1    "Securitization/Disposition Activities," et

2    cetera.

3              Correct?

4    A.  Correct.

5    Q.  And this, again, was something that you had

6    asked about, whether she could give something to

7    you at the meeting earlier that day, correct?

8    A.  Yeah.  I don't know if it was myself or

9    Michael Carp that asked for it.

10   Q.  This was a very useful document; am I

11   correct?

12   A.  I don't know if it was or wasn't.  It was

13   something that we needed to understand the

14   department, so, I mean, without reviewing it, I

15   can't remember if it was useful or not.

16   Q.  Okay.  But it was something that you needed

17   to know in order to understand her department?

18   A.  Yes.

19   Q.  Prior to her joining your department, did

20   you have any sort of understanding of what her

21   department did?

22   A.  Yes, certainly.

23   Q.  Okay.  And did you understand sort of the

24   nitty-gritty of how her team asset-managed

25   compared to how Servicing did it?

1    A.   Yes, I would say so.

2    Q.   Had you ever done any risk ratings yourself?

3    A.   Not in -- have I done them?  I've been in

4    the meetings.  I could do one.  I don't think I

5    ever had the responsibility of actually

6    performing it, so I would say no.

7    Q.   Have you ever had the jurisdiction over

8    people who were in charge of doing asset risk

9    ratings?

10   A.   Well, Wanda's group would have been --

11   Q.   Right.  The first time.

12   A.   Yes.  Within Capmark Finance or GMAC CM.

13   Q.   Okay.  And do you recall discussing the

14   substance of the memo, as to what her group's

15   functions were, after she gave you the memo?

16   A.   That would have been part of all the

17   meetings we were having, understanding the

18   roles.

19   Q.   And you can't recall Ms. Speight being

20   unable to address any questions you had related

21   to any of the descriptions set forth in that

22   memo, correct?

23   A.   I'm sorry, could you repeat that for me?

24   Q.   Sure.  You don't recall Ms. Speight having

25   the inability to address questions that arose

1    out of this memo?

2    A.  Actually, I did.  I don't know if they arose

3    out of this memo, but --

4    Q.  Can you turn to your deposition, Page 124,

5    starting at Line 9.

6    A.  (Witness complies.)

7    Q.  I asked you if you recalled receiving the

8    memo.  You said,

9            "A.  Well, I remember seeing the

10   document."

11           A little bit later, on Page 125, Line

12   14, I say,

13           "Q.  Do you recall reviewing the

14   document with Ms. Speight?"

15           At first you say, "No," and then --

16           MR. BANKS:  Can I get where you are?

17           MR. SALMANSON:  Sure, 125, Line 14.

18           MR. BANKS:  I see.  My apologies.

19   BY MR. SALMANSON:

20   Q.  "Q.  Do you recall reviewing the document

21   with Ms. Speight?"  And you say,

22           "A.  No."  And then you say "Actually,

23   yes, I do recall."

24           "Q.  And when did you review the

25   document with Ms. Speight?

1          "A.   That I don't recall.  I know it

2     was during the series of meetings that we were

3     holding during the same period."

4          Then later on, I said,

5          "Q. Do you recall Ms. Speight being

6     unable to answer any questions that anybody else

7     raised in the review of the document?"

8          And your answer was,

9          "A.   No.  I thought there was a

10    different document, a checklist-type document."

11         And then I think we agreed that that

12    checklist-type document was a document that was

13    later prepared on May 23rd, correct?

14    A.   Yeah, I recall that distinction being made.

15    Q.   So, at least as to any discussions that

16    arose out of the P-17 document, Ms. Speight, as

17    far as you can recall, was able to answer your

18    questions, if you had any, from your review of

19    that document?

20    A.   Yeah.  I don't know that I had any questions

21    on this particular document.

22    Q.   Can you turn to the next document, P-18?

23    A.   (Witness complies.)

24    Q.   Let me know when you're ready.

25    A.   Okay.

1  Q.  And this e-mail is in relation to Orion

2  Hack, correct?

3  A.  That's correct.

4  Q.  And Ms. Speight is writing an e-mail on

5  May 15th to someone named Sal Tarsia,

6  Ms. Berger, CC to Mr. McCool and Mr. Carp.

7        Mr. Hack had decided that he wanted to

8  go into Underwriting, correct?

9  A.  Well, based on this, yes.

10  Q.  Is that consistent with your recollection?

11  A.  I couldn't remember the department, but,

12  yes.

13  Q.  Okay.  And Ms. Speight says, "Orion just

14  stopped in my office and asked if it would be

15  okay to set a start date in underwriting for

16  June 26th.  No replacement has been identified

17  at this time.

18        "(Mark, please let me know otherwise.)

19  My concerns are having coverage for the 2Q risk

20  rating, (should be wrapped up by June 21st) and

21  coverage on his loans targeted for the CDO,

22  (early July?)"

23        Do you agree that, as of May 15th, no

24  replacement had been identified for Mr. Hack's

25  portfolio?

1    A.  Not that I was aware of, no.

2    Q.  And would you have responsibility for

3    ultimately determining who that replacement

4    would be?

5    A.  I think it would be up to Wanda to make a

6    recommendation to me, and I would probably agree

7    or disagree.

8    Q.  And just so we're clear, Ms. Speight didn't

9    actually have the power to hire a replacement on

10   her own, correct?  She didn't have the authority

11   to do that?

12   A.  I would agree with that, yes.

13   Q.  So she would have had to have gotten your

14   approval or somebody else's approval for the

15   replacement?

16   A.  For a new hire, yes.

17   Q.  And if it were an internal transfer of hire,

18   that was a possibility, too, right?

19   A.  It would have been a possibility, yes.

20   Q.  Is it true that, as of May 15th,

21   Ms. Speight, to your recollection, no

22   replacement had been identified as of May 15th?

23   A.  Yeah, again, not that I'm aware of.

24   Q.  Do you recall whether you ever told

25   Ms. Speight otherwise when she said, "Mark,

1    please let me know otherwise"?

2    A.  I doubt I would have.

3    Q.  Do you know whether a replacement was

4    identified before Ms. Speight's termination on

5    May 26th?

6    A.  I have no idea.

7    Q.  There was nothing wrong with Ms. Speight

8    reaching out to the individuals on this e-mail

9    and expressing her concerns about replacement

10   for Mr. Hack?

11   A.  No.

12   Q.  Do you recall who Mr. Tarsia is?

13   A.  He was -- I'm not sure of his title, but he

14   was maybe a head underwriter, which is a person

15   responsible for analyzing the loans.

16   Q.  So he would have been in the Underwriting

17   Department --

18   A.  Correct.

19   Q.  -- with Mr. Hohenleitner?

20   A.  No.  It would have been -- Mr. Hohenleitner

21   was in the Credit Department.  Underwriting is a

22   team that looks at a proposal on whether or not

23   we're going to make a loan.

24   Q.  And there's nothing wrong with her CCing the

25   Underwriting Department about a staffing issue

1   related to her group?

2   A.  Well, no.  I think if they were trying to

3   figure out a date when Orion would move over to

4   the group, that's fine.

5   Q.  So she's keeping him apprised because

6   ultimately he's going to be getting Mr. Hack,

7   correct?

8   A.  I would assume so, yes.

9   Q.  Look at P-19.

10  A.  (Witness complies.)

11  Q.  Let me know when you're ready.

12  A.  Do you want me to read the attachment?

13  Q.  You can look at it and see if you recognize

14  it.

15  A.  I do recognize it.  If you were going to ask

16  me specific questions, I wanted to familiarize

17  myself.

18          Okay.  I'm ready.

19  Q.  The attachment is the announcement related

20  to the creation of Real Estate Solutions as a

21  formal group, correct?

22  A.  Yes, it is.

23  Q.  All right.  And you wrote to Wanda on

24  May 16th, "Wanda, we decided to limit the

25  announcement today to only the groups

1    immediately impacted by the Real Estate

2    Solutions integration.

3              "There are other departments that are

4    subject to organizational changes, such as Asset

5    Management, those will be announced shortly.

6    Thanks."

7              Now, Asset Management was Wanda's

8    group, correct?

9    A.  Yes, that's what I would have thought.

10   Q.  And Wanda writes, "Thanks for letting me

11   know."

12             The reason they didn't make the

13   announcement on May 16th was that there were

14   still a lot of issues up in the air related to

15   how the organizational changes would impact

16   Asset Management, correct?

17   A.  Well, the things were up in the air as to an

18   understanding of what the department was doing.

19   Q.  And in terms of what the department was

20   doing, that would impact how Asset Management

21   could fulfill its functions, correct?

22   A.  Yes.

23   Q.  Now, you want to go back.  We're going to

24   get into this May 23rd meeting.

25   A.  Okay.  (Witness complies.)

1   Q.  You don't recall whether you responded to

2   her e-mail about whether there were specific

3   areas that she should be prepared to discuss,

4   right?

5   A.  Yeah, I don't recall.  I'm not a prolific

6   e-mailer, so I would have called or something.

7   Q.  Do you recall whether you e-mailed or called

8   or informed her in any way of what the subject

9   matter was?

10  A.  I don't know.

11  Q.  Do you think it would have been useful to

12  respond to her and let her know what the

13  specific subject areas were going to be so that

14  she could be prepared?

15  A.  Sure, which is probably why I would have

16  called her.

17  Q.  Yet you don't have any recollection of doing

18  that?

19  A.  No.

20  Q.  And right around this time, Ms. Speight lost

21  yet another individual, correct?  I think you

22  mentioned Chuck Mathews.

23  A.  Yes.

24  Q.  If you look at P-22, it shows that

25  Mr. Mathews submitted his resignation on May

1    19th, correct?

2    A.  Just give me a second.

3    Q.  That's actually at the bottom, if you look

4    at the bottom of the first page.  It's the

5    e-mail from Mr. Mathews to Ms. Speight.

6    A.  I'm sorry.  There's just a lot of pages

7    to 19 -- or to 22.  I just want to make sure.

8    Q.  Okay.

9    A.  Okay.  I'm sorry.  The question?

10   Q.  So Ms. Speight let you know that Mr. Mathews

11   had submitted his resignation on May 19th,

12   correct?

13   A.  Well, based on reading this e-mail, he had

14   called her to resign and then submitted it in

15   writing on May 19th, so I don't know when he

16   actually resigned.

17   Q.  And she let you know, once she got the

18   e-mail, that he was resigning?

19   A.  Right.  She forwarded me the e-mail.

20   Q.  Okay.  In addition, she asked you to put the

21   question of who the heck was going to replace

22   Mr. Mathews on to the agenda for May 23rd,

23   correct?

24   A.  I'm sorry?

25   Q.  Do you recall that she asked to put on the

1    agenda for May 23rd the issue of who is going to

2    handle the portfolio that Mr. Mathews had

3    handled?

4    A.  I believe so, yes.

5    Q.  Now, also, prior to the meeting on

6    May 23rd -- if you would look at P-23.

7    A.  Okay.

8    Q.  -- she attaches a copy of an ERMC

9    presentation prepared for Credit.  "You may want

10   to keep this in mind as a replacement is

11   identified."

12          And she is forwarding an e-mail from

13   Mr. Mathews that had been sent to

14   Mr. Hohenleitner and herself and Mr. Nienas,

15   correct?

16   A.  Yes.

17   Q.  Was it your understanding that Mr. Mathews

18   had been handling this Apollo relationship?

19   A.  That's what I understood, yes.

20   Q.  So she is sending an e-mail to you saying

21   here's a copy of one of the things that he did

22   for Credit, correct, this kind of report?

23   A.  Yes.

24   Q.  And she is letting you know that this is a

25   skill that Mr. Mathews' replacement will need to

1   have, as you start thinking about who the

2   appropriate person is to replace him?

3   A.   That's the way I took it, yeah.

4   Q.   And there's nothing wrong with copying

5   Mr. Hohenleitner on that e-mail in terms of

6   discussing staffing of a replacement for that

7   portfolio, is there?

8   A.   I don't think -- no, I don't know.  I don't

9   think there's anything wrong with it.  I don't

10  think it was necessary, but.

11  Q.   All right.  Look at P-24, and let me know

12  when you're ready.

13  A.   Okay.

14  Q.   And Ms. Speight's forwarding Mr. Mathews'

15  resignation e-mail had been sent, among others,

16  to Mr. Nienas, who was one of Ms. Speight's two

17  team leaders, correct?

18  A.   Correct.

19  Q.   And Mr. Nienas wrote, "Wanda, as you're

20  aware, this comes as a big blow to our Asset

21  Management area.  Chuck has been responsible for

22  the condo portfolio, the Apollo relationship,

23  and several other complex transactions.  His

24  loss will be strongly felt, and departmental

25  morale has already been impacted.

1          "In addition to Chuck's position, we

2     have one additional position, full-time position

3     that was not filled and which has been withdrawn

4     from the HR system.  I've attached Chuck's

5     current portfolio listing.  (Dan is working on

6     the full portfolio breakdown.)"

7          Presumably, that's the other Don, Don

8     Irwin, and then he signs it "Don."  Correct?

9     A.  Yes.  It says "(Dan is working on the full

10    portfolio breakdown.)"

11    Q.  Oh, I'm sorry, "Dan."  Do you know who Dan

12    is?

13    A.  No, I don't know who Dan is, but I -- just

14    for clarity.

15    Q.  You are absolutely correct.

16          And Wanda forwards that e-mail to you,

17    right?

18    A.  Yes.

19    Q.  And she says, "Mark, can you please add to

20    the agenda for our meeting tomorrow the topic of

21    Chuck's portfolio?  Given the complexity and

22    high-profile visibility, especially with

23    reporting to Credit on the condo exposure, I

24    need your guidance on the ongoing coverage.  As

25    noted below, Chuck handles the Apollo

1    relationship, which requires frequent

2    interaction, the Principal Finance Underwriting

3    team, the Red Bank Mortgage Bankers, as well as

4    senior Apollo reps.

5            "Chuck functions as the primary asset

6    manager for the CV loans and both Meg and Steve

7    are very demanding.  It will be helpful with the

8    transition if someone is identified soon to take

9    over his portfolio.  Please let me know who that

10   person will be."

11           So Ms. Speight forwarded to you an

12   e-mail telling you, according to Mr. Nienas,

13   that Mr. Mathews' resignation comes as a big

14   blow to the Asset Management area, right?

15   A.  Yes.

16   Q.  And you knew, because she forwarded Mr.

17   Nienas' e-mail to you, that the departmental

18   morale had already been impacted by his

19   resignation, correct?

20   A.  Well, reading the e-mail, it was Don's

21   opinion that it been impacted, yes.

22   Q.  And Ms. Speight made sure that you were

23   aware of Mr. Nienas's opinion by forwarding the

24   e-mail on to you?

25   A.  I guess so, yes.

1   Q.  And she asked you to put the question of the

2   specific replacement for Chuck on the agenda the

3   next day, right?

4   A.  Yes, I did recall that before.

5   Q.  You don't recall whether, in fact, you got

6   to the question of Mr. Mathews' replacement in

7   the meeting, do you?

8   A.  I don't know if we did or not.

9   Q.  All right.  And from this memo it sounds

10  like she has some familiarity with Mr. Mathews'

11  portfolio and what he was doing with it, right?

12  A.  Yes.

13  Q.  And you didn't have any issue with her not

14  understanding what Mr. Mathews' portfolio was

15  like or what the importance of it was, did you?

16  A.  I'm sorry, can you repeat that, or just read

17  it back?

18  Q.  It's okay.  I'll leave it out.

19          Let's go to P-25.

20  A.  (Witness complies.)

21  Q.  Now, to your recollection, do you recall

22  when the May 23rd meeting took place, what time

23  of day?

24  A.  No.  I think it was early to mid-morning.

25  That's a guess.

1    Q.   Okay.  Well, at 11:17 that morning,

2    Ms. Speight is sending you an e-mail that says

3    to Ms. Dooley, yourself, Mr. Irwin, Mr. Nienas,

4    showing you a 2006 Q1 Financial Tracking

5    document, correct?

6    A.   Yes.

7    Q.   And if you turn to P-26, a couple of minutes

8    later she sends you another document and writes,

9    "Mark/Mike" -- and it's actually an e-mail to

10   you and Mr. Carp and Ms. Dooley and

11   Mr. Finkenstaedt.

12         She says, "Mark/Mike, Attached are the

13   procedures which were recently revised.

14   (Carolyn Mendicino and her staff were drafting

15   these, based on PLG Asset Management input.)

16   Revisions to other policies were put on hold in

17   late March, given the pending changes."

18         Do you recall Ms. Speight forwarding

19   this document to you on the morning of May 23rd?

20   A.   Well, seeing it here, no, I don't remember.

21   I remember seeing the documents.

22   Q.   And if the meeting was first thing in the

23   morning, then, the last two e-mails we saw were

24   following up on the meeting.  And if it was

25   after this, she is sending this in preparation

1   of the meeting, correct?

2   A.  I would agree.

3   Q.  Let's go to P-27.

4   A.  (Witness complies.)

5   Q.  I will ask you to take the time to look at

6   the document, because I think it's actually two

7   separate documents.  If you see the first couple

8   of pages have functions listed without any

9   columns to the left, and then after you get

10  through to the end there's what's, in essence,

11  the same document with some functions filled in.

12          Do you see the distinction between

13  them?

14  A.  I do.

15  Q.  Now, this was the document that was created

16  in preparation for the May 23rd meeting,

17  correct?

18  A.  Yeah.  I believe it was -- I don't know if

19  it was specifically for the 23rd, but this is

20  what we were getting to.  With all the meetings

21  that we were having, ultimately this is what

22  we're looking for.

23  Q.  The meeting has been described, I believe,

24  by you, in P-30.  It says the "purpose of the

25  meeting was to continue the discussion held the

1  prior week with Mike Carp, in which we

2  identified tasks for the separate departments.

3  This meeting was a, quote, "a further drill

4  down," unquote, into the Asset Management

5  program."

6          Do you agree with me that that was the

7  purpose of the meeting?

8  A.  Yes.

9  Q.  All right.  And then it says, "Clare took

10  the time to prepare a spreadsheet to facilitate

11  the discussion; the spreadsheet was an

12  adaptation from the Asset Management Job

13  Functions worksheet previously forwarded to me."

14  Right?

15  A.  Yes.

16  Q.  And the Asset Management job functions

17  worksheet was the function that Wanda had

18  forwarded to you, that we just saw a few minutes

19  ago, with all of the descriptions of the

20  different Asset Management job functions?

21  A.  I would think that the worksheet I'm

22  referring to is probably the first part of

23  Exhibit 27, and then the second part was Clare's

24  adaptation to that document.

25  Q.  Well, let's try and be clear on that.

1          If you look at P-27, I think the first

2    couple of pages is actually Clare's adaptation

3    that was created prior to the meeting, and then

4    when it's filled in that's what got filled in as

5    a result of the meeting.  Does that make sense?

6    A.  I don't know if that's -- I don't recall if

7    that's what happened, or if this is just leading

8    up to this meeting.  I don't recall which one

9    came first or last.

10   Q.  If you look at the e-mail that Clare wrote,

11   she writes -- there's an attachment --

12   A.  Where?

13   Q.  I'm sorry, on P-27.

14   A.  Okay.

15   Q.  It says, "Attachments:  Job Functions

16   5.22.06 x/s."

17          She says, "Attached is -- and it's

18   dated May 24th -- it says, "Attached is the list

19   we discussed yesterday.  Please review and let

20   me know if you have any changes/corrections.

21   Thank you, Clare Dooley."

22   A.  Okay.

23   Q.  So does that help refresh your recollection

24   of the second document that's behind this is the

25   version that was filled in as a result of the

1    discussions that you had on May 23rd?

2    A.  I guess it does.  I don't recall.

3    Q.  Now, the meeting was among four people,

4    correct --

5    A.  Yes.

6    Q.  -- you, Clare Dooley, Ned Finkenstaedt, and

7    Wanda?

8    A.  Correct.

9    Q.  Do you recall how long that meeting lasted?

10   A.  About an hour.

11   Q.  Could it have been two?

12   A.  I don't think it would have been two, but it

13   could have been a little over an hour.

14   Q.  And do you recall going through this

15   spreadsheet, line by line, and trying to figure

16   out what group should be assigned to which task?

17   A.  Yes, I do.

18   Q.  Now, that was a fairly tedious process,

19   wasn't it?

20   A.  Uh-huh.  Yes.  Yes, I'm sorry.

21   Q.  Learn from your deposition.

22         And Ms. Speight was able to contribute

23   at the level that you were able to fill in all

24   the assignments, correct, at least on a

25   temporary basis?

