IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
---

WANDA JAMES SPEIGHT          :   CIVIL ACTION

        vs.                  :

CAPMARK FINANCE, INC.        :   NO. 07-0890

WILLIAM F. ALDINGER, III     :

PHILADELPHIA, PENNSYLVANIA

February 27, 2009

BEFORE HONORABLE J. CURTIS JOYNER, J.

AND A JURY

CLOSING ARGUMENT

APPEARANCES:
FOR THE PLAINTIFF:    SALMANSON GOLDSHAW, P.C.
                      BY: MICHAEL SALMANSON, ESQUIRE
                      1500 JFK Boulevard, Suite 1230
                      Philadelphia, Pennsylvania 19102


FOR THE DEFENDANT:    MORGAN, LEWIS & BOCKIUS, LLP
                      BY: MICHAEL L. BANKS, ESQUIRE
                      1701 Market Street
                      Philadelphia, Pennsylvania 19103


                      BLANK ROME LLP
                      BY:  MICHAEL J. EAGLES, ESQUIRE
                      One Logan Square
                      130 North 18th Street
                      Philadelphia, Pennsylvania 19103




                  GREGG B. WOLFE, RPR, CM
                   Official Court Reporter
                  601 Market Street, Room 1234
                Philadelphia, Pennsylvania 19106
                       (215) 460-1511

1

2          (The Court resumed the proceedings at

3   12:25 p.m., at which time the jury entered the

4   courtroom.)

5          THE COURT:  Good afternoon, lady and

6   gentlemen.

7          When I sent you out for the break, the

8   plaintiff had rested their case, and the defense

9   had also rested their case.  They didn't call

10  any witnesses.

11         Now we're at the stage or the phase of

12  the trial where counsel will give you their

13  closing summation.

14         Initially, the plaintiff's counsel will

15  close or sum up to you, followed by the defense

16  counsel, and then the plaintiff has the right of

17  a brief rebuttal argument, if they care to.  All

18  right?

19         I ask you to give counsel your

20  undivided attention, and after they are finished

21  with their arguments, I will instruct you on the

22  law that you are to apply in the case before

23  you.  All right?

24         So saying, now, counsel, do you wish to

25  close?

1          MR. SALMANSON:  I do, Your Honor.

2          Lady and gentlemen of the jury, first

3    of all, thank you, of course, for your service.

4    I know it's been interesting sometimes, maybe

5    tedious a lot of the time, and I'm sure if you

6    never hear the term "risk rating" again for the

7    rest of your life, it will be too soon.

8          Having said that, we're here for a

9    pretty serious purpose.

10          In Ms. Speight's termination meeting,

11    John Zurick told the truth, the whole truth and

12    nothing but the truth.

13          What he said was, "Wanda, you've done

14    nothing egregious."

15          Mr. McCool told the truth, the whole

16    truth and nothing but the truth.

17          He said, "I just decided it wasn't

18    going to work out."

19          Mr. McCool testified that he always

20    tells the truth at their termination meetings.

21    Remember what he said:  "I decided it wasn't

22    going to work out."

23          Now, Ms. Pickles testified yesterday

24    that Ms. Speight hadn't violated any company

25    policy.  She couldn't say that Ms. Speight had

1    been insubordinate.  Capmark can encode her

2    termination as insubordination, a violation of

3    company policy, or improper conduct, or, most

4    importantly, a refusal to perform job duties.

5             Now, of course, they are going to claim

6    that she was refusing to perform her job duties,

7    and that's why she got terminated.

8             Remember what Mr. Finkenstaedt said.

9    He said that if he were assigned that task, he

10   felt he was supposed to be objecting and

11   refusing to perform that task.  Nothing happened

12   to Mr. Finkenstaedt.

13            Ms. Speight's termination for cause

14   wasn't for cause within the meaning of the

15   severance policy.  And while they contend that

16   they offered her severance to be nice -- nice?

17            You heard that Ms. Pickles, as the plan

18   administrator, was bound to the terms in the

19   policy.  She wasn't allowed to give Ms. Speight

20   severance, if she were terminated for cause.

21   They can only give severance if, and only if,

22   that termination is not for cause.

23            It wasn't for cause, so it meant it

24   couldn't have been that Ms. Speight failed to

25   follow the lawful direction, policies, or

1    procedures of the company.

2              I suspect that Mr. Banks is going to

3    tell you that she failed to follow the

4    directions, but she didn't, and they determined

5    that back at the time she was terminated.

6              If it were for cause, it meant that she

7    failed to perform a material obligation of the

8    company, but it wasn't for cause.

9              So we now know or we know that back

10   then they said it wasn't for cause.  She hadn't

11   been terminated for insubordination, improper

12   conduct, or failure to perform job duties, but

13   that's not the way they used to tell the story.

14             Once upon a time, they wrote a fairy

15   tale.  The fairy tale was that Ms. Speight was

16   terminated for her, quote, "unprofessional,

17   uncooperative and disrespectful conduct."

18             Remember, that's what they said in

19   their Answers to Interrogatories.  As part of

20   that fairy tale, Mr. Lipson testified in his

21   deposition that Ms. Speight showed a poor

22   attitude.  The only thing he could really point

23   to was that she tried to move half her assets

24   into Real Estate Solutions.

25             Mr. Lipson tried to say he heard that

1  from Ms. Speight directly when, in fact, he

2  wasn't even talking to her.  Remember they had

3  one meeting at the beginning.  There's nothing

4  to back him up.  Eventually, he thought he heard

5  that from Mr. McCool.

6        In fact, there's no testimony that

7  Ms. Speight tried to move half the assets over

8  to Real Estate Solutions.  The only thing

9  Ms. Speight actually recommended in regard to

10  the movement was that some of her people go over

11  there.  She made that recommendation after

12  Mr. McCool asked Ms. Speight for her views.

13        Mr. Lipson said in his deposition -- I

14  read it to you this morning.  Those suggestions,

15  that was a ploy.  It was disingenuous, designed

16  to make trouble.  He didn't know that Mr. McCool

17  would get on the stand this week and say there

18  was nothing wrong with that recommendation.  It

19  was consistent with the -- these are his words,

20  "tenor and tone" of the discussions they were

21  having.

22        In fact, they actually ultimately

23  called those recommendations, according to Mr.

24  McCool, with a few minor exceptions.  Even more

25  telling, he said he didn't even think Mr. Lipson

1    had any basis for objecting because he didn't

2    even know the people.

3              Mr. Lipson also testified in his

4    deposition that Ms. Speight was passive.

5    Remember I asked him that?  Passive.  They

6    decided to go with that one for awhile.  In

7    fact, they started out the trial with it, "she

8    was indifferent," right?

9              You heard Ms. Speight.  You heard her

10   testimony for a day and a half.  You heard her

11   constant e-mails.  She was not passive.  She was

12   doing exactly what she needed to do.  She was

13   shorthanded.

14             She said, "What do I do?"

15             "Go to Mr. Lauerman."

16             She immediately went to Mr. Lauerman.

17   She got him to help her with the SBG loan

18   portfolio, and then she went and she asked him

19   to help her out with the Canadian loan

20   portfolio, just like she was supposed to.

21             She was being proactive, solutions

22   oriented, and she got what she needed to be

23   done, or at least so she thought.

24             If there's one thing maybe, maybe, we

25   can agree on about the May 25th e-mail is that

1   surely it isn't passive.