1    A.   That's why I'm having trouble with

2    remembering when this was actually created,

3    because we had been having a series of meetings.

4    All of those meetings were designed to identify

5    task responsibilities.  So I don't -- we went

6    line by line, but many of them were, yeah,

7    agree, I agree, I agree.  So tedious, but

8    efficient.

9    Q.   If you look at D -- starting with D010932.

10   A.   Okay.

11   Q.   Starting on that version of the document,

12   there's a column on the left labeled "Proposed

13   Department."  Right?

14   A.   Yes.

15   Q.   And those are all filled in, right?

16        If you go from there to the end of the

17   document --

18   A.   Okay.

19   Q.   -- you would agree with me that there's

20   nothing left on the table as a result of the

21   meeting you had on May 23rd, in terms of

22   proposed departments?

23   A.   No, I don't know that I agree with you.

24   Q.   All right.  Well, do you see any blanks on

25   the document in terms of where there's a

1   proposed department?

2   A.  Well, I see inserted comments, and at least

3   one question mark as I look through.

4   Q.  But those are not on which department should

5   be handling the job, right?

6   A.  The one question mark is.  That's the only

7   one I see.

8   Q.  Where's that's?

9   A.  D010934.

10  Q.  And the question mark you have is "CAG?"

11  Correct?

12  A.  No.  It's the fifth item from the bottom,

13  sixth item.

14  Q.  Oh, I see.  "AM-LB?" is what you're talking

15  about?

16  A.  That's correct.

17  Q.  And "AM" was Asset Management?

18  A.  Yes.

19  Q.  And what was "LB"?

20  A.  Loan Boarding.

21  Q.  That was the only assignment that you were

22  still talking about where it should go, correct?

23  A.  Based on this worksheet, yes.

24  Q.  And in order to make the assignments, you

25  needed Ms. Speight's input, correct?

1   A.   Yes.

2   Q.   And in order to provide that input in a

3   meaningful way to make the assignments, she had

4   to have a working knowledge of what her

5   department did, right?

6   A.   Yes.

7   Q.   And as far as you're concerned, she

8   exhibited that working knowledge in that meeting

9   for the most part?

10   A.   No.

11   Q.   She didn't exhibit a working knowledge of

12   the department?

13   A.   No, I don't believe she did.

14   Q.   If she didn't exhibit a working knowledge of

15   the department, how are you able to make all of

16   these assignments?

17   A.   Well, the people who were in the meeting

18   with me, Ned Finkenstaedt, Clare Dooley, myself,

19   and Wanda, between all of us we had a very sound

20   understanding of Servicing and Asset Management,

21   so we were able to come to conclusions as a

22   team.

23   Q.   From March to May, end of March to May, in

24   order to gain an understanding of what

25   Ms. Speight's group did at a granular level, you

1    needed her input, right?  You testified to that

2    earlier today?

3    A.  I don't know about the time limit.

4    Q.  Well, not before she started, right?  Before

5    she started talking to you at the end of March,

6    you hadn't had any discussions about what Asset

7    Management did at a granular level, right?

8    A.  Not with Wanda, no.

9    Q.  With anybody else?

10   A.  Not that I recall, no.

11   Q.  And Mr. Finkenstaedt hadn't been part of the

12   Asset Management Group, of Wanda's group, right?

13   A.  No, he was not part of that group.

14   Q.  You wouldn't expect him to have an

15   understanding at a granular level of what the

16   Asset Management functions were?

17   A.  I think he was very familiar with what asset

18   managers do.

19   Q.  The way that Wanda's group did them, or

20   asset managers in other departments?

21   A.  Asset Management, generally.

22   Q.  Did you understand that the type of Asset

23   Management that Wanda did in the Proprietary

24   Lending Group differed in many significant

25   respects from how Asset Management was done

1    different, otherwise?

2    A.   I don't think the functions were different.

3    I think the client was different.

4    Q.   And you had to have an understanding of that

5    at the granular level, right?

6    A.   An understanding of what?  I'm sorry.

7    Q.   Of the client interactions and the types of

8    clients that they were.

9    A.   Yes.

10   Q.   Okay.  And --

11   A.   Understanding of the client --  sorry.

12   Q.   And Ms. Speight would have been the one who

13   would have provided that to you of the four

14   participants in the meeting, right?

15   A.   Yes.

16   Q.   Let's go back to P-30.

17   A.   (Witness complies.)

18   Q.   On the second page of P-30, "The meeting was

19   extremely disappointing.  Wanda did not exhibit

20   any working knowledge of her department."

21          Now, that's not true, is it?

22          MR. BANKS:  Excuse me, Your Honor, he

23   cut off in the middle of the sentence.  May I

24   ask that the entire sentence be read?

25          MR. SALMANSON:  I'm going to get to the

1  second half, too, Your Honor.

2          THE COURT:  We'll give him an

3  opportunity to do that.

4          MR. BANKS:  Thank you, Your Honor.

5          THE COURT:  Sure.

6  BY MR. SALMANSON:

7  Q.  Wanda did not exhibit any working knowledge

8  for her department.  That's not true, is it?

9  A.  I believe at the time I wrote this, yes, it

10  was true.

11  Q.  You're saying you got through the six-page

12  document, which was the purpose of the meeting,

13  without Wanda being able to exhibit any working

14  knowledge of her department?

15  A.  That's what I'm saying, yes.

16  Q.  Second half of the sentence says, "When

17  asked about particular functions" -- again,

18  citing" -- sorry.  Now I understand Mr. Banks'

19  concern.  So I want to be fair.

20          "Wanda did not exhibit any working

21  knowledge of her department when asked about

22  particular functions, again, citing, you will

23  have to ask them."

24          So actually the concern was that she

25  didn't exhibit a working knowledge about a

1  particular function or set of functions, not

2  overall, correct?

3  A.  I thought that's what I answered.

4  Q.  All right.  And do you recall the specific

5  function that you were talking about?

6  A.  A particular function?

7  Q.  Yes.

8  A.  No.  I think my comments were that they were

9  generally speaking.  She didn't understand them.

10  Q.  All right.  Well, that's what I'm trying to

11  get clear.  I think Mr. Banks legitimately

12  thinks that I misread the e-mail because there's

13  an ambiguity here as to whether you're saying

14  she didn't have any working knowledge of her

15  department as a whole, or she didn't have any

16  working knowledge of her department when asked

17  about her particular functions.

18        In other words, were there a couple of

19  things that she was less certain of, or was it

20  as a whole, I don't know what my department is?

21        MR. BANKS:  Objection.

22        THE COURT:  It is a compound question,

23  counsel.

24        MR. SALMANSON:  Okay.

25        THE COURT:  Why don't you break it up,

1    counsel?

2              MR. SALMANSON:  Fair enough.

3    BY MR. SALMANSON:

4    Q.  Can you tell me, in writing the sentence,

5    what your intent was trying to express?

6    A.  Well, the meeting was designed to be a very

7    granular meeting.  So when discussing the

8    various functions, my recollection is that she

9    was not able to answer any questions related to

10   those functions, so I would rely on others in

11   the group.

12   Q.  But that wasn't true through the entire

13   meeting, right?  That was just at specific times

14   within the meeting?

15   A.  Yeah.  I'm not saying that she didn't

16   understand one thing.

17   Q.  That's all I'm trying to get to.

18              The purpose of creating P-30 was to

19   make sure that you memorialized all of your

20   concerns about Ms. Speight's performance up

21   until that time, correct?

22   A.  No.

23   Q.  No?

24   A.  No.

25   Q.  If you would look at Page 156 of your

1    deposition, Line 17.

2    A.  Okay.

3    Q.  It says,

4         "Q.  And was it in particular to make

5    sure that you memorialized all of your concerns

6    about Ms. Speight's performance?"  And your

7    answer was,

8         "A.   Yes, among other things."

9         Does that help refresh your

10   recollection, that the purpose of this memo was

11   to document all of your concerns about her

12   performance up until that time?

13   A.  No.  And, as I read my deposition, I would

14   say that it was designed to memorialize my

15   thoughts on that particular meeting, which I

16   think I said earlier as well.

17   Q.  Okay.  So you're saying what you said a year

18   ago in your deposition is incorrect?

19   A.  No, I don't think I am.

20   Q.  Well, I asked you in your deposition,

21        "Q.  Wasn't it in particular to make

22   sure that you memorialized all your concerns

23   about Ms. Speight's performance?"  And you said,

24        "A.   Yes.  Among other things."

25        All of your concerns.

1    A.  Well, as I sit here today, and as I sat

2    there in the deposition a year ago, the idea was

3    to memorialize my concerns about the meeting on

4    May 23rd.

5    Q.  That's not what you said in your deposition

6    a year ago, right?

7    A.  Just give me a second to read the questions

8    that are leading up to this.

9    Q.  Sure.

10   A.  Well, you know, all I can say is that when I

11   look at this and the reason behind me writing

12   that up was based on that particular meeting.

13   Q.  Well, that was the trigger for why you wrote

14   it up, right?

15   A.  What?  The meeting was the trigger?

16   Q.  Yes.

17   A.  Yes.  The outcome of the meeting caused me

18   to write this.

19   Q.  But the purpose of the meeting was to

20   document all of your concerns right up until

21   that date, until the day you wrote that memo,

22   right?

23        MR. BANKS:  Objection, Your Honor.

24   This has been asked and answered.

25        THE COURT:  We'll allow it one last

1    time.

2            THE WITNESS:   I think you said the

3    purpose of the meeting was to memorialize my

4    thoughts; is that it?   The purpose of -- well,

5    again, I'll --

6    BY MR. SALMANSON:

7    Q.   To memorialize all of your concerns about

8    Ms. Speight's performance.

9    A.   The reason why I sat down and wrote the memo

10   was to memorialize my thoughts about the outcome

11   of the May 23rd meeting.

12   Q.   Now, at the time that you wrote the memo, it

13   wasn't for the purpose of handing out any kind

14   of discipline to Ms. Speight, was it?

15   A.   The purpose behind it?

16   Q.   Yes.

17   A.   I think the purpose behind it was to

18   memorialize my thoughts.

19   Q.   And you were going to share those thoughts

20   with Mr. Lipson in Human Resources?

21   A.   I don't know what I would have done,

22   ultimately.   You know, as a rule, I tend to

23   memorialize my thoughts when things happen that

24   are material.

25   Q.   In fact, you forwarded the memo to Human

1    Resources for their input, correct?

2    A.   Eventually I did, yes.

3    Q.   And when you did that, it was prior to what

4    we call -- if I refer to the risk rating e-mail,

5    you'll know what I'm talking about, the May 25th

6    e-mail?

7    A.   Yes.

8    Q.   You forwarded it to Human Resources prior to

9    getting the risk rating e-mail, correct?

10   A.   I believe I did, yes.

11   Q.   All right.  You asked for some feedback from

12   them, correct?

13   A.   Of course.

14   Q.   In fact, you forwarded it to Mr. Fogle?

15   A.   I believe I did, yes.

16   Q.   And Mr. Fogle gave you some feedback,

17   correct?

18   A.   Yes.

19          MR. BANKS:  Can I ask what exhibit is

20   being shown?

21          MR. SALMANSON:  It's your D-20, our

22   P-32.  That was Salmanson.

23          THE WITNESS:  Which one should I look

24   at?

25          MR. SALMANSON:  P-32 is fine.

1        MR. BANKS:  Is it D-21, possibly?

2        MR. SALMANSON:  Your D.

3    BY MR. SALMANSON:

4    Q.  D-20 is actually P-30, so you can take a

5    look at P-30, if you want.

6    A.  P-30?

7    Q.  Yes.

8    A.  P-30 is my memo.

9    Q.  And if you turn to the second page, somebody

10   has stuck in a comment, correct?

11   A.  Yes.

12   Q.  It's comment JCF-1, right?

13   A.  Yes.

14   Q.  And do you know who JCF-1 is?

15   A.  Well, I would assume it's John Fogle.

16   Q.  John Fogle is in Human Resources, right?

17   A.  He was at the time.

18   Q.  In the paragraph, after "You will have to

19   ask them," you wrote, "Today, May 24th, 2006, I

20   received follow-up items from Wanda, as we

21   discussed yesterday; at this time, I'm convinced

22   Wanda is providing this information to portray a

23   sense of cooperation, which simply does not

24   exist."

25        And Mr. Fogle wrote a comment to you

1    and said, "Was the information thorough/not

2    thorough; would just elaborate on why you

3    received the conclusion -- why you reached the

4    conclusion as objectively as possible."

5              Now, let's start with answering

6    Mr. Fogle's question.

7              Was the information that Ms. Speight

8    provided as a follow-up to the meeting thorough

9    or not thorough?

10             MR. BANKS:  Excuse me, Your Honor, I

11   would object.  I don't think that Fogle

12   commented anything about as a follow-up to the

13   meeting.  I think that's a mischaracterization.

14             THE COURT:  The witness can answer if

15   that's his recollection.  All right?

16             MR. BANKS:  Okay.

17   BY MR. SALMANSON:

18   Q.  Let's try and answer that question that

19   Mr. Banks just posed.

20             Was it your understanding when

21   Mr. Fogle wrote, "was this information thorough,

22   or not thorough," the only time you used

23   information in that paragraph in relation to

24   Wanda following up, right?

25             "Today, May 24th, 2006, I received

1   follow-up items from Wanda, as we discussed

2   yesterday; at the time, I'm convinced Wanda is

3   providing this information."

4          Do you agree that "this information"

5   refers to the follow-up items?

6   A.  Yes.

7   Q.  Okay.  So, now, with that understanding, do

8   you believe that the information that

9   Ms. Speight provided to you as a result of the

10  meeting was thorough or not thorough?

11  A.  I have no idea.

12  Q.  Do you recall that she provided a whole

13  bunch of reports to you as a result of the

14  meeting?

15  A.  Yes.  I remember receiving information.

16  Q.  In fact, Ms. Dooley had set out a bunch of

17  action items for Ms. Speight to follow-up on,

18  correct?

19  A.  Yes, I think so.

20  Q.  And those were also reflected in the

21  spreadsheet.  There were little comments that

22  said "Wanda to provide a report," correct?

23  A.  That's my recollection.

24  Q.  Okay.  And were you able to elaborate on why

25  you reached that conclusion as objectively as

1    possible?

2    A.   I think I modified the memo at one point.

3    Q.   If you look at P-33.

4    A.   (Witness complies.)

5    Q.   If you look on the second page, if you can

6    find the same paragraph.

7    A.   Yes.

8    Q.   You wrote, "On May 24th, 2006, I received

9    follow-up items from Wanda, as we had discussed

10   during Tuesday's meeting; at this time, however,

11   I am convinced Wanda is providing this

12   information to portray a sense of cooperation,

13   which, given her demeanor in the meeting, simply

14   does not exist."

15           Correct?

16   A.   Yes, I see that.

17   Q.   And so what you had done was Mr. Fogle asked

18   you for something, as objectively as possible,

19   to put forth your views of why she appeared to

20   just be going through the motions on the day

21   after the meeting, and you referred back to the

22   demeanor of the meeting itself, correct?

23   A.   Yes.

24   Q.   And that was your response to him asking you

25   to set forth, as objectively as possible, why

1   you thought she was going through the motions?

2   A.  I don't know if it was done in response to

3   John Fogle's comment, or if it was just further

4   edits by me.

5   Q.  Okay.  Now, do you recall discussing with

6   Human Resources the contents of this e-mail?

7   A.  Yes.

8   Q.  At that point, you all agreed whatever

9   happened in the May 23rd meeting wasn't going to

10  result in any sort of discipline to Wanda,

11  correct?

12  A.  We agreed it would not result in discipline?

13  Q.  Right.

14  A.  I don't know if we had agreed on that at

15  that point, or not.

16  Q.  At some point you agreed that you should

17  have a sit-down with Wanda, right --

18  A.  Yes.

19  Q.  -- and talk about what happened in the

20  May 23rd meeting, correct?

21  A.  Yes.

22  Q.  And didn't you all agree that that sit-down

23  was not going to be disciplinary in nature?

24  A.  I don't think we agreed to anything at that

25  point.  I think we agreed we had to sit down and

1    talk to her.

2    Q.  Did you think that the meeting would result

3    in her being given any sort of warning?

4    A.  I don't know what I thought at the time.  I

5    was -- I needed to speak to her and understand

6    what was going on.

7    Q.  You wanted to know why she was unhappy?

8    A.  I guess I wanted to know why she was acting

9    the way that she was.

10   Q.  Were her actions in that May 23rd meeting

11   surprising to you?

12   A.  Very.

13   Q.  Was it inconsistent with whatever you knew

14   about Wanda before she joined you?

15   A.  You know, I didn't really know Wanda before

16   she was transferred over to Services.

17   Q.  Did you think to talk to Ms. Berger about

18   whether Wanda had engaged in such behavior back

19   when she was reporting to Ms. Berger?

20   A.  I don't think so.  I don't know.

21   Q.  Did you think to look at her prior

22   performance evaluation to see if this was

23   something that had been a problem in the past?

24   A.  I don't think so.

25   Q.  In fact, prior to her termination, did you

1   ever look at her prior performance evaluations?

2   A.  I don't think I did.

3   Q.  Did you know what kind of ratings she had

4   gotten?

5   A.  No, I did not.

6   Q.  Do you know if she acted inappropriately in

7   this meeting, whether she had ever previously

8   been disciplined for inappropriate activities

9   along these lines in the past?

10  A.  I'm not aware of it.

11  Q.  Did you have discussions with Mr. Fogle

12  about whether this was indicative of prior

13  behavior?

14  A.  I don't think so.

15  Q.  Whatever happened in the May 23rd meeting

16  wasn't enough to merit termination, correct?

17  A.  I don't think -- at that point, I hadn't

18  decided or the decision hadn't been made.

19  Q.  And you weren't asking Human Resources to

20  have Ms. Speight terminated as a result of what

21  happened in the May 23rd meeting?

22  A.  No.

23  Q.  Let's actually talk about this.  We have

24  sort of been dancing around it.

25          What exactly happened in the May 23rd

1    meeting that set off the alarms?  And I want to

2    focus on what Ms. Speight said that got you

3    upset.  My understanding is that there were

4    basically two sets of comments.

5            Let's deal with -- do you recall you

6    had discussions with her about the morale of her

7    group?

8    A.  I do.

9    Q.  And her response was, "You have to ask

10   them."

11   A.  That's correct.

12   Q.  And did you think that was inappropriate?

13   A.  Yes.

14   Q.  Why?

15   A.  Well, looking back, she had forwarded me the

16   e-mail about Chuck Mathews.  I was asking -- I

17   was asking the manager of a department whether

18   or not there were morale issues in that

19   department.

20           And again, I'm still surprised, as I

21   sit here today, at the comment that I would have

22   to ask them.

23   Q.  Well, she had suggested to you or put you on

24   notice that there had been morale issues in the

25   department related to the resignations, right,

1    as we saw in the earlier e-mail?  She forwarded

2    Mr. Nienas' e-mail.

3    A.   I'm sorry.  I would say she forwarded an

4    e-mail to me.  She and I -- at that point, I

5    don't believe we had ever spoken about it.

6             And I was -- you know, as a manager, I

7    was curious, concerned.  It was a legitimate

8    question on my behalf.

9    Q.   And she had multiple discussions with you

10   about morale in her department in the past,

11   correct?

12   A.   I don't know that we had.

13   Q.   You don't recall that she specifically asked

14   you to address her group in order to enhance

15   morale?

16   A.   I think the context of that discussion was

17   they didn't know who I was, and it was

18   appropriate that I would spend some time with

19   them, so we had those meetings.

20   Q.   And part of that was to make them feel

21   comfortable with the transition?

22   A.   Yes.  I would make a distinction between

23   comfort with transition to morale, though.

24   Q.   Do you recall Ms. Speight specifically told

25   you that Mr. Mathews' resignation came as a

1    surprise to her?

2    A.  I don't know if I recall that or not.  I'm

3    sure it did.

4    Q.  You're sure that it was a surprise to her?

5    A.  I would think so, yes.

6    Q.  If she thought that Mr. Mathews had been

7    happy and then got this resignation, would it be

8    fair to say that maybe she was concerned that

9    she didn't know actually what the morale was of

10   her department?

11           MR. BANKS:  Objection, Your Honor.  I

12   think it calls for speculation as to Ms.

13   Speight's state of mind.

14           THE COURT:  Overruled.  I think there's

15   some ability to answer this.

16           Do you know?

17           THE WITNESS:  Can I just have the

18   question again?

19   BY MR. SALMANSON:

20   Q.  Sure.  I'm not sure I can give it to you.

21           (Whereupon, the court reporter read

22   back the last question.)