2            I'm sure you see what is really going

3   on here.  I respectfully suggest to you that

4   they only came up with the idea that she was

5   being passive after they got Ms. Speight's

6   e-mail to Ms. Wilson.

7            Beth Wilson.  Do you remember the

8   career coach?  Then they thought, "Well, if

9   Ms. Speight thought she was indifferent, let's

10  go with that one for awhile."

11           Well, maybe they should have talked to

12  Bob Jones before they wrote that chapter as a

13  fairy tale, right?

14           They tried so hard to suggest he was

15  bias.  You're getting paid for today, right,

16  they asked him.

17           Nope, he said.  I'm just here because

18  it's the right thing to do.  I'm here because I

19  know the truth about Ms. Speight's attitude

20  during that time period.  Of all the people I

21  helped out through transitions like this, from

22  CEOs all the way down, she's a nine or nine and

23  a half out of ten.  And I don't give tens.

24           Unbiased observer during the time

25  period.

1          Whatever else Ms. Speight was, in late

2     May, she was certainly not passive.

3          She paid Mr. Jones to help her, to help

4     her figure out the best way to get through this

5     transition.

6          She wasn't passive.  She had 140,000

7     reasons not to be.

8          You know it, and I know it.

9          Mr. Lipson claimed he was being

10    increasingly concerned about Ms. Speight's

11    attitude.  He talked to her in person once at

12    the beginning of the process, and couldn't

13    dispute Ms. Speight's testimony that, except for

14    that group meeting shortly thereafter, he didn't

15    even talk to her again.

16          How can you judge someone's altitude if

17    you're not even talking to her?

18          At most, there were two incidents over

19    a period of three days.  Ms. Pickles testified

20    in her deposition, as I mentioned, that

21    Ms. Speight violated company policy.  She was

22    insubordinate.

23          No one else believed it then.  You can

24    see the documents.  The truth is, Ms. Pickles'

25    actions in determining that Ms. Speight was not

1   terminated for cause speaks volumes louder than

2   even her own words.

3           Indeed, not a single individual

4   involved in this determination was willing to

5   back up Ms. Pickles' deposition testimony.  Not

6   Mr. Zurick.  He told you there wasn't any

7   violation of company policy.  Not Mr. Lipson,

8   not Mr. McCool.  Most tellingly, not even

9   Ms. Pickles herself.

10          She disavoid her own testimony,

11  testimony given under oath, and she admitted to

12  you yesterday that she didn't consider the

13  termination to be on the basis of company

14  policy.

15          Fairy tales continued right during the

16  trial, right out of the gate.  Mr. Banks told

17  you in the opening that for Ms. Speight it was

18  all about the money and tried to paint her as a

19  malcontent because she was worried about it.

20          As Mr. Lipson told you, everybody was

21  worried about the money.  Everyone.  Even

22  Mr. Lipson himself.  He told you that yesterday,

23  remember?

24          Mr. McCool tried to tell you, again, he

25  had concerns over many weeks leading up to

1    Ms. Speight's termination.  Then he was

2    confronted with his own internal memo, which

3    showed that whatever concerns he had first arose

4    at the May 23rd meeting.

5         He claimed that the purpose of the

6    meeting wasn't to document all of his prior

7    concerns, just the May 23rd concerns, and he

8    just wrote the background because that didn't

9    really mean anything.  He was just trying to

10   remind himself for context.

11        Too bad he testified under oath in his

12   deposition -- remember, I confronted him with

13   it -- that the memo was designed to document all

14   of his prior concerns.  The truth is, he didn't

15   have any before May 23rd.

16        So then he had to admit that the

17   May 12th meeting went very well.  It was very

18   productive, remember?

19        He changed history again to say, well,

20   my real concerns were real.  It was just in that

21   time period from May 12th to May 26th, based on

22   my nearly daily interactions with Wanda and all

23   the back and forth we had.

24        I didn't see any e-mails before

25   May 23rd going back and forth that would suggest

1   anything to raise a concern, and he didn't point

2   to anything.

3           Unfortunately for him, his own calendar

4   showed that he was on paid time off for all but

5   three of those days.

6           Some of their misrepresentations to you

7   were more subtle.  They want you to believe that

8   the decisions to terminate Ms. Speight was made

9   wholly by Mr. Lipson without Mr. McCool's

10  influence.

11          Why?  Because it fits into their theory

12  that if Mr. Lipson wanted Wanda in March,

13  knowing her race, it wouldn't make sense that he

14  would want to terminate her in May knowing her

15  race.

16          You can't say the same thing for

17  Mr. McCool, because he basically got her.  He

18  didn't have any input into her transfer.

19          So it looks better for them if

20  Mr. Lipson says, "Mr. McCool came to me and

21  showed me the e-mail and I called Ms. Pickles

22  and I said fire her."

23          It would work really well for them if

24  it fit that way.

25          I respectfully suggest to you that

1   Mr. McCool was, in part, the driving force

2   between Ms. Speight's termination.

3            Heck, just three days earlier, he told

4   Human Resources, "I don't want her reporting to

5   me anymore.  I want her reporting to

6   Mr. Finkenstaedt."

7            "Sorry," they told him, "we want her

8   reporting directly to you."

9            So he was stuck with her.  And then he

10  gets the e-mail.  What's his immediate reaction?

11           He e-mails her and says, "We obviously

12  need to talk."  "We obviously need to talk."

13           They make a big deal about Wanda not

14  picking up the phone all the time.  Even though

15  he says "We need to talk," does he pick up the

16  phone and call Wanda?  Does he arrange a meeting

17  with her?  Does he talk to her?  No.

18           He takes the e-mail to Mike Lipson,

19  whose authority he needs to fire her.

20           He goes and he says, "I want to get rid

21  of Ms. Speight."

22           And just 14 days after she first starts

23  officially reporting to him, Mr. Lipson takes

24  Mr. McCool's recommendation and gets the deal

25  done.

1      I'll assume for their sake that
2  Mr. Lipson was the decision-maker.  The story
3  doesn't go quite so well for them either.
4      They say, "Why would we bring over
5  Ms. Speight if we were going to discriminate
6  against her based on her race?"
7      Of course, he wasn't just taking
8  Ms. Speight.  He was taking the entire group, a
9  group which would lend luster and prestige to
10  the back office, a group that contributed to the
11  bottom line.  It wasn't about taking
12  Ms. Speight.  It was about taking her team.
13      Mr. Lipson and Mr. McCool had never in
14  their whole history at Capmark or GMACM -- they
15  can't recall being directly responsible for ever
16  hiring an African-American.  Ever.
17      Let's talk about the May 23rd meeting.
18  I'll call this fairy tale "The Mole Hill and the
19  Mountain."
20      The company claims that this is one of
21  the two primary reasons for her termination,
22  because she "wouldn't," according to them, or is
23  it "couldn't" answer Mr. McCool's question about
24  her group's morale, and because she said that
25  her opinion didn't count.  I'll come back to

1    that one in a minute.

2             Her group's morale.  She refused to

3    tell him.  She had just forwarded him an e-mail

4    a couple days before saying "Chuck Mathews

5    resigned.  We got concerns about morale."

6             She had told him about the morale

7    before.  The truth of the matter is, she told

8    him that because at that point she wasn't sure

9    what the answer was.  She didn't know, she said.

10            "I thought Chuck was happy and now he's

11   resigned.  I can't answer your question, Mark.