23           THE WITNESS:  I guess I have a couple

24   thoughts about that.

25           People resign for a lot of different

1   reasons.  It's not always because they are

2   unhappy.

3           And then if it did come as a surprise

4   to her, I would have expected that she would

5   have reached out to her department to gain an

6   understanding of whether or not there was an

7   issue.

8           So for her to respond to me in the way

9   that she did was surprising.

10  BY MR. SALMANSON:

11  Q.  Well, if at that moment that you asked the

12  question, how's the morale in your department,

13  she felt like she didn't have a handle on it,

14  wouldn't it have been appropriate for her to

15  say, "I don't know.  You're going to have to ask

16  them"?

17  A.  No, I don't think that would be appropriate.

18  Q.  Because she should know?

19  A.  Well, I would say as the manager of the

20  department, she would either know or take

21  responsibility to get an understanding of it,

22  not just I don't know and I don't care.

23  Q.  No, she didn't say "I don't care," did she?

24  A.  No, but you're asking for my opinion.

25  Q.  Right.  No, but the question is, if she

1    didn't know, the response was, "I don't know.

2    You'll have to ask."  Right?

3           She didn't say, I don't care what the

4    morale is, right?

5    A.  That was her response, yes.

6    Q.  "I don't know.  You'll have to ask."

7    Correct?  And if she didn't know, that's a fair

8    response, right?

9    A.  No, I don't think it is.

10   Q.  Do you know whether she knew what the morale

11   was of her department?

12   A.  No.  That's why I asked if there were any

13   morale issues.

14   Q.  Do you think she was being insubordinate

15   when she said "I don't know"?

16   A.  When she said "I don't know," no, I would

17   say probably not.

18           "You'll have to ask them," yes, I would

19   say she should have.

20   Q.  Why do you think that is insubordinate?

21   A.  Again, the way I received that comment was

22   that I don't know and I don't care.  If you want

23   to know, go and ask them yourself.

24   Q.  So you inferred from what she was saying, I

25   don't know, I don't care?

1    A.  Yes.  The language and the body language, if

2    you will.

3    Q.  I want to be very clear.  She never said I

4    don't know and I don't care to you?

5    A.  That's correct.  Not that I recall.

6    Q.  Now, the other comment that she made was

7    that at some point you asked for her opinion

8    about a particular task, correct?

9    A.  Yes.

10   Q.  And her response was allegedly something

11   along the lines, "My opinion doesn't count,"

12   correct?

13   A.  Yes.

14   Q.  And what was your response when she said

15   that?

16   A.  I don't know if I had a direct response to

17   that comment.

18   Q.  Do you recall whether you followed up in any

19   way to try to convince Ms. Speight that her

20   opinion did, in fact, count?

21   A.  Well, I just asked her her opinion, so I

22   would think that that would indicate that I did.

23   I wanted to know what that was.

24          There were -- so I don't know.

25   Q.  You don't recall whether you tried to

1    encourage Ms. Speight after she made the comment

2    to say, "Ms. Speight, you're opinion does count.

3    Please let me know.  What are you thinking?"

4    A.   I don't recall that.

5    Q.   Do you recall any time after May 23rd saying

6    to her, "I want you to know I value your

7    opinion, and I would appreciate it if you share

8    it with me?"

9    A.   Specifically that, no, I don't remember

10   that.

11   Q.   Was it part of your intent, when you set up

12   the meeting to discuss the May 23rd meeting with

13   Human Resources, to let Ms. Speight know that

14   her opinion was going to be valued going

15   forward?

16   A.   Yeah, that I -- I'm reading the thing here,

17   too, and I recall saying or at least thinking

18   that we believe in her abilities, and that's why

19   we had offered her the position to begin with.

20   Q.   And as part of believing in her abilities,

21   you were looking to her opinion and you hoped to

22   value it, correct?

23   A.   Yes.

24   Q.   Now, one of the things that you discussed

25   was the possibility of Ms. Speight, instead of

1    reporting to you, reporting to Mr. Finkenstaedt,

2    correct?

3    A.  Yes, that's correct.

4    Q.  You had those discussions with HR?

5    A.  Yes, I believe I did.

6    Q.  What was your thought process in terms of

7    having her report to Mr. Finkenstaedt instead of

8    to you?

9    A.  Ned was -- well, to say he had more time

10   wouldn't be accurate.  He was busy, too.  We

11   were all busy.

12          I think gaining the level of

13   understanding that I had, I believe that Wanda

14   and her group needed closer supervision than I

15   was probably capable of doing, so I wanted her

16   to have the availability to work with Ned.

17   Q.  And eventually Mr. Fogle convinced you that

18   that was not a good idea, correct?

19   A.  Yes.

20   Q.  And do you recall what his rationale was?

21   A.  No, I don't.

22          MR. SALMANSON:  Your Honor, we'll be

23   moving into the risk rating e-mail.  I don't

24   know if you want to break or go into that topic.

25          THE COURT:  We'll take our lunch break

1    now, and we'll pick up this afternoon.

2          Lady and gentlemen, we're going to

3    adjourn for lunch now.  We'll be in recess until

4    1:30.

5          Please do not talk about the case among

6    yourselves or with others.

7          Enjoy your lunch today.

8          You're excused.

9          (Luncheon recess was held at

10   12:30 p.m.)

11         (The Court resumed the proceedings at

12   1:30 p.m., at which time the jury entered the

13   courtroom.)

14         THE COURT:  Good afternoon, lady and

15   gentlemen.

16         You may proceed, counsel.

17   BY MR. SALMANSON:

18   Q.  I want to make sure that I clarify two

19   things from your testimony this morning before

20   we move on to the risk rating memo.

21         You testified that the concerns you

22   were starting to have started to manifest

23   themselves after that May 12th meeting or

24   whatever the date of that meeting was, correct,

25   from May 12th to May 23rd?

1   A.  Yes, it was in that time frame.

2   Q.  And during that time frame, you said that

3   you had a number of meetings and interactions

4   with Ms. Speight that manifested in which those

5   concerns started to manifest themselves?

6   A.  Yes, I believe so.

7   Q.  Can you estimate for me how many meetings

8   you think you had in that time period?

9   A.  I don't know if I could.

10          Meetings or interactions?

11  Q.  Let's say interactions.

12  A.  Many.

13  Q.  Several a day or daily?

14  A.  No.  It would probably be maybe one or two a

15  day, that's all.

16  Q.  And you generally didn't interact with her

17  on the weekends, did you?

18  A.  No.

19  Q.  And do you recall between May 12th and

20  May 23rd, whether you were interacting in person

21  or on the phone?

22  A.  I believe it would have been both.

23  Q.  Do you have a sense of whether the in-person

24  interactions or the telephonic interactions were

25  giving you the increased concern, or both?

1    A.   I would say both.

2    Q.   Do you recall how many in-person

3    interactions you had with her between May 12th

4    and May 23rd?

5    A.   No, I don't.

6    Q.   Do you recall whether you even had any?

7    A.   I can't recall any meetings.   I know we had

8    been speaking frequently at that point.

9    Q.   Turn your attention to P-15.

10   A.   (Witness complies.)

11   Q.   Do you recall that May 12th was a Friday,

12   correct?

13   A.   Yes.   I see that on the memo.

14   Q.   So that was the date that you had the

15   meeting with Ms. Speight.

16          You didn't talk to Ms. Speight, as far

17   as you know, over the weekend?   You didn't

18   typically do that?

19   A.   I don't think I would have.

20   Q.   Do you recognize the document that's set

21   forth in P-15?

22   A.   Yes.   This is a schedule that's prepared

23   often.

24   Q.   And, in particular, this schedule shows your

25   schedule from May 15th to May 26th, correct?

1   A.  Yes.

2   Q.  So May 15th, Monday, the first working day

3   that you had to interact with Ms. Speight, you

4   were in the office that day, correct, according

5   to this calendar?

6   A.  According to the schedule, yes, I was

7   scheduled to be in the office that day.

8   Q.  And on May 16th there's a plus sign.

9        Do you know what that means?

10  A.  Yes.  That would indicate the previous cell

11  or office.  That I was in the office, yes.

12  Q.  So you were in the office on Monday,

13  Tuesday, and Wednesday, so you had three days to

14  interact with Ms. Speight on those dates,

15  correct?

16  A.  Yes.

17  Q.  But then until May 23rd, you didn't have the

18  opportunity to interact with her again, did you?

19  A.  No, I don't agree with that.

20  Q.  Well, what does the calendar say for

21  May 18th?

22  A.  The schedule says that it's "PTO."

23  Q.  That stands for paid time off?

24  A.  Correct.

25  Q.  You were, in fact, on paid time off on

1    Thursday, May 18th, correct?

2    A.  I have no idea whether I was or wasn't.

3    Q.  Do you have any reason to believe that you

4    were not on paid time off on that day?

5    A.  Very often I schedule time off, but I'm not

6    able to take it, so I have no idea if I was in

7    that day or not.

8    Q.  The next day it also shows you being on paid

9    time off, right?

10   A.  Correct.

11   Q.  So that would be Friday.  In fact, it

12   continued until Monday, May 22nd, on paid time

13   off, right?

14   A.  On the schedule, yes.

15   Q.  You didn't return to the office until

16   May 23rd, the day of the May 23rd meeting,

17   according to the schedule, correct?

18   A.  Yes.

19   Q.  And do you agree with me that when you're on

20   paid time off, you try to honor that time and

21   not do business things?

22   A.  No.

23   Q.  Do you recall what your view was in terms

24   of -- or what you had planned to do in May of

25   2006 with your paid time off?

1    A.  I have no recollection.

2    Q.  Do you recall having any discussions with

3    Ms. Speight about the fact that you were going

4    to be out of the office for several days leading

5    up to the May 23rd meeting?

6    A.  I don't know.

7    Q.  The only other question is, In the May 23rd

8    meeting, it was you and Speight,

9    Mr. Finkenstaedt, and Ms. Dooley.

10           I'll represent to you -- and it's in

11   Mr. Finkenstaedt's deposition on Page 51.

12   A.  Page 51?

13   Q.  Yes.  It's Mr. Finkenstaedt's deposition.

14   I'll give the counsel the line.

15           MR. SALMANSON:  It's actually starting

16   on Page 50, leading into Page 51.

17   BY MR. SALMANSON:

18   Q.  There was a discussion about his

19   recollection of the interaction between you and

20   Wanda at the meeting.

21           And he says, "After she made the

22   comment" --

23           MR. BANKS:  Objection.  I don't think

24   there's a basis to read another witness'

25   testimony.

1          MR. SALMANSON:  I'm trying to refresh

2     his recollection, Your Honor.

3          THE COURT:  How are you refreshing his

4     recollection as to the testimony?

5          MR. SALMANSON:  Mr. Finkenstaedt

6     testified as to something that he recalled

7     Mr. McCool saying in reaction to the meeting,

8     and I just want to see if that refreshes his

9     recollection.

10          THE COURT:  I'm going to overrule your

11     objection.  It's premature.  We haven't heard

12     the question yet.

13          Proceed with your question.

14          And hold off answering it, until I have

15     ruled on it.

16          THE WITNESS:  Okay.

17     BY MR. SALMANSON:

18     Q.  The leading was that Mr. Finkenstaedt

19     described you requesting solicitor

20     recommendation from Wanda -- I'm sorry, it's --

21     we're now on Page 50 at the bottom, Line 21.  I

22     say,

23          "Q.  And if you could describe what you

24     recall.

25          "A.  I recall that there was -- I

1  generally recall that there was a discussion

2  about business practices and overlaps in

3  functional responsibilities and I recall

4  Mr. McCool soliciting recommendations.

5          "I recall Mr. -- I recall Mark

6  requesting -- soliciting a recommendation from

7  Wanda as to her opinion on a practice.  I don't

8  recall what practice it was, and I recall her

9  response, something to the effect of, her

10 opinion -- she felt her opinion didn't matter,

11 and that management was going to do whatever

12 they wanted anyway."

13         And then I asked,

14         "Q.  Okay.  And what happened next?"

15         And then, Your Honor, he says what

16 Mr. McCool's response was, and that's what I

17 would like to refresh his recollection on.

18         THE COURT:  So you want to ask the

19 question, Did you say this at this particular

20 time?

21         MR. SALMANSON:  Right.  Or does this

22 help refresh your recollection that you said

23 this?

24         MR. BANKS:  I'll withdraw the objection

25 as to the next answer, Your Honor.

1          THE COURT:  Very well.

2     BY MR. SALMANSON:

3     Q.  So I say,

4          "Q.  Okay.  And what happened next?"

5          Actually, it was my colleague, Ms. Ire.

6          His response was,

7          "A.  I recall that there was, you know,

8     an effort on Mark's part, Mark McCool's part, to

9     say that that wasn't the case."

10         As you sit here today, do you recall

11    whether you tried to convince Ms. Speight in the

12    meeting that that wasn't the case, and that you

13    did, in fact, want her opinion?

14         And if you don't recall --

15    A.  I think that I said earlier that I did want

16    her opinion, which is why I asked the question

17    to begin with.  But I don't remember pressing

18    her on it.

19    Q.  So you don't recall one way or the other

20    whether you responded to her comment or not?

21    A.  No, I don't.

22    Q.  I want to turn your attention to P-3.

23    A.  (Witness complies.)

24    Q.  Now, P-3 is something captioned "Defendant

25    Capmark Finance, Inc.'s Supplemental Answers and

1    Objections to Plaintiff's First Set of

2    Interrogatories."

3              MR. SALMANSON:  Your Honor, I don't

4    know whether it's appropriate to tell the jury

5    what Interrogatories are or --

6              THE COURT:  Is that your request?

7              MR. SALMANSON:  Yes, please.

8              THE COURT:  Very well.  Lady and

9    gentlemen, the particular document is an

10   Interrogatory.

11             An Interrogatory is a form or a

12   question that is presented to the opposing side

13   for their response or statement in relation to

14   the question that's contained in that

15   Interrogatory.  These are affirmed or sworn to

16   as their position or their response to the

17   question that is posed in the Interrogatories.

18             The plaintiff sends theirs to the

19   defendant, and the defendant then in return

20   sends theirs to the plaintiff for responses to

21   particular questions and aspects of the

22   discovery process in the case as it's beginning,

23   at the very outset of the case, so that they

24   know where to pursue their discovery in the

25   case.

1          Anything additional?

2          MR. SALMANSON:  Your Honor, thank you

3   very much.

4          THE COURT:  You're welcome.

5   BY MR. SALMANSON:

6   Q.  If you could turn to Page 2 of the

7   Interrogatories.

8   A.  (Witness complies.)

9   Q.  The first question that we asked of Capmark

10  was to, "Please describe in detail each and

11  every legitimate non-discriminatory reason that

12  you contend motivated the termination of

13  Ms. Speight."

14          The objections and answer, although

15  there isn't really any objection, is,

16  "Ms. Speight's employment was terminated because

17  of her unprofessional, uncooperative, and

18  disrespectful conduct."

19          Do you agree with that statement?

20  A.  Yes, I do.

21  Q.  And when I asked you in your deposition

22  about all of the ways in which she was

23  unprofessional, uncooperative, and

24  disrespectful, you only pointed to her conduct

25  in the May 23rd meeting and the May 26th risk

1  rating e-mail, correct?

2  A.  I believe so, yes.

3  Q.  So as far as you know, those are the only

4  two ways in which she was unprofessional,

5  uncooperative and disrespectful, which were the

6  only factors that led to her termination?

7  A.  Yes.

8  Q.  So you would agree with me that whatever

9  concerns you allegedly had between May 12th and

10 May 23rd had nothing to do with the reasons for

11 her termination, as far as you knew?

12 A.  I think the manner in which she was

13 exhibiting her disinterest was all leading up to

14 her demeanor in the May 23rd meeting, so you

15 think it's all part of it.

16        So I don't know that I agree with your

17 statement.

18 Q.  Well, I asked you, let's go to your

19 deposition.  Look at Pages 42 to 44 of your

20 deposition.  You can read it as a whole.

21        I asked you to tell me all the ways in

22 which you thought that Ms. Speight was

23 unprofessional, uncooperative and disrespectful.

24 A.  Okay.

25 Q.  Why don't you take the time to read that.

1    A.   (Witness complies.)

2             MR. BANKS:   Is it those three pages in

3    their entirety?

4             MR. SALMANSON:    I think to be fair

5    and to give them a full context, he should read

6    all three pages.

7             MR. BANKS:   Very well.

8             THE WITNESS:   I'm sorry.   Out loud or

9    to myself?

10            MR. SALMANSON:   No, to yourself.   Tell

11   me when you're ready.

12            (Pause.)

13            THE WITNESS:   Okay.

14   BY MR. SALMANSON:

15   Q.   Would you agree with me that in that

16   testimony overall you could only point to things

17   that happened in the May 23rd meeting and the

18   May 26th risk rating as being unprofessional,

19   uncooperative, or disrespectful?

20   A.   Yes, I would agree with that.

21   Q.   Now, let's turn to the May 25th risk rating.

22   A.   (Witness complies.)

23   Q.   Actually, before I do that, I want to read

24   you Capmark's counsel's, Mr. Banks's parts of

25   his opening statement because he said some

1    things in there which I think you can comment

2    on.

3         He says, "Although she had already

4    commented in e-mails about" --

5         MR. BANKS:  Can I get a page number,

6    please?

7         MR. SALMANSON:  Sure, Page 8.

8         MR. BANKS:  Thank you.

9         MR. SALMANSON:  Line 18.

10   BY MR. SALMANSON:

11   Q.  Mr. Banks said, "Well, although she had

12   already commented in e-mails about knowing that

13   people in her group were not unhappy, not to

14   McCool" --

15        MR. BANKS:  Excuse me, Mr. Salmanson?

16        MR. SALMANSON:  Yes?

17        MR. BANKS:  Page 8 on my copy is Judge

18   Joyner's preliminary comments.

19        MR. SALMANSON:  This is just your

20   opening.

21        MR. BANKS:  Oh, so you don't know where

22   it comes in at.

23        MR. SALMANSON:  Do you just want to

24   read along?

25        MR. BANKS:  Just bear with me for a

1    minute.  If I could look for a moment.

2              THE COURT:  Sure.

3              MR. BANKS:  Just show me where you're

4    going to read from.

5    BY MR. SALMANSON:

6    Q.  Mr. Banks told the jury, "Although she had

7    already commented in e-mails about knowing that

8    the people in her group are not unhappy" -- I'm

9    sorry -- "that the people in her group were" --

10   he said "not unhappy," but I think he meant to

11   say "were unhappy" --  "not to Mr. McCool, but

12   to others, she just said to Mr. McCool, I don't

13   know."

14             Now, that's not completely accurate,

15   right, because she did forward the e-mail to you

16   from Mr. Nienas suggesting that the group's

17   morale was low as a result of Mr. Mathews'

18   resignation, correct?

19   A.  The e-mail that -- part of that e-mail

20   string?  The comment that -- you know, I think

21   that was part of the e-mail.  I don't know why

22   she forwarded the e-mail, other than to deliver

23   the e-mail to me, but, yeah.

24   Q.  So she had informed you, at least once by

25   e-mail, that her group was unhappy?

1   A.  I don't know if I would say it that way.

2   Q.  Okay.  The other thing is that this morning

3   you were talking about the purpose of getting HR

4   involved.

5           And he said, "After the May 23rd

6   meeting, so, as Mr. McCool will tell you and all

7   the evidence will show, there was no plan to

8   terminate her, there was no plan to discipline

9   her.  He did the right thing.  He went to the

10  Human Resources organization and he said, come

11  help me.  Help me.  Come talk to Ms. Speight so

12  that she can be a valuable member of our team,

13  so that she can lead her group in bringing these

14  departments together and earn what we are paying

15  her."

16          This morning I asked you whether you

17  thought the intent of going to HR was not for

18  discipline, and you said that you hadn't made

19  that determination yet, right?

20  A.  Yes, I believe that's what I said.

21  Q.  So do you disagree with the characterization

22  in any way of what Mr. Banks said?

23  A.  Not at all, no.  It's more eloquent than I

24  would be, but, you know.

25  Q.  Okay.

1              Now, prior to May 25th, had you had

2    discussions about the Canadian loan portfolio

3    with Ms. Speight?

4    A.  I don't remember if I had discussions with

5    her or not about that portfolio.

6              Again, we were talking all the time

7    about a lot of different things.