12   I don't know.  You're going to have to go ask

13   them."

14            But, of course, he interpreted it a

15   completely different way.

16            The May 23rd meeting is a reason for

17   her termination; that's what they said before as

18   one of the reasons why she was terminated.

19            But even they admit that Human

20   Resources was going to get involved as a result

21   of the May 23rd meeting, not because she was

22   going to be disciplined, but because they wanted

23   to figure out why she was apparently unhappy and

24   tell her again how much they valued her.

25            This wasn't a yellow card event.  He's

1    talking with a coach on the sidelines.  Let's

2    get back in the game, figure out what's going

3    on.

4         Now the e-mail.  You've heard

5    Mr. Finkenstaedt say that Mr. McCool told

6    Ms. Speight at the May 23rd meeting, "Wanda,

7    it's not true that your opinion doesn't count.

8    Please give it to me.  I value your opinion.  I

9    want your opinion.  Don't be passive.  Be

10   proactive.  You got a problem, deal with it.

11   Tell me."  Unless, of course, I use it to get

12   you fired.

13        And I respectfully suggest to you that

14   if Ms. Speight was not black, this e-mail would

15   not have gotten her fired.

16        Here's some things for you to consider

17   in that regard.

18        One reason they have to make the e-mail

19   insubordinate is because if Wanda were just

20   terminated for her attitude, as I told you, as

21   they actually told her in her termination

22   meeting, then those members of the jury who can

23   remember the words of Ricky Ricardo, "You got

24   some explaining to do."

25        Because they otherwise can't explain

1   why Bryan Pollack, the white manager also

2   terminated by Mr. McCool, first got a warning

3   and an opportunity to tell his side of the story

4   and a chance to continue to play in the game,

5   not only through the end of regulation, the 30

6   days, but into overtime before he finally found

7   out.  They had to try to make Ms. Speight's

8   infractions not comparable to Mr. Pollack

9   because otherwise it's clear that she was held

10  to a different standard than he was, a different

11  standard between her and a white employee.

12          Another reason that you can conclude

13  that maybe race had something to do with it or

14  that race did have something to do with it is

15  that they didn't follow their own policies for

16  termination.  Those policies apply to all

17  employees.

18          That's what the policy says.  And they

19  exist for the express purpose to insure

20  fairness.  That means treating similarly

21  situated people the same.  You can't have

22  fairness without equality.

23          Whatever you want to call those

24  policies, guidance, guidelines, policies, they

25  are the standard operating procedures for

1  quality control in Human Resources.  In this

2  case, quality control translates to equality

3  control.

4       And they know they didn't follow their

5  policies.  So what do they say?  "These are just

6  guidelines."  Or they say, "Oh, they apply to

7  all employees."  But they really don't.

8       Or my personal favorite, "Yeah, sure,

9  we followed the policy.  It says we have to hear

10  her side of the story.  Yeah, we did that, right

11  after we fired her."

12       Sometimes, folks, explanations are so

13  implausible that you have to believe something

14  else is going on.

15       But the real proof is the way they

16  interpreted the e-mail.  I tried to find my

17  junior detective kit last night.  Remember

18  those?  Have them as a kid?  One of the tricks

19  was writing in invisible ink.  I think you put

20  lemon juice on it and held it up to the light.

21       Then you saw the words you couldn't see

22  before, words like, "I'm doing this with the

23  intent of embarrassing my boss," which is what

24  Mr. Banks said in his opening.  Words like, "I'm

25  refusing to do what my boss is telling me to

1   do," as opposed to "I can't be competent."

2   Words like, "Sorry for the non-existent

3   miscommunications."  And when you make a

4   reasonable suggestion that moving your people

5   into another place is really just to promote

6   trouble.

7           Mr. Banks is right.  I told you at the

8   beginning, a company acts through its people.

9   Companies don't have prejudices, people do.

10          Wanda Speight had no reason to complain

11  about race discrimination until she began to

12  work for people with prejudice.

13          Of course, she didn't complain about

14  race discrimination before she got fired.  Why

15  should she?  It's not like people wear prejudice

16  on their sleeve.  They tell you that they value

17  you, and they tell you that right up until the

18  moment that they terminate you.

19          Mr. McCool and Mr. Lipson showed you

20  their prejudice.  Prejudice is not an easy word,

21  and it's not easy to accuse someone of it.

22          Prejudice, it means to prejudge, right?

23  In the context of discrimination, it means to

24  prejudge someone based on assumptions or

25  stereotypes about them.

1          Mr. Hohenleitner didn't prejudge

2     Ms. Speight.  He knew her.  He had worked with

3     her.  He thought the risk rating e-mail was

4     okay.  Better than okay.  He knew that she was

5     doing what she had always done and for what she

6     had been amply rewarded, fostering an excellent

7     working relationship with credit, just like they

8     said in her evaluation, keeping him in the loop,

9     shooting straight.

10          He had been accounting for her for a

11    long time, and he was surprised that she got

12    fired over that e-mail.  But Mr. Lipson

13    certainly prejudged her and so did Mr. McCool,

14    and you can easily, easily infer that they did

15    it based on a racial stereotype.

16          You can call it the angry black woman.

17    You can call it the black woman with attitude,

18    because if you believe in that stereotype,

19    their interpretation of the e-mail, a sarcastic,

20    angry, uppity, defiant, disobedient

21    interpretation of that e-mail makes perfect

22    sense.  What else did they have to go on?

23          Mr. Lipson admitted that he didn't know

24    much about Ms. Speight, except for her skin

25    color.  He didn't know about her background, her

1   preCapmark history, her advanced degrees, her

2   performance evaluation, or even despite his

3   attempts to suggest otherwise, her performance

4   since she had -- prior to her joining his group

5   or even actually after.

6            It makes sense with Mr. McCool, too, to

7   whom she had been formally reporting for all of

8   two days.  He admitted that he didn't even have

9   a sense of what her reputation was within the

10  company.  So what else did he have to go on?

11           If you believe in this stereotype, then

12  everything they do makes sense.  You don't need

13  to hear Ms. Speight's side of the story, because

14  her behavior is inbred.  No point in counseling

15  an angry black woman because she's just going to

16  be angry, if you believe in the stereotype and

17  you read her e-mail exactly the way they did on

18  May 26th, 2006, the day they acted on the

19  prejudice.

20           When they got caught, they changed

21  their story, again and again and again, to the

22  point that, during this trial, I went line by

23  line over that e-mail with Mr. McCool, and he

24  could hardly even tell you what was wrong with

25  it.  Because unless you're reading the e-mail

1   with a prejudicial eye, there really isn't

2   anything wrong with it.

3           She was expressing statements of fact.

4   She was apologizing for the obvious

5   communications breakdown.  She was even

6   apologizing on behalf of everybody.  You cannot

7   read that e-mail string without believing that

8   there is a communications breakdown somewhere

9   along the line.

10          She reminds them again where the risk

11  ratings are and what was happening.  She

12  expresses her honest belief -- nobody says it's

13  disingenuous -- that if she's required to do the

14  risk ratings, she can't have confidence that

15  they are going to be right.

16          They are trying to say, well, she had

17  these loans all the time.  But she didn't.  The

18  SBG orphan loan had gone to Mr. Lauerman.  Right

19  up until the morning of May 22nd or whenever

20  that e-mail string was, the Canadian loan

21  portfolio loan was in Mr. Lauerman's group as

22  well.