8    Q.  Do you recall whether prior to May 25th you

9    had been made aware that Mr. Lauerman had

10   offered a helping hand specifically with the

11   Canadian loan portfolio?

12   A.  Yes.  I recall e-mails about that.

13   Q.  So was it your understanding that, at least

14   at some point, Ms. Speight had arranged with

15   Mr. Lauerman to have his people asset-manage the

16   Canadian loan portfolio?

17   A.  Okay.  Whether Mr. Lauerman had arranged for

18   his employees to asset-manage?

19   Q.  No, whether Ms. Speight had arranged with

20   Mr. Lauerman to have Mr. Lauerman's people

21   asset-manage part or all of the Canadian loan

22   portfolio?

23   A.  I recall there being discussion, but the

24   asset management of that portfolio would have

25   been in Wanda's group's responsibilities.

1    Q.  And you agreed with me that asset management

2    and risk ratings go hand in hand?

3    A.  Risk ratings are part of the asset

4    management process.

5    Q.  And so are you saying that you didn't know

6    that Mr. Lauerman and Ms. Speight were working

7    together to have some of the Asset Management

8    responsibilities handled by Mr. Lauerman, as

9    opposed to Ms. Speight's group?

10   A.  No.

11   Q.  No, you weren't aware?

12   A.  No, I'm not saying that.

13   Q.  Oh, okay.

14   A.  I thought I just said that I was aware that

15   there were conversations going on.

16   Q.  And aside from those conversations, did you

17   know whether any assignments had been made?

18   A.  I don't know.

19   Q.  Do you recall whether you knew that some of

20   the SPG loan orphan portfolio had been assigned

21   to Mr. Lauerman's group?

22   A.  I know that was part of the discussion, but

23   I don't know at what stage they were at, at that

24   time.

25   Q.  During those discussions, you never said to

1    Ms. Speight, Wait a minute, you can't give this

2    over to Mr. Lauerman.   Right?

3    A.   I don't know at what time I became aware of

4    discussions.

5    Q.   Regardless of when you became aware of it,

6    prior to May 25th, you never said to anybody,

7    No, I want Ms. Speight to be handling all of

8    those?

9    A.   Well, I believe that's what we were talking

10   about in the meetings that we were having.   I

11   don't know what other conversations were

12   occurring, but, during the meetings that I was

13   in, that was part of the topic.

14   Q.   And part of the topic was that Ms. Speight

15   was shorthanded with her asset managers, right?

16   A.   That would have been part of the

17   conversation.

18   Q.   And do you recall whether you were CC'd on

19   any e-mails having Mr. Lauerman's group doing

20   the Asset Management functions for some of her

21   portfolio?

22   A.   I believe I was CC'd on some e-mails, yes.

23   Q.   Those e-mails went back as far as April,

24   right?

25   A.   E-mails, with respect to --

1    Q.  Assignment of some Asset Management

2    functions to Mr. Lauerman.

3    A.  Yep, yes.

4    Q.  And from whenever in April, those first

5    e-mails you were kept in the loop on that, until

6    at least May 23rd, you never said, I don't want

7    Mr. Lauerman's group doing that.  I want you to

8    do that?

9    A.  I don't know if I really follow your

10   question.

11   Q.  Well, you were being kept in the loop that

12   there were discussions going back and forth

13   about assigning some of the stuff to

14   Mr. Lauerman, right, or at least to his people?

15   A.  I was certainly copied on some e-mails.  I

16   don't know if I was copied on all e-mails or

17   not.

18   Q.  So you knew some of these assignments were

19   potentially going to Mr. Lauerman's group and

20   until May 23rd, at least, you didn't say, bad

21   idea, don't do it, these are yours, right?

22   A.  I don't know if I agree with that.  I mean,

23   they are not in e-mails, but we were certainly

24   talking about all of the assignments in the

25   meetings that we were having.

1  Q.  Can you point me to any e-mail in which

2  Ms. Speight was saying to you, Mr. Lauerman is

3  lending out a helping hand, and I don't think

4  that we should do that?

5  A.  I don't know that I can.

6  Q.  As you sit here today, can you recall any

7  conversation where you told Ms. Speight, Mr.

8  Lauerman shouldn't be doing this?

9  A.  I don't know how I can put it differently

10  for you.  I know we were talking about this

11  topic during our meetings.  I don't know whether

12  I ever told Wanda, Ms. Speight, that I don't

13  want Tony Lauerman working on this.  I don't

14  know.

15  Q.  You can't recall telling Mr. Lauerman, I

16  don't want you working on this, right?

17          THE WITNESS:  Can you read that back to

18  me, please?

19  BY MR. SALMANSON:

20  Q.  Actually, let me step back.

21          Mr. Lauerman didn't report to you,

22  right?

23  A.  No, he did not.

24  Q.  He reported to Mr. Carp, correct?

25  A.  I believe so, at the time, yes.

1    Q.  So you didn't tell Mr. Lauerman, I don't

2    want you working on part of Wanda's portfolio,

3    right?

4    A.  No, I wouldn't have.

5    Q.  You would have talked to Mr. Carp, right, if

6    you were going to talk to anybody?

7    A.  I would assume.

8    Q.  And do you recall, as you sit here today,

9    having any discussions with Mr. Carp about

10   Ms. Speight inappropriately assigning those

11   portfolios to Mr. Lauerman's group?

12   A.  No.

13   Q.  So the first time that Ms. Speight would

14   have learned that you didn't want Mr. Lauerman's

15   group doing the risk ratings was on May 25th,

16   when you put it in the e-mail, right?

17   A.  No, I do not agree with that.

18   Q.  Because you think you told her on May 23rd?

19   A.  The assignment of responsibilities was being

20   discussed for several weeks.

21   Q.  Right.  And no final decisions had been

22   made, right?

23   A.  No, no final decisions had been made.

24   Q.  So you couldn't have possibly told her that

25   the decision would have been made not to let the

1    risk ratings for the SPG portfolio or the

2    Canadian portfolio go to Mr. Lauerman's group,

3    if you hadn't made any decisions yet, right?

4    A.  You know, I don't think that's an accurate

5    reflection of what we were discussing in the

6    meetings.

7    Q.  I don't understand, quite frankly,

8    Mr. McCool.  You never told her before you sent

9    the e-mail on May 25th?  It's a real simple

10   question, I don't think it's appropriate for

11   you, Ms. Speight, to assign the risk ratings and

12   the Asset Management to Mr. Lauerman's group.

13   A.  If you would phrase that question that I

14   never put it in an e-mail, I would agree with

15   you.  I don't agree with it.

16   Q.  You don't specifically recall telling her

17   either, right?

18   A.  As I sit here today, I don't specifically

19   recall having that conversation.  But part of

20   the discussions that we were having was who was

21   going to do what work.  The Asset Management

22   group's responsible for risk ratings.  They

23   always have been.  There's no intention to

24   change that.

25   Q.  You made that clear in the May 23rd meeting,

1   right?

2   A.  I believe that was made clear all along.

3   Q.  Including the May 23rd meeting?

4   A.  It would have been part of the meeting as

5   well.

6   Q.  So you would have made it clear on May 23rd;

7   that all the Asset Management responsibilities

8   belonged to Ms. Speight's group, and none of it

9   should go to Real Estate Solutions, right?

10  A.  I don't think I agree with that distinction.

11  Part of the meetings that we were having was

12  identifying the specific functions that would go

13  to Real Estate Solutions or stay with Asset

14  Management.  Financial statements would be done

15  by our Financial Statements Group.

16          So all of that was being discussed, and

17  we continued to discuss it at a granular level

18  on May 23rd.

19  Q.  I want to focus specifically on risk

20  ratings, not anything else.

21  A.  Okay.

22  Q.  May 23rd meeting, you believed that you said

23  in the May 23rd meeting that risk ratings would

24  only be done by Ms. Speight's group.

25  A.  I don't think I testified that I said that.

1    Q.   I'm asking you now.

2    A.   I don't remember what I said in that meeting

3    exactly.  I don't.  Sorry.

4    Q.   Is it possible that, as of the May 23rd

5    meeting, you were still okay with the idea that

6    risk ratings could be done either by Real Estate

7    Solutions or by Asset Management?

8    A.   No, I wouldn't.

9    Q.   So if somebody walked away from that meeting

10   with that impression, there was clearly a

11   communications breakdown?

12   A.   I don't know what it would have been.

13   Q.   Oh.  A misunderstanding between you and the

14   recipient?

15   A.   A misunderstanding, or, you know, a refusal

16   to accept.  I don't know what it is.

17   Q.   Could it have been a refusal to accept if

18   they thought that Asset Management could be done

19   by Real Estate Solutions or by Wanda's group?

20   A.   Well, you're speaking about the risk ratings

21   only, right?

22   Q.   Yes, risk ratings only.

23   A.   So the risk ratings are performed by Asset

24   Management.  That's a very clear standard.

25   Q.   So anybody who thought otherwise was either

1    not listening or being insubordinate?

2    A.   In the May 23rd meeting or after?

3    Q.   After.  If they walked away from that

4    May 23rd meeting with the thought that the risk

5    ratings could be done either by Wanda's group or

6    Real Estate Solutions, they either weren't

7    paying attention in the May 23rd meeting or they

8    were being insubordinate.

9         Is that what you're saying?

10   A.   No.  I would not say that failure to

11   understand something was insubordinate.

12   Q.   Okay.  So if Ms. Speight walked out of that

13   meeting without understanding that, what the

14   direction of your sentiment was, was that she

15   wasn't being insubordinate?

16   A.   No.  I would say that she would not be

17   insubordinate.

18   Q.   If you could take a look at D-23.

19   A.   D-23?

20   Q.   Yes.

21   A.   Okay.

22   Q.   Now, this is an e-mail from Mr. Lauerman to

23   Justin Snarponis, Edward Schmon, John Kipping,

24   and CCs to Stacy Ciarlanti, Michael Carp, and

25   Wanda Speight, and the subject is "Canadian

1    Loans."

2          I don't want to be standing there

3    reading it all.  Can you just read it out loud

4    to the jury, please?

5    A.   The e-mail itself?

6    Q.   Yes.

7    A.   "My understanding is that all these loans

8    which have been funded are on McCracken, and

9    have been assigned a CRM in Canada.  Since they

10   are performing loans, effective today we will

11   not be managing these loans.  The assigned CRM

12   will handle the day-to-day management of these

13   loans, including all borrower interaction.  If

14   special requests arise, extensions, assumptions,

15   major leases, et cetera, for which our expertise

16   is required, we can review and respond as

17   needed.  Thanks.  Justin and Ed, please forward

18   this to the CRMs listed on McCracken for these

19   loans.  Thanks."

20   Q.   Now, Mr. Lauerman is saying that "effective

21   today, we're no longer going to be managing

22   these loans," correct?

23   A.   That's what the e-mail says.

24   Q.   And would you agree with me that that

25   suggests that prior to today Mr. Lauerman's

1   group had been managing those loans?

2   A.   I guess that's implied.

3   Q.   And, again, just to be clear, the management

4   of the loans would include the risk ratings of

5   the loans, correct?

6   A.   No, I don't think so.

7   Q.   I thought you testified this morning that

8   Asset Management and risk rating went hand in

9   hand?

10   A.   I think you're taking that out of context.

11   I think managing the loans is the Real Estate

12   Solutions' -- is -- the loans would be in danger

13   of defaulting so they required more

14   hand-holding, but the Asset Management group

15   would still have interaction with those

16   particular loans.

17   Q.   Okay.   That's the way you interpreted the

18   e-mail?

19   A.   Yes.

20   Q.   Do you know whether, in fact, Wanda's group

21   had been asset-managing the loans in any way

22   since Mr. Suri's departure?

23   A.   No, I don't.

24   Q.   Do you know whether Mr. Lauerman had

25   actually trained or agreed to have some of his

1    people trained to do the risk ratings on those

2    loans when he was assigned to asset-manage the

3    loans?

4    A.  No, I don't.

5    Q.  Before we go to the next page, do you know

6    why this reassignment or how this reassignment

7    occurred?

8    A.  What do you mean by "reassignment"?

9    Q.  Well, it appears that effective today, those

10   people are no longer asset-managing the loans,

11   right?  Do you know why, as of May 22nd, the

12   loans -- why the loans were being reassigned?

13   A.  Well, the e-mails of their understanding is

14   that the loans are being reassigned, so I don't

15   know what went into Mr. Lauerman's thoughts.

16   Q.  I guess you anticipated my next question.

17           Do you know who made the decision to

18   have the loans reassigned?  It wasn't your

19   decision, right, as far as you recall?

20   A.  I don't remember.  This is a smaller

21   portfolio that was part of a larger transition.

22   Q.  So you don't recall what was the triggering

23   event that led to this first e-mail?

24   A.  No, I don't.

25   Q.  You don't recall prior to this e-mail going

1     out and saying to Ms. Speight, we decided that

2     you're going to get the asset management of the

3     loans back, do you?

4     A.   No.

5     Q.   If we can read up the e-mail chain.   There's

6     an e-mail from Mr. Nienas.

7          Do you know who he is?

8     A.   I do.

9     Q.   And he was one of Ms. Speight's team

10    leaders, correct?

11    A.   Correct.

12    Q.   Can you read the substance of the e-mail to

13    the jury?

14    A.   "Maureen, it appears from the following

15    e-mail correspondence that Asset Management

16    responsibilities for the Canadian portfolio have

17    been reassigned to the CRM in Canada.   With risk

18    ratings for the second quarter quickly

19    approaching, the Canadian team will need to be

20    trained on the methodology for using the risk

21    rating model and determining the inputs.   I have

22    copied the CRMs in Canada who handle the PLG

23    Canada assets.   Thanks, Don."

24    Q.   Now, are there parts of that e-mail that you

25    don't agree with?

1   A.   I would say, yes.

2   Q.   And am I right that the part that you don't

3   agree with is that Mr. Nienas seems to be making

4   an assumption that the risk ratings are going

5   hand in hand with the Asset Management

6   responsibilities, correct?

7   A.   Well, I would say that I disagree that the

8   Asset Management responsibilities were

9   reassigned to the CRM.  I would disagree with

10  that right from the beginning.

11  Q.   And do you know whether Ms. Speight shared

12  that disagreement?

13  A.   With whom?

14  Q.   Well, shared that view, that the risk rating

15  should be assigned to CRMs in Canada?

16  A.   I don't know.

17  Q.   Just before we go on, I just want to go

18  back, if you can take a look at P-11, and tell

19  me when you have had a chance to review it.

20  A.   Okay.

21  Q.   Now, as I understood what you testified to a

22  couple minutes ago, you thought that all along

23  that the risk ratings, no matter who is

24  asset-managing these various loans, the risk

25  ratings always belonged with Wanda's group,

Case 2:07-cv-00890-JCJ   Document 56   Filed 03/25/09   Page 171 of 263

1    correct?

2    A.   With the Asset Management Group.

3    Q.   Now, P-11 relates to risk ratings, right?

4    It includes talking about the risk ratings for

5    the orphan loan portfolio, correct?

6    A.   Correct.

7    Q.   And it's your view that those risk ratings,

8    even if they were being asset-managed by Real

9    Estate Solutions, should have been done by

10   Wanda's group, the Asset Management Group,

11   correct?

12   A.   The process is managed by Asset Management.

13   Other parties may contribute to the process, but

14   the process is the responsibility of Asset

15   Management.

16   Q.   Would you agree with me that other people

17   outside of Wanda's group could actually perform

18   the risk ratings for the loans?

19   A.   Could they actually perform them?

20   Q.   Yes.

21   A.   Yes.

22   Q.   And that would have been okay, right?  I

23   mean, ultimately they would have to give the

24   risk ratings to Wanda, so that she could defend

25   them, right?

1    A.   Yes.

2    Q.   But there was nothing wrong with having the

3    actual risk rating function performed by

4    Mr. Lauerman's Servicing people, right?

5    A.   The Asset Management Group was responsible

6    for the risk ratings; therefore, they would be

7    responsible for understanding that at an

8    incredibly granular level.  And if they weren't

9    doing the work themselves, which is one of their

10   charters, I don't know that they would be able

11   to defend that in the credit rating.

12   Q.   So my question was, Was it wrong for someone

13   outside of Ms. Speight's department to be

14   performing the actual risk ratings themselves?

15   A.   No, I don't think it would have been wrong.

16   Q.   In fact, Ms. Speight told you that she was

17   getting people trained outside her department to

18   do the risk ratings on the orphan loans, right?

19   A.   Well, she says here that the Credit

20   Department was going to provide training.

21   Q.   In fact, what she said is, she writes to you

22   and to Mr. Carp and to Julie Gschwind, and Julie

23   had written, "Wanda, I understand Mark McCool's

24   group will be handling all the orphan loans, and

25   that Special Servicing will be transferring them

1   in the next week to ten days.  In the meantime,

2   I understand Nathan Perry is continuing to

3   handle these loans.  In light of this, is it

4   appropriate for us to be trained?"  And the

5   subject matter of the e-mail is "Risk Rating

6   Training," right?

7   A.  Correct.

8   Q.  And she writes and CCs you on May 9th,

9   "Thanks for the feedback, Julie.  Mark, Mike,

10  the Credit Department will be providing training

11  for the risk rating process."  Right?

12       You understood that Julie was talking

13  about getting people trained for risk ratings,

14  correct?

15  A.  Yes, I do.

16  Q.  "The next cycle will Begin in late May.  If

17  Julie and Jackie are not the appropriate

18  individuals to perform the risk ratings of the

19  orphan SPG loans, please identify the

20  appropriate personnel."

21       Jackie and Julie weren't any of Wanda's

22  asset managers, right?

23  A.  I don't believe so.

24  Q.  They were Tony Lauerman's, right?

25  A.  I think so.  I'm not sure who they reported

1  to, but I believe so.

2  Q.  But she's telling you, I'm getting the risk

3  ratings done by someone outside of her

4  department, right, on May 9th?

5  A.  Well, I think the e-mail says that there are

6  people outside of the department that were going

7  to receive training.

8  Q.  Right.  And the training was so that they

9  could perform the risk ratings on the orphan

10  loan portfolio, right?

11  A.  Well, it just says they are going to get

12  training.  If they are not the right people to

13  do it on the orphan portfolio, then identify the

14  people.

15  Q.  Right.  You understood from this e-mail that

16  Jackie and Julie were going to be trained to do

17  risk ratings so they could do the risk ratings

18  on the SPG loan portfolio, didn't you?

19  A.  I don't know what I understood from this.

20  Q.  Well, as you read it today, do you have that

21  understanding?  She's not saying anything else.

22  She's not talking about risk rating training so

23  they could go out and do risk ratings, you know,

24  just for whatever portfolio they want to pick up

25  someday; is that right?

1    A.  No, that's fair.

2    Q.  Right.  And these SPG orphan loans were

3    orphan loans that her group had assigned?

4    A.  I'm sorry, "had assigned"?

5    Q.  Had been originally assigned to Wanda's

6    group, correct?

7    A.  Yes.  They had been assigned to Wanda's

8    group.

9    Q.  And you never told her when she wrote this

10   e-mail on May 9th, Wanda, I don't want people

11   outside your group doing risk ratings.  That's

12   your responsibility and your responsibility

13   alone.

14   A.  No, I don't know if we ever had that

15   conversation.

16   Q.  Okay.  Moving up the chain.

17          The bottom of Bates stamp 10956,

18   there's an e-mail from Carolyn Grandstaff to

19   Dana Jo Martino.  The importance is high, and

20   she says, "Can we please discuss?  Risk ratings

21   are not a function of Client Relations.

22   Thanks."

23          You agree with that statement, right?

24   A.  I do.

25   Q.  It's a really bad idea to just have CRNs in

1    Canada doing the risk ratings, right?

2    A.  No, I don't agree with that.

3    Q.  Well, you agree with the statement that risk

4    ratings aren't a product of Client Relations,

5    right?

6    A.  I do agree with that.

7    Q.  And in those days -- and maybe this is where

8    we may disagree, in those days CRNs were in

9    Client Relations only, right?

10   A.  Yes.  They were Client Relations managers,

11   yes.

12   Q.  The terminology has now been broadened to

13   cover other individuals, right?

14   A.  I believe they have, yes.

15   Q.  So at the time you agreed with this

16   statement that the CRNs in Canada shouldn't be

17   doing the risk rating, or if the people in

18   Client Relations were CRNs, they shouldn't be

19   doing the risk ratings, right?

20   A.  Yes.  It's not one of their functions.

21   Q.  And do you know whether Ms. Speight shared

22   that view with you?

23   A.  I don't know.

24   Q.  Okay.  Moving up.  The next one in the chain

25   is from Mr. Finkenstaedt, right?  It's not the

1  next one up in the chain, but I want to move up

2  to Mr. Finkenstaedt.

3         Mr. Finkenstaedt is sounding an alarm,

4  right?