23          They said they didn't know that.  "I

24  didn't realize that."  Well, it's right there in

25  black and white in the e-mail.  Did you read it,

1  or did you rush to judgment?

2          We're asking for a lot of damages here,

3  compensatory damages for Ms. Speight's

4  devastating emotional harm, to which Calvin

5  testified this morning; Ms. Speight's financial

6  losses.

7          Mr. Banks spent a lot of time this

8  morning suggesting to you that the company is in

9  bad financial shape, a big loss for the year, as

10  if Ms. Speight shouldn't get money.  But despite

11  that loss, they still paid bonuses last week,

12  didn't they?  Why should you assume that

13  Ms. Speight wouldn't have shared in that pie.

14          And then punitive damages for Capmark's

15  new antidiscrimination laws.  They didn't do

16  anything to make sure that they were complying

17  with them; in fact, they completely disregarded

18  them and with malice with which they treated

19  Ms. Speight.

20          There's one last thing, and I think

21  you're going to be surprised by what I'm about

22  to tell you.  I want you to believe Mr. Lipson.

23  That's right.

24          Mr. Lipson told you that all these

25  negative things he was hearing about Mr. McCool

1    didn't make any sense to him.  He's right.  They

2    don't make sense then.  They didn't make sense

3    then, unless, of course, Mr. McCool was feeding

4    him information that was biased by prejudice.

5          They didn't make sense to Mr. Lipson

6    then, and, by the way, of course, he never

7    questioned Mr. McCool.  That just doesn't make

8    any sense to me.

9          But if they weren't making any sense to

10   Mr. Lipson then, then why in the world should

11   they make any sense to you now?

12         Their story is so inherently

13   implausible, that I want you to agree with

14   Mr. Lipson.  Their story doesn't make sense.

15         The only plausible explanation is that

16   Ms. Speight was not fired wholly because of the

17   content of the character or because of what she

18   did, but because of the color of her skin.

19         Thank you.

20         THE COURT:  Thank you, counsel.

21         Now, Mr. Banks.

22         MR. BANKS:  Thank you, Judge Joyner.

23   May I move the easel up here in case I need to

24   use it?

25         THE COURT:  Surely, Mr. Banks.

1      MR. BANKS:  Okay.  So Mr. Salmanson

2  said let's think about this e-mail, right, and

3  let's pretend for a moment that maybe Lipson and

4  McCool and Pickles had stereotypes in their mind

5  the way they interpreted it.  That's what he was

6  saying to you.

7      Let's focus on what Ms. Speight said.

8  Can I read to you for just one minute -- you've

9  heard it before, what Ms. Speight said she meant

10  in her e-mail?  These are her words.  This is

11  her testimony in this courtroom on that stand.

12      I asked her about her comment to

13  Mr. Hohenleitner, the client at the end of the

14  e-mail.

15      I said, "So you're telling him,"

16  Hohenleitner, "if you did what McCool told you

17  to do, he," Hohenleitner, "risked having

18  inaccurate and indefensible risk ratings?"

19      Her answer, I quote, "That is what I

20  told him."

21      That's what she meant.  This isn't just

22  what Lipson interpreted.  That's what

23  Ms. Speight meant.

24      Let's make this really simple for a

25  moment, okay?

1           Suppose you take your car in for

2    service.  You need new brakes.  You take it into

3    the shop, and the mechanic is there with you,

4    the person doing the work.  All right?

5           You say to the mechanic, "I need new

6    brakes, and I'd like to get them by 2:00 this

7    afternoon."

8           And the manager is standing there with

9    the mechanic.  The mechanic looks up and says,

10   "Oh, sir, I'm not doing that.  But if my boss

11   makes me do it, I can't have confidence that

12   you're going to get good brakes.  Your car may

13   crash."

14          Now, think about that.  You, this

15   customer, coming in, in that circumstance,

16   suppose the manager says, "Look, don't worry

17   about it.  I'm going to talk to him.  I'm going

18   to find out what he meant, and I'm going to give

19   him a 30-day warning."

20          Do you want him to do your brakes?  If

21   you're the manager in that circumstance, are you

22   going to send out that mechanic in that

23   circumstance to do the brake job after he said,

24   "Look, I can't get it done and if they make me

25   get it done, I don't have confidence that the

1   car won't crash"?

2          I mean, let's be serious because that's

3   what happened here with Ms. Speight.  That's

4   exactly what happened.  She said, "I can't do

5   it.  I can't get it done.  I won't get it done."

6          Well, can we go back for a moment to

7   Monday, when we picked the jury on Monday, we

8   had a big group of people out there in the jury

9   panel, and I asked all the jurors some

10  questions.  There's a reason we ended up with

11  you people, in part.  Part of it was because you

12  were early in the order.  But there were some

13  people who were early in the order who didn't

14  end up on the jury.

15         But the most important thing was, I

16  asked a critical question.  I said, "Can you

17  decide the question before you, the one the

18  judge will ask, on the basis of the evidence,

19  the evidence alone, and that's the question:

20  Was Wanda Speight terminated because of her

21  race?"

22         That's the only real question before

23  you.  Was she terminated because of her race?

24         Now, let me just take a look at

25  something here.  This is the question.  You're

1   going to get it in typed form, rather than my

2   chicken scratch on this easel.

3          But this is Question Number 1 that

4   you're going to get that Judge Joyner will hand

5   to you, or someone in the courtroom will give to

6   you, probably his assistant, after the judge

7   instructs you.

8          The question is:  "Do you find that

9   Ms. Speight has proved by a preponderance of the

10  evidence that her race was a determinative

11  factor in Capmark's decision to terminate her

12  employment?  Yes or no."

13         That's the question:  Has she proved

14  race discrimination, was there race

15  discrimination?  You know the answer to that.

16  Of course not.

17         There are a ton of pieces of evidence

18  in this case, but you'll also get instructions

19  from Judge Joyner on what the law is to help you

20  answer that question.

21         Judge Joyner has told you what his

22  instruction will be.  It's a form of

23  instructions that the courts use all the time.

24         He will tell you that in determining

25  whether there was discrimination, you may not

1   question Capmark's business judgment.  You

2   cannot find intentional discrimination, simply

3   because you disagree with the business judgment

4   of Capmark or believe it is harsh or

5   unreasonable.

6          You are not to consider Capmark's

7   wisdom.  However, you may consider whether

8   Capmark's reason is merely a cover-up for

9   discrimination.  That's the question.  Not that

10  they get it right.

11          The question is:  Was there race

12  discrimination?  And to answer that you need

13  look no further than the May 25th e-mail from

14  Ms. Speight, the one where I just read to you

15  her deposition testimony about it.

16          She admitted several times.  She said

17  in the e-mail, "I'm not doing what my boss told

18  me to do."

19          You know, there was some confusion

20  earlier in the e-mail trail, but she said that

21  McCool's instruction was clear as a bell.  She

22  understood it.

23          He said, "Asset Management will do

24  this."

25          She said, "No, not me, not my group."

1    She then went on to say, "And if you make me do

2    it, I can't have confidence that it will be done

3    well."

4            That's why she was terminated.  So

5    where is the evidence of race discrimination?

6            What's the basis for this

7    extraordinarily serious allegation?  I told you

8    in my opening —— and I think Mr. Salmanson has

9    acknowledged —— this isn't Capmark, some

10   corporation, being accused.  It's people.  This

11   is a really serious accusation against people.