5  A.  Well, he's saying "STOP."

6  Q.  "STOP" in big, all cap letters, with an

7  explanation point, right?

8  A.  I don't see the exclamation point, but --

9  Q.  You're right.  It's the problem with

10  bifocals.

11         And Mr. Finkenstaedt, who is at the

12  May 23rd meeting, says, This is not what was

13  discussed with Wanda.  Right?

14  A.  Yes.

15  Q.  Other than the May 23rd meeting, had you had

16  discussions with Mr. Finkenstaedt and

17  Ms. Speight together about who was going to do

18  the risk ratings?

19  A.  I don't think Mr. Finkenstaedt was in any

20  other meetings other than that, May 23rd.

21  Q.  So when he says this is not what was

22  discussed with Wanda, he must have been

23  referring to what was discussed in the May 23rd

24  meeting?

25  A.  I believe so.

1    Q.  And Mr. Finkenstaedt says, Risk ratings

2    belong to Asset Management and RES, right?

3    A.  Correct.

4    Q.  And that's very different than what you just

5    told me before, right?  You thought Asset

6    Management only belonged to Ms. Speight's group?

7    A.  I think the responsibility lies with Asset

8    Management.  Real Estate Solutions would

9    contribute to those risk ratings, but the

10   responsibility lies with the Asset Management

11   Group.

12   Q.  So the problem is in the words "belong to."

13   There's a little ambiguity there?

14   A.  Well, I don't know what -- it's Ned's

15   e-mail.  It's not mine.

16   Q.  Would you agree with me that it appears that

17   Mr. Finkenstaedt had a different takeaway, as a

18   result of the May 23rd meeting, as to whether

19   risk ratings would be done exclusively by

20   Ms. Speight's group or shared between

21   Ms. Speight's group and RES solutions?

22   A.  Do I agree with you that he had a different

23   takeaway?

24   Q.  That it appears that he had a different

25   takeaway.

1    A.  Well, I think that the basis of his e-mail

2    is that he was in agreement with me.

3    Q.  Well, you said it was exclusively Asset

4    Management, right?

5    A.  The responsibility for the process lies with

6    Asset Management.

7    Q.  Okay.  And he is saying, risk ratings belong

8    to Asset Management and RES.

9    A.  I see that.

10   Q.  Right.  And you don't think that's

11   disagreeing with your view that Asset Management

12   or risk ratings belong exclusively to Asset

13   Management?

14   A.  I mean, it says what it says.  I guess that

15   was his -- you know, I don't know why he chose

16   the words that he chose.

17   Q.  Okay.  Would you agree with me that it

18   appears, at least on first blush, that he seems

19   to have a different final take on it than you

20   do?

21   A.  No, I don't agree with that.

22   Q.  But he says, "Risk ratings belong to Asset

23   Management and RES."

24   A.  I see that, yes.

25   Q.  Are you saying that risk ratings could

1    actually belong to RES, but ultimately have to

2    be defended by Asset Management?

3    A.  The responsibility for the process of risk

4    ratings lies with Asset Management.

5    Q.  I'm not talking about the responsibility of

6    the process.

7    A.  But that's what I have been speaking to.

8    Q.  I'm talking about doing the risk ratings

9    themselves, the actual function/task itself of

10   doing a risk rating.

11          Do you agree with me that

12   Mr. Finkenstaedt, by his e-mail, is saying,

13   Gee, I thought that the actual doing of the risk

14   rating could be either RES or Asset Management?

15   A.  That's what he is saying there.

16   Q.  And that wasn't your view at all, right?

17   You didn't think even the risk ratings

18   themselves should be done by RES, correct?

19   A.  Correct.

20   Q.  So you and he are having apparently a

21   miscommunication about what you decided in the

22   February 23rd meeting with Wanda, right?

23   A.  I don't know what he meant by his e-mail, so

24   I don't know if we miscommunicated or not.

25   Q.  You would agree with me that by his e-mail

1    he meant, We're going to do the risk ratings

2    too, and Wanda's group is too, that that

3    certainly wasn't what you thought you had

4    communicated in the May 23rd meeting?

5    A.   No.  I think Ned is Mr. Finkenstaedt.

6    Sorry.

7         His e-mail was simply saying that the

8    Client Relations team is not responsible for

9    this.  That's how he took this e-mail.

10   Q.   That's not what he says.  He says, "The risk

11   ratings belong to Asset Management and RES."

12        MR. BANKS:  Objection.

13        THE COURT:  You're becoming

14   argumentative, now, counsel.  You can move on.

15   BY MR. SALMANSON:

16   Q.   And he does agree with you, right, that, as

17   you just said, Asset Management duties to Client

18   Relations, "Please don't assign Asset Management

19   duties to Client Relations without discussing

20   them with me first.  Moving these duties around

21   is a slippery slope, and I want to make sure

22   that we are disciplined in our decision-making."

23   Right?

24   A.   Yes.

25   Q.   You agreed with that, right?

1    A.  I do.

2    Q.  Do you know whether Ms. Speight agreed with

3    that?

4    A.  I don't know.

5    Q.  Now, up until this point, Ms. Speight hadn't

6    chimed in, right?

7    A.  Not that I'm aware of.

8    Q.  So you're next on the e-mail chain, and

9    you're actually responding to Mr. Finkenstaedt's

10   e-mail, right?

11   A.  Correct.

12   Q.  What you say to Mr. Finkenstaedt is, "All

13   risk ratings will be done by the Asset

14   Management Group."

15          Right?  That's your first line?

16   A.  Correct.

17   Q.  So you're, in fact, telling

18   Mr. Finkenstaedt, you know what, Ned, you got it

19   wrong.  I don't want it to be RES.  If he does

20   have it wrong.  I don't want it to be RES or

21   Asset Management.  I want them all done by Asset

22   Management, right?

23   A.  No, I don't agree with that.  I'm not just

24   telling Ned.  I think I'm providing clarity to

25   the group that I've e-mailed.

1    Q.  Okay.  Providing clarity to the group,

2    because you would agree with that up until then

3    there was a lack of clarity?

4    A.  I think, at this point, it was appropriate

5    for me to respond to an e-mail.

6    Q.  All right.  Because there was a lack of

7    clarity, right?

8    A.  I don't know about "lack of clarity" or not.

9    I was providing -- I was responding to an e-mail

10   chain.

11   Q.  And by "responding," you were providing

12   clarity, right?

13   A.  I was attempting to.

14   Q.  You also say, "Ned, Wanda, Clare and I are

15   in the process of identifying the specific

16   functionalities to be assigned to the various

17   groups, i.e., CAG to complete financials; RES to

18   handle special requests; SPM to take the first

19   cut on the watch lists, et cetera.  While we

20   have not completed that assessment, I thought we

21   were all on the same page that the Asset

22   Management team is and will continue to be

23   responsible for daily borrower interaction, as

24   well as the risk rating process."

25          Now, when you said you thought we were

1   all on the same page, you're referring to having

2   been on the same page as a result of the

3   May 23rd meeting, right?

4   A.  I believe so.  That was the most recent

5   meeting.

6   Q.  It appeared to you, in fact, that maybe Ned

7   wasn't on the same page?

8   A.  I don't think I had that thought.

9   Q.  Well, you don't know whether Wanda is on the

10  same page or not, yet, right, because she hadn't

11  chimed in yet?

12  A.  Correct.

13  Q.  So when you're saying I thought we were all

14  on the same page, who are you directing that to

15  you?

16  A.  Ned, Tony, Wanda, Michael, and Clare.

17  Q.  Now, Wanda responds, right?

18  A.  Correct.

19  Q.  And you would agree with me that but for

20  Wanda sending this e-mail, she would not have

21  been terminated?

22  A.  Yes, I would agree.

23  Q.  Do you believe this e-mail was

24  unprofessional?

25  A.  Yes.

1   Q.  Do you believe it was uncooperative?

2   A.  Yes.

3   Q.  Do you believe it was insubordinate?

4   A.  Yes.

5   Q.  Okay.  Let's go through it.  Her first line

6   says, "Sorry for the communications breakdown.

7   Let me try again."

8          Would you agree with me that, based on

9   the e-mail string, there had been a

10  communications breakdown?

11  A.  No.  Not in my mind.

12  Q.  Well, you got Ned saying risk ratings belong

13  to either RES or Asset Management, and you have

14  you saying, I thought we all agreed that we were

15  all on the same page.  That was just Asset

16  Management.

17  A.  Okay.

18  Q.  So there's something of a communications

19  breakdown, right?

20  A.  Okay.

21  Q.  Okay.  Let me try again, right?

22         When you read that, did you think that

23  it was sarcastic?

24  A.  Absolutely.

25  Q.  Now, how did you come to that conclusion?

1   A.   Well, the way I received it is the way I

2   received it now.   It's the same way, "Sorry for

3   the communications breakdown.   Let me try

4   again."

5            You didn't hear me the first time, so

6   let me tell you again what we're going to do.

7   Q.   Well, you hadn't heard from her yet.

8   A.   This is the response that I got from all --

9   this is the first time I'm hearing from her on

10  this topic, yes.

11  Q.   Right.   Right.   So it can't be, You're not

12  hearing from me for the first time, or you

13  didn't hear me the first time, because this is

14  the first time, right?

15  A.   No, because I'm referring, as you said, to

16  the May 23rd meeting, and I believe Wanda was

17  referring to that as well.

18  Q.   There couldn't have been a communications

19  breakdown between you and her in the string of

20  e-mails because she hadn't commented yet, right?

21  A.   Not in the string of e-mails, correct.

22  Q.   So she can't be sarcastically saying, sorry

23  for the communications breakdown between you and

24  me, because you and she haven't yet communicated

25  in this string yet, right?

1      MR. BANKS:  Objection.  He's going to

2  be arguing with the witness at this point.

3      THE COURT:  I'm going to overrule.

4  There seems to be some inability to understand

5  the question.  We'll allow it.

6      THE WITNESS:  I think this goes beyond

7  an e-mail chain.  That's what we're talking

8  about.

9  BY MR. SALMANSON:

10  Q.  So you're feeding it based on what happened

11  based on May 23rd.

12      You're reading it in light of what you

13  think happened on May 23rd?

14  A.  I think that was the spirit in which I wrote

15  the e-mail to begin with that Wanda was

16  responding to.

17  Q.  Her next line is, The Canadian --

18      MR. BANKS:  Mr. Salmanson, maybe I

19  should direct this to the Court.  We do have a

20  bigger blow-up.  I do notice that some of the

21  jurors are straining to read it.

22      Would it be helpful if we can put up

23  the bigger one?

24      MR. SALMANSON:  That would be great.

25      MR. BANKS:  Let me just see which on is

1    here.

2              THE COURT:  Members of the jury, can

3    you see that exhibit as it exists?  Thank you.

4              MR. SALMANSON:  Yes?

5              THE COURT:  Yes, it's fine.  Let's get

6    around here, and ask the witness some questions.

7    BY MR. SALMANSON:

8    Q.  The next sentence says, "The Canadian loans

9    and the SPG loans" -- in bold, underlined --

10   "**are not** being asset-managed by any one of the

11   former PLG Asset Management team."

12             Now, as of May 25th, that was a true

13   statement, right?

14   A.  As of May 25th, I think it was.

15   Q.  So Wanda is just reiterating that, as of

16   that date, they weren't being asset-managed by

17   her group, right?

18   A.  Yes.

19   Q.  And at that point, if they weren't being

20   asset-managed, that wasn't because she was

21   disobeying any directive to you up to this

22   point, right?

23   A.  I'm sorry, I'm not following.

24   Q.  Sure.  As I said that, I realized it.

25             As of up to May 25th, if they weren't

1    being asset-managed by Ms. Speight's group, it

2    wasn't -- if she had had them being

3    asset-managed by somebody else, that wasn't

4    contrary to any directive of yours, right?

5    A.  Correct.

6    Q.  Do you know how often the risk ratings are

7    done?

8    A.  Quarterly.

9    Q.  They are done quarterly because a lot can

10   happen in one quarter, right?

11   A.  Absolutely.

12   Q.  You have to be really on top of the loans in

13   order to be able to risk rate them, right?

14   A.  Correct.

15   Q.  You have to know what happened in those

16   previous 60, 90 days leading up to the risk

17   ratings, right?

18   A.  Yes.

19   Q.  So she says in the next sentence,

20   "Consequently, the former PLG Asset Management

21   individuals are not in a position to perform an

22   evaluation for risk rating purposes."

23          You just agreed with me on that, right?

24   If they hadn't been asset managing the loans,

25   they wouldn't be in a position to perform the

1    ratings for the risk ratings purposes, right?

2    A.   Performing the risk ratings requires

3    knowledge of the process, as well as the asset.

4    Q.   And you just said to me, if they didn't have

5    the knowledge of the asset of the previous 60 or

6    90 days, they wouldn't have the knowledge to

7    perform the risk rating, right?

8    A.   No, I don't necessarily agree with that.

9    They would have to take the steps necessary to

10   gain the understanding.

11   Q.   But as of May 25th, if they hadn't -- I'm

12   talking about present tense, right?

13        It's may 25th that they hadn't been

14   asset-managing the loans for the last 60 or 90

15   days, so they wouldn't be in a position to risk

16   rate the loans, right, without getting back on

17   top of that?

18   A.   That's what they would have been required to

19   do.

20   Q.   Right.  If they came back with that, right?

21   This is a present tense statement, would you

22   agree?

23   A.   I would agree it's present tense, yes.

24   Q.   Do you agree with me that she's saying as of

25   May 25th, that her asset managers are not in any

1    position to perform an evaluation for risk

2    rating purposes, because they hadn't been

3    handling the loans for the last 60 or 90 days,

4    right?

5    A.  I think that the distinction is the former

6    PLG Asset Management in the business.

7    Q.  Well, by that she's referring to her team,

8    right?

9    A.  Correct.

10   Q.  And as far as you knew, nobody on her team

11   was asset-managing those assets as of May 25th?

12   A.  I believe that's correct, yes.

13   Q.  So they are not in a position to risk rate

14   assets that they haven't been managing during

15   that time period, right?

16   A.  Well, as of May 25th, they may not have

17   been, but --

18          MR. BANKS:  Can he let the witness

19   finish his answer?

20          THE COURT:  Very well.

21          THE WITNESS:  As of May 25th, they

22   wouldn't have been, but the risk ratings were

23   due in June.

24   BY MR. SALMANSON:

25   Q.  Right.  So when she's saying, present tense,

1   "my folks aren't in a position to do this," as

2   of May 25th, you agree with her, right, unless

3   they came back -- sorry.  Go ahead.

4   A.  Taking that statement as a stand-alone

5   statement, yes.

6   Q.  Okay.  Her next sentence says, "I hope that

7   I am not being told by Capmark Management to

8   sign-off on reserves and provide risk ratings on

9   a portfolio of loans, for which my staff has no

10  knowledge."

11         Now, you would agree with me that it

12  would be a really bad idea for her to have to

13  talk about reserves and set up risk ratings for

14  loans for which she had no knowledge, right?

15  A.  Yes.

16  Q.  And you would share that hope that nobody in

17  Capmark Management was going to tell her that,

18  right?

19  A.  I would share -- I'm sorry?

20  Q.  The hope that she's not being told by

21  someone in Capmark Management that I need to do

22  risk ratings on loans that my staff has no

23  knowledge on, right?

24  A.  I'm not following you.  I'm sorry.

25  Q.  Let's go back to the exact language.  She

1   says, "I would hope that I am not being told by

2   Capmark Management to sign-off on reserves and

3   provide risk ratings on a portfolio of loans for

4   which my staff has no knowledge."

5           Right?

6   A.  Yes.

7   Q.  You would agree with her that -- you would

8   hope that she's not being told -- and I'm not

9   saying that she was being told, but that she's

10  not being told by Capmark Management to sign off

11  on reserves and provide risk ratings on a

12  portfolio of loans for which she had no

13  knowledge, right, you would agree with that?

14  A.  Yeah, believe me, I'm not trying to be

15  difficult.  I'm having a lot of trouble

16  following your question.

17          I see what's written here.  I just

18  don't know what your question is.

19  Q.  Okay.  My question is, Do you agree with

20  that statement that you would hope -- you would

21  share that hope?

22  A.  Yes.  Okay, thank you.  Yes.

23  Q.  Okay.  Then she says -- and she directs it

24  to you, "Mark, again, the Asset Management team

25  is and will continue to be responsible for daily

1    borrower interaction, as well as the risk rating

2    process for its existing portfolio."

3              Now, am I correct that you took that as

4    being insubordinate?

5    A.   Yes.

6    Q.   And it's because you interpreted it as

7    saying she would not take on any additional

8    assignments?

9    A.   Correct.

10   Q.   Does she actually say she's not taking on

11   any additional assignments?

12   A.   I believe she does.

13   Q.   Where does she say that?

14   A.   Paraphrasing, they will continue to be

15   responsible for their existing portfolio.

16   Q.   So you're inferring from that, that she's

17   not going to take on any other additional

18   portfolio?

19   A.   Yes.

20   Q.   Okay.  Now, at the time she wrote that, you

21   knew that she was already not being able to have

22   enough personnel to handle the risk ratings for

23   all the portfolios that had been previously

24   assigned to her, right?

25   A.   No, I don't agree with that.

1   Q.  Well, you knew that part of the orphan loan,

2   the SPG portfolio had all been assigned to her,

3   and she had ended up getting some people

4   assigned to her to help her with the orphan

5   loans, right?

6   A.  Yes.

7   Q.  And she had been telling you that she was

8   shorthanded throughout this time period, right?

9   A.  She had said that, yes.

10  Q.  And you never said to her, You have to

11  handle whatever we give to you, each and every

12  loan.  You can't go and get that assigned to

13  anybody else, right?

14  A.  No, I never said that.

15  Q.  So are you saying that she's being

16  insubordinate because in your e-mail and the

17  prior e-mail you made it clear that she was

18  going to do the asset management for every set

19  of loans that came her way?

20  A.  Well, at this point, we had agreed, or at

21  least I thought we had agreed, that the

22  assignment of responsibilities was -- at least,

23  at this point, was becoming more clear, and she

24  was putting it out there that she was not

25  willing to do any additional work.

196

1    Q.  You said "it was becoming more clear."

2           It wasn't clear yet, right?

3    A.  The assignment of responsibilities in the

4    meetings that we had had all through May, we

5    were working towards identifying the specific

6    tasks.

7    Q.  It was becoming more clear.  It wasn't clear

8    yet?

9    A.  In my mind it was clear.

10   Q.  Well, it was clear, as of May 20th, when you

11   sent that e-mail?

12   A.  I believe so.

13   Q.  Okay.  It wasn't clear before that because

14   Mr. Finkenstaedt had a different view as of May

15   23rd, right?

16   A.  I disagree.

17   Q.  Then she writes a separate paragraph to

18   Mr. Hohenleitner, right?

19   A.  Correct.

20   Q.  And Mr. Hohenleitner was in the Credit

21   Department?

22   A.  Correct.

23   Q.  Ultimately, Ms. Speight had to defend the

24   risk ratings to the Credit Department, correct?

25   A.  That's correct.

1    Q.  Just so we're clear, the Credit Department

2    is part of GMAC CM or Capmark, correct?

3    A.  That's correct.

4    Q.  They are all on the same team, correct?

5    A.  We're all different departments.

6    Q.  All working towards the same ultimate goal,

7    right, making GMAC CM profitable, right?

8    A.  We all have responsibilities that we're

9    contributing, yes.

10   Q.  And part of Ms. Speight's responsibilities

11   is in providing the risk ratings, the Credit

12   Department is making sure that the Credit

13   Department understands -- well, her

14   responsibility is to provide as accurate as

15   possible risk ratings to the Credit Department,

16   right?

17   A.  That's part of the responsibility, yes.

18   Q.  That's a big part of her job function, isn't

19   it?

20   A.  Yes, it would have been.

21   Q.  And would you expect her, if she had

22   concerns about performing that job function for

23   the Credit department, that she would reach out

24   to the Credit Department and say, I have some

25   concerns here?

1   A.   No, I wouldn't expect that at all.

2   Q.   You would expect her to just be quiet?

3   A.   Well, we're referring to the exhibit,

4   correct?

5   Q.   Yes.

6   A.   No.  I did not expect Mr. Hohenleitner to be

7   copied here at all.

8   Q.   Do you know whether Ms. Speight and

9   Mr. Hohenleitner had had any previous

10  discussions about the risk rating process?

11  A.   Ever or --

12  Q.   Ever.

13  A.   I'm sure they had.

14  Q.   Okay.  Do you know whether they, within the

15  previous couple of weeks, had shared concerns

16  about whether the risk rating process for all

17  the portfolio was going to get done in an

18  adequate way?