12           Let's not mince words here.  The

13   accusation here is that Linda Pickles is a

14   racist, and that she's lying on the witness

15   stand; that Michael Lipson and Mark McCool are

16   racists, and that they lied on the witness

17   stand.

18           I don't know what their contentions are

19   about Joe Hohenleitner and Ned Finkenstaedt and

20   the others.  That is a serious accusation.  It

21   makes me shudder, because the evidence in this

22   case shows that that accusation is not only

23   inflammatory, but it is outrageous in light of

24   what Ms. Speight did to get herself fired.

25           The evidence really isn't in dispute on

1    everything that's important and material, so

2    let's start at the beginning, all right?

3              The beginning, meaning 2006.

4    Mr. Lipson knew Ms. Speight's race; he knew it

5    quite well; he knew who she was, and he wanted

6    her in the group.  Any real dispute about that?

7    He brought her into the group, and McCool knew

8    her race.

9              In fact, when Ms. Speight submitted her

10   initial recommendations, if you remember, she

11   wrote a preliminary recommendation saying, "I'd

12   like to go into a different group.  I'd like to

13   go into Mr. Carp's group with half my people."

14   That's Real Estate Solutions.

15             Mr. McCool said, "No, no, no.  I'd like

16   to keep you in my group.  I want you hear

17   because I, like Mr. Lipson, believe that you are

18   a good manager, and you can do good things from

19   my group."

20             Does that tell you that he had a

21   stereotype in his mind about Ms. Speight, or

22   that he thought that she could do the job?  They

23   thought they were getting an excellent manager.

24             The problem was -- and Ms. Speight had

25   been a good manager.  Take my auto mechanic on

1    the brake job.  Maybe he had done great jobs on

2    brakes for five years.  The question was:  What

3    happened when she got there?

4              I don't know exactly why Ms. Speight

5    was so unhappy when she moved into servicing.

6    Maybe it was the money.  Maybe, as she said, she

7    didn't like her new manager, Lipson, as she

8    wrote in her e-mail.

9              But this is what we know again.  This

10   case really always comes down to her words, her

11   e-mail, her words at the May 23rd meeting, and

12   her other e-mails.  We've seen it again and

13   again.

14             McCool and Lipson did not know that on

15   April 22nd, nine days before Speight moved to

16   servicing, she wrote that, "I am somewhat

17   indifferent about GMAC CM, about the company."

18   They didn't know that.

19             They didn't know that she wrote that

20   she was -- that her management didn't excite

21   her.  They had no vision in good communications.

22             How could they know?  She told her

23   counselor that, but not them.  It speaks volumes

24   now.

25             They didn't know that Ms. Speight wrote

1   to Bob Jones on May 3rd, two days after she came

2   into the department saying, "Titles,

3   organization, that stuff didn't matter.  I am

4   more concerned about money."

5           Yeah, she had a right to be concerned

6   about money, as long as she was doing her job

7   well.

8           They didn't know that in that same

9   e-mail Ms. Speight wrote that because of her

10  concerns, because she was so upset, she was

11  going to deal with that by taking a, quote,

12  "detached perspective."

13          "Detached."  They didn't know that she

14  wrote to Ms. Jones that she was going to

15  pretend.  That's how she was going to deal with

16  her concerns.  She wrote, "Publicly, I will

17  continue to say I am committed to seeing the

18  transition through."  "I'll pretend."

19          The next sentence, all she talks about

20  are what the packages are, what the severance

21  packages are.  She was entitled to have those

22  views.  She was entitled to be concerned.

23  There's no problem with that.

24          As long as it didn't translate into

25  what she did at work.  If she was detached and

1    indifferent and just pretending and that carried

2    through in her job, it's a problem because she's

3    a senior manager with important

4    responsibilities.

5            McCool and Lipson saw it before

6    May 23rd.  In fact, Mr. Lipson had been talking

7    to Ms. Pickles about it.  She just wasn't

8    proactive.  Detached isn't a good way to be a

9    senior leader.  Indifferent isn't a good way to

10   be a manager.

11           But we all know that what happened on

12   May 23rd now isn't disputed.  She came into a

13   meeting.  Ms. Speight came into a meeting with

14   her boss McCool and two others, Finkenstaedt and

15   Dooley.  We heard from Finkenstaedt.  We heard

16   from Ms. Speight.  We heard from McCool.

17   Everybody seems to agree.

18           Ms. Speight was asked:  "Tell me about

19   the morale of your group.  Tell me about what

20   people are thinking."

21           Not once, not twice, at least three

22   times, as Mr. McCool wrote in his memo, she

23   said, "I don't know.  You'll have to ask them."

24           Not "Let me share some of the

25   concerns."

1          Not, "You know what?  That's a good
2    question.  How about if we go talk to them.  I'm
3    their manager and I'll go and talk to them and
4    find out.  Get back to you in a day."
5          She wrote, "I don't know.  You'd have
6    to ask them."
7          And here's how we know that this is an
8    attitude problem, not just an honest response,
9    because on May 3rd, Ms. Speight had written to
10   Bob Jones, her counselor.  She wrote about the
11   frustrations that her people had.  She had a
12   whole section in her e-mails talking about
13   employee morale issues, how people were
14   frustrated, how people were concerned.
15         Do you find it a little odd that she
16   would write that to her outside counselor?  But
17   when her boss said, "So how are the people
18   doing," she'd say, "I don't know.  You'd have to
19   ask them."
20         Is that indifferent?  Is it detached?
21   I don't know.  Is it hostile?  Is it
22   uncooperative?
23         Then it got worse.  Towards the end of
24   the meeting, as it moved on, Mr. McCool said to
25   Ms. Speight, "I'd like to know your opinion on

1   something."

2          Nobody even remembered exactly what it

3   was.

4          She crossed her arms and said, "You

5   know my opinion doesn't count so I don't have

6   one."

7          Remember Finkenstaedt up there?

8   Finkenstaedt said he was shocked.  He couldn't

9   believe she responded that way.  And, McCool, to

10  his credit, didn't just get angry.

11         He said to her several times, "No, no,

12  no, Wanda, I really do care.  I want your

13  opinion.  You're a senior manager.  Please tell

14  me your opinion."

15         And she said, again and again, "My

16  opinion didn't count so I don't have one."

17         Indifferent?  Attached?  Detached?

18  Yeah, to say the least.

19         And this is how you know that her race

20  had nothing to do with anything, because not

21  only had McCool fought to keep her in the group,

22  not only had Lipson brought her in, but at that

23  moment McCool didn't run out to HR and say, I've

24  got a woman -- what did Mr. Salmanson say -- an

25  angry black woman?  He didn't run out and say

1    let's fire her.

2          She had mouthed off to him at a meeting

3    with others.  She had refused to answer her

4    questions, even as to things that she had

5    complained to her counselor about it.

6          And what was his response?  He got HR

7    involved so they could work with her.  McCool's

8    goal was to make it work, not to get rid of a

9    black woman, but to make it work.  The plan was

10   to counsel her.

11         He wrote a memo up, and they had a

12   plan -- this is before they knew about the

13   May 25th e-mail.

14         He wrote in his memo, "It is my

15   intention to reiterate to Ms. Speight that we

16   believe in her abilities, which is why we

17   offered her the position to begin with."