19  A.   I have no idea.

20  Q.   Okay.  So you don't know if, in fact,

21  Ms. Speight, including Mr. Hohenleitner --

22  because Mr. Hohenleitner had, in fact, just

23  recently expressed concerns to her about the

24  risk ratings?

25  A.   I don't know that.

1  Q.  Okay.  And if he had just done that, do you

2  think it would have been appropriate for her to

3  keep Mr. Hohenleitner apprised of what was going

4  on?

5  A.  Not in this way.

6  Q.  Well, how should she have done it?

7  A.  There are a number of ways that would have

8  been more appropriate.

9  Q.  What was inappropriate about him being

10 copied on the e-mail?

11 A.  Well, and by "him," meaning --

12 Q.  Mr. Hohenleitner.

13 A.  And then Maria Menarde and Beth Coady, who

14 were also CC'd.  They are all part of the Credit

15 team.  Up to this point, they hadn't been, I

16 don't believe, part of the e-mail train, and to

17 escalate this type of correspondence to your

18 client is -- to say "inflammatory," is an

19 understatement.

20 Q.  Let's look back.  Do you see if

21 Mr. Hohenleitner was included by anybody else in

22 the e-mail string?

23 A.  Perhaps initially, but by the time we were

24 discussing with any degree of detail, he was not

25 part of that.

1  Q.  Let's go through from back to front.  Tell

2  me if anybody else had included Mr. Hohenleitner

3  in the e-mail string.

4  A.  Tell you what?  I'm sorry.

5  Q.  If anybody else had included

6  Mr. Hohenleitner in the e-mail string.

7  A.  It appears Don Nienas did on May 24th.

8  Q.  Mr. Nienas was the only other person in

9  Wanda's group who participated in this string,

10  correct?

11  A.  The only one of her direct reports, or just

12  in her group?

13  Q.  In her group, who is actually writing, not

14  just being cc'd, but writing in this string,

15  right?

16  A.  Yes.

17  Q.  So do you know whether Ms. Speight and her

18  group typically would CC Mr. Hohenleitner on

19  issues related to risk ratings?

20  A.  I don't know.

21  Q.  You never told her, Hey, look, if you're

22  having problems with the risk rating, don't

23  include Mr. Hohenleitner.  Right?

24  A.  No.

25  Q.  It would be okay, generally, to CC

1    Mr. Hohenleitner, to let him know about staffing

2    issues or who is staffing the risk ratings,

3    right?

4    A.  Well, I don't know.  I mean,

5    Mr. Hohenleitner, in this case, is the client.

6    So you would have to treat the client with --

7    and certainly keeping the client informed, but

8    whether or not you would copy him on internal

9    correspondence, I think, is different.

10   Q.  Internal correspondence?  These are all GMAC

11   people, right?  She is not saying to the outside

12   world, I can't do the job.  Right?

13         She's telling the person to whom she

14   owes that responsibility to, ultimately, right?

15         I mean, you keep calling him a client.

16   He's the one -- she's responsible to him for

17   this, right, and her group?

18   A.  I would say she's responsible for providing

19   the data to his group so they can analyze that

20   data and --

21   Q.  She's just not handing him raw data.  She

22   does the risk ratings, right?

23   A.  I think they make the recommendation that

24   the Credit Committee meets.

25   Q.  She provides the score, right?

1    A.  Correct.

2    Q.  And she gets in front of the Credit

3    Committee, and they hammer her with questions,

4    right?

5    A.  Absolutely.

6    Q.  And she has to be prepared to defend them?

7    A.  Yes.

8    Q.  And that can be sort of brutal, can't it?

9    A.  At times, the questions are pretty intense.

10   Q.  So if you were in Wanda's shoes, you want to

11   be darn sure that you would be able to defend

12   those risk ratings?

13   A.  Yes, I would agree.

14   Q.  She didn't just have to defend those risk

15   ratings to the committee, right?  There were

16   times when she had to defend them to the outside

17   auditors?

18   A.  Yes.

19   Q.  Isn't it true that just a couple of months

20   earlier, they had gotten comments from the

21   outside auditors that said, you better be

22   careful, more careful, about documenting your

23   risk ratings?

24   A.  I'm not aware of that.

25   Q.  Now, she says, "Joe, please be aware if we

1  are being told to risk rate the SPG loans and

2  the Canadian portfolio, I cannot be confident in

3  the accuracy of the assigned ratings, nor can we

4  be expected to defend such ratings, given our

5  lack of knowledge and experience with this

6  portfolio."

7  　　　Now, we're talking specifically about

8  this particular quarter's risk ratings, right?

9  A.  Correct.

10  Q.  You didn't interpret that as forever, right?

11  A.  No.  I would say we're talking about the

12  current quarter or current in that sense.

13  Q.  Other than the fact that she is addressing

14  this to Joe, who you say is outside the group,

15  you don't disagree with her, if she says, if I

16  have to risk rate these SPG loans and Canadian

17  portfolio, which I'm going to have to do in

18  about two and a half weeks, I can't have the

19  same confidence level and the accuracy of the

20  ratings and don't expect me to defend the

21  ratings because I don't have a knowledge or

22  experience with this portfolio over this quarter

23  for which we are doing the risk ratings.

24  　　　Isn't that fair?

25  A.  No.  You know, I look at this, and it upsets

1    me as much today as the day I saw it.

2    Q.  You don't think it's fair -- the question

3    is, Do you think it's fair, not whether or not

4    it upsets you.

5           Do you think it's fair for her to say,

6    I am not sure I can do this at the level that

7    I'm expected to do this, because I don't know

8    this portfolio?

9    A.  No, I don't think it's fair.

10   Q.  Because, as of May 25th, did she have

11   knowledge of the portfolio, to your knowledge,

12   of these two sets of loans?

13   A.  I don't know if Wanda had specific knowledge

14   on May 25th about those two loans.

15   Q.  Do you know whether anybody in her group had

16   specific knowledge of those two portfolios for

17   that quarter?

18   A.  I don't know.  Wanda's group was responsible

19   for the risk ratings within that portfolio, and

20   I would have expected that she would take steps,

21   which she did, to make sure that they were going

22   to be handled, managed.

23   Q.  But you would agree with me, on May 25th, it

24   wasn't clear whether she was going to have

25   responsibility for the risk ratings of those

1   portfolios?

2   A.   No, I don't agree with you.

3   Q.   You respond to Ms. Speight and you say, "We

4   obviously need to talk.  Are you available to

5   discuss this e-mail string and the meeting from

6   Tuesday?"  Correct?

7   A.   Correct.

8   Q.   At the time that you wrote that -- well,

9   first of all, she wrote the e-mail on May 25th

10  at 5:33.

11          I believe you testified in your

12  deposition that you don't think you saw it until

13  the next morning, correct --

14  A.   That's correct.

15  Q.   -- when you got to work?

16  A.   Correct.

17  Q.   So you're responding to Wanda Speight.  You

18  come in, in the morning, you see your e-mails

19  and you see this e-mail, correct?

20  A.   Correct.

21  Q.   And would you agree with me that when you

22  read it, your initial thought was, we obviously

23  need to sit down and clear the air?

24  A.   I don't remember what my frame of mind was

25  at that time, but it was upsetting, and I

1    replied that we needed to talk.  Obviously, we

2    needed to talk.

3    Q.  And it wasn't your intent to say, we need to

4    talk because I need to terminate you, right?

5    A.  No, it wasn't.

6    Q.  You took the e-mail, and you went to

7    Mr. Lipson's office, right?

8    A.  Sometime later, yes.

9    Q.  Okay.  And what happened in Mr. Lipson's

10   office?

11   A.  Well, I had printed the e-mail.  And when he

12   came in, I went in, showed him the e-mail.  He

13   read it, and I believe he called Linda Pickles.

14   Q.  Now, do you recall discussing with him the

15   events leading up to the e-mail?

16   A.  Prior to receiving the e-mail?

17   Q.  No, I'm sorry.  Sorry.  When you brought the

18   e-mail to him, did you just -- let's just be

19   clear.

20          Do you recall whether you gave him just

21   Wanda's e-mail, or whether you gave him the

22   whole e-mail string?

23   A.  I think I had hit the print button, which

24   meant that it would print the entire document.

25   Q.  Okay.  Do you recall having a discussion

1    with Mr. Lipson about the e-mail itself?  In

2    other words, you didn't just hand it to him and

3    say, this is what I got from Wanda, but did you

4    talk about the content of the e-mail?

5    A.  I'm sure I did, yes.

6    Q.  As you sit here today, do you have any

7    recollection about any specific discussion with

8    him about the content?

9    A.  No, I don't.

10   Q.  Do you recall whether you tried to put the

11   e-mail in context?

12   A.  I don't know.

13   Q.  Do you recall whether you talked to him

14   about the May 23rd meeting?

15   A.  No, I don't.

16   Q.  Were you present when Mr. Lipson talked to

17   Ms. Pickles on the phone?

18   A.  I don't think I was.

19   Q.  Were you still in the room when he got off

20   the phone?  I'm sorry.  You said you didn't

21   think you were there.

22   A.  Right.

23   Q.  So you left.  He was calling Ms. Pickles,

24   and you left?

25   A.  That's correct.  That's my recollection.

1    Q.  And what do you recall next happening in

2    regard to Ms. Speight?

3    A.  My being advised that she was going to be

4    terminated.

5    Q.  Now, prior to that, do you have a

6    recollection that Mr. Lipson sought your

7    recommendation as to whether she should be

8    terminated or not?

9    A.  No, no.

10   Q.  Do you recall whether you told him that you

11   concurred with that decision?

12   A.  I don't know if I told him that or not.

13   Q.  Is it your opinion that this e-mail,

14   standing alone, putting aside what had happened

15   on May 23rd, do you believe that this e-mail,

16   standing alone, would have merited Ms. Speight's

17   termination?

18   A.  I don't know.

19   Q.  Do you believe that Ms. Speight's

20   termination was appropriate?

21   A.  I do.

22   Q.  To your knowledge, until she was told that

23   she was terminated, Ms. Speight hadn't received

24   any performance counsel, had she?

25   A.  No, I don't think so.

1    Q.  To your knowledge, had anybody talked to her

2    about her alleged poor attitude?

3    A.  I don't believe so.

4    Q.  Now, you had already had a meeting scheduled

5    with Human Resources and Ms. Speight for

6    May 26th, correct?

7    A.  I don't know if it was already done.  I

8    believe it was scheduled.

9    Q.  Okay.

10   A.  I don't know what time it was scheduled.

11   Q.  Okay.  Do you recall that you decided to

12   turn that meeting into the termination meeting?

13   A.  Well, that was the end result of the

14   meeting.

15   Q.  Do you recall, other than the Canadian loan

16   portfolio, there weren't any other issues

17   regarding loans for which Mr. Speight's team had

18   responsibility, were there?

19   A.  Any other issues?

20   Q.  Yes.

21   A.  Well, it was a very active portfolio, so it

22   was actively managed.

23   Q.  And the question is, other than the issues

24   related to the Canadian loan portfolio, you

25   didn't have any idea that there were any other

1    issues regarding the loans for which she had a

2    responsibility, do you?

3    A.  I'm not sure I know what you mean by

4    "issues."

5            In my opinion, there was -- again, it

6    was an actively managed portfolio, so there were

7    a myriad of issues that would come up every day.

8    Q.  Okay.  But in terms of her refusal to take

9    on responsibility for the portfolio, or anything

10   like that -- an issue with the way that

11   Ms. Speight was handling her portfolio?

12   A.  No, not that I'm aware of.

13   Q.  Okay.  Prior to receiving this e-mail, you

14   hadn't had any discussions with anyone about the

15   possibility of terminating Ms. Speight, had you?

16   A.  No.

17   Q.  I hear you're a soccer coach, correct?

18   A.  Among other things, yes.

19   Q.  Now, soccer, we have the concept of getting

20   a yellow card if you commit a foul, and you get

21   one of those before you get red-carded, right --

22   A.  Yep.  Well,  it depends --

23   Q.  -- except -- except -- you anticipated --

24   you get a red card for a flagrant foul, right?

25   A.  Correct.

1   Q.  Did you think that Ms. Speight deserved to

2   be yellow carded for this e-mail and for

3   May 23rd, rather than throwing down the red card

4   as the first throw?

5   A.  I don't know.  I don't recall exactly how I

6   felt at that time.  It wasn't my decision.  So I

7   don't know.

8   Q.  Well, you concurred in the recommendation

9   that she be fired, right?

10  A.  I do agree that she should have been fired.

11  Q.  And you concurred back then, right?

12  A.  Well, I concurred with the decision, yeah.

13  Q.  Okay.  Now, you would agree with me that

14  officially Ms. Speight was not terminated for

15  insubordination, correct?

16  A.  Officially?

17  Q.  Yes.  Capmark's actual HR records don't say

18  she was terminated for insubordination, right?

19  A.  I don't know if I know that record.

20  Q.  Before we get there, I forgot to ask you

21  about the termination meeting.

22          The termination meeting was short,

23  right?

24  A.  Yes, it was.

25  Q.  It was you, Mr. Zurick, Ms. Speight?

1    A.  Correct.

2    Q.  And in those termination meetings, you

3    always want to be honest with the employee,

4    right?

5    A.  Certainly.

6    Q.  You are always honest with the employees,

7    right?

8    A.  Yes.

9    Q.  In that meeting, if I can direct your

10   attention to P-78.

11   A.  Okay.

12   Q.  This is a memo that Mr. Zurick wrote to the

13   file.  He testified yesterday regarding the

14   termination meeting.

15        It says, "Mark informed Wanda that he

16   had planned on meeting with her regarding the

17   events that took place during the meeting on

18   Tuesday, 5-23-06.  See file.

19        "However, Mark stated that after he

20   received Wanda's e-mail on Thursday, 5-25, he

21   realized that, quote, it was not going to work

22   out, unquote.

23        "Mark informed Wanda that he had

24   certain expectations from her, and wanted

25   someone that was committed to the group.

1          "Wanda was not meeting his expectations

2     and did not appear to be committed."

3          Do you disagree that that is what you

4     said on May 26th?

5     A.  That it was not going to work out?

6     Q.  Right.  That you had concluded that it was

7     not going to work out?

8     A.  Well, I don't remember what I said, but it

9     was probably something along those lines.

10    Q.  Okay.  And part of the purpose of the

11    termination meeting is to tell the employee why

12    they are being fired, right?

13    A.  Yes.

14    Q.  And you didn't say, Mr. Lipson decided to

15    fire you, right?

16    A.  Well, Wanda reported to me, so I would have

17    been the one delivering that message.

18    Q.  Right.  The message that Mr. Lipson had

19    decided to fire her as the result of the e-mail,

20    right?

21    A.  Correct.

22    Q.  That's your view that Mr. Lipson made the

23    decision?

24    A.  Absolutely.

25    Q.  But that's not what you told her, right, in

1    the meeting?  You said that after you saw the

2    e-mail, you realized it wasn't going to work

3    out, right?

4    A.  Well, that's what it says, yes.

5    Q.  The point of that was to convey that you had

6    made the subjective determination that, based on

7    her e-mail and the meeting, it wasn't going to

8    work out so you wanted her to go, correct?

9    A.  Well, I don't know what the point of this

10   was.  I didn't make the decision to terminate

11   Wanda.

12   Q.  But part of the point of the meeting is to

13   tell her why she's being terminated, right?

14   A.  Because she was a direct report of mine,

15   that would be common practice.

16   Q.  But you didn't tell her why she was being

17   terminated, right?  You didn't tell her that

18   Mr. Lipson thinks you were insubordinate,

19   Mr. Lipson decided to terminate her.

20          You gave her the impression that you

21   had concluded that it wasn't going to work out.

22   A.  I don't know what impression I gave her.

23   The meeting was probably too brief to give much

24   of an impression.

25   Q.  Well, do you agree that one of the things

1    that is supposed to go on in the termination

2    meeting is to give Ms. Speight an opportunity to

3    say, you're wrong, you misunderstood?

4    A.   Typically, that would be what would happen.

5    Q.   And that's one of the points in the meeting,

6    right?

7    A.   Well, the meeting would be to convey the

8    message that the decision was made that she

9    should be terminated.

10   Q.   And, presumably, the decision would have

11   been made by someone, right?  She can't say,

12   so-and-so is wrong or whatever, if she doesn't

13   know who the decision-maker is?

14   A.   I don't agree with that.  I think in that

15   example Mr. Lipson would have to be in every

16   termination meeting in the office, right, if he

17   is the ultimate authority?

18   Q.   No, no.  You could say to her, Mr. Lipson

19   made this decision.  He decided when he saw your

20   e-mail to fire you.

21            Right?

22   A.   I guess I could have said that.

23   Q.   Right.

24   A.   Yeah.

25   Q.   And, as you sit here today, you say, that's

1  the truth, right?  That's what happened.

2  Mr. Lipson saw the e-mail, and he decided to

3  fire you?

4  A.  That's right.

5  Q.  But that's not what you told her.  You said,

6  after I got -- after the May 23rd meeting and I

7  got the e-mail, I decided it wasn't going to

8  work out?

9  A.  Well, I didn't say in here that I decided

10  anything.

11  Q.  But you had decided based on the May 23rd

12  meeting and the e-mail that it wasn't going to

13  work out, right?

14  A.  I didn't make a decision related to Wanda's

15  termination.

16  Q.  I'm not asking what you decided.  I'm asking

17  what you told her.

18  A.  And, again, I don't remember what I told

19  her.  It says here that I said it's not going to

20  work out, or I realize it's not going to work

21  out.

22  Q.  Now, Mr. Zurick says, "Wanda replied, Okay."

23          And then Mr. Zurick says, "I informed

24  Wanda that she had done nothing egregious and

25  was not being terminated for cause."

1          Do you remember Mr. Zurick saying that?

2    A.  Not really.

3    Q.  Do you agree with him that she was not being

4    terminated for anything egregious?

5    A.  No, I don't agree.

6    Q.  And do you agree with him that she was not

7    being terminated for cause?

8    A.  No, I don't agree.

9    Q.  So you're saying that Mr. Zurick wasn't

10   being honest with Ms. Speight when he told her

11   that?

12   A.  No, that's not what I'm saying.  I'm sure he

13   had his own impressions.  I don't recall what he

14   said, so I don't know.

15   Q.  And "Mr. Zurick then informed Ms. Speight

16   what benefits she was entitled to.  She asked

17   for something in writing, and I handed her the

18   severance documents that I had prepared."

19          Do you recall that?

20   A.  Yes.

21   Q.  "He told Wanda, if she wanted the severance

22   amount, she would have to sign and return a

23   release, a waiver of her claims," right?

24   A.  Yes, I recall something like that.

25   Q.  And do you recall that Mr. Zurick said to

1    her, "You need to get an attorney to review

2    this"?

3    A.  No.

4    Q.  The next sentence says, "Wanda stated that

5    her lawyer would be reviewing the release

6    agreement.  I advised Wanda to call me if she

7    had any other questions."

8           And your recollection is that Wanda

9    responded simply, "You'll be hearing from my

10   lawyer," right?

11   A.  My recollection was that Wanda said, "Okay."

12   She smirked and said, "You'll hear from my

13   lawyer."

14   Q.  Would you agree with me that's not

15   consistent with what Mr. Zurick wrote here?

16   A.  It's fairly consistent.

17   Q.  She says her lawyer would be reviewing the

18   release agreement, not "You'll be hearing from

19   my lawyer," but that "My lawyer will be

20   reviewing the release agreement."  Okay?

21   A.  I still think it's fairly consistent.

22           THE COURT:  Counsel, we're going to

23   take our afternoon break now.  We'll be in

24   recess for 15 minutes.

25           Members of the jury, please do not talk

1    about the case among yourselves or with others.

2            Enjoy your afternoon break.

3            You're excused.

4            Sir, let me give you some caution.

5    You're under cross-examination, and you're not

6    to have any discussions with your counsel in

7    reference to your testimony while you're under

8    cross-examination.

9            MR. BANKS:  Yes, I understand, Your

10   Honor.  I was just looking --

11           THE COURT:  I'm not saying you didn't

12   understand.  I'm just giving the witness an

13   instruction.

14           Enjoy your break.

15           (Recess was held at 3:00 p.m.)

16           (The Court resumed the proceedings at

17   3:20 p.m., at which time the jury entered the

18   courtroom.)

19   BY MR. SALMANSON:

20   Q.  Mr. McCool, are you aware that after an

21   employee is terminated, an employee's

22   termination request has to be processed through

23   Capmark system, correct?

24   A.  Yes.

25   Q.  If you would turn to P-85, please.

1    A.  Okay.

2    Q.  Do you recognize this type of document,

3    generally?