18         He didn't want to get rid of her.  He

19   wanted to make it work because everybody thought

20   she had the talent, and they were on the way to

21   making it work or trying to make it work if she

22   could become attached rather than detached, and

23   committed rather than indifferent, but sadly

24   Ms. Speight crossed the line.

25         She stepped way out of bounds, because

1 on May 25th, just two days after the meeting,

2 she ratcheted up there.  I had it up on that

3 house-size board.  I'm not going to put it up

4 there again.

5    I mean, if you want it, when you go

6 back to deliberate, you can ask Judge Joyner and

7 he'll send back any exhibit you want.  But you

8 know what it says.  I told you what it says.

9 You heard Ms. Speight admit what it says.

10    Yes, was there some confusion leading

11 up to Mr. McCool's e-mail?  A little bit.  He

12 cleared it up.

13    He said, "this is what you're supposed

14 to do."

15    And we know what Ms. Speight's response

16 is.  Her response is, if you make me put those

17 brakes on your car, I can't be confident that

18 it's not going to crash.  And she told that to

19 the customer, to the internal client.

20    Think about what she could have done if

21 she really wanted to make it work.  She could

22 have, instead of writing that e-mail 40 minutes

23 after she got it -- I assume it took some time

24 to type it -- she could have tried to find

25 people to help her.

1    It was the Friday before Memorial Day.

2    She could have made some calls.  She could have

3    sent some e-mails.  She could have called or

4    e-mailed McCool and said, "Mark, I need to talk

5    to you.  Let's talk about this.  I don't think

6    your suggestion is going to work."

7    She could have contacted Mike Lipson or

8    tried to contact Mike Lipson to say, "Look,

9    Mr. Lipson, I'm responsible for these credit

10    ratings, and I think Mark McCool is giving me

11    something that I shouldn't be doing."

12    You heard Lipson say she'd come to my

13    office and say that.  He had talked to her

14    before.  She chose her path.

15    With 12 days to get the risk ratings

16    done, her response was, I can't be confident the

17    brakes will work.

18    She told eight people, including the

19    three clients she was servicing -- I am so glad

20    they brought in Joe Hohenleitner, the client.

21    Mr. Hohenleitner was one of their last

22    witnesses.  He was up on the stand.  He clearly

23    had no axe to grind, and he had a very high

24    regard for Wanda Speight.  Unlike some of the

25    others, he worked with her a lot before this.

1   He nailed it down completely.  He followed up on

2   what McCool said.

3            Just think about this for a moment.

4   The e-mail from Wanda Speight goes out 5:33 p.m.

5   on the Friday before Memorial Day -- excuse me,

6   the Thursday before Memorial Day.  I misspoke.

7   That's "the brakes won't work" e-mail.  Okay?

8            McCool sees it the next day.  Lipson

9   sees it the next morning.  Ms. Speight said that

10  she was terminated at about 2:30 in the

11  afternoon, or sometime in the afternoon, and

12  also in that afternoon Irwin is told, Don Irwin,

13  You're taking over for Wanda Speight.  You're

14  the new guy who has to fix the brakes.

15           He doesn't come in and say, I can't do

16  this.  The brakes are going to work.

17           What does he do?  He immediately goes

18  about getting it done.  What Ms. Speight was

19  supposed to do and able to do, he finds the

20  people to do it, he marshals all his resources,

21  and he gets it done.  Hohenleitner told us.

22           I asked Mr. Hohenleitner, I said,

23  "Mr. Irwin's first day on the job really was

24  Tuesday, May 30th."

25           That's nine days before the risk

1    ratings were due, a full ten days after

2    Ms. Speight learned that Mr. Lauerman wasn't

3    doing them.

4         Mr. Hohenleitner said, "We got them

5    done just fine.  The risk ratings were perfect."

6         Mr. Hohenleitner was so pleased with

7    the job that Don Irwin did, he actually went out

8    of his way and wrote a memo to the head of

9    credit saying, to Mr. Ballard, saying, "This was

10   done perfectly.  Couldn't have been done any

11   better."

12        He got the brakes fixed, and the car

13   ran.  Had Ms. Speight not been so detached and

14   indifferent and frustrated, she could have done

15   that, too.

16        It's really, really, really easy to see

17   why Ms. Pickles approved this termination

18   decision.  This wasn't like Bryan Pollack, a

19   lower level manager, who had been inappropriate

20   in his dealings with some people who reported to

21   Pollack.

22        As we've heard, Pollack never sounded

23   off to anyone above him or to a client.  He had

24   a management style problem.

25        McCool and Pickles and everyone

1   understood why an action plan wouldn't work.

2   You can't take a senior manager who has to do

3   risk ratings in 12 days and who said, "I won't

4   do them or I'll do them badly," and give that

5   person a 30-day action plan.

6            The risk ratings are too darn

7   important.  They had to get done, and they had

8   to get right.  That's what Lipson said.  Lipson

9   made it very clear.

10           "Look, I'm not trying to punish Wanda

11   Speight.  I need someone who can do these risk

12   ratings timely and well.  I had to make a

13   change."

14            A $600,000 a year executive has to get

15   things done.  There wasn't time to give her an

16   action plan.  And they didn't need to hear what

17   she had to say about it because her words were

18   already clear.  Her words were on the e-mail

19   itself.  They were clear as day.

20           She might be able to say why she wrote

21   it, but no matter why she wrote it, you cannot

22   put her out there, then, in front of the client

23   as the one to sign off and approve these risk

24   ratings after she said, "if you make me do it,

25   I'll mess it up.  It's not going to be done in a

1    way that is going to be reliable."

2           That's why it's that e-mail that got

3    her fired.  Her words were clear, her conduct

4    was clear, and Lipson knew what he had to do.

5           I'm not saying Wanda Speight is a bad

6    person.  I have no reason to believe that she is

7    a bad person, but neither was Lipson and neither

8    was Pickles and neither was McCool.

9           Lipson and Pickles wanted Wanda Speight

10   to get a severance package.  I think that was a

11   good thing to do.  I hope you do, too.  Is there

12   something wrong with saying, "Look, she has

13   shown she can't function as the head of this

14   group, but we're going to create a situation

15   where she can qualify for a severance package,

16   if she wants it."

17          Is there anything wrong with that?

18   Does that say that's race discrimination?

19          That shows that they weren't out to get

20   her.  They were trying to run the business.

21   They needed a leader like Don Irwin who could

22   get it done.

23          It's sad, but there's zero evidence of

24   discrimination.  There's nothing that would make

25   you check this yes.

1          I want to go back to something that I

2     asked Ms. Speight, and I want to tie it up a

3     little bit with something that her husband said

4     today, who came here, and also seems like a very

5     decent man.

6          I asked Ms. Speight, "You're writing

7     all these e-mails to your career counselors,

8     trying to get help from them, trying to educate

9     them on what's going on at Capmark.  You never

10    said, I think they are discriminating against me

11    because of my race, not once."

12         Wouldn't you want your career counselor

13    to know that that's the obstacle you faced, if

14    you really believed that you faced that

15    obstacle?

16         She wrote her log, her lengthy log,

17    that Exhibit D-30, a long notebook.  Not once

18    did she say "I think I'm being treated badly

19    because of my race."

20         Do you know what else is interesting?

21    Calvin Speight, her husband, got up and he's

22    been here throughout the trial and attentive as

23    you have been.  He heard me ask those questions

24    of Ms. Speight.