4    A.  I think I only recognize it from my

5    deposition.

6    Q.  All right.  It shows you as the originator

7    of this document, correct?  If you look on the

8    second page.

9    A.  Yes.

10   Q.  It says "Originator, Mark McCool.  Completed

11   by Mark McCool," correct?

12   A.  Correct.

13   Q.  And then it was approved by Mr. Zurick,

14   right?

15   A.  Correct.

16   Q.  And on this form that, according to this,

17   was originated and completed by you, the reason

18   for termination given is "5200 Discharge Other."

19          Do you see that?

20   A.  I do.

21   Q.  Now, there are lots of other codes you could

22   have used, right?

23   A.  Yes.  I would assume.  I don't know the

24   form.

25   Q.  Do you know that one potential code is

1    insubordination?

2    A.  No.

3    Q.  Do you know how you came about to approve

4    the code of "5200 Discharge Other"?

5    A.  I don't know that I did.

6    Q.  Are you saying that this form is inaccurate,

7    that it was completed by you?

8    A.  I testified in my deposition, I had never

9    seen the form before.

10   Q.  Well, do you recall whether you had seen the

11   form before, whether you provided some of the

12   information that was needed to complete the

13   form?

14   A.  I don't believe I did.

15   Q.  So you don't have any idea how this form

16   came about?

17   A.  I know within our Human Resource system

18   there's forms.  I assume that this is one of

19   them.

20   Q.  Do you recall anyone from Human Resources

21   asking you what the reason for the discharge

22   should be recorded as?

23   A.  No.

24   Q.  Did you have any discussions with anyone in

25   Human Resources about the reasons for

1    Ms. Speight's termination, either -- you know, I

2    had asked you prior to the termination and you

3    said no --

4    A.  Yeah.

5    Q.  -- but afterwards, did you have any

6    discussions after the termination decision was

7    made?

8    A.  No.

9    Q.  Now, is it fair to say that, in your view,

10   you did not agree with Ms. Speight's management

11   style?

12   A.  I don't think it was about management style.

13   Q.  Would you agree that it was the way in which

14   she was accepting or failing to accept the

15   responsibilities for her department?

16   A.  Do I agree that -- what are you asking me to

17   agree with?

18   Q.  Let me withdraw that question.

19         Do you recall an employee named Bryan

20   Pollack?

21   A.  Yes.

22   Q.  Bryan Pollack is white, right?

23   A.  He is.

24   Q.  And you had to approve Mr. Pollack's

25   termination, right?

1    A.  Well, yeah.  I guess I did, or recommend it.

2    Q.  He was a manager?

3    A.  He would probably say he was a manager,

4    yeah.

5    Q.  He was supposed to be a manager?

6    A.  He was a lower-level employee.

7    Q.  And do you recall that there came a time

8    when you were not happy with the way Mr. Pollack

9    was managing?

10   A.  Yes.  I recall, yes.

11   Q.  And do you recall that part of the problem

12   was that you thought that Mr. Pollack was

13   affecting the morale of his group?

14   A.  Well, my recollection is that the way he was

15   managing that group was called into question.

16   Q.  And, in fact, you reported to Human

17   Resources that, based on your expectations,

18   Mr. Pollack was not where he should be in terms

19   of performance and staff development?

20   A.  Okay.

21   Q.  Is that consistent with your recollection?

22   A.  It is consistent, yes.

23   Q.  Now, if you were having these ongoing

24   concerns up until the termination of

25   Ms. Speight, do you agree that you were having

1   similar types of concerns in terms of

2   performance and staff development up until, not

3   including, the May 25th e-mail?

4   A.  That I would have the same concerns with

5   Ms. Speight?

6   Q.  Yes.

7   A.  Yes.  I was beginning to -- yes, I was

8   having those concerns.

9   Q.  Okay.  Now, in Mr. Pollack's case, you gave

10  him a warning, right?

11  A.  I believe he was given a warning.

12  Q.  You yellow-flagged him, right?  I love that

13  analogy.  I don't know.  I just came up with it

14  today.  I remembered that you played soccer.

15         You yellow-flagged Mr. Pollak, right?

16  A.  I know he was given a warning.  So, yes.  He

17  wasn't one of my direct reports.

18  Q.  If you look at P-110 --

19  A.  Uh-huh.

20  Q.  -- the date of the internal e-mails begins

21  on January 9th.

22         Then the second page is a memo

23  documented by John Zurick, dated January 31st,

24  2006, saying you and Tony Perez and Mr. Zurick

25  "met with Bryan on January 31st to inform Bryan

1    the concerns of Bryan's staff that were brought

2    to Mark's attention.  Mark also wanted to tell

3    Bryan what he expected of him in regard to the

4    way he was managing his staff."  Right?

5    A.  I'm just trying to find out where you are.

6    Q.  I'm sorry.  I'm right at the top of the

7    second page.

8    A.  Okay, thank you.

9    Q.  Do you see where I am?

10   A.  I do, yes.

11   Q.  I apologize for that.

12        And you informed Bryan that you weren't

13   seeing Bryan progress the way he should have

14   been.  Based on his skills and experience.  Mark

15   and Ned had certain expectations from Bryan when

16   they hired him nine months ago, and Bryan was

17   not meeting those expectations," correct?

18   A.  Okay.

19   Q.  Is that your recollection of the way it

20   happened?

21   A.  Yeah.  Generally, yes.

22   Q.  And if a manager isn't meeting someone's

23   expectations, you're generally supposed to have

24   this kind of counseling session, right?

25   A.  Yes.

1   Q.  And you didn't have the opportunity to have

2   that kind of counseling session with

3   Ms. Speight, right?

4   A.  No, I did not have the opportunity.

5   Q.  Okay.  In fact, going back to Mr. Pollack,

6   you told him that he had 30 days to improve?  I

7   don't know if it says it in this memo.

8   A.  I don't recall.  I know that he was given a

9   time frame to improve.

10  Q.  Actually, it is at the bottom.  If you look

11  at the second to last line, it says "Mark told

12  Bryan that he had 30 days to improve the

13  relations within his department."

14  A.  Okay.

15  Q.  And that, "Tony also stated he would be more

16  involved in the day-to-day within the

17  department."  Right?

18  A.  Yes.

19  Q.  So Tony is going to step in with a little

20  more day-to-day?

21  A.  Correct.

22  Q.  Just the way you were thinking about

23  Ms. Speight that maybe Mr. Finkenstaedt would

24  get more involved in the day-to-day, right?

25  A.  I don't know if it's the same or not.

1    Q.  Okay.  In fact, you gave Mr. Pollack a lot

2    more than 30 days, right?

3    A.  I don't know.

4    Q.  Well, let's turn to the next page.

5    A.  That's what I figured we'd do.

6    Q.  The date is April 12th.  He's given 30 days

7    on January 31st.  Right?

8    A.  Okay.

9    Q.  It says, "Mark McCool called me and told me

10   he wanted to terminate Bryan."

11          So his termination didn't occur and got

12   all the month of February, all the month of

13   March, and part of April to improve, right?

14   A.  All right.  Based on this, yes.

15   Q.  I believe it was Mr. Zurick's testimony

16   yesterday that that wasn't extended because

17   Mr. Pollack's improvement went up and then came

18   back down, right?  It sort of flat-lined all the

19   way from January 31st to April 12th, right?

20   A.  I don't know.  He wasn't one of my direct

21   reports.

22   Q.  So, as you sit here today, you don't have

23   any reason to disagree with Mr. Zurick's

24   testimony in that regard?

25   A.  No.

1    Q.  Okay.  Now, ultimately it would have been

2    your decision to terminate Mr. Pollack, correct?

3    A.  No, I don't believe so.

4    Q.  Whose decision would it have been?

5    A.  Again, I would think I would have gone to

6    Mike Lipson.

7    Q.  So Mike Lipson would have ultimately been

8    responsible for Mr. Pollack's termination?

9    A.  I believe so, yes.

10   Q.  And your testimony today --

11   A.  Well, I would say I think Mr. Pollack was

12   responsible for his termination.

13   Q.  Fair enough.  The termination decision.

14   A.  Yes.  Thank you.

15   Q.  And you believe that's the same as in

16   Ms. Speight's case, that Mr. Lipson ultimately

17   had the decision?

18   A.  Yes.  Mr. Lipson is the executive

19   vice-president of the group.  I think it's his

20   responsibility.

21   Q.  Okay.  And if you had told Ms. Speight, I

22   want her out, as you testified at the beginning,

23   he would always take your recommendations,

24   right?

25   A.  He would always take my recommendations?

229

1    Q.  Yes.

2    A.  No, he's not always taken my

3    recommendations.

4    Q.  I thought you testified to that this

5    morning.

6            Does he generally take your

7    recommendations?

8    A.  I think he relies on them, yes.

9    Q.  Basically, you told him in Ms. Speight's

10   case, I want her out, right?

11   A.  I don't recall that.

12   Q.  You told Ms. Speight, I'm the one

13   who realized it wasn't going to work out, right?

14   That's what you told her at termination.

15           MR. BANKS:  Objection.  He's testified

16   to this.

17           THE COURT:  Overruled, one last time.

18   BY MR. SALMANSON:

19   Q.  One last time.  That's what you told

20   Ms. Speight in the meeting, right, that you had

21   decided that it wasn't going to work out?

22   A.  I communicated to Ms. Speight that she was

23   being terminated.

24   Q.  Okay.  And according to the memo from

25   Mr. Zurick, you communicated to her that she's

1    being terminated because after the May 23rd

2    meeting and the May 26th e-mail, you realized it

3    wasn't going to work out?

4    A.   That's my recollection of the meeting.

5             MR. SALMANSON:   Nothing further, Your

6    Honor.

7                    CROSS-EXAMINATION

8    BY MR. BANKS:

9    Q.   Hello, Mr. McCool.

10   A.   Hello.

11   Q.   Long day up there.

12   A.   Yes, it has been.

13   Q.   Mr. McCool, did you view Mr. Pollack's

14   situation as comparable to Ms. Speight's

15   situation?

16   A.   Not at all.

17   Q.   To your knowledge, did Mr. Pollack ever act

18   in a way that was insubordinate to you or any of

19   his superiors?

20   A.   Never.

21   Q.   Did he ever tell a client, even an internal

22   client, that they would get deficient work

23   product if your directives were followed?

24   A.   Absolutely not.

25   Q.   Mr. Salmanson asked you about an e-mail that

1  was labeled D-11.  I know you have a bunch of

2  binders there.  It was a May 9th, 2006 e-mail

3  from Ms. Speight to a bunch of people, and

4  you're copied on it, or you're one of the people

5  that are addressed on it.

6        He spent awhile asking you about this.

7  This e-mail appears to have been addressed to

8  Julie Gschwind.

9        Am I pronouncing that right?

10 A.  I don't know.

11 Q.  It says, "Thanks for the feedback, Julie.

12 Mark, Mike, the Credit Department will be

13 providing training for the risk rating process.

14 The next cycle will begin in late May.  If Julie

15 and Jackie are not the appropriate individuals,"

16 et cetera.

17        You recall him asking you about this?

18 A.  I do.

19 Q.  When he asked you about this, did you

20 understand this to be an e-mail discussing the

21 possibility of providing training to people in

22 the Credit Department?

23 A.  The -- I'm sorry.  I lost it there for a

24 second.

25 Q.  Okay.  Did you understand this e-mail from

1  Ms. Speight to be suggesting that the
2  possibility that people in the Credit Department
3  would be trained on how to do risk ratings?
4  A.  Yes.
5         MR. SALMANSON:  Objection.
6         THE COURT:  What's your basis for the
7  objection?
8         MR. SALMANSON:  Leading.
9         THE COURT:  It is somewhat leading.
10  I'm going to overrule your objection to this
11  question, but I won't for the next one.
12  BY MR. BANKS:
13  Q.  Did he ask you to read your response to the
14  e-mail aloud to the jury?
15  A.  Not that I recall.
16  Q.  Okay.  Let's read your response aloud that
17  you gave to Ms. Speight in response to her
18  e-mail?  Now, what did you say?
19  A.  "Let's talk about this tomorrow.  What times
20  are you available?"
21  Q.  Did you tell Ms. Speight at any time that
22  you agreed with her suggestion to have training
23  given by the Credit Department on how to do risk
24  ratings?
25  A.  No.

1    Q.  I'd like to turn to, for lack of a better

2    term, the termination e-mail, the May 25th

3    e-mail, first from you, and then from

4    Ms. Speight.  It's on the giganda blow-up over

5    there.  It's D-23 in your binder.

6         Tell me when you're there.  It's the

7    defendant's exhibits.  Is that the right one?

8    A.  I'll get it in a second.

9         MR. BANKS:  May I help the witness,

10   Your Honor?

11        THE WITNESS:  I have it.

12        MR. BANKS:  Your Honor, may I just move

13   some of these away to clear this out a bit, give

14   the man some space?

15   BY MR. BANKS:

16   Q.  Now, first, in this e-mail trail, there was

17   a reference to an e-mail from Mr. Nienas.  It's

18   on Page 4 of the e-mail dated May 24th.

19        Do you remember Mr. Salmanson asking

20   you about that?

21   A.  I do.

22   Q.  In this e-mail, Mr. Nienas wrote to a bunch

23   of people, "It appears from the following e-mail

24   correspondence that Asset Management

25   responsibilities for the Canadian portfolio have

1    been reassigned to the CRM in Canada."

2              And then it goes on, right?

3    A.  Yes.

4    Q.  And he copied Mr. Hohenleitner on that

5    e-mail, right?

6    A.  Yes.

7    Q.  Were you troubled that Mr. Hohenleitner

8    would be copied on this e-mail?

9    A.  No, no.  The e-mail is about training.

10   Q.  Okay.  Now, let's turn back, then, to the

11   e-mail that is on the blow-up, the first page,

12   your e-mail, and the response from Ms. Speight.

13             I want to go through some of the things

14   in Ms. Speight's response to you.  Do you have

15   it there?

16   A.  Yes, I do.

17   Q.  Let's go to the third paragraph, the portion

18   that begins, "Consequently, the former PLG Asset

19   Management individuals **are not** in a position to

20   perform an evaluation for risk rating purposes."

21             Do you see that sentence?

22   A.  I do.

23   Q.  Do you recall Mr. Salmanson asking you about

24   whether you would agree that the people may not

25   have been in a position to do those risk ratings

1  that day on May 25th?

2  A.  Yes, I do.

3  Q.  When were the risk ratings due?

4  A.  I believe it was either June 8th or

5  June 16th.

6  Q.  Well, what, if anything, did you expect

7  those people to be able to do, the people in

8  Wanda Speight's group, to be in a position to do

9  the risk ratings by June 8th or 16th?

10  A.  Whatever it took.

11  Q.  Give me some ideas about someone who hadn't

12  been managing that could get up to speed to do

13  the risk ratings?  What would they do?

14  A.  We have available to us a tremendous amount

15  of information.  There are financial statements

16  that they would have access to or should have

17  access to, and would pull down  and review,

18  spread the financial statements, pull market

19  analyses, look at rent roles for a particular

20  property which lists how many tenants are there.

21  There's a myriad of things that they could do,

22  should do.

23  Q.  When you wrote your e-mail, at the bottom of

24  this page, at the bottom of the blow-up, saying

25  "All risk ratings will be done by the Asset

1    Management group," did you believe that people

2    in that group had enough time to get up to speed

3    on the Canadian loans to get the risk ratings

4    done by June 8th or 16th?

5    A.  Positively.

6    Q.  The next sentence that Mr. Salmanson read to

7    you is in the next paragraph.

8              This is Ms. Speight writing.  "I would

9    hope that I am not being told by Capmark

10   Management to sign off on reserves and provide

11   risk ratings on a portfolio of loans, for which

12   my staff has no knowledge."

13             Did that statement trouble you?

14   A.  Absolutely.

15   Q.  Did you believe they could get knowledge?

16   A.  Yeah, absolutely they could.  Readily.

17   Q.  Is that consistent with what you have just

18   told us?

19   A.  That's very consistent with what I just

20   said.

21   Q.  Okay.  Now, let's go to the next sentence.

22   This is the next to last sentence in

23   Ms. Speight's e-mail.

24             I know you weren't here yesterday, at

25   least, I don't believe you were, right?

1   A.  No, I wasn't.

2   Q.  Okay.  Do you know that Ms. Speight

3   testified yesterday, or do you only know because

4   I have told you?

5   A.  I understand because you told me.

6   Q.  Okay.  This last sentence says, "Mark,

7   again, the Asset Management team is and will

8   continue to be responsible for daily borrower

9   interaction as well as the risk rating process,

10  for its existing portfolio."

11          What did you interpret Ms. Speight to

12  mean by that?

13  A.  My interpretation was that she would

14  continue to be responsible for risk ratings, but

15  only for the loans that she felt her group was

16  responsible for.

17  Q.  I'm going to read to you a question and

18  answer --

19          THE COURT:  One moment.

20          MR. BANKS:  I'm sorry, Your Honor.

21          MR. SALMANSON:  I don't have a copy.

22          MR. BANKS:  You can come and look.

23          MR. SALMANSON:  That's what I was going

24  to ask, if I could come up and look.

25          MR. BANKS:  Sure.  You can stand right

1    next to me, if you want.

2            MR. SALMANSON:  Okay.

3    BY MR. BANKS:

4    Q.  Page 159, Line 15,

5            I asked you -- actually, I take it

6    back.  Let me go back a little further.  I asked

7    Ms. Speight --

8    A.  Is this in my deposition?

9    Q.  No.  This is from Ms. Speight's testimony

10   yesterday.  I'm going ask you if her answer is

11   consistent with what you understood when you

12   read that sentence.

13   A.  Okay.

14   Q.  "Q.  What you were saying to him there,

15   though, was, we'll do the risk ratings for our

16   existing portfolio, meaning portfolios other

17   than the Canadian loan portfolio, right?"

18            And she answered,

19            "A.  That's correct."

20            Is that what you understood her to be

21   saying?

22   A.  Yes, it is.

23   Q.  Did you understood her to be saying that she

24   just wasn't going to be doing the Canadian

25   portfolio?

1    A.  Absolutely.

2    Q.  Let's look at the next line.  This is the

3    final one, and this is the one addressed to Joe

4    in the Credit Department.

5         She says, "Joe, please be aware if we

6    are being told to risk rate the SPG loans and

7    Canadian portfolio, I cannot be confident in the

8    accuracy of assigned ratings, nor can we be

9    expected to defend such ratings given our lack

10   of knowledge and experience with this

11   portfolio."

12        Did that concern you?

13   A.  Absolutely.

14   Q.  Why?  What bothered you about that comment

15   being addressed to Joe Hohenleitner and the

16   others?

17   A.  Well, as I discussed before, Joe, Maureen,

18   and Beth on the e-mail are all clients, and the

19   comment here is that she is putting them on

20   notice that if she does what I'm telling her to

21   do, you, Joe, won't be able to rely on this

22   information.

23   Q.  This is what I asked Ms. Speight yesterday.

24        MR. BANKS:  If you want to come up

25   again, Mr. Salmanson, feel free.  It's on Page

1   162, Line 9 through Page 162, Line 12.  This was

2   my question, and this is her answer.

3           I want to know if her testimony

4   yesterday is consistent with the way you read it

5   in May of 2006.  I asked,

6           "Q.  So you were telling him if you did

7   what McCool told you to do, he risked having

8   inaccurate and indefensible risk ratings?"

9           Ms. Speight answered,

10          "A.  That's what I told him."

11          Is that the way you interpreted it in

12   May of 2006?

13   A.  Yes.

14   Q.  Why did that bother you?

15   A.  Ms. Speight's department was responsible for

16   performing this function.  And for her to say

17   that -- well, first off, the inference was that

18   I was telling her to do something that is

19   against -- you know, against everything that our

20   company stands for, I think.

21          And then to say that if I do what I'm

22   being told, everything I give you is unreliable.

23   You can't rely on it.  And, you know, the

24   ratings that I give you are useless.  From a

25   credit perspective, I can't stress how

1    unbelievable that is.

2    Q.  What was your belief, if any, as to whether

3    Ms. Speight had the time and the resources in

4    her group to get accurate and defensible risk

5    ratings before they were due?

6    A.  I'm very confident and comfortable that she

7    had the resources available, and she would have

8    gotten them done on time.

9    Q.  Mr. Salmanson asked you about soccer, yellow

10   cards and red cards.  He compared her situation

11   to Bryan Pollack who got, I think, as

12   Mr. Salmanson described it, a 30-day yellow

13   card?