25         He heard me ask, "Did you ever tell

1  anyone at Capmark, your career counselors, your

2  bosses, Human Resources, your own log, that you

3  thought this was discrimination, anyone in the

4  universe, until you went to a lawyer to file a

5  lawsuit?"

6         She said no.

7         Not even her husband testified that

8  Ms. Speight ever complained to him or suggested

9  to him that she was discriminated against.  Even

10 after she was fired, even when she went home and

11 was so upset, she didn't even say that to him.

12         Now Ms. Speight is asking you to award

13 her one or two or three or $4 million for a

14 wholly inappropriate e-mail that she wrote.

15 That's a lawsuit over money, so I guess we

16 shouldn't be surprised that they pay an expert

17 to come in and put some big numbers up on an

18 easel.  It's not shocking in this day and age.

19         But in the end, it's not about that.

20 It keeps coming back to the same question.  We

21 know the answer.  It's the answer to this

22 question.

23         Look, it's time for me to wrap-up.  As

24 Judge Joyner said, Mr. Salmanson gets to go

25 first and then I get to go and he gets to go

1 again, Mr. Salmanson does.

2          You may be asking yourself, is that

3 fair?  How come he gets to go first and last and

4 I only get to go once?  It is fair.  I have no

5 problem with it.

6          Bear in mind, I don't get to come back

7 again, no matter what he says.  Even if he says

8 something that has no relationship to the

9 evidence or logic, I can't get up and say he's

10 wrong.  I have to trust your memories and your

11 logic and your wisdom.

12          But the reason he gets to go twice is

13 because the question here is:  Do you find that

14 Ms. Speight has proved by a preponderance of the

15 evidence that her race was a determinative

16 factor in the termination decision?  In other

17 words, has she proven to you that her race was

18 the reason why she was terminated?

19          He gets to go first and last because he

20 has a heavy burden.

21          I'll just bring you back to one point I

22 said on day one.  I asked you another question.

23 Not only could you limit your facts to the

24 analysis in this question, but I asked every

25 potential juror in that box.

1         I said, "Do you understand that merely

2  because someone makes an accusation of

3  discrimination, that doesn't make it true?  Is

4  there anyone here who thinks that just because

5  someone accuses someone of discrimination it's

6  likely or necessarily true?"

7         Not one of you raised your hands,

8  because you know that's not the case.  Anyone

9  can make an accusation, even if the facts don't

10  support it.

11         So now I have to pass it over to

12  Mr. Salmanson, and it's just about time for you

13  to do your duty.

14         I'm going to ask you to do what you

15  were sworn to do, which is to follow the judge's

16  instructions on the law -- only Judge Joyner can

17  tell you what the law is, and then to remember

18  the facts that you heard and apply the wisdom

19  that you bring as jurors.

20         You've been remarkably attentive

21  throughout this trial.  You've heard about risk

22  ratings and Canadian portfolios and

23  Hohenleitners and Finkenstaedts and places and

24  names.  It was amazing to me that you guys were

25  really tuned in.

1         We're almost there.  I want you to take

2    as much time as you need to deliberate and

3    understand all the facts, but I hope you agree

4    with me right now that you know exactly what you

5    need to check off "No" here.

6         "No," that there are no facts

7    suggesting discrimination, and that it was

8    Ms. Speight's words and actions alone that

9    resulted in her termination.

10        I thank you for your attentiveness and

11   for your service to this Court.  The parties

12   thank you.  I'm sure the judge will.

13        Have a good weekend, folks.

14        THE COURT:  Thank you, Mr. Banks.

15        MR. BANKS:  Thank you, Judge Joyner.

16        THE COURT:  Mr. Salmanson.

17        MR. SALMANSON:  Just to be clear, the

18   question isn't the act by race alone.  The

19   question is whether race was a determinative

20   factor.  In other words, if she weren't black,

21   would she not have been fired?  It doesn't mean

22   that something didn't happen.  Something

23   happened.

24        The question is, what did they do as a

25   result of that event?  That's the question.

1           A man walks into a car shop.  Says,

2     "Can you fix my brakes?"

3           I said, "Of course, I can fix your

4     brakes."

5           "Good, because here's my kid's little

6     plastic tool.  Go ahead and fix the brakes."

7           He said, "I can't fix your brakes with

8     your little kid's plastic tools.  I don't have

9     the tools.  But I can fix the brakes if I go

10    back into the shop, and I get the right tools to

11    get them done.  Do you want to give me the

12    tools?  I'll get it done.

13          In fact, didn't you ask me to do it

14    with the right tools and I went and I got them.

15    You took those tools away from me.  I can't fix

16    the brakes if you give me a piece of plastic to

17    do it with.  Give me the people; I'll fix the

18    brakes.  Give me the people; I'll do the risk

19    ratings.  But if you want me to fix the brakes

20    with your plastic wrench, I can't be confident

21    those brakes are going to work."

22          That's what she said.  I love that

23    analogy.

24          Mr. Banks spent a fair portion of his

25    closing talking to you about facts that neither

1   Mr. McCool nor Mr. Lipson had any idea about.

2   They couldn't have acted based on what

3   Ms. Speight was writing because they didn't know

4   about it.  They couldn't have acted based on

5   what happened after she was terminated because

6   that hadn't happened yet.

7           They had to act based on what they knew

8   on May 25th, no more, no less.  Of course, what

9   Mr. Banks didn't tell you was that after

10  Ms. Speight had been saying for weeks, "I need

11  people, help me out, oh, I've got these people,

12  I've got Mr. Lauerman's people."

13          May 4th, she says, "I've been trying to

14  tell you for 30 days.  I don't have the people

15  to get this done.  Tell me, again, what's the

16  plan."

17          There was no evidence that she was told

18  the plan.  Within how many hours of her

19  termination?  Effective immediately.  We've got

20  four new people assigned.

21          She had been asking for weeks, months,

22  "Can you give me some more people to be

23  assigned?"  It took them, what, three hours to

24  give four of their best asset managers assigned?

25  Not maybe for those risk ratings, but going

1      forward, exactly what she wanted.

2           She thought she had the risk ratings

3      covered until May 22nd.  She thought she had

4      people to help her with the SBG loan portfolio,

5      and she thought she had people cover for the

6      Canadian loan portfolio.

7           She wasn't refusing to do the job.

8      They claimed, "Oh, that's really what she said

9      in her deposition."  She wasn't refusing.  They

10     didn't read the e-mail that way at the time,

11     even if she was thinking that way.  They didn't

12     read the e-mail.

13          Ms. Pickles said, "I didn't read the

14     e-mail that way.  I didn't read it as

15     insubordination.  I didn't read it as refusal to

16     do the job."

17          I read it as, "If you're making me do

18     the job, I don't have confidence in the job."

19          And then they say, "Oh, and, by the

20     way, we weren't making her do the job."

21          Remember?  That's part of what they

22     complained about in the e-mail.

23          She said, "If I am being told by

24     Capmark to risk rate those loans, I can't be

25     competent."

1          Yeah.  What they said was, "This was

2    incredibly inappropriate, because we're acting

3    like we're forcing her to do the risk ratings."

4          Well, either they were telling her that

5    she had to do the risk ratings or they weren't.

6    Make up your mind, folks.  Come up with a story

7    and stick with it.