14   A.  Correct.

15   Q.  You said these risk ratings were due

16   June 8th or 16th?

17   A.  That's my recollection.

18   Q.  I want to tell you that Ms. Speight said

19   yesterday that she thought it was June 8th.

20          Would you have any basis to disagree

21   with that?

22   A.  No, I wouldn't.

23   Q.  So that's about 12 days after the e-mail?

24   A.  Okay.

25   Q.  In light of what Ms. Speight said to the

1    Credit Department about her inability to produce

2    accurate and defensible risk ratings, did you

3    think you had time to give her a 30-day yellow

4    card to see how she could do?

5    A.  Not at all.  That's a hard date.  You can't

6    change that date at all.

7    Q.  Who took over for Ms. Speight?

8    A.  Don Irwin.

9    Q.  And where was he before that?  Where did he

10   come from?

11   A.  Don was one of Wanda's direct reports.

12   Q.  So he was in the Asset Management Group?

13   A.  Yes, he was.

14   Q.  When did he learn that he was taking over

15   for Ms. Speight?  Did he find out before she was

16   told of her termination or after?

17   A.  No, after.

18   Q.  Was it that afternoon?

19   A.  Yes, I think it was that afternoon.

20   Q.  So that is Friday, the day before Memorial

21   Day, the afternoon, May 26th?

22   A.  Correct.

23   Q.  And Monday was a holiday?

24   A.  Yes.

25   Q.  So his first day back at work, after the

1   holiday, was May 30th?

2   A.  Yes.

3   Q.  And you said the risk ratings were due --

4   well, if Ms. Speight is right, June 8th?

5   A.  Correct, June 8th.

6   Q.  Did Mr. Irwin and his group get them done on

7   time?

8   A.  They absolutely did.

9   Q.  Was there any problem with the accuracy or

10  defendability or defensibility of the risk

11  ratings, if that's a word?

12          MR. SALMANSON:  Objection, Your Honor.

13  I think he has to lay a foundation for that.

14  I'm not sure that Mr. McCool would have been

15  present when the risk ratings would have been

16  defended.

17          MR. BANKS:  I'll ask it differently,

18  Your Honor.

19          THE COURT:  Very well.

20  BY MR. BANKS:

21  Q.  Mr. McCool, as Mr. Irwin's immediate

22  superior, did you ever learn of any problems

23  with the accuracy or defensibility of the risk

24  ratings that his group did?

25  A.  Quite to the contrary.

1    Q.  There was some testimony in response to

2    Mr. Salmanson that there were discussions in

3    late April and early May of 2006 with

4    Ms. Speight about whether or not she would be in

5    RES or in your group; is that right?

6    A.  Correct.

7    Q.  If she had been in RES, to whom would she

8    have been reporting?

9    A.  I believe it would have been Tony Lauerman.

10   I'm sorry.  Excuse me.  Michael Carp.

11   Q.  Would that have taken her out of her group

12   if she went into RES?

13   A.  Yes.

14   Q.  What did you tell her about where you wanted

15   her to work?

16   A.  I wanted her to be part of the skill set

17   that Wanda brought to the table, and I wanted

18   her to continue to manage the Asset Management

19   function, primarily responsible for client

20   contact and borrower interaction, risk ratings,

21   and the like.  That was a better role for her in

22   the company.

23   Q.  Did you want her in your group in Asset

24   Management reporting to you?

25   A.  Absolutely.

1   Q.  Was her race a factor in that?  Did you want

2   her because of her race?

3   A.  No.

4   Q.  Did her race cause you not to want her?

5   A.  No.

6   Q.  How about your reaction to the meeting on

7   May 23rd?  We talked a good bit about the

8   meeting on May 23rd.

9           MR. BANKS:  Your Honor, actually I know

10   the jurors were read portions of Mr. McCool's

11   memo, which was D-21.

12           I'd like to give it to him, but might I

13   also hand copies to the jury, so they can

14   actually see it up -- I'm addressing it to the

15   Court.

16           THE COURT:  No objections to that, is

17   there?

18           MR. SALMANSON:  Just so that we're

19   clear, which version of the memo.

20           MR. BANKS:  The final version.  D-21.

21           MR. SALMANSON:  Okay.

22           THE COURT:  Very well.  You may exhibit

23   it to the jury.

24   BY MR. BANKS:

25   Q.  Mr. McCool, if you look in your book, it's

1   exhibit D-21.

2           MR. BANKS:  I'm going to hand these out

3   to the jury, if I may.

4   BY MR. BANKS:

5   Q.  Would you let me know when you have D-21?

6   A.  I have it.

7   Q.  Okay.  Is this the final version of the memo

8   that you wrote between the May 23rd meeting and

9   the date of receiving Ms. Speight's May 25th

10  e-mail?

11  A.  Yes, it is.

12  Q.  I'm not going to go through the entirety of

13  this, but just in the background section, I know

14  that Mr. Salmanson asked you some questions with

15  that.

16          Were you attempting to document

17  everything that had happened prior to May 23rd

18  in that section?

19  A.  No, I wasn't.

20  Q.  What was the purpose of that section?

21  A.  Well, to provide background.

22  Q.  Was it a timeline or something else?

23  A.  Yes, effectively it was a timeline.

24  Q.  Okay.  Now, you said, I think in response to

25  Mr. Salmanson's questions, that the purpose of

1   this memo was to address what happened at the

2   May 23rd meeting?

3   A.   Correct, to memorialize my thoughts.

4   Q.   Were things fresh in your mind when you

5   wrote this note?

6   A.   They were.

7   Q.   All right.  Let's skip the first couple of

8   paragraphs that discussed the purpose of the

9   meeting and what you were doing in reviewing the

10  six-page document.

11       I'm going to ask you to skip to the

12  next-to-last paragraph on the first page that

13  begins "The Asset Management team."

14       Would you read just that paragraph and

15  the next one aloud?

16  A.   "The Asset Management team was recently

17  advised that one of the asset managers had

18  resigned; I inquired as to the demeanor or

19  morale of the remainder of the team, to which

20  Wanda responded, "You will have to ask them."

21  Q.   Continue, please.

22  A.   "I then asked whether Marla or anyone else

23  had expressed concerns, Wanda replied, "Well, I

24  don't speak for them, so you would have to ask

25  them."

1    Q.  And the first line of the next page.

2    A.  "The foregoing was repeated a few more

3    times."

4    Q.  Why did you keep asking her that?

5    A.  I thought it was a legitimate question.

6    I -- frankly, I think I was shocked at the

7    initial response, and I needed to know if there

8    were issues within the department.

9    Q.  What was your reaction to Ms. Speight

10   saying, you go ask them instead of saying, how

11   about if I go ask them and get back to you?

12   A.  I was surprised, shocked, even.

13   Q.  The next line, you wrote, "Wanda was not

14   engaged in the conversation, nor did she

15   willingly contribute to the discussion."

16           Can you describe a little bit what you

17   meant by that?

18   A.  The four of us were going through, again, a

19   very granular level, trying to identify the

20   various tasks and the placement of those tasks

21   within Services.

22           I mean what I say.  She was not

23   engaged.  Her arms were folded.  She was looking

24   around.  She did not willingly contribute at

25   all.

1  Q.  Read the next sentence, please, or the next

2  paragraph?

3  A.  "When asked what her opinion was on a

4  particular task assignment, she replied, well,

5  you know my opinion does not count, so I don't

6  have one."

7  Q.  Did that bother you?

8  A.  Yes, it did.

9  Q.  Why?

10  A.  I did value her opinion, and I wanted to

11  know -- she had a -- reportedly a better

12  understanding in that group than anybody else.

13  Part of the transition was to insure a smooth

14  transition.  I needed her feedback.

15  Q.  When you brought Ms. Speight into your

16  group, what did you expect of her?

17  A.  That she would, you know, be the senior

18  manager that she was.

19  Q.  Did you expect her to contribute ideas to

20  the group?

21  A.  Certainly.

22  Q.  Would you skip down to the last paragraph.

23  A.  (Witness complies.)

24  Q.  The second sentence refers to the plan to

25  schedule a meeting, and it says, "It is my

1    intention to reiterate that we believe in her

2    abilities, which is why we offered her the

3    position to begin with."

4         Was that sincere?

5    A.  Absolutely.

6    Q.  Even as of that time, did you still believe

7    there was a potential to make it work?

8    A.  Yes.  I did, absolutely.

9    Q.  What changed?

10   A.  The e-mail on the 25th.

11   Q.  Did your reaction to Ms. Speight's e-mail

12   have anything to do with her race?

13   A.  No.

14   Q.  Did you ever consider her race in any of the

15   decisions or recommendations you made about

16   Ms. Speight, whether it's bringing her in the

17   department, scheduling meetings, talking to her,

18   e-mailing to her, discussing her e-mail with

19   Mr. Lipson, or anything else?

20   A.  Absolutely not.

21   Q.  You were asked about some forms.  I think

22   you said they were Human Resources forms that

23   showed you as an originator.

24   A.  Yes.

25   Q.  Do you actually fill out those forms?

1    A.  No, I don't.

2    Q.  Do you take part in the electronic process

3    of recreating them?

4    A.  No, I don't.

5    Q.  Do you do that for any employees?

6    A.  No.

7    Q.  You've had other people in your group who

8    have terminated employment before, I take it?

9    A.  Yes, I have.

10   Q.  You have never done the paperwork?

11   A.  No.

12   Q.  Do you know why you are shown as the

13   originator, or do you have a belief as to why

14   you are shown as the originator?

15   A.  I believe the system works on reporting

16   lines, and Marla was a direct report, so I would

17   have been reflected that way.

18   Q.  In the termination decision of Ms. Speight,

19   did she ask you who actually made the decision

20   to terminate her employment?

21   A.  No.

22   Q.  Did you ever volunteer who made the

23   decision, whether it was Mr. Lipson or you or

24   someone else?

25   A.  No, I didn't.

1          MR. BANKS:  May I check with

2     co-counsel?

3          THE COURT:  Yes.

4          MR. BANKS:  I don't have any further

5     questions of Mr. McCool.

6          Thank you, Judge Joyner and Mr. McCool.

7     Mr. Salmanson may have some follow-up.

8          MR. SALMANSON:  Very briefly.

9               REDIRECT EXAMINATION

10    BY MR. SALMANSON:

11    Q.  If Ms. Speight, as of May 25th, had to do

12    these risk ratings, there are a lot of resources

13    available to her, right?  There's all sorts of

14    reports that she could have gotten her hands on,

15    hard data, right?

16    A.  Yes.

17    Q.  But you didn't say that there was also a

18    subjective element to the risk ratings, right?

19    A.  No, correct, there is a subjective element.

20    Q.  That's a really important part of the risk

21    ratings, right?

22    A.  It certainly is.

23    Q.  And none of the reports were going to

24    provide that subjective information, right?

25    A.  No.  That would have come from the expertise

1   within the group.

2   Q.  And the expertise within the group, in order

3   to make that subjective determination, they had

4   to know what was going on in those loans, right?

5   A.  And apparently they did know.

6   Q.  Well, eventually, right?

7   A.  They got it done on time, so they knew.

8   Q.  With a whole lot of extra resources, right?

9   A.  When I referred to the whole lot of

10  resources -- you know, without going into

11  nauseating detail, we have a lot of electronic

12  information that's available.

13  Q.  Let me try it again.  Maybe I wasn't clear.

14          After May 25th, and, in fact, virtually

15  as soon as Mr. Irwin was assigned to the task,

16  you gave him four extra asset managers to help

17  him finish the job, right?

18  A.  No, I don't think so.

19  Q.  Do you recall how many asset managers he was

20  given to help do the job?

21  A.  I identified four asset managers that would

22  eventually move into the group.

23  Q.  And did you recall how quickly they were

24  assigned to the group?

25  A.  I think they took on that role sometime in

1  July or August.

2  Q.  You don't think they helped participate in

3  the Asset Management function to get it done for

4  the June risk ratings?

5  A.  I'm pretty positive they did not.

6  Q.  Now, Ms. Speight, I believe Mr. Banks

7  testified -- he characterized -- I shouldn't say

8  "testified," but said that Ms. Speight was

9  saying, you know, the risk ratings are going to

10  be, pardon my French, for crap basically, right?

11        But that's not what she said.  She said

12  she couldn't be confident in the accuracy.  She

13  didn't say they were going to be inaccurate,

14  right?

15  A.  I think that's the same thing.

16  Q.  Now, Mr. Banks also talked about yellow

17  carding.  We're back to soccer.

18        He said, you didn't have time to yellow

19  card and give her 30 days, right?  But I didn't

20  ask you about yellow carding and giving her 30

21  days.  I just asked you about yellow carding.

22        As soon as you're yellow carded, you

23  know you're in trouble, right?

24  A.  Yes, but going back to the soccer.

25  Q.  She wasn't given a yellow card in one day to

M. MCCOOL - REDIRECT                     255

1   improve or change her tune, right?

2   A.   That's correct, she wasn't.

3   Q.   Just so we're clear, you were told that

4   Ms. Speight's group was moving into Servicing,

5   right?

6   A.   Yes.

7   Q.   You didn't have any input on that?

8   A.   No.

9   Q.   At the end of the day, on May 12th, when the

10  decision was finally made to take Ms. Speight,

11  you weren't just taking Ms. Speight, right, you

12  were taking Ms. Speight and all 20 of her people

13  altogether?

14  A.   I don't know how many of those employees

15  were identified as going to Real Estate

16  Solutions or Asset Management, so I don't know

17  that answer.

18  Q.   But at least as of May 12th, when you agreed

19  to take Ms. Speight, you were also taking a lot

20  of her people, too?

21  A.   Yes.

22  Q.   So the decision wasn't just about taking

23  Ms. Speight, right?

24  A.   The decision would have never been just

25  about that.

1   Q.  Right.  So when Mr. Banks talks about, well,

2   you agreed to have Ms. Speight come in and she

3   was African-American, that had nothing to do

4   with it.

5           I mean, the truth of the matter is that

6   it was never just about Ms. Speight, where she

7   was going to go, but it was about where she and

8   her group were going to go, right?

9   A.  Well, I think the first decision was who was

10  the right person to manage the group, and

11  Ms. Speight was the right person to manage the

12  group.

13  Q.  She had always managed that group, right?

14  A.  Correct.

15  Q.  And based on everything you knew, she was

16  really good at it, right?

17  A.  I had heard no complaints.

18  Q.  As far as you knew, having Ms. Speight come

19  over was going to lend real prestige to your

20  group, right?

21  A.  Yes.  Having Ms. Speight as part of the team

22  gave me comfort that the transition would move

23  along very well.

24  Q.  Ms. Speight and her team, right?

25  A.  Certainly.

1   Q.  And you understood that this was a team that

2   basically Ms. Speight had developed from the

3   ground up, right?

4   A.  I don't know the whole history of the group

5   itself.

6   Q.  You would be happy to have Ms. Speight's

7   group, whether Ms. Speight was part of the group

8   or not, right?

9   A.  I don't know that.

10  Q.  Now, Mr. Banks also said that you were happy

11  to have her report to you, right?

12  A.  Sure.

13  Q.  That was true as of May 12th, right?

14  A.  Certainly.

15  Q.  Within 13 days, it wasn't true anymore,

16  right, or actually less than that?

17        By May 23rd, May 24th, was 12 days, 12

18  days later, you didn't want her reporting

19  directly to you anymore, right?

20  A.  I don't think it was because I didn't want

21  her reporting to me.  It was that she required

22  more oversight than I was capable of doing.

23  Q.  And as a result of that, you didn't want her

24  reporting to you, right, because she was too

25  much for you?

1   A.   No.   She required more assistance than I had

2   anticipated, so I wanted to give her that

3   support.

4   Q.   And you didn't want her reporting directly

5   to you, then?

6   A.   Well, again, I'll say it my way,  again.   I

7   thought she needed more support than I was

8   capable of doing, so to give her the correct

9   amount of support would mean that she would

10  report to Ned Finkenstaedt.

11  Q.   It took you 14 days to figure that out,

12  right?

13  A.   Apparently.

14  Q.   And that's 14 working days, right, two

15  weekends in between?  May 12th was a Friday,

16  remember?

17  A.   Okay, yes.

18  Q.   So we're really talking ten days, two

19  business weeks --

20  A.   Okay.

21  Q.   -- during part of which you might have been

22  on PTO, right?

23  A.   Based on the schedule, yes.  I don't know if

24  I was on PTO or not.

25  Q.   Now, you say you valued her opinion, right?

1   A.   Yes.

2   Q.   And one of your concerns was that you

3   weren't getting her opinion, right?

4   A.   Correct.

5   Q.   You certainly walked out of the May 23rd

6   meeting, and you thought to yourself, I want her

7   to know that I value her opinion, right?

8   A.   Correct.

9   Q.   The very next time she renders her opinion,

10  it's in that e-mail, right?

11  A.   I believe so.

12  Q.   You didn't value her opinion at all in that

13  e-mail, right?

14  A.   I don't know if you can say I didn't value

15  her opinion.  I didn't value the way that she,

16  you know, typed up the e-mail and sent the

17  e-mail.

18  Q.   In fact, the first time she gave you her

19  opinion of anything, her opinion not only didn't

20  count, but it got her fired; isn't that true?

21  A.   I don't think I agree with that

22  classification.

23  Q.   Because she had rendered her opinion in some

24  other manner between May 23rd and May 25th, to

25  your recollection?

1   A.  I think you're making a distinction that

2   it's her opinion that got her fired, and I don't

3   agree with you.

4   Q.  Would you agree with me that this is the

5   first time that she rendered her opinion after

6   the May 23rd meeting, that you can recall?

7   A.  That I can recall, yes.  I don't know if I

8   spoke to her on the phone in-between.

9   Q.  And regardless of the manner of the way in

10  which she rendered her opinion, she gave you her

11  opinion and it got her fired; isn't that true?

12  A.  Well, again, it was how that opinion was

13  delivered.

14          MR. SALMANSON:  I have nothing further,

15  Your Honor.

16          MR. BANKS:  Just one or two, Your

17  Honor.

18                  RECROSS-EXAMINATION

19  BY MR. BANKS:

20  Q.  On this yellow card, just to go back for a

21  moment to what Ms. Speight said yesterday, she

22  said she told Hohenleitner if you did what --

23          MR. SALMANSON:  Can you wait just a

24  second?

25

1   BY MR. BANKS:

2   Q.  -- if you did what McCool told you to do,

3   he, Hohenleitner, risked having inaccurate and

4   indefensible risk ratings?

5           If Ms. Speight had stayed in the job,

6   rather than being terminated, who would have had

7   to sign off on the risk ratings for the Canadian

8   loan portfolio?

9   A.  Ms. Speight would have.

10  Q.  Okay.  Did you feel comfortable, after she

11  had delivered that message to the client,

12  keeping her in the position with the yellow card

13  to be the one to sign off on the client's risk

14  ratings?

15  A.  I think it's very clear that she did not

16  think she could get it done at all, so I had no

17  confidence that she could have gotten it done.

18          MR. BANKS:  Nothing further.  Thank

19  you.

20          THE COURT:  Very well.  Who is your

21  next witness, just out of curiosity?

22          MR. SALMANSON:  I think they would like

23  it to be -- we're willing to accommodate them.

24  I think it's going to be Mr. Lipson, who is

25  going to be for awhile, so I don't know if you

1    want to get started with him, or not.

2              THE COURT:  You may step down now, sir,

3    and watch your step.

4              THE WITNESS:  Thank you.

5              Ladies and gentlemen, we're going to

6    adjourn for the day.  We'll pick up tomorrow

7    morning at 9:30.

8              Please do not talk about the case among

9    yourselves or with others.

10             You can just leave those in your seat.

11   Counsel will collect those at the end of the

12   day.

13             Have a nice day.  See you tomorrow

14   morning at 9:30.  Thank you.

15             (The jury exited the courtroom at

16   4:03 p.m., at which time the Court adjourned the

17   proceedings.)

18

19

20

21

22

23

24

25

1                            I   N   D   E   X

2    WITNESS                      DIRECT CROSS REDIRECT RECROSS

3

     ROBERT JONES
4      By Mr. Goldshaw        2                  24
       By Mr. Banks                   13                    25
5

6    MARK McCOOL
       By Mr. Salmanson     39                 230
7      By Mr. Banks                  230                   260

8

9

10

11

12

13

14

15              C   E   R   T   I   F   I   C   A   T   E

16

17

     I certify that the foregoing is a correct transcript
18
     from the record of the proceedings in the
19
     above-entitled matter.
20

21
     DATE_____
22         Gregg B. Wolfe, R.P.R., C.M.

23

24

25