8          Now, Mr. Banks says, "Just because

9    someone makes an accusation doesn't mean it's

10   true."

11         I would say, yeah, just because you

12   deny an accusation, that denial doesn't

13   necessarily mean it's true either, otherwise we

14   wouldn't be here.  That's your job.  You figure

15   out who is telling the truth, who is credible

16   and who is not.

17         Mr. Banks says, "Mr. Salmanson

18   complains because you didn't give her a 30-day

19   warning.  Didn't have time to get a 30-day

20   warning."

21         I never said that.  I didn't say they

22   had to give her a 30-day warning.

23         How about a talking to?  How about a

24   coaching on the sidelines?  How about a one-day

25   warning?  How about "let's get the job done"?

1    How about, "Wanda, are you into it or aren't

2    you?  Is your head in the game?"

3         Mr. Banks said Mr. Speight didn't even

4    testify that she said she thought it was race

5    discrimination.  Well, he wasn't asked.  That

6    wasn't why he was up there.  He was talking

7    about the emotional part.  He could have asked

8    him.  He didn't.  You can't take anything from

9    that.

10        If Wanda Speight didn't think that

11   discrimination had something to do with her

12   lawsuit, then I don't know why any of us are

13   here.  Obviously, at some point she reached that

14   conclusion, and she hired a great attorney to

15   make sure that you guys understood it, too.

16        The other thing about that e-mail is

17   that she sent it before she actually went into

18   servicing, before she was given a job, before

19   she was told to whom she was reporting, before

20   she knew her responsibilities, before she knew

21   her salary, before she had any direction or

22   guidance from these people.

23        She said she had been upset by all of

24   this, and now she could have taken an attached,

25   emotional perspective.  They make that sound

1    like it's horrible.  No, she's saying, "I'm not

2    going to be emotional.  I'm going to ride it

3    out, see what happens."

4         Bob Jones has told me, "You know what,

5    stuff like this happens, Wanda, in transitions.

6    Calm down, figure out what's going on.  Keep

7    your eye on the prize, your nose to the

8    grindstone.  Get the job done.  Don't be

9    emotional about it.  Just go ahead and do it."

10        And that's exactly what she did.

11        May 23rd, she's given a list of

12   assignments.  May 24th, they are all done,

13   (snapping finger) like that, every single thing

14   on that checklist.

15        May 23rd, the horrible meeting.  Have a

16   six-page sheet.  They were able to go down every

17   single one, remember?  There wasn't a single

18   blank left out.  It wasn't a blank.  It was a

19   question mark.  "Do we go here or there?"

20        They couldn't have gotten that done

21   without Wanda.

22        May 12th, a very constructive meeting.

23   How do you have a very constructive meeting

24   about how the assignments were going to be with

25   someone who is detached, indifferent?  She

1    wasn't indifferent.  And the proof is on

2    May 25th.

3              If she were indifferent, she would have

4    said, yeah, I'll do the risk ratings.  She had

5    pride in her work.  She knew what it took to get

6    them done and how to get them done write.

7    That's why she was paid $500,000 the year

8    before.

9              She wasn't indifferent.  She stuck her

10   neck out and said, guys, you know what?  I've

11   been screaming about this for weeks and days and

12   now we're down to game time.  Got three weeks to

13   go and I still don't have anybody to help me

14   out.  I don't have confidence.

15             That sounds like the words of an

16   indifferent person?  That's a person who cares

17   and cares deeply about her work.

18             Now, they keep saying -- Mr. Banks did

19   it again, that here's an executive being paid

20   $600,000 so of course they expected her to do

21   everything that she should do and be proactive,

22   et cetera.

23             She wasn't being paid $600,000.  She

24   had been paid $600,000 for the excellent job she

25   had done before exactly what she was trying to

1    accomplish now.

2         The truth of the matter is that she was

3    being paid $120,000 at that point.  She might

4    get the $600,000 if she did a great job at the

5    end of the next year.

6         She didn't even know what her bonus was

7    going to be.  They weren't paying her $500,000.

8    It was $120,000.

9         They keep talking about

10   Mr. Hohenleitner as the client.  As if he's some

11   outside person.  Owe my God, you're embarrassing

12   us to the public.  I feel like I'm with my six

13   year old in the grocery store when he has a

14   temper tantrum.  Don't embarrass me.  This

15   wasn't really a client.  You heard Mr. Lipson

16   say, you know what, this whole transition was to

17   get everybody on the same team, working

18   together, breaking down the walls, stop

19   miscommunicating.  She knew that.

20        She understood that because that's the

21   way she had always operated.  She had fostered

22   an excellent working teamwork relationship with

23   Mr. Hohenleitner.  She had done -- she kept him

24   in the loop because that's what she had always

25   done and that's what she had been rewarded for

1  over and over and over again.  She was a leader

2  in breaking down those walls, being a team

3  player.

4          She wasn't trying to shoot for the

5  three pointers way out there to get those

6  spotlights shining on her, passing the ball

7  around, elbowing everybody at the sidelines,

8  getting a job done.  Let's get the basket.

9          At the end of the day, I'd like to use

10  the word "racist" because that really is an ugly

11  word and nobody likes to be thought of as a

12  racist and you don't think of people as racist.

13          Racist isn't just putting a noose on

14  the ceiling or wearing a robe and setting fire.

15  Racism can happen in much more subtle ways.

16  It's about discrimination.  That's what this is

17  about.  Treating people differently, either in a

18  broad way or a more subtle way, based on their

19  skin color.

20          It's discrimination.  It's about

21  holding people to a different standard.  It's

22  about assuming that they're being insubordinate

23  when they're not.  It's about reading into tone,

24  tenor, things that aren't even there.  It's

25  jumping the gun, right?  It's about prejudice,

1  prejudging.

2          If there were ever a case you thought

3  someone was prejudged, it's Wanda Speight,

4  because what else did they have to judge her on?

5  Not very much.

6          And I don't mean judging her on the

7  facial statements of the e-mail.  It's what they

8  implied, how they read it, all the things they

9  assumed in making that determination.

10         At the end of the day, you do have to

11  answer this question.  Ultimately, did

12  Ms. Speight prove by a preponderance of the

13  evidence that race wasn't the sole factor,

14  wasn't the only factor, but a determinative

15  factor in Capmark's decision to terminate her

16  employment?

17         I think there are enough

18  implausibilities and inconsistencies in their

19  story.  You can assume if they had the truth to

20  tell, that it wasn't, they wouldn't have had to

21  lie, change their story and do a cover-up, claim

22  it was insubordination when it was not, claim it

23  was a terrible thing to send it out to

24  Mr. Hohenleitner when it wasn't.

25         Why do you have to do that, unless you

1  think or you know that race did have something

2  to do with it.

3          Thank you very much.

4          THE COURT:  Thank you, counsel.

5          Members of the jury, we're going to

6  take a brief break before I instruct you on the

7  law to apply in the case before you.

8          Please do not talk about the case among

9  yourselves and we'll call you back in, in ten

10  minutes.  All right?

11          (Recess was held at 1:30 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

CLOSING ARGUMENT                    PAGE NO.

   By Mr. Salmanson                    3

   By Mr. Banks                       24


REBUTTAL ARGUMENT

   By Mr. Salmanson                   48

      I certify that the foregoing is a correct transcript from the record of the proceedings in the above-entitled matter.


DATE_____

    Gregg B. Wolfe, R.P.R., C.M.