1               IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3
   WANDA JAMES SPEIGHT          :   CIVIL ACTION
4                                :
                                 :
5            PLAINTIFF           :
                                 :
6       VS.                      :   NO. 07-CV-0890
                                 :
7   CAPMARK FINANCE INC.         :
         AND                     :
8   WILLIAM F. ALDINGER III      :
                                 :
9            DEFENDANT           :

10
                              ---
11

12               PHILADELPHIA, PENNSYLVANIA
                 MONDAY, FEBRUARY 23, 2009
13

14
         BEFORE: THE HONORABLE J. CURTIS JOYNER, J.
15

16
                      JURY TRIAL
17
                      DAY ONE
18

19
                 SUZANNE R. WHITE, CM
20        FEDERAL CERTIFIED REALTIME REPORTER
            FIRST FLOOR U. S. COURTHOUSE
21              601 MARKET STREET
              PHILADELPHIA, PA  19106
22              (215)627-1882

23

24
   PROCEEDINGS RECORDED BY STENOTYPE-COMPUTER,
25 TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
 1     APPEARANCES:

 2     SALMANSON GOLDSHAW, P.C.
       MICHAEL J. SALMANSON, ESQUIRE
 3     SCOTT B. GOLDSHAW, ESQUIRE
       TWO PENN CENTER
 4     1500 JOHN F. KENNEDY BOULEVARD
       SUITE 1500
 5     PHILADELPHIA, PA 19102

 6     REPRESENTING THE PLAINTIFF

 7     MORGAN LEWIS & BOCKIUS LLP
       MICHAEL L. BANKS, ESQUIRE
 8     MICHAEL J. EAGLES, ESQUIRE
       1701 MARKET STREET
 9     PHILADELPHIA, PA  19103

10     REPRESENTING THE DEFENDANT, CAPMARK FINANCE, INC
       WILLIAM F. ALDINGER, III
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    THE CLERK:  ALL RISE.

2                    THE COURT:  MISS MICKIE, PLEASE SWEAR IN

3       THE JURY.

4                    (THE JURY IS SWORN IN.)

5                    THE COURT:  YOU MAY BE SEATED, LADIES AND

6       GENTLEMEN.  GOOD AFTERNOON.  LADY AND GENTLEMEN, YOU

7       HAVE NOW BEEN SWORN IN THE JURY TO TRY THIS CIVIL CASE

8       IN WHICH THE PLAINTIFF, WANDA JAMES SPEIGHT, VERSUS

9       CAPMARK FINANCIAL, INC., THE DEFENDANT, IS -- SHE IS

10      SUEING THE DEFENDANT BASED ON A CLAIM OF RACE

11      DISCRIMINATION, PURSUANT TO HER TERMINATION FROM

12      EMPLOYMENT IN VIOLATION OF TITLE 42 UNITED STATES CODE,

13      SECTION 1981.

14                    YOUR OATH AS A JUROR HAS COMMITTED EACH

15      OF YOU TO BE AN ACTIVE PARTICIPANT IN THE ADMINISTRATION

16      OF JUSTICE.  THE TRIAL WILL DEVELOP QUESTIONS OF FACTS

17      UPON WHICH THE PARTIES DO NOT AGREE.  IT IS YOUR DUTY AS

18      JURORS AND YOURS ALONE TO DETERMINE THE FACTS FROM THE

19      EVIDENCE PRESENTED DURING THE TRIAL.  QUESTIONS OF

20      PROCEDURE AND OF THE LAW TO BE APPLIED TO THE FACTS WILL

21      ALSO OCCUR IN THE COURSE OF THE TRIAL.

22                    IT IS MY DUTY AS THE TRIAL JUDGE TO MAKE

23      CERTAIN THAT THE TRIAL IS CONDUCTED PROPERLY AND

24      ACCORDING TO RULES OF LAW AND I WILL INSTRUCT YOU AFTER

25      ALL OF THE EVIDENCE HAS BEEN SUBMITTED AS TO THE LAW

1    WHICH YOU WILL APPLY TO THIS CASE.

2              NOW, WE WILL TELL YOU SOME GENERAL THINGS

3    ABOUT THE PROCEDURE WE WILL FOLLOW AND HOW YOU ARE TO

4    PERFORM YOUR DUTIES.

5              FIRST, THE PLAINTIFF'S ATTORNEY MAY MAKE

6    AN OPENING STATEMENT OUTLINING THE PLAINTIFF'S CASE.

7    IMMEDIATELY THEREAFTER THE DEFENDANT'S ATTORNEY MAY ALSO

8    MAKE AN OPENING STATEMENT OUTLINING HIS DEFENSE, OR HE

9    MAY POSTPONE IT.  THE PLAINTIFF INTRODUCES HER EVIDENCE

10   FIRST, AND WHEN SHE HAS FINISHED, THE DEFENDANT MAY

11   PRESENT THEIR EVIDENCE.

12             WITNESSES AND EVIDENCE MAY BE CALLED IN

13   REBUTTAL.  THE DIRECT EXAMINATION OF WITNESSES IS

14   CONDUCTED BY THE ATTORNEY CALLING THE WITNESS, AND ALL

15   WITNESSES MAY BE CROSS-EXAMINED BY OPPOSING COUNSEL.  I

16   MAY ASK QUESTIONS OF A WITNESS IN ORDER TO OBTAIN

17   INFORMATION OR BRING OUT SOME FACTS NOT FULLY DEVELOPED

18   BY THE TESTIMONY.

19             AT THE END OF ALL OF THE EVIDENCE, THE

20   ATTORNEYS MAY MAKE THEIR CLOSING ARGUMENT OR SUMMATION

21   TO YOU.  IN THESE ARGUMENTS THE ATTORNEYS WILL GIVE YOU

22   THEIR VIEWS ON WHAT THE EVIDENCE PROVES ON THE QUESTIONS

23   YOU HAVE TO DECIDE, AND THESE ARGUMENTS SHOULD BE GIVEN

24   DUE CONSIDERATION.  BUT THEY ARE NOT EVIDENCE.  ONLY THE

25   EVIDENCE WHICH HAS BEEN ADMITTED DURING THE TRIAL CAN BE

1    CONSIDERED BY YOU IN DETERMINING THE FACTS.  THE

2    ADMISSION OF EVIDENCE IN COURT IS GOVERN BY RULES OF

3    LAW.

4               DURING THE TRIAL, THE ATTORNEYS MAY DEEM

5    IT NECESSARY TO MAKE AN OBJECTION, AND IT THEN BECOMES

6    MY DUTY TO RULE ON THOSE OBJECTIONS AND TO DECIDE

7    WHETHER CERTAIN EVIDENCE CAN BE ADMITTED FOR YOUR

8    CONSIDERATION.  YOU MUST NOT CONCERN YOURSELF WITH THE

9    OBJECTIONS OR MY REASONS FOR MY RULINGS.  YOU MUST NOT

10   CONSIDER TESTIMONY OR EXHIBITS TO WHICH I HAVE SUSTAINED

11   AN OBJECTION OR WHICH I HAVE ORDERED STRICKEN FROM THE

12   RECORD.

13              NONE OF MY RULINGS SHOULD BE REGARDED AS

14   AN INDICATION OF MY OPINION AS TO WHAT YOUR FINDINGS

15   SHOULD BE.  YOU SHOULD NOT TAKE ANY QUESTIONS I MAY ASK

16   WITNESSES AS ANY INDICATION OF MY OPINION AS TO HOW YOU

17   SHOULD DETERMINE THE ISSUES OF FACTS.  ANY OPINION WHICH

18   YOU THINK I MAY HAVE AS TO THE FACTS WOULD NOT BE AT ALL

19   IMPORTANT.  FOR YOU AND YOU ALONE ARE THE SOLE FINDERS

20   OF THE FACTS.

21              LADY AND GENTLEMEN, YOU MUST CONSIDER AND

22   WEIGH THE TESTIMONY OF EACH WITNESS AND GIVE IT SUCH

23   WEIGHT AS IN YOUR JUDGMENT IT IS FAIRLY ENTITLED TO

24   RECEIVE.

25              THE MATTER OF THE CREDIBILITY OF A

1    WITNESS; THAT IS, WHETHER HIS OR HER TESTIMONY IS

2    BELIEVABLE IN WHOLE OR IN PART IS SOLELY FOR YOUR

3    DETERMINATION.  I WILL MENTION SOME OF THE FACTORS WHICH

4    MIGHT BEAR IN SUCH DETERMINATION.

5            WHETHER THE WITNESS HAS ANY INTEREST IN

6    THE OUTCOME OF THE CASE OR HAS FRIENDSHIP OR ANIMOSITY

7    TOWARD OTHER PERSONS CONCERNED IN THE CASE; THE BEHAVIOR

8    OF THE WITNESS ON THE WITNESS STAND AND HIS OR HER

9    DEMEANOR; THE WITNESS' MANNER OF TESTIFYING AND WHETHER

10   HE OR SHE SHOWS ANY BIAS OR PREJUDICE WHICH MIGHT COLOR

11   HIS OR HER TESTIMONY; THE ACCURACY OF THE WITNESS'

12   MEMORY AND RECOLLECTION; THE WITNESS' ABILITY AND

13   OPPORTUNITY TO ACQUIRE KNOWLEDGE OF OR TO OBSERVE THE

14   MATTERS CONCERNING WHICH HE OR SHE TESTIFIES; THE

15   CONSISTENCY OR INCONSISTENCY OF A WITNESS' TESTIMONY, AS

16   WELL AS REASONABLENESS OR UNREASONABLENESS IN LIGHT OF

17   ALL OF THE EVIDENCE IN THE CASE.

18           IN CIVIL CASES SUCH AS THIS ONE THE

19   PLAINTIFF HAS THE BURDEN OF PROVING THOSE CONTENTIONS

20   WHICH ENTITLE HER TO RELIEF.  WHEN A PARTY HAS THE

21   BURDEN OF PROOF ON A PARTICULAR ISSUE, HIS CONTENTION ON

22   THAT ISSUE MUST BE ESTABLISHED BY A FAIR PREPONDERANCE

23   OF THE EVIDENCE.  THE EVIDENCE ESTABLISHES A CONTENTION

24   BY A FAIR PREPONDERANCE OF THE EVIDENCE IF YOU ARE

25   PERSUADED THAT IT IS MORE PROBABLY ACCURATE AND TRUE

1    THAN NOT.

2              TO PUT IT ANOTHER WAY, LADY AND

3    GENTLEMEN, THINK IF YOU WILL, OF AN ORDINARY BALANCE

4    SCALE WITH A PAN ON EACH SIDE.  ONTO ONE SIDE OF THE

5    SCALE PLACE ALL OF THE EVIDENCE FAVORABLE TO THE

6    PLAINTIFF, ONTO THE OTHER PLACE ALL OF EVIDENCE

7    FAVORABLE TO THE DEFENDANT.  IF, AFTER CONSIDERING

8    CAPABLE WEIGHT OF THE EVIDENCE, YOU FEEL THAT THE SCALES

9    TIP EVER SO SLIGHTLY OR TO THE SLIGHTEST DEGREE IN FAVOR

10   OF THE PLAINTIFF, YOUR VERDICT MUST BE FOR THE

11   PLAINTIFF.  IF THE SCALES TIP IN FAVOR OF THE DEFENDANT

12   OR ARE EQUALLY BALANCED YOUR VERDICT MUST BE FOR THE

13   DEFENDANT.

14              MEMBERS OF THE JURY, YOU ARE NOT

15   PERMITTED TO TAKE NOTES ON THE TESTIMONY OR, ON ANYTHING

16   SAID BY ME OR COUNSEL.  WHEN YOU DELIBERATE ON YOUR

17   VERDICT, YOU WILL HAVE TO RELY ON YOUR OWN MEMORIES OF

18   WHAT WAS SAID IN THE COURTROOM.  WE HAVE A COURT

19   REPORTER WHO WILL MAKE A RECORD OF THE TESTIMONY.  IF

20   YOU FAIL TO HEAR A QUESTION OR AN ANSWER WHILE A WITNESS

21   IS TESTIFYING, RAISE YOUR HAND IMMEDIATELY.  THE

22   REPORTER CAN READ BACK WHATEVER YOU MISSED.

23              AFTER YOU GO TO THE JURY ROOM TO

24   DELIBERATE ON YOUR VERDICT, IF YOU FIND THAT YOUR

25   RECOLLECTION OF PARTICULAR TESTIMONY HAS BECOME CONFUSED

1    OR UNCERTAIN, I MAY -- AND I REPEAT THAT, I MAY, AT YOUR

2    REQUEST, PERMIT THE REPORTER TO READ THAT TESTIMONY BACK

3    TO YOU.  HOWEVER, YOU OUGHT NOT TO RELY ON GETTING THIS

4    KIND OF HELP FROM THE COURT REPORTER.  LISTEN

5    ATTENTIVELY TO EVERY WITNESS SO THAT THE TESTIMONY WILL

6    BE CLEAR IN YOUR MINDS.

7              MEMBERS OF THE JURY, DO NOT DISCUSS THIS

8    CASE OR ANYTHING CONNECTED WITH IT AMONG YOURSELVES

9    UNTIL ALL OF THE EVIDENCE IS IN AND YOU HAVE RECEIVED

10   THE FINAL INSTRUCTIONS FROM ME AND HAVE RETIRED TO THE

11   JURY ROOM FOR DELIBERATIONS TO REACH YOUR VERDICT.  DO

12   NOT PERMIT OTHERS TO DISCUSS THIS CASE WITH YOU OR IN

13   YOUR PRESENCE.  IF SUCH A THING SHOULD OCCUR, YOU SHOULD

14   ADVISE ME PROMPTLY.  IN ADDITION, DO NOT TALK TO COUNSEL

15   OR THE PARTIES OR WITNESSES ON ANY SUBJECT.  IF YOU WERE

16   TO DO SO, EVEN THOUGH INNOCENTLY, IT COULD BE

17   MISINTERPRETED AND COULD CREATE SERIOUS PROBLEMS.

18              COUNSEL AND I ARE REQUIRED TO TAKE UP

19   CERTAIN MATTERS OUT OF YOUR HEARING.  THEY ARE KNOWN AS

20   SIDEBAR CONFERENCES.  WE MAY COME HERE TO THE SIDE OF

21   THE BAR.  THIS IS KNOWN AS A BAR IN COURTROOM PARLANCE.

22   WE MAY COME OVER HERE TO THE SIDE OF THE BAR AND HAVE A

23   CONFERENCE WITH COUNSEL AND MYSELF OUT OF YOUR HEARING,

24   OR I MAY ASK YOU TO RETURN TO THE JURY ROOM AND HAVE THE

25   WHOLE USE OF THE COURTROOM OR COUNSEL AND I MAY GO TO MY

1    CHAMBERS, WHICH IS LOCATED ON THE OTHER SIDE OF THAT

2    DOOR AND ACROSS THE HALL, ALL RIGHT.  UNDER ANY OF THESE

3    SCENARIOS, YOU ARE NOT TO CONCERN YOURSELF WITH THE

4    THESE SIDEBAR CONFERENCES.  THEY DEAL WITH ISSUES AND

5    MATTERS OF LAW THAT ARE NOT FOR YOUR HEARING, IS THAT

6    UNDERSTOOD?  VERY GOOD.

7              LADY AND GENTLEMEN, WE NORMALLY START

8    COURT HERE EACH MORNING AT 9:30.  WE WILL PROCEED TO

9    APPROXIMATELY AROUND 11 O'CLOCK WHERE WE WILL HAVE A TEN

10   OR 15-MINUTE BREAK, THEN WE WILL PROCEED TO 12:30,

11   QUARTER OF 1, 1:00, BEFORE WE BREAK FOR LUNCH.  YOU WILL

12   HAVE AN HOUR FOR LUNCH EACH DAY.  WE WILL RESUME

13   APPROXIMATELY 1:30, AND THEN WE WILL GO TO APPROXIMATELY

14   3 O'CLOCK WHERE WE WILL HAVE A 10 OR 15-MINUTE BREAK AND

15   THEN WE WILL GO TO THE END OF THE DAY, WHICH IS NORMALLY

16   4:35, QUARTER OF 5, 5:00, OKAY, DEPENDING ON YOUR

17   TRANSPORTATION SCHEDULE.  I HAVE NOT LOOKED AT YOUR

18   AREAS WHERE YOU COME FROM, BUT SOME MAY COME AS FAR AWAY

19   AS READING OR FURTHER OUT IN LANCASTER COUNTY THAT NEED

20   AN OPPORTUNITY TO CATCH A TRAIN TO BE HOME BY A

21   REASONABLE TIME.  WE WILL ACCOMMODATE YOU, IF THAT IS

22   THE CASE.

23              I HAVE ENDEAVORED TO DO EVERYTHING IN MY

24   POWER TO LIST EVERYTHING ELSE THAT I HAVE SCHEDULED FOR

25   THIS WEEK.  I DON'T HAVE THE LUXURY OF HAVING ONE THING

1    SCHEDULED.  SO THEY ARE LISTED BEFORE WE START EACH

2    MORNING, DURING MY LUNCH BREAK, YOUR LUNCH BREAK, OR AT

3    THE END OF THE DAY WHEN YOU ARE GONE.  WE HAVE SOMETHING

4    LISTED TODAY, BUT WE WON'T TAKE IT UNTIL APPROXIMATELY

5    4:30, SO IT SHOULD NOT INTERRUPT WITH THE TRIAL.

6              IF, AT ANY TIME, DURING THE COURSE OF

7    THESE PROCEEDINGS YOU NEED TO BRING ANYTHING TO MY

8    ATTENTION, YOU CAN DO SO BY LETTING MY DEPUTY CLERK,

9    MISS MICKIE, WHO JUST SWORE YOU IN, WHOSE OFFICE IS

10   LOCATED ADJACENT FROM YOUR JURY ROOM.  LET HER KNOW OR

11   LET THE COURT REPORTER KNOW.  TODAY I HAVE HAD THE

12   PLEASURE AND EXPERIENCE OF HAVING MISS FELDMAN HERE

13   EARLIER THIS MORNING/AFTERNOON, AND NOW I HAVE MISS

14   WHITE HERE.  NEITHER OF THEM ARE MY REGULAR COURT

15   REPORTER.  HE IS OUT TODAY, AND HE WILL BE BACK IN

16   BEFORE THIS TRIAL IS OVER.  BUT LET ANY OF THE COURT

17   REPORTERS KNOW, AND THEY WILL LET ME KNOW THAT YOU NEED

18   TO HAVE SOMETHING ADDRESSED.

19              LADY AND GENTLEMEN, I WILL DO EVERYTHING

20   IN MY POWER TO MOVE THIS CASE AS QUICKLY AND AS

21   EFFICIENTLY AS POSSIBLE.  IN THAT REGARD, I NEED YOUR

22   HELP AND ASSISTANCE.  SO WHEN I ASK YOU TO BE BACK LIKE

23   TODAY, AT A QUARTER OF TWO, WHICH YOU ALL MET THE

24   STANDARDS, I DON'T WANT YOU GOING THROUGH THE METAL

25   DETECTORS DOWNSTAIRS AT QUARTER OF 2.  I WANT YOU IN THE

1   JURY BOX.  SO TOMORROW MORNING WHEN WE START AT 9:30, I

2   EXPECT ALL COUNSEL, THE PARTIES, THE WITNESSES, TO BE

3   HERE, TO BE READY TO GO, AND WE WILL MOVE THIS CASE

4   THROUGH.  I KNOW IT'S AN INCONVENIENCE FOR YOU TO

5   PARTICIPATE WITH YOUR OTHER MATTERS IN YOUR OTHER LIFE,

6   BUT WE WILL MOVE THIS ALONG QUICKLY, IS THAT UNDERSTOOD?

7            SO SAYING, THAT CONCLUDES THE COURT'S

8   OPENING INSTRUCTION.

9            COUNSEL FOR MS. SPEIGHT, WHO WISHES TO

10  OPEN?

11           MR. SALMANSON:  GOOD AFTERNOON.  MAY IT

12  PLEASE THE COURT AND LADY AND GENTLEMEN OF THE JURY, AS

13  YOU KNOW FROM YOUR VOIR DIRE THIS MORNING, MY NAME IS

14  MIKE SALMANSON, ONE OF THE MANY MIKES IN THIS CASE.  I,

15  ALONG WITH MY PARTNER, SCOTT GOLDSHAW, HAVE THE

16  PRIVILEGE OF REPRESENTING WANDA SPEIGHT IN THIS LAWSUIT.

17           MISS SPEIGHT ALLEGES THAT CAPMARK

18  DISCRIMINATED AGAINST HER ON THE BASIS OF HER RACE WHEN

19  IT ABRUPTLY ENDED HER STELLAR SEVEN-YEAR CAREER AT GMAC,

20  WITHOUT WARNING, ULTIMATELY BECAUSE OF A SINGLE E-MAIL

21  SHE SENT.  WE ARE GOING TO SHOW YOU THAT E-MAIL THIS

22  AFTERNOON.

23           YOUR JOB AS JURORS WILL BE TO DETERMINE

24  IF THAT E-MAIL WOULD HAVE GOTTEN A WHITE PERSON IN HER

25  POSITION FIRED AS WELL.  UNLIKE MANY CASES, THERE IS

1      ACTUALLY A LOT ON WHICH THE PARTIES AGREE; MISS SPEIGHT

2      IS AFRICAN-AMERICAN, FOR EXAMPLE.  NO SURPRISE.

3      MISS SPEIGHT JOINED THE COMPANY, NOVEMBER 1998.  UNTIL

4      SHE WAS TERMINATED IN MAY OF 2006, HER PERFORMANCE WAS

5      FLAWLESS AND WITHOUT ANY INCIDENT.  SHE NEVER HAD BEEN

6      DISCIPLINED, REPRIMANDED, OR EVEN REALLY CRITICIZED.

7                  SHE CONSISTENTLY RECEIVED PROMOTIONS.

8      SHE TOOK ON MORE AND MORE AND YET MORE RESPONSIBILITY.

9      BY 2006, BEFORE HER TERMINATION, HER HARD WORK HAD FULLY

10     PAID OFF, AND QUITE HANDSOMELY.  I HOPE YOU ARE NOT

11     GOING TO BE SHOCKED BY THIS, BUT THE PROOF IS THAT IN

12     HER LAST YEAR HER COMBINED BONUSES FOR HER 2005

13     PERFORMANCE WAS $500,000, AND THAT WAS ON TOP OF HER IN

14     EXCESS OF $100,000 SALARY.

15                 NOW, MISS SPEIGHT WAS IN CHARGE OF

16     SOMETHING CALLED THE OFFSET MANAGEMENT FUNCTIONS FOR

17     SOMETHING CALLED PROPRIETARY LENDING GROUP OR PLG.  ONE

18     THING YOU ARE GOING TO HEAR A LOT OF IS CAPMARK LOVES TO

19     USE ACRONYMS, SO HOPEFULLY YOU WILL BE ABLE TO KEEP THEM

20     STRAIGHT IN YOUR HEAD.

21                 HER GROUP WAS CALLED THE PROPRIETARY

22     LENDING GROUP, PLG.  WHAT MISS SPEIGHT DID WAS SHE

23     OVERSAW A GROUP OF APPROXIMATELY 20 INDIVIDUALS KNOWN AS

24     ASSET MANAGERS.  HER GROUP MANAGED THE COMPANY'S OWN

25     LOANS, UNLIKE OTHER DEPARTMENTS; IN OTHER WORDS, THE

1    COMPANY HAD ACTUALLY LENT THE MONEY TO A BORROWER AND

2    HELD THE MORTGAGE.  YOU MAY HEAR THESE LOANS CALLED

3    BALANCE SHEET LOANS, BECAUSE THE LOANS WERE ACTUALLY ON

4    THE COMPANY'S BALANCE SHEETS, AND THEY WERE A COMPANY

5    ASSET.  BECAUSE THE COMPANY'S OWN MONEY WAS AT RISK, IF

6    THE BORROWER COULD NOT PAY THE MONEY BACK, THE ASSET

7    MANAGERS WERE RESPONSIBLE FOR KEEPING THE CAREFUL WATCH

8    OVER THE BORROWERS AND THEIR PROPERTIES IN MAKING SURE

9    THAT THE COMPANY KNEW IF THE BORROWER WAS AT RISK OF

10   NONPAYMENT OR DEFAULT.

11           MISS SPEIGHT'S TEAM DID THIS BY

12   PERFORMING SOMETHING CALLED RISK RATINGS.  YOU ARE GOING

13   TO HEAR A LOT ABOUT THOSE.  THE RISK RATINGS ARE THE

14   LOANS THEY OVERSAW, WHICH THEY REPORTED TO THE CREDIT

15   DEPARTMENT AMONG OTHERS.  THE CREDIT DEPARTMENT RELIED

16   ON THE ACCURACY OF THESE RATINGS TO DECIDE WHETHER AND

17   HOW MUCH MONEY THEY NEEDED TO PUT ASIDE IN RESERVES IN

18   THE EVENT OF DEFAULT, OR WHETHER AND HOW TO MAKE NEW

19   LOANS TO THE SAME BORROWER.

20           MISS SPEIGHT WAS REQUIRED TO DEFEND HER

21   DEPARTMENT'S RISK RATING, NOT ONLY TO THE CREDIT

22   DEPARTMENT AND INTERNALLY, BUT TO THE COMPANY'S OUTSIDE

23   AUDITORS.  EVERYONE, I THINK, WILL AGREE THAT GETTING

24   THE RISK RATINGS DONE RIGHT IS CRITICAL FOR THOSE

25   REASONS.  THERE WERE OTHER DEPARTMENTS WITHIN GMAC CM

1    THAT PERFORMED OTHER FUNCTIONS.  ONE OF THOSE

2    DEPARTMENTS WAS KNOWN AS GLOBAL SERVICING.  YOU WILL

3    HEAR THAT, IN GENERAL, THE SERVICING DEPARTMENT ACTUALLY

4    SERVICED LOANS FOR OTHER LENDERS FOR THE MOST PART.  IN

5    OTHER WORDS, ANOTHER BANK OR ENTITY WAS LENDING THE

6    MONEY TO THE BORROWER AND THEY HIRED CAPMARK.  AND, AS

7    YOU HEARD IN VOIR DIRE, GMAC CM BECAME CAPMARK, SO WE

8    ARE GENERALLY GOING TO REFER TO IT AS CAPMARK.

9                    BUT THEY HIRED CAPMARK TO DO ROUTINE

10   TASKS, SUCH AS COLLECTING THE MORTGAGE PAYMENTS, PAYING

11   THE ESCROW PAYMENTS OUT TO THE TAXING AUTHORITIES OR

12   PAYING THE TAXES AND GM OR CAPMARK WOULD GET A FEE FOR

13   THIS.  BUT IF THE BORROWER DEFAULTED, IT WAS NOT

14   CAPMARK'S OWN MONEY THAT WAS LOST.

15                    IN EARLY 2006, THINGS CHANGED.  WHAT WAS

16   THEN GMAC CM WAS SOLD IN PART TO PRIVATE INVESTORS, AND

17   THEY CHANGED THEIR NAME TO CAPMARK.  THE NEW INVESTORS

18   NOT SURPRISINGLY HAD INTEREST IN MAKING SURE THE COMPANY

19   WAS WORKING AS EFFICIENTLY AS POSSIBLE.  MANY IDEAS WERE

20   PUT ON THE TABLE, AND ONE OF THEM WAS THAT

21   MISS SPEIGHT'S GROUP OF PLG ASSET MANAGERS WOULD BE

22   TRANSFERRED INTO THE SERVICING DEPARTMENT.  THEY HAD NOT

23   BEEN IN SERVICING BEFORE.

24                    AT THE END OF MARCH, MISS SPEIGHT WAS

25   ADVISED OF THIS AND AFTER MEETING MIKE LIPSON, WHO'S THE

1    HEAD OF GLOBAL SERVICING, AGREED WITH THE CONCEPT THAT

2    HER FOLKS WOULD MOVE OVER.  OVER THE NEXT SEVERAL WEEKS,

3    SEVERAL THINGS HAPPENED.  FIRST, A NEW GROUP WAS FORMED

4    WITHIN GLOBAL SERVICING KNOWN AS REAL ESTATE SOLUTIONS,

5    OR, YOU WILL HEAR AGAIN, THE ACRONYM, RES.  RES WAS

6    FORMED TO HANDLE SOME OF THE MORE COMPLEX LOANS THAT

7    SERVICING TRADITIONALLY HANDLED.  THE HEAD OF RES

8    WAS AN INDIVIDUAL NAME MICHAEL CARP.

9                 ONE ISSUE WAS WHETHER ALL OR PART OF MISS

10   SPEIGHT'S GROUP WOULD WORK UNDER MICHAEL CARP UNDER RES,

11   OR, IF NOT, THEY WOULD REPORT TO ANOTHER INDIVIDUAL

12   NAMED MARK MCCOOL.  ANOTHER ISSUE WAS WHETHER RES AND

13   PLG WERE BOTH DOING THE SAME SORTS OF JOBS AND WHETHER

14   THOSE FUNCTIONS SHOULD BE REASSIGNED TO ONE GROUP OR THE

15   OTHER SO THEY WERE NOT DOING ESSENTIALLY THE SAME TASK

16   IN AN EFFICIENT WAY.

17                IN THE MEANTIME, MISS SPEIGHT LEARNED

18   THAT WHEREVER SHE ENDED UP HER GROUP WAS GOING TO TAKE

19   OVER A WHOLE NEW SET OF LOANS WHICH HAD BEEN CALLED --

20   WHICH HAD BEEN PART OF SOMETHING CALLED THE SPG LOAN

21   PORTFOLIO, YET ANOTHER ACRONYM.  THE LOANS HAD BEEN

22   ASSET MANAGED BY ANOTHER GROUP ENTIRELY OUT IN DENVER,

23   AND MOST OF THE PROPERTIES IN THAT PORTFOLIO WERE IN

24   COLORADO.  LOANS IN THE PROPERTIES WERE VERY COMPLEX AND

25   WOULD REQUIRE CAREFUL MANAGEMENT.  AND MISS SPEIGHT WAS

1    ADVISED OF THIS, EVEN BEFORE THE FORMAL INTEGRATION,

2    THAT SHE WAS GOING TO NEED TO TAKE OVER THE ASSET

3    MANAGEMENT OF THAT PORTFOLIO.

4              UNFORTUNATELY, JUST AROUND THE SAME TIME,

5    MISS SPEIGHT LOST SEVERAL PEOPLE, SEVERAL OF HER ASSET

6    MANAGERS THROUGH EITHER RESIGNATION OR TRANSFER, AS THE

7    COMPANY WAS GETTING REORGANIZED.  AS A RESULT, SHE WAS

8    CONCERNED ABOUT HER ABILITY TO PICK UP THE ENTIRE SPG

9    LOAN PORTFOLIO, THOSE LOANS OUT IN DENVER.

10             MISS SPEIGHT WENT THROUGH THE SPG LOAN

11   PORTFOLIO AND SIGNED AS MUCH AS SHE COULD TO HER OWN

12   GROUP.  THERE WERE A FEW -- WHAT WE CALL DISTRESS LOANS

13   THAT WERE NATURALLY ASSIGNED TO THE RES GROUP, BUT THERE

14   WERE A FEW LEFTOVER LOANS, WHICH SOMEBODY ALONG THE WAY

15   DENOMINATED THE ORPHAN LOANS.  YOU ARE GOING TO HEAR A

16   LOT ABOUT SPG ORPHAN LOANS.  SHE ASKED MR. LIPSON --

17   REMEMBER THE HEAD OF GLOBAL SERVICING -- IF SHE COULD

18   HIRE NEW PEOPLE TO COVER THESE ORPHAN LOANS AND OTHER

19   LOANS THAT WERE NOW NOT BEING COVERED BECAUSE OF HER

20   LOST SUBORDINATES.

21             MISS SPEIGHT WILL TESTIFY THAT MR. LIPSON

22   SUGGESTED INSTEAD THAT SHE CONTACT AN INDIVIDUAL NAMED

23   TONY LAUERMAN, WHO WORKED IN RES TO SEE IF HE COULD LEND

24   HER SOME PEOPLE BECAUSE HE THOUGHT THAT ALL OF

25   MR. LAUERMAN'S PEOPLE WERE NOT FULLY ENGAGED.

1    MISS SPEIGHT, IN FACT, WENT TO MR. LAUERMAN WHO AGREED

2    TO PROVIDE SOME PEOPLE TO HELP MANAGE THE ORPHAN LOANS,

3    SO MISS SPEIGHT AT LEAST THOUGHT SHE HAD THE ORPHAN

4    LOANS COVERED.

5                   AS IF THINGS WERE NOT BAD ENOUGH, ANOTHER

6    KEY ASSET MANAGER, AN INDIVIDUAL NAMED GAGAN SURI, LEFT

7    MISS SPEIGHT'S GROUP.  MR. SURI MANAGED A GROUP OF LOANS

8    KNOWN AS THE CANADIAN PORTFOLIO.  AGAIN, MS. SPEIGHT

9    WENT TO MR. LAUERMAN, AND AGAIN HE ASSIGNED SOME

10   INDIVIDUALS TO HELP HER WITH THE ASSET MANAGEMENT

11   FUNCTION.  THE TESTIMONY WILL BE, WE ANTICIPATE, THAT IF

12   YOU HAD THE ASSET MANAGEMENT FUNCTIONS, YOU WILL ALSO

13   RESPONSIBILITY FOR THE RISK RATINGS OF THOSE LOANS.

14   THAT WAS PART AND PARCEL OF WHAT THE ASSET MANAGEMENT

15   FUNCTION WAS.

16                   ALTHOUGH THERE WAS STILL A LOT UP IN THE

17   AIR, THE TRANSITION CONTINUED TO MOVE FORWARD.

18   MS. SPEIGHT'S GROUP FORMALLY TRANSFERRED TO SERVICING AS

19   OF MAY 1ST, 2006.  MISS SPEIGHT MET WITH MCCOOL AND

20   OTHERS TO TRY AND FIGURE OUT WHAT TASKS HAD TO BE

21   PERFORMED BY HER GROUP, AND WHICH BY PEOPLE IN REAL

22   ESTATE SOLUTIONS.

23                   MISS SPEIGHT WAS TERMINATED ON MAY 26TH,

24   2006, 26 DAYS AFTER SHE FORMALLY STARTED REPORTING TO

25   MR. MCCOOL.  UNTIL MAY 23RD, THREE DAYS BEFORE HER

1   TERMINATION, THERE IS NOT A HINT OF ANY PROBLEM

2   WHATSOEVER.  THE COMPANY MAY CONTEND THAT MR. MCCOOL AND

3   MR. LIPSON HAD CONCERNS ABOUT MISS SPEIGHT'S

4   COMMUNICATION AND HER COMMITMENT AND HER ATTITUDE ABOUT

5   THE TRANSITION PRIOR TO THIS TIME.

6                IN FACT, I BELIEVE YOU WILL HEAR THAT

7   MR. LIPSON CLAIMS HE WAS CONCERNED FOR MANY WEEKS ABOUT

8   MISS SPEIGHT DURING THIS TIME PERIOD, BUT, IF SO, THERE

9   IS NO PAPER TRAIL.  NOT A SINGLE DOCUMENT, NOT A SINGLE

10   E-MAIL, NOT A SINGLE PHONE CALL, INSTANT MESSAGE, MEMO,

11   FAX, DIARY ENTRY, YOU NAME IT, FROM ANYONE IN MANAGEMENT

12   AT THE COMPANY TO SUGGEST THAT THEY HAD ANY CONCERNS

13   ABOUT MISS SPEIGHT PRIOR TO MAY 23RD.

14                IN FACT, WHEN MISS SPEIGHT WAS FINALLY

15   FORMALLY TOLD WHAT HER POSITION WAS GOING TO BE IN MID

16   MAY, SHE WAS NOT ONLY GIVING HER OWN PORTFOLIO, BUT THE

17   ENTIRE NORTH AMERICAN PORTFOLIO, WITH MORE LOANS AND

18   MORE ASSETS AND MORE RESPONSIBILITY.

19                NOW THINGS START TO GO WRONG.  MAY 23RD.

20   MISS SPEIGHT ATTENDS A MEETING WITH MR. MCCOOL AND TWO

21   OTHER INDIVIDUALS, ED FINKENSTAEDT AND CLARE DOOLEY,

22   FOUR PEOPLE IN THE MEETING.  THE PRIMARY PURPOSE OF THE

23   MEETING WAS TO GO THROUGH ALL THE DIFFERENT TASKS

24   PERFORMED BY THE ASSET MANAGERS AND BY REAL ESTATE

25   SOLUTIONS, AMONG OTHERS, AND FIGURE OUT WHO SHOULD BE

1    PERFORMING THOSE TASKS IN THE LONG RUN.

2              THE EVIDENCE WILL SHOW THAT THE MEETING

3    WAS HIGHLY SUCCESSFUL IN THAT REGARD, BUT A SMALL PART

4    OF THE MEETING DID NOT GO WELL.  MR. MCCOOL ASKED

5    MISS SPEIGHT ABOUT THE MORALE OF HER GROUP, AND

6    MISS SPEIGHT RESPONDED THAT HE WOULD HAVE TO ASK THE

7    INDIVIDUALS IN HER GROUP DIRECTLY.  HE ASKED A SIMILAR

8    QUESTION ABOUT HER FORMER BOSS, MARLA BERGER, TO WHOM

9    SHE PROVIDED A SIMILAR RESPONSE.  HE CLAIMS THAT

10   MISS SPEIGHT RESPONDED TO A QUESTION, TO WHICH HE

11   SOLICITED HER OPINION, BY SAYING THAT HER OPINION DIDN'T

12   MATTER.

13             MR. MCCOOL WALKED AWAY FROM THAT MEETING

14   WHERE HE FELT MISS SPEIGHT'S COMMITMENT WAS NOT AS

15   COMMITTED TO THE TRANSITION AS HE WANTED HER TO BE, AND

16   WROTE UP A MEMO TO DOCUMENT HIS ALLEGED CONCERNS.  YOU

17   WILL SEE THAT MEMO.  YOU WILL SEE THAT THERE IS NOTHING

18   IN THAT MEMO TO SUGGEST THAT MR. MCCOOL HAD ANY CONCERNS

19   ABOUT MISS SPEIGHT UNTIL THAT MAY 23RD MEETING.

20             AS A RESULT OF THAT MEETING, MISS SPEIGHT

21   WAS ASSIGNED CERTAIN FOLLOW-UP TASKS.  THE EVIDENCE WILL

22   SHOW THAT SHE IMMEDIATELY PERFORMED THOSE ASSIGNMENTS.

23   NEVERTHELESS, MR. MCCOOL INSTANTLY CONCLUDED FROM

24   WALKING OUT OF THAT MEETING THAT MISS SPEIGHT WAS MERELY

25   GOING THROUGH THE MOTIONS TO SHOW A LEVEL OF

1    COOPERATION, WHICH HE CLAIMED DID NOT REALLY EXIST.

2              WE WILL DEMONSTRATE TO YOU THAT MR.

3    MCCOOL HAD NO REAL BASIS FOR REACHING THIS WHOLLY

4    SUBJECTIVE CONCLUSION.  IN FACT, HE SHARED HIS MEMO WITH

5    HUMAN RESOURCES AND THEY SPECIFICALLY CAME BACK TO HIM

6    AND SAID, CAN YOU GIVE US SOME OBJECTIVE EVIDENCE TO

7    BACK THAT UP?  THE EVIDENCE WILL SHOW THAT MR. MCCOOL

8    COULDN'T.

9              MR. MCCOOL WILL ADMIT THAT EVEN AFTER THE

10   MAY 23RD MEETING, HE DIDN'T THINK MISS SPEIGHT SHOULD BE

11   DISCIPLINED IN ANY WAY.  HE JUST WANTED TO BE ABLE TO

12   SIT DOWN AND MEET WITH HER TO SEE IF HE COULD FIGURE OUT

13   WHY SHE WAS APPARENTLY UNHAPPY AND ASSURE HER THAT HE

14   VALUED HER AND WANTED HER INPUT AND WANTED TO WORK WITH

15   HER.  BUT BEFORE HE HAD A CHANCE TO HAVE THAT MEETING, A

16   NEW PROBLEM AROSE.

17             REMEMBER I TALKED ABOUT THAT CANADIAN

18   LOAN PORTFOLIO THAT MR. SURI HAD.  WELL, MISS SPEIGHT

19   THOUGHT IT WAS BEING COVERED BY MR. LAUERMAN'S PEOPLE.

20   REMEMBER SHE HAD THAT GONE TO MR. LAUERMAN AND ASKED IF

21   SHE COULD HAVE HELP AND HE SAID YES.

22             THROUGH A SERIES OF E-MAILS, IT APPEARED

23   THAT THE LOANS WERE BEING REASSIGNED, NOT TO ASSET

24   MANAGERS, BUT TO INDIVIDUALS IN CANADA KNOWN AS CRM,

25   CLIENT RELATION MANAGERS, AND THOSE PEOPLE ARE UNDER THE

1    JURISDICTION OF MR. FINKENSTAEDT, ONE OF THE PEOPLE WHO

2    HAD ATTENDED THE MEETING.  IT IS NOT CLEAR WHO DECIDED

3    THAT THE LOANS SHOULD BE REASSIGNED, BUT MR. LAUERMAN

4    STATED THAT HIS GROUP WOULD NO LONGER HAVE

5    RESPONSIBILITY FOR THE LOANS.  AN INDIVIDUAL IN MISS

6    SPEIGHT'S GROUP ASSUMED THAT SINCE THE LOANS WERE BEING

7    REASSIGNED, THE RISK RATINGS WERE BEING REASSIGNED TO

8    THE CRM'S TOO.

9                NOW, THE EVIDENCE WILL SHOW THAT THE

10   CRM'S HAD NOT BEEN TRAINED TO DO RISK RATINGS.

11   MR. FINKENSTAEDT DIDN'T THINK HIS PEOPLE SHOULD BE DOING

12   THEM.  IN FACT, HE WILL TESTIFY THAT HE BAUKED AT THE

13   REASSIGNMENT.  HE THOUGHT THIS CONTRADICTED THE

14   DECISIONS THAT HAD BEEN MADE AT THE MAY 23RD MEETING, SO

15   HE WROTE AN E-MAIL WHICH STARTED OUT "STOP" AND WENT ON

16   TO SAY THAT THE RISK RATINGS WERE THE RESPONSIBILITY OF

17   EITHER THE ASSET MANAGEMENT, MEANING WANDA'S GROUP, OR

18   REAL ESTATE SOLUTIONS, I.E., MICHAEL CARP'S GROUP AND

19   TONY LAUERMAN'S GROUP, WHICH IS, IN FACT, WHERE THOSE

20   LOANS HAD BEEN PLACED.

21                INDEED, WANDA HAD THOUGHT THAT UNTIL SHE

22   GOT THOSE E-MAILS THAT MR. LAUERMAN'S GROUP HAD BEEN

23   HANDLING THE LOANS, AND INDEED MR. LAUERMAN HIMSELF AT

24   THE BEGINNING OF THE E-MAIL STRING SAID, UNTIL TODAY WE

25   THOUGHT THAT WE WERE HANDLING THOSE LOANS.  MR. MCCOOL,

1   ON THE OTHER HAND, THOUGHT THAT THEY HAD AGREED AT THE

2   MAY 23RD MEETING THAT ALL OF THE RISK RATINGS WERE GOING

3   TO BE DONE BY WANDA'S GROUP.  THE RISK RATING PROCESS

4   WAS ONLY A FEW DAYS AWAY FROM BEGINNING.  AS WE

5   MENTIONED, THIS IS NOT JUST A TASK THAT YOU CAN PICK UP.

6   THIS IS A VERY SERIOUS TASK.

7           MISS SPEIGHT WAS EXTREMELY CONCERNED THAT

8   THESE LOANS WOULD NOT BE ADEQUATELY COVERED.  SHE

9   RECOGNIZED THAT THERE HAD BEEN A COMMUNICATIONS

10  BREAKDOWN.  MR. LAUERMAN THOUGHT HE WAS HANDLING THE

11  LOANS UNTIL THE DAY BEFORE.  MR. FINKENSTAEDT SAID BASED

12  ON THE MAY 23RD MEETING, HE DIDN'T THINK HE WAS SUPPOSED

13  TO GET THE LOANS, AND EVERYONE APPEARED CONFUSED, SO SHE

14  DECIDES TO WRITE AN E-MAIL.

15          THIS IS THE E-MAIL SHE WROTE.  SHE WROTE

16  IT TO MR. MCCOOL, HER NEW BOSS; MR. FINKENSTAEDT, WHO

17  HAD BEEN AT THE MEETING WITH HER, WHO NOW, IT APPEARED,

18  WAS GETTING THE RISK RATING FOR THE LOANS; MR. LAUERMAN,

19  WHO WAS IN THE REAL ESTATE SOLUTIONS, WHO UP UNTIL THE

20  DAY OR TWO BEFORE HAD HAD THE LOANS; MICHAEL CARP, WHO

21  IS MR. LAUERMAN'S BOSS, CLARE DOOLEY, WHO WAS THE OTHER

22  PARTICIPANT.  SHE ALSO CC'D THREE PEOPLE; THE CREDIT

23  DEPARTMENT, THE PEOPLE TO WHOM SHE WOULD HAVE TO REPORT

24  THE LOANS, THE RISK RATINGS, TO.  MR. HOHENLEITNER WAS

25  THE ULTIMATE HEAD OF THE CREDIT DEPARTMENT TO WHOM SHE

1    WOULD REPORT THE RISK RATINGS TO, AND THEN TWO OF HIS

2    SUBORDINATES.  THIS E-MAIL GOT HER FIRED.

3                  MR. LIPSON WILL TESTIFY THAT IF

4    MISS SPEIGHT HAD NOT SENT THIS E-MAIL, SHE WOULD NOT

5    HAVE BEEN FIRED, AND HE WILL SAY THAT UNEQUIVOCALLY.

6    THEY ARE GOING TO CONTEND THAT THIS E-MAIL WAS

7    INCREDIBLY INSUBORDINATE, INAPPROPRIATE, AND THAT WANDA

8    KNEW BETTER THAN TO SEND AN E-MAIL LIKE THIS, AND THAT

9    ANYBODY WHO SENT THIS E-MAIL WOULD HAVE GOTTEN FIRED.

10                  AT THE END OF THE DAY, WE ARE GOING TO

11   PROVE TO YOU THAT IF A WHITE PERSON HAD WRITTEN THAT

12   E-MAIL, ESPECIALLY ONE WITH MISS SPEIGHT'S WORK HISTORY

13   AT THE COMPANY, THEY WOULD NEVER HAVE GOTTEN FIRED.  WE

14   WILL SHOW YOU THAT SIMILARLY SITUATED WHITE EMPLOYEES,

15   EXCEPT IN THE MOST OFFENSIVE OR EGREGIOUS CIRCUMSTANCES,

16   WOULD, CONSISTENT WITH THE COMPANY'S POLICIES, HAVE AT

17   LEAST GOTTEN A COUNSELING OR A WARNING.  THEY WILL ADMIT

18   TO YOU THAT MISS SPEIGHT NEVER EVEN GOT A WARNING.

19                  WE WILL ASK YOU TO CONCLUDE THAT IF

20   MISS SPEIGHT WERE NOT AFRICAN-AMERICAN BUT WHITE, SHE

21   WOULD NOT HAVE BEEN FIRED.  WE WILL SHOW YOU THAT THE

22   COMPANY'S REASONS FOR CLAIMING THAT HER SKIN COLOR HAD

23   NOTHING TO DO WITH THE TERMINATION SIMPLY ARE NOT

24   CREDIBLE.  FOR EXAMPLE, ALTHOUGH WE EXPECT THAT THE

25   COMPANY WILL NOW CONTEND THAT MISS SPEIGHT'S BEHAVIOR

1    WAS EGREGIOUS AND CONSTITUTED INSUBORDINATION, THEIR OWN

2    STATEMENTS MADE PRIOR TO THEIR LEARNING OF

3    MISS SPEIGHT'S LAWSUIT AND DOCUMENTED IN THEIR OWN

4    FILES, SAY SOMETHING VERY DIFFERENT.  IN FACT, IN THE

5    MEETING IN WHICH THEY TERMINATED HER, THEY SPECIFICALLY

6    TOLD HER THEY DIDN'T THINK SHE HAD DONE ANYTHING

7    EGREGIOUS.  IT WAS JUST THAT MR. MCCOOL HAD CONCLUDED

8    THAT HE DIDN'T THINK IT WAS GOING TO WORK OUT BETWEEN

9    THE TWO OF THEM.

10             WE WILL SHOW YOU THAT THEIR STATED

11   REASONS FOR WHY TERMINATION WAS APPROPRIATE HAVE CHANGED

12   OVER TIME, SO THEREFORE YOU SHOULD NOT BELIEVE THEM,

13   PARTICULARLY AS TO MR. LIPSON'S EXPLANATIONS FOR HER

14   TERMINATION, AND WE WILL SHOW YOU THAT, AS THEY DIDN'T

15   HOLDUP TO SCRUTINY, THEY CHANGED THEIR TUNE.

16             WE WILL ASK YOU AT THE END OF THE DAY TO

17   CONCLUDE THAT THE ONLY REASON THAT THEY NEED TO LIE IS

18   BECAUSE THE TRUTH ESTABLISHES, BY THE PREPONDERANCE OF

19   THE EVIDENCE, THAT HAD MISS SPEIGHT NOT BEEN PREJUDGED,

20   AT LEAST IN PART, BY THE COLOR OF HER SKIN, BY MANAGERS

21   TO WHOM SHE HAD ONLY BEEN REPORTING FOR SEVERAL WEEKS AT

22   MOST, THAT SHE WOULD NOT HAVE BEEN TERMINATED.  THANK

23   YOU IN ADVANCE FOR YOUR TIME AND ATTENTION, AND GOOD

24   AFTERNOON.

25             THE COURT:  COUNSEL, YOU WANT TO OPEN

1      NOW?

2                          MR. BANKS:  I WOULD LIKE TO.

3                          THE COURT:  I WAS --

4                          MR. BANKS:  I BEG YOUR PARDON?

5                          THE COURT:  DO YOU WANT TO TAKE DOWN YOUR

6      MEMO --

7                          MR. BANKS:  I WILL PROBABLY PUT IT BACK

8      UP AT SOME POINT, BUT -- IF I MAY.

9                          THE COURT:  SURE.

10                         MR. BANKS:  I'LL SLIDE THIS OVER HERE.

11     GOOD AFTERNOON, MEMBERS OF THE JURY.  I'M MICHAEL BANKS,

12     AND I REPRESENT CAPMARK.  I WANT TO START BY TELLING YOU

13     THAT ACCUSATION OF RACE DISCRIMINATION IS A VERY SERIOUS

14     MATTER AND ONE THAT YOU SHOULD TAKE SERIOUSLY.  CAPMARK

15     CERTAINLY DOES.  WE HOPE THAT YOU WILL JUDGE IT BY THE

16     FACTS, AND WE ARE GOING TO SHOW YOU THOSE FACTS.

17                         YOU KNOW, IT'S AN ACCUSATION IN THIS CASE

18     THAT IS MADE AGAINST A COMPANY, CAPMARK.  BUT AS I SAID

19     WHEN WE WERE GOING THROUGH THE PROCESS BEFORE LUNCH, A

20     COMPANY LIKE CAPMARK ACTS THROUGH ITS PEOPLE.  IT'S

21     REALLY A COMPANY OF PEOPLE, AND THERE ARE TWO PEOPLE

22     HERE WHO ARE ACCUSED OF RACE DISCRIMINATION, TWO

23     DECISION-MAKERS, THE TWO PEOPLE WHO PARTICIPATED IN THE

24     DECISION TO TERMINATE MISS SPEIGHT'S EMPLOYMENT.  THOSE

25     TWO PEOPLE ARE LINDA PICKLES -- YOU PROBABLY CAN'T SEE

1    HER BEHIND MY EASEL RIGHT NOW, AND MIKE LIPSON.

2    MR. LIPSON WILL BE IN HERE TO TESTIFY, AND YOU WILL HAVE

3    AN OPPORTUNITY TO HEAR WHAT MR. LIPSON HAS TO SAY.

4                   THEY WILL SHOW YOU THAT THIS SERIOUS

5    ACCUSATION IS COMPLETELY AND TOTALLY UNTRUE.  THEY WILL

6    SHOW YOU THAT MISS SPEIGHT WAS TERMINATED NOT BECAUSE OF

7    THE COLOR OF HER SKIN -- THAT HAD NOTHING TO DO WITH IT,

8    BUT BECAUSE OF WHAT SHE DID IN THE WORKPLACE AND WHAT

9    SHE SAID.  YOU WILL HEAR FROM THEM.

10                   YOU WILL HEAR FROM CO-WORKERS OF

11   MISS SPEIGHT.  YOU WILL HEAR FROM MARK MCCOOL, ANOTHER

12   MANAGER WHO SUPERVISED MISS SPEIGHT, AND MOST OF ALL,

13   MOST TELLING, YOU ARE GOING TO HEAR FROM MISS SPEIGHT,

14   NOT JUST ON THE WITNESS STAND, BUT YOU WILL SEE WHAT SHE

15   WROTE IN THAT E-MAIL AND OTHERS.  YOU WILL SEE AND HEAR

16   THE WORDS THAT SHE USED, BECAUSE IT'S HER WORDS AND HER

17   CONDUCT THAT ARE REALLY AT ISSUE HERE.  AND WHEN YOU PUT

18   IT ALTOGETHER, IT'S GOING TO BE VERY, VERY CLEAR TO YOU

19   THAT MISS SPEIGHT'S RACE HAD NOTHING TO DO WITH HER

20   TERMINATION.

21                   LET ME GO THROUGH A LITTLE BIT OF

22   BACKGROUND HERE SO YOU UNDERSTAND IT.  MR. SALMANSON DID

23   A NICE JOB OF TELLING YOU ABOUT MISS SPEIGHT'S HISTORY,

24   AND HE IS RIGHT:  FOR EIGHT YEARS, SHE WAS A VERY GOOD

25   EMPLOYEE.  HER COMPENSATION DID MOVE UP TO THE POINT

1    WHERE WHEN SHE WAS TERMINATED IN HER LAST FULL YEAR OF

2    EMPLOYMENT WITH BONUSES INVOLVED, SHE EARNED MORE THAN

3    HALF A MILLION DOLLARS.  SHE HAD BEEN PROMOTED TO A

4    POINT WHERE SHE WAS MANAGING A TEAM OF 20 EMPLOYEES,

5    OVERSEEING SEVERAL BILLION DOLLARS WORTH OF LOANS THAT

6    HAD BEEN MADE BY CAPMARK THAT HAD TO BE MANAGED.

7              IN THOSE EIGHT YEARS, THROUGH ALL OF HER

8    PROMOTIONS, AND ALL HER PAY INCREASES, HER RACE WAS

9    NEVER A FACTOR, JUST AS IT WASN'T A FACTOR AT THE END.

10   ALL ALONG SHE WAS JUDGED BASED ON HER PERFORMANCE.

11   UNFORTUNATELY, IN THE SPRING OF 2006, THINGS CHANGED.

12   THERE WAS A SIGNIFICANT CHANGE WITHIN THE COMPANY.

13   MR. SALMANSON TOLD YOU, AND I THINK I TOLD YOU THIS

14   MORNING, THE COMPANY USED TO BE PART OF GM.  IT WAS

15   KNOWN AS GMAC COMMERCIAL MORTGAGE.  IT WAS SOLD.  GM

16   SOLD THE BUSINESS, AND IT BECAME CAPMARK WITH NEW

17   OWNERS.

18             WHEN THE NEW OWNERS CAME IN, THEY DECIDED

19   TO MAKE THINGS A LITTLE MORE EFFICIENT TO CHANGE SOME OF

20   THE WAY THAT THINGS OPERATED.  LET ME JUST -- I KNOW YOU

21   ARE GOING TO HEAR A LOT OF NAMES, AND GET A LOT OF

22   INFORMATION PUT IN FRONT OF YOU, MISS SPEIGHT USED TO

23   WORK IN WHAT WAS CALLED PLG, PROPRIETARY LENDING.  THAT

24   WAS A GROUP THAT MANAGED AND MADE CAPMARK LOANS, LOANS

25   TO PEOPLE BORROWING DIRECTLY, NOT PEOPLE, BIG

1    BUSINESSES, THESE BIG COMMERCIAL LOANS.

2              IN THE SPRING OF 2006, MISS SPEIGHT'S

3    ENTIRE GROUP MOVED INTO THE SERVICING DEPARTMENT.  THE

4    SERVICING DEPARTMENT ALSO MANAGED LOANS, DIFFERENT KINDS

5    OF LOANS, AND THE DECISION WAS LET'S TAKE THESE TWO

6    GROUPS THAT ARE MANAGING LOANS, AND LET'S COMBINE THEM

7    SO WE CAN BE MORE EFFICIENT.

8              HERE IS WHAT YOU ARE GOING TO HEAR THAT

9    IS IMPORTANT ABOUT THIS:  HEAD OF SERVICING WAS A GUY

10   NAME MIKE LIPSON.  I TOLD YOU, YOU WILL HEAR FROM MIKE

11   LIPSON.  MIKE LIPSON SUPERVISED MARK MCCOOL AND WANDA

12   SPEIGHT AND HER TEAM WERE BROUGHT INTO THAT GROUP.  ALL

13   20 PEOPLE IN MISS SPEIGHT'S GROUP WERE BROUGHT INTO

14   SERVICING.  WHY?

15             WHY DID MR. LIPSON BRING MISS SPEIGHT AND

16   HER GROUP?  BECAUSE HE THOUGHT HE WAS GETTING A TOP

17   FLIGHT MANAGER.  YES, AN EXPENSIVE ONE, BUT A CAPABLE,

18   EXPERIENCED, DEDICATED, COMMITTED MANAGER.  THAT IS WHAT

19   HE WANTED IN BRINGING THESE ORGANIZATIONS TOGETHER, AND

20   THAT IS WHY HE AFFIRMATIVELY DECIDED TO BRING

21   MISS SPEIGHT IN.

22             AS YOU WILL HEAR, HE KNEW MISS SPEIGHT'S

23   RACE.  THAT WAS IRRELEVANT TO HIM.  IT HAD BEEN

24   IRRELEVANT TO EVERYONE FOR EIGHT YEARS AT CAPMARK, AND

25   IT WAS IRRELEVANT TOTALLY TO MR. LIPSON.  HE BROUGHT HER

1      INTO THAT GROUP BECAUSE HE WANTED HER THERE.  HE WANTED

2      MISS SPEIGHT TO HELP HIM MAKE THE SERVICING DEPARTMENT

3      SUCCEED.

4                  NOW, MR. LIPSON THOUGHT THIS WAS A GREAT

5      IDEA.  THERE WAS ONE PERSON WHO DIDN'T LIKE IT AT ALL,

6      THOUGH, AND THAT IS MISS SPEIGHT.  IT'S AN OPINION YOU

7      WILL HEAR FROM HER IN HER TESTIMONY, AND YOU WILL SEE IT

8      IN HER OWN E-MAILS.  SHE MOVED INTO THE OTHER GROUP,

9      INTO SERVICING, ON MAY 1ST OF 2006.

10                 BEFORE SHE EVEN GOT THERE, SHE STARTED

11     COMPLAINING ABOUT IT.  MISS SPEIGHT WROTE THAT SHE WAS

12     INDIFFERENT -- THAT IS A WORD SHE USES -- INDIFFERENT TO

13     THE COMPANY.  SHE DIDN'T LIKE THE NEW MANAGEMENT.  SHE

14     DIDN'T LIKE LIPSON.  SHE DIDN'T WANT TO WORK FOR MCCOOL.

15     SHE DIDN'T HAVE A HIGH OPINION OF THEM.  SHE DIDN'T HAVE

16     A HIGH OPINION OF THEIR BOSSES EITHER, AND THAT IS WHAT

17     SHE WROTE.  SHE WROTE THAT PUBLICLY SHE WOULD PRETEND TO

18     BE ON BOARD, BUT IN REALITY SHE WOULDN'T.  IN REALITY,

19     AS SHE SAID, SHE WAS INDIFFERENT.

20                 SHE WAS UPSET FOR A COUPLE OF REASONS;

21     ONE, SERVICING WAS A LITTLE LESS PRESTIGIOUS.  PLG WAS

22     LIKE THE BLUE CHIP PART OF THE ORGANIZATION.  THAT'S

23     WHAT MADE MONEY FOR THE COMPANY.  THEY MADE THE BIG

24     COMPANY LOANS, AND SERVICING WAS A LITTLE MORE LIKE IT

25     SOUNDED.  THEY DIDN'T CUT HER PAY OR ANYTHING LIKE THAT.

1   THEY DIDN'T CHANGE HER TITLE.  BUT SHE WAS WORRIED, AND

2   SHE SAID SOMETHING ELSE, BOTH IN HER E-MAILS, IN HER

3   TESTIMONY THAT YOU WILL HEAR HERE.  MISS SPEIGHT

4   CONCLUDED THAT THE COMPENSATION STRUCTURE IN SERVICING

5   WAS NOT AS GENEROUS AS IT WAS IN PLG.  SHE WROTE AND HAS

6   TESTIFIED THAT SHE WAS CONCERNED SHE WAS GOING TO MAKE

7   LESS MONEY.  THAT BOTHERED HER.  I UNDERSTAND THAT.

8   THAT'S OKAY.  IT WAS ABOUT THE MONEY.  UNFORTUNATELY,

9   HER UNHAPPINESS SHOWED BIG TIME.

10                  ON MAY 23RD, 2006, MR. MCCOOL HAD A

11  MEETING WITH MISS SPEIGHT AND TWO OTHERS.  MR. SALMANSON

12  REFERRED TO IT TOO.  IT WAS A MEETING OF FOUR PEOPLE

13  THAT LASTED A COUPLE OF HOURS, AND THEY HAD A DETAILED

14  SIX-PAGE LIST OF TASKS, BECAUSE AS YOU ARE COMBINING

15  THESE ORGANIZATIONS YOU HAVE TO DECIDE WHO IS DOING

16  WHAT.  RIGHT?  SO THEY ARE DIVIDING UP THE TASKS IN THIS

17  MEETING.  THIS WAS REALLY THE FIRST OPPORTUNITY TO DO

18  THIS AFTER THE TRANSITION.

19                  IN FRONT OF THE OTHER THREE PEOPLE, MR.

20  MCCOOL ASKED MISS SPEIGHT SOME QUESTIONS.  ONE OF THE

21  QUESTIONS HE ASKED WAS A SIMPLE ONE:  TELL ME ABOUT THE

22  MORALE OF YOUR GROUP.  HOW DO PEOPLE FEEL ABOUT THIS

23  MOVE?  ARE PEOPLE UNHAPPY?  ARE THE 20 MEMBERS OF YOUR

24  TEAM OVERSEEING ALL THESE LOANS CONCERNED OR DISMAYED?

25  MISS SPEIGHT SAID NOT ONCE, NOT TWICE, BUT THREE TIMES,

1    I DON'T KNOW, YOU WILL HAVE TO ASK THEM.

2              WELL, ALTHOUGH SHE HAD ALREADY COMMENTED

3    IN E-MAILS ABOUT KNOWING THAT THE PEOPLE IN HER GROUP

4    WERE NOT UNHAPPY, NOT TO MCCOOL, BUT TO OTHERS, SHE JUST

5    SAID TO MR. MCCOOL, I DON'T KNOW.  I'M NOT GOING TO TALK

6    TO YOU ABOUT MY GROUP.  GO ASK THEM YOURSELF.

7              HE WAS BOTHERED BY THAT.  BUT IT WAS THE

8    NEXT QUESTION HE ASKED HER TOWARDS THE END OF THE

9    MEETING THAT REALLY GOT HIM.  YOU SEE MCCOOL, AS HE WILL

10   TELL YOU, HAD BROUGHT WANDA SPEIGHT INTO THE DEPARTMENT,

11   ALONG WITH LIPSON, AS A 5 TO $600,000 A YEAR MANAGER TO

12   CONTRIBUTE IDEAS, TO MAKE THINGS HAPPEN.  THEY BROUGHT

13   HER IN BECAUSE THEY WANTED HER TO MAKE IT WORK, AND THEY

14   THOUGHT SHE COULD DO IT.

15             SO HE ASKED HER, TELL ME WANDA, WHAT ARE

16   YOUR THOUGHTS?  WHAT ARE YOUR VIEWS?  WHAT ARE YOUR

17   OPINIONS ON HOW TO MAKE THIS WORK?

18             SHE SAT THERE.  SHE CROSSED HER ARMS.

19   SHE SAID, MY OPINIONS DON'T COUNT, SO I DON'T HAVE ANY.

20             MCCOOL JUST ABOUT BLUE A GASKET AFTER THE

21   MEETING.  HE WAS ANNOYED.  BUT, STILL, THEY HAD MADE THE

22   INVESTMENT IN MISS SPEIGHT, AND THEY KNEW THAT SHE WAS

23   CAPABLE IF ONLY THEY COULD BRING HER ON BOARD.  SO AS

24   MR. MCCOOL WILL TELL YOU, AND ALL THE EVIDENCE WILL

25   SHOW, THERE WAS NO PLAN TO TERMINATE HER.  THERE WAS NO

1      PLAN TO DISCIPLINE HER.  HE DID THE RIGHT THING.

2                   HE WENT TO THE HUMAN RESOURCES

3      ORGANIZATION, AND HE SAID, COME HELP ME.  HELP ME COME

4      TALK TO MISS SPEIGHT SO SHE CAN BE A VALUABLE MEMBER OF

5      OUR TEAM SO SHE CAN HELP LEAD HER GROUP IN BRINGING

6      THESE DEPARTMENTS TOGETHER AND EARN WHAT WE ARE PAYING

7      HER.

8                   THERE IS NO DISPUTE ABOUT THAT.  HE TRIED

9      TO MAKE IT BETTER, NOT FIRE HER.  THIS WAS MAY 23RD ON

10     THIS MEETING, AND THEY SCHEDULED A MEETING FOR MAY 26TH.

11     MCCOOL, A GUY NAMED JON FOGLE FROM HUMAN RESOURCES WHO

12     REPORTED TO LINDA PICKLES, THEY WERE GOING TO MEET WITH

13     MISS SPEIGHT ON THE AFTERNOON OF THE 26TH.  AND THEN

14     CAME THE STRAW THAT BROKE THE CAMEL'S BACK.

15                   I'M GOING TO GET YOU HERE THE LARGEST

16     BLOWUP OF THE E-MAIL IN THE WESTERN CIVILIZATION, AS FAR

17     AS I KNOW.  I WOULD ASK IF EVERYBODY CAN SEE THAT, BUT

18     IT'S SORT OF A DUMB QUESTION, GIVEN THE SIZE OF IT.

19                   THIS IS WHAT HE WROTE.  THIS IS WHAT

20     MISS SPEIGHT WROTE.  FIRST, YOU HAVE TO UNDERSTAND

21     WHAT'S GOING ON HERE.  AS MR. SALMANSON TOLD YOU, THEY

22     HAD SOMETHING CALLED RISK RATING.  NOW, WHEN YOU ARE

23     LOANING MILLIONS OF DOLLARS TO SHOPPING CENTER

24     DEVELOPERS AND HOTEL BUILDERS AND THINGS LIKE THAT, YOU

25     NEED TO KEEP TRACK OF THE LOANS.  YOU DON'T WANT TO FIND

1    OUT FOR THE FIRST TIME THAT A LOAN IS NOT BEING REPAID.

2    SO FOUR TIMES A YEAR, ONCE A QUARTER, THEY TAKE PEOPLE

3    FROM MISS SPEIGHT'S GROUP, AND THEY DO WHAT IS CALLED A

4    RISK RATING.  THEY ANALYZE THE LOAN, THEY LOOK AT THE

5    FINANCIAL STATEMENTS, AND THEY DECIDE A RISK OF 1 TO 11.

6    THAT INDICATED, BASED ON ALL THAT THEY REVIEWED, WHETHER

7    THERE WAS A RISK OF THE LOAN NOT BEING REPAID, BECAUSE

8    IF THERE WAS A RISK, THERE WAS A PROBLEM, YOU HAD TO

9    DEAL WITH IT IN ADVANCE.

10           THERE WAS SOME QUESTION, AS MR. SALMANSON

11   TOLD YOU, ABOUT WHO WAS GOING TO DO THE RISK RATINGS FOR

12   THESE CANADIAN LOANS.  THEY CALLED IT CANADIAN PLG

13   LOANS, LOANS THAT CAPMARK HAD MADE TO BUSINESSES IN

14   CANADA.  THIS IS ACTUALLY A LENGTHY E-MAIL TRAIL

15   PROCEEDING THIS.  IT'S ABOUT FOUR PAGES LONG.  THERE

16   WERE MAYBE 8 OR 10 E-MAILS AND THERE IS SOME DISCUSSION,

17   WHO'S GOING TO DO THE RISK RATINGS.  IT WAS NOT GOING TO

18   BE LAUERMAN'S GROUP.  CONTRARY TO WHAT MR. SALMANSON

19   TOLD YOU, LAUERMAN SAID ON MAY 22ND, THIS IS NOT FOR US.

20   IT WAS NOT GOING TO BE MR. FINKENSTAEDT'S GROUP, AND

21   THEY WENT BACK AND FORTH.

22           MR. MCCOOL, MISS SPEIGHT'S BOSS, WROTE A

23   VERY MEASURED, CALM E-MAIL, CONSTRUCTIVE.  HE SAID, "ALL

24   RISK RATINGS WILL BE DONE BY THE ASSET MANAGEMENT GROUP.

25   NED, WANDA, CLARE, AND I ARE IN THE PROCESS OF

```
 1    IDENTIFYING THE SPECIFIC FUNCTIONALITIES TO BE ASSIGNED

 2    TO THE VARIOUS GROUPS."  SKIP AROUND A LITTLE AS YOU GO

 3    THROUGH IT.  "WHILE WE HAVE NOT COMPLETED THAT

 4    ASSESSMENT, I THOUGHT WE WERE ALL ON THE SAME PAGE, THAT

 5    THE ASSET MANAGEMENT TEAM" -- THAT WAS WANDA'S TEAM,

 6    ASSET MANAGEMENT TEAM -- "IS AND WILL CONTINUE TO BE

 7    RESPONSIBLE FOR DAILY BORROWER INTERACTION, AS WELL AS

 8    THE RISK RATING PROCESS."

 9              SO ALL HE WAS SAYING, IN A CALM, MEASURED

10    WAY, DESPITE WHAT HAD HAPPENED A FEW DAYS EARLIER, IS

11    WANDA SPEIGHT'S GROUP, THE ASSET MANAGEMENT TEAM, HAS

12    DONE THESE RISK RATINGS FOR THESE LOANS BEFORE, AND THEY

13    WILL CONTINUE TO DO THOSE RISK RATINGS.

14              THIS IS WHERE THE SCREW FALLS OUT.  MAY

15    25TH, 2006, HALF AN HOUR, MAYBE A LITTLE MORE,

16    35 MINUTES AFTER MCCOOL'S MEMO, SPEIGHT FIRES BACK

17    QUICKLY AN E-MAIL.  IT'S TO MCCOOL, FINKENSTAEDT,

18    LAUERMAN, CARP, AND DOOLEY.  THEY'RE THE SAME PEOPLE WHO

19    WERE ON THIS OTHER E-MAIL.  THEY ARE CONTEMPORARIES AND

20    SOME PEOPLE IN HER GROUP.

21              THERE IS A CC THAT I WILL COME BACK TO.

22    ACTUALLY, I WILL TELL YOU NOW.  THESE WERE THE CLIENTS.

23    MISS SPEIGHT TRIED DELIBERATELY TO EMBARRASS AND

24    HUMILIATE MR. MCCOOL.  SHE ACTUALLY ADDED THE CLIENTS TO

25    THIS E-MAIL, EVEN THOUGH THEY WERE NOT ON THE PRIOR
```

1    E-MAIL TRAIL.

2                    HERE IS WHAT SHE WROTE TO MARK MCCOOL.

3    "SORRY FOR THE COMMUNICATIONS BREAKDOWN.  LET ME TRY

4    AGAIN."

5                    SHE BEGAN BY DRESSING DOWN MR. MCCOOL IN

6    FRONT OF SEVEN OTHER PEOPLE, INCLUDING THE CLIENTS --

7    EIGHT OTHER PEOPLE, INCLUDING THE CLIENTS.  SARCASTIC.

8    SHE BEGINS BY SAYING THE CANADIAN LOANS AND THE SPG

9    LOANS ARE NOT BEING MANAGED BY ANYONE ON THE GROUP, AND

10   SHE CONTINUES, "CONSEQUENTLY, HER TEAM, THE FORMER PLG

11   ASSET MANAGEMENT INDIVIDUALS, ARE NOT IN A POSITION TO

12   PERFORM AN EVALUATION FOR RISK RATING PURPOSES."

13                   SEE WHAT IS HAPPENING?  YOU WILL.  MCCOOL

14   HAD SAID WANDA'S TEAM IS GOING TO DO IT.  MISS SPEIGHT

15   RESPONDED TO EVERYONE, INCLUDING TO THE CLIENTS, NO, I'M

16   NOT.  SHE GOES ON.  "I WOULD HOPE I'M NOT BEING TOLD BY

17   CAPMARK MANAGEMENT TO SIGN OFF ON RESERVES AND PROVIDE

18   RISK RATINGS ON A PORTFOLIO OF LOANS, FOR WHICH MY STAFF

19   HAS NO KNOWLEDGE."

20                   NOW SHE IS SUGGESTING TO THE CLIENTS AS

21   WELL THAT MCCOOL WAS TELLING HER TO DO SOMETHING

22   IMPROPER.  IT'S THIS LAST PARAGRAPH THAT PUSHED LIPSON

23   OVER THE TOP.

24                   SHE BEGINS WITH "JOE."  JOE IS JOE

25   HOHENLEITNER.  YOU WILL HEAR FROM HIM.  HE IS THE HEAD

1    OF THE CREDIT DEPARTMENT.  HE WAS THE LEAD OF THE

2    CLIENTS.  "JOE, PLEASE BE AWARE IF WE ARE BEING TOLD TO

3    RISK RATE THE LOANS, I CANNOT BE CONFIDENT IN THE

4    ACCURACY OF ASSIGNED RATINGS, NOR CAN WE BE EXPECTED TO

5    DEFEND SUCH RATINGS GIVEN OUR LACK OF KNOWLEDGE AND

6    EXPERIENCE WITH THIS PORTFOLIO," THE PORTFOLIO THAT HER

7    GROUP HAD BEEN MANAGING FOR A LONG TIME.

8              WHAT SHE WAS SAYING HERE, IF YOU MAKE ME

9    DO WHAT MCCOOL IS SAYING, YOU ARE GOING TO GET JUNK;

10   THESE RISK RATINGS THAT ARE SO IMPORTANT WILL BE

11   WORTHLESS.  MCCOOL WAS MEASURED AGAIN.  I SHOULD HAVE

12   SHOWN YOU THE VERY TOP OF THE E-MAIL.  HIS INITIAL

13   RESPONSE -- YOU WILL SEE IT WAS, WELL, "WANDA, WE NEED

14   TO MEET.  LET'S GET TOGETHER AND TALK ABOUT THIS."

15             THAT IS WHEN HE SAW IT FIRST THING THE

16   NEXT MORNING.  BUT WHAT HE DID IMMEDIATELY UPON PRINTING

17   IT, AFTER HE SENT THAT E-MAIL, HE WENT IN TO SEE HIS

18   BOSS, LIPSON, BECAUSE HE WAS CONCERNED.  THIS IS MIKE

19   LIPSON, THE GUY WHO BROUGHT WANDA SPEIGHT INTO HIS

20   GROUP, WHO FOUND THE TEAM, BROUGHT THEM IN, AND AGREED

21   TO TAKE ON HER VERY SUBSTANTIAL COMPENSATION IN PART OF

22   HIS BUDGET.

23             LIPSON, WHO WILL TESTIFY, LOOKED AT THAT

24   E-MAIL AND SAID, IT'S NOT GOING TO WORK, SHE HAS TO GO.

25   HE DID NOT NEED A $500,000 A YEAR PERSON WHO WOULD NOT

1    ANSWER QUESTIONS, WHO UNDERMINED THE WORK OF THE GROUP,

2    WHO WAS DELIBERATELY OVERTLY INSUBORDINATE.

3              MR. LIPSON CALLED MISS PICKLES, THE HEAD

4    OF HUMAN RESOURCES, THE PERSON WHO HAS BEEN DOING THIS

5    AT CAPMARK FOR 12 YEARS, AND IT WAS THE HIGHEST LEVEL IN

6    THE PERSON RESPONSIBLE FOR EMPLOYMENT ISSUES.  HE READ

7    HER THE E-MAIL, AND SHE AGREED.  SHE WILL TELL YOU THAT.

8    THERE WAS NO QUESTION IN HER MIND THAT MISS SPEIGHT

9    CROSSED THE LINE.

10             LATER THAT DAY THERE WAS A MEETING,

11   MCCOOL AND ANOTHER PERSON FROM HUMAN RESOURCES SAT DOWN

12   WITH MISS SPEIGHT AND TOLD HER.  THEY TOLD HER THAT THEY

13   COULD NOT CONTINUE TO EMPLOY HER, THAT THEY NEEDED

14   SOMEONE WITH LEADERSHIP SKILLS WHO WAS ON BOARD WITH THE

15   TEAM.  AND HER EMPLOYMENT ENDED THAT DAY.

16             YES, AS MR. SALMANSON TOLD YOU, WAS IT A

17   SINGLE E-MAIL THAT CAUSED THIS?  WELL, THE E-MAIL WAS

18   THE TRIGGER, BUT THE CONDUCT WAS APPARENT ON MAY 23RD,

19   WHEN SHE REFUSED TO ANSWER MR. MCCOOL'S QUESTION, WAS

20   INSUBORDINATE TO HIM IN FRONT OF THE OTHERS IN THE

21   MEETING.  YOU WILL SEE IT IN THE COURSE OF THIS TRIAL IN

22   OTHER E-MAILS THAT MISS SPEIGHT WROTE.

23             YOU WILL SEE THAT I AM CONFIDENT THAT

24   RACE WAS UTTERLY IRRELEVANT.  IT WAS IRRELEVANT TO HER

25   PROMOTIONS; IT WAS IRRELEVANT TO HER VERY SIZABLE PAY;

1       IT WAS IRRELEVANT TO MR. LIPSON WHEN HE DECIDED TO BRING

2       WANDA SPEIGHT INTO HIS GROUP; IT WAS IRRELEVANT TO MARK

3       MCCOOL WHEN HE WENT TO HUMAN RESOURCES AFTER THE

4       MAY 23RD MEETING, TO TRY TO HELP MISS SPEIGHT RATHER

5       THAN DISCIPLINE HER.  IT WAS IRRELEVANT ON MAY 26TH WHEN

6       MISS SPEIGHT'S EMPLOYMENT WAS TERMINATED.  NEVER HAD

7       ANYTHING TO DO WITH ANYTHING.

8               IT MAY TAKE A FEW DAYS FOR ALL THIS

9       EVIDENCE TO COME OUT.  AS I SAID IN THE BEGINNING,

10      MISS SPEIGHT GETS TO GO FIRST.  THAT IS OKAY.  I HOPE

11      YOU WILL LISTEN AND HEAR IT ALL.  I HOPE YOU WILL WAIT

12      UNTIL YOU HEAR FROM MIKE LIPSON AND MARK MCCOOL.  I HOPE

13      YOU WILL WAIT UNTIL YOU SEE ALL OF THE E-MAILS THAT I'M

14      TELLING YOU ABOUT.  I HOPE YOU WILL WAIT UNTIL MISS

15      PICKLES TESTIFIES.

16              THEN, IN THE END, THE JUDGE WILL GIVE YOU

17      AN INSTRUCTION, AND I WILL ASK YOU TO RENDER A VERDICT

18      IN FAVOR OF CAPMARK.  I WILL ASK YOU TO LOOK AT THE

19      FACTS, NOT THE ACCUSATIONS, BECAUSE THOSE SERIOUS

20      ACCUSATIONS WILL BE BEHIND US.  I'M CONFIDENT YOU WILL

21      SEE THAT THEY WILL GIVE WAY TO THE FACTS.

22              AS THE JUDGE TOLD YOU, AS JUDGE JOYNER

23      TOLD YOU, DURING THE COURSE OF THIS TRIAL, WE CAN'T TALK

24      TO YOU EXCEPT IN THE COURTROOM.  THERE MAY BE TIMES I

25      SEE YOU WALKING OUT OF A REST ROOM OR GETTING OFF AN,

1    ELEVATOR, I'M GOING TO PUT MY HEAD DOWN AND WALK.  IT'S

2    NOT BECAUSE I DON'T LIKE YOU OR HAVE ANY REGARD FOR YOU

3    OR BECAUSE I'M BEING RUDE.  I HOPE YOU UNDERSTAND THAT

4    WE HAVE TO PLAY BY THE RULES HERE.  I WILL HAVE A CHANCE

5    TO TALK TO YOU WHEN I QUESTION WITNESSES AND THEN IN MY

6    CLOSING.  UNTIL THEN, I JUST ASK YOU TO BE ATTENTIVE AND

7    FAIR AND JUDGE THIS ON THE FACTS.  THANK YOU, MEMBERS OF

8    THE JURY.

9                    THE COURT:  THANK YOU, COUNSEL.  CALL

10   YOUR FIRST WITNESS.

11                   MR. BANKS:  MAY I MOVE THIS AWAY, YOUR

12   HONOR, UNLESS YOU WANT THIS HERE?

13                   THE COURT:  NO.

14                   MR. SALMANSON:  PLAINTIFF CALLS WANDA

15   SPEIGHT TO THE STAND.

16                   THE CLERK:  STATE AND SPELL YOUR FULL

17   NAME FOR THE RECORD, PLEASE.

18                   WANDA SPEIGHT, PLAINTIFF'S WITNESS,

19   AFFIRMS.

20                   THE WITNESS:  MY NAME IS WANDA,

21   W-A-N-D-A, JAMES, J-A-M-E-S.  LAST NAME IS SPEIGHT,

22   S-P-E-I-G-H-T.

23                   DIRECT EXAMINATION

24   BY MR. SALMANSON:

25   Q.     GOOD AFTERNOON, MISS SPEIGHT.

1    A.      GOOD AFTERNOON.

2    Q.      IF YOU ARE NERVOUS, JUST TAKE YOUR TIME.

3                    CAN YOU TELL ME YOUR AGE?

4    A.      I'M 51.

5    Q.      AND ARE YOU MARRIED?

6    A.      YES.

7    Q.      AND IS YOUR HUSBAND IN THE COURTROOM?

8    A.      HE IS.

9    Q.      AND CAN YOU JUST POINT HIM OUT?

10   A.      CALVIN.

11   Q.      AND DO YOU HAVE KIDS?

12   A.      YES.  WE HAVE TWO CHILDREN.  WE HAVE A DAUGHTER

13   MEGAN, WHO IS A SENIOR IN HIGH SCHOOL, AND WE HAVE A

14   SON, CALVIN, JR., WHO IS A FRESHMAN IN HIGH SCHOOL.

15   Q.      AND CAN YOU TELL US WHERE YOU GREW UP, A LITTLE

16   BIT ABOUT YOUR BACKGROUND LEADING UP THROUGH COLLEGE?

17   A.      SURE.  I'M ORIGINALLY FROM PHILADELPHIA.  WHEN I

18   WAS FIRST BORN, MY FAMILY MOVED TO NORTH PHILADELPHIA.

19   BEFORE I WENT TO SCHOOL, WE MOVED TO THE MOUNT AIRY

20   SECTION OF PHILADELPHIA.  I WENT TO PASTORIUS ELEMENTARY

21   SCHOOL IN GERMANTOWN, WAGNER JUNIOR HIGH IN WEST OAK

22   LANE, AND GRADUATED AT THE AGE OF 16 FROM PHILADELPHIA

23   HIGH SCHOOL FOR GIRLS.

24   Q.      AND DID YOU GO ON TO COLLEGE?

25   A.      I DID.  I ATTENDED DICKINSON COLLEGE IN

1    CARLISLE, PENNSYLVANIA WHERE I OBTAINED A BA IN

2    ECONOMICS.

3    Q.      AND DO YOU HAVE ANY OTHER DEGREES?

4    A.      I DO.  I HAVE AN MBA FROM DREXEL.  I MAJORED IN

5    FINANCE.

6    Q.      WHEN DID YOU OBTAIN THAT DEGREE?

7    A.      I GOT THAT DEGREE IN JUNE OF 1988.  I WENT TO

8    SCHOOL WHILE WORKING FULL TIME.

9    Q.      AND IF YOU COULD JUST TAKE ME THROUGH YOUR

10   EMPLOYMENT HISTORY, STARTING WITH YOUR FIRST JOB AFTER

11   COLLEGE.

12   A.      SURE.  WHEN I FIRST GRADUATED FROM COLLEGE, I

13   GOT A JOB WITH FIDELITY BANK, WAS IN THEIR CORPORATE

14   CREDIT TRAINING PROGRAM, AND IT WAS ENTRY LEVEL POSITION

15   TO EXPOSE ANALYZES TO THEIR COMMERCIAL BANKING AREA.  I

16   STARTED OUT AS A CREDIT ANALYST, AND OVER A NINE-MONTH

17   PERIOD GOT PROMOTED TO SENIOR CREDIT ANALYST.  AFTER

18   ABOUT A YEAR AND-A-HALF, I HAD EXCELLED IN ANALYTICAL

19   WORK AND WAS ASKED TO BE ONE OF THE ASSISTANT MANAGERS

20   OF THE CREDIT DEPARTMENT.

21           QUITE FRANKLY, THAT IS WHEN I GOT SOME OF

22   MY FIRST EXPERIENCE WITH MANAGING INDIVIDUALS.  I --

23   ALONG WITH TWO OTHER ASSISTANT MANAGERS AND A PRIMARY

24   MANAGER, WE WERE RESPONSIBLE FOR A TEAM OF CREDIT

25   ANALYSTS.  IT WAS ON-THE-JOB TRAINING WHERE I REVIEWED

```
 1     THE WORK PRODUCT OF THE ANALYSTS, AND THEN I HELPED

 2     TEACH ACCOUNTING CLASSES ONE DAY A WEEK.

 3     Q.      HOW OLD WERE YOU WHEN YOU FIRST BECAME A

 4     MANAGER?

 5     A.      I WAS ABOUT 22, 23?

 6     Q.      AND CAN YOU JUST DESCRIBE THE JOB FUNCTIONS THAT

 7     YOU WERE PERFORMING IN ADDITION TO YOUR MANAGEMENT

 8     FUNCTIONS?

 9     A.      IN ADDITION TO THE MANAGEMENT, I ALSO WAS

10     RESPONSIBLE FOR THE OPERATING BUDGET OF THE COMMERCIAL

11     LENDING AREA OF FIDELITY BANK.  IT WAS ROUGHLY A

12     $500 MILLION BUDGET.  I REPORTED TO SENIOR MANAGEMENT,

13     AT THAT POINT, ANY VARIANCE, AND I LOOKED INTO ANY

14     DISCREPANCIES BETWEEN WHAT THE ACTUAL RESULTS WERE AND

15     BUDGET AND ALSO COMPARED KIND OF PREVIOUS QUARTERS WITH

16     EXISTING QUARTERS.

17     Q.      AND WHAT, IF ANY, EXPERIENCE DID YOU HAVE IN

18     TERMS OF GAINING BUSINESS FOR THE BANK?

19     A.      LATER ON I MOVED INTO THE LENDING POSITION WHERE

20     I WAS RESPONSIBLE FOR A PORTFOLIO OF SMALL BUSINESS

21     LOANS, LOANS TO NON-PROFIT ORGANIZATIONS, SOCIAL

22     SERVICES ORGANIZATIONS, AS WELL AS BUSINESS WITH

23     INSURANCE COMPANIES.  THAT REQUIRED KNOWING CASH

24     MANAGEMENT SKILLS AND SELLING BANKS, BANKING PRODUCTS,

25     AS WELL AS OFFERING THEM CREDIT OR LOANS.
```

1    Q.      AND HOW LONG DID YOU STAY AT FIDELITY?

2    A.      I WAS AT FIDELITY FOR ABOUT FIVE YEARS.  IN THE

3    EARLY 1980S, A NUMBER OF NEW YORK CITY BANKS RELOCATED

4    TO WILMINGTON, DELAWARE.  I STARTED GETTING CALLS FROM

5    HEADHUNTERS ASKING IF I WOULD BE INTERESTED IN

6    RELOCATING OR JOINING ONE OF THE BANKS DOWN IN DELAWARE.

7               I FOLLOWED UP ON AN OPPORTUNITY WITH

8    CHEMICAL BANK, AND IN MID 1983 I ENDED UP JOINING

9    CHEMICAL BANK IN WILMINGTON.

10   Q.      AND WHAT WAS YOUR POSITION WHEN YOU JOINED THEM?

11   A.      AT THAT POINT I JOINED -- I CAN'T REMEMBER MY

12   OFFICIAL TITLE, BUT I WAS A LENDING OFFICER/RELATIONSHIP

13   MANAGER CALLING ON FINANCIAL INSTITUTIONS, CORPORATIONS

14   AND PUBLIC SECTOR ENTITIES IN THE MIDWEST AND MY

15   TERRITORY INCLUDED MICHIGAN, INDIANA, KENTUCKY, AND

16   OHIO.

17   Q.      AND WHAT DO YOU MEAN BY YOU CALLED ON THEM?

18   A.      I HAD KIND OF LIKE A SALES JOB.  I WOULD CALL ON

19   THE BANK HOLDING COMPANIES OR BANKING OFFICERS AND TRY

20   TO OBTAIN BUSINESS, SUCH AS PARTICIPATING IN LOANS.

21   AGAIN, AT THAT POINT I WAS WITH CHEMICAL BANK.  IT WAS A

22   MONEY CENTER BANK.  WE HAD A LARGER LEGAL LENDING LIMIT

23   THAN MANY OF REGIONAL BANK S IN THE MIDWEST;

24   CONSEQUENTLY, IF THEY WANTED TO LEND MONEY TO MIDDLE

25   MARKET COMPANIES, THEY, MANY TIMES, WOULD NEED A LARGER

1     BANK TO HELP PARTICIPATE IN THE LOAN.

2               ADDITIONALLY, THERE WAS A FINANCING

3     VEHICLE CALLED IRB'S.  IT WAS -- I CAN'T REMEMBER

4     ANOTHER ACRONYM, BUT ESSENTIALLY IT WAS A TAX-FREE

5     FINANCING VEHICLE, AND IT WAS A BOND IN TERMS OF

6     -- WELL, AT ANY RATE, CHEMICAL BANK WOULD ISSUE A LETTER

7     OF CREDIT TO BANK THESE BONDS, AND IT WAS A FINANCING

8     VEHICLE FOR COMPANIES THAT ALLOWED THEM TO TAKE

9     ADVANTAGE OF LOW INTEREST RATE LOANS.

10    Q.      AND DID YOU HAVE OVERSIGHT OF A PORTFOLIO?

11    A.      I DID.  THE PORTFOLIO THAT I HAD WAS PROBABLY

12    SOMEWHERE BETWEEN 50 MILLION AND 100 MILLION.

13    Q.      AND HOW LONG DID YOU STAY AT CHEMICAL?

14    A.      I WAS AT CHEMICAL A TOTAL OF FIVE YEARS, BUT

15    AFTER ABOUT THREE AND-A-HALF TO FOUR YEARS I MOVED OVER

16    TO THE REAL ESTATE AREA.  THAT IS WHERE I GOT MY INITIAL

17    EXPOSURE, WITH REAL ESTATE LENDING.

18    Q.      AND HOW LONG DID YOU STAY IN THE REAL ESTATE

19    AREA ABOUT?

20    A.      A YEAR.

21    Q.      AND WHAT DID YOU DO IN THE REAL ESTATE AREA?

22    A.      THE REAL ESTATE AREA INITIALLY STARTED OUT AS A

23    LENDER RELATIONSHIP MANAGER, BUT THEN I ENDED UP TAKING

24    ON RESPONSIBILITIES AS MANAGER OF THE REAL ESTATE

25    PORTFOLIO.  WE HAD -- THE CHEMICAL BANK DELAWARE ENDED

1    UP OBTAINING A LARGE PORTFOLIO OF REAL ESTATE LOANS, SO

2    I WAS RESPONSIBLE FOR PORTFOLIO MANAGEMENT OF THESE REAL

3    ESTATE LOANS.  THAT MEANT I HAD TO TRACK PAYMENTS OF

4    INTEREST AND PRINCIPLE TO MAKE SURE THERE WERE NO

5    DELINQUENCIES, I DID MONTHLY SURVEILLANCE OF THE

6    PROPERTIES AND THE PROJECTS TO MAKE SURE THAT THEY WERE

7    MEETING THEIR BUSINESS PLANS, AND I REPORTED QUARTERLY

8    TO THE BOARD OF DIRECTORS ON ANY DETERIORATION IN THE

9    PORTFOLIO.

10   Q.     NOW, YOU USED THE WORD "SURVEILLANCE," WHICH I

11   KNOW COMES UP LATER DURING YOUR RESPONSIBILITIES.

12          CAN YOU EXPLAIN TO THE JURY, WHAT DO YOU

13   MEAN BY CONDUCTING SURVEILLANCE OF A LOAN?

14   A.     LET'S SEE, SURVEILLANCE IS CHECKING ON -- KIND

15   OF LIKE -- KIND OF LIKE A TEACHER, WHEN YOU HAVE KIND OF

16   A GROUP OF KIDS, KIDS ARE YOUR PORTFOLIO, IN MY CASE,

17   THESE LOANS WERE MY PORTFOLIO.  WHAT I WAS RESPONSIBLE

18   FOR DOING WAS MAKING SURE THAT THE LOANS WERE MEETING

19   THE BUSINESS PLAN.  MORE IMPORTANTLY, I NEEDED TO MAKE

20   SURE THAT THE BANK WAS GOING TO GET PAID BACK ON A

21   TIMELY BASIS.  MANY OF THESE LOANS WERE CONSTRUCTION

22   LOANS ON PROJECTS LOCATED THROUGHOUT THE COUNTRY.  I WAS

23   RESPONSIBLE FOR COLLECTING THE FINANCIAL -- OR PEOPLE

24   REPORTING TO ME THAT WOULD BE RESPONSIBLE FOR COLLECTING

25   FINANCIAL STATEMENTS, BRINGING THE FINANCIAL STATEMENTS.

1    I WOULD LOOK AT THE OPERATING RESULTS TO MAKE SURE THEY

2    WERE CONSISTENT WITH THE WAY THE LOAN HAD BEEN

3    UNDERWRITTEN.  AS I SAID BEFORE, EVEN BACK THEN THERE

4    WAS A RISK RATING PROCESS THAT I WAS FAMILIAR WITH, AND

5    THAT I HAD TO UTILIZE TO MAKE SURE THAT THE LOANS WERE

6    RISK RATED ADEQUATELY.

7    Q.     AND AT THE TIME THAT YOU LEFT, DO YOU KNOW

8    APPROXIMATELY HOW LARGE A PORTFOLIO YOU WERE

9    RESPONSIBILITY FOR?

10   A.     SURE.  AT THAT POINT, AGAIN, IT WAS ABOUT

11   $550 MILLION.

12   Q.     WHY DID YOU LEAVE CHEMICAL?

13   A.     I WAS GETTING MARRIED AND KNEW THAT I WANTED TO

14   HAVE A JOB BACK IN PHILADELPHIA.  WHEN I WORKED FOR

15   CHEMICAL BANK OF DELAWARE, I WAS WORKING IN WILMINGTON,

16   COMMUTING FROM PHILADELPHIA, AND I WANTED TO HAVE A JOB

17   BACK IN PHILADELPHIA BECAUSE I LEFT THE COMPANY --

18   BECAUSE I LEFT FIDELITY BANK ON GOOD TERMS, IT WAS

19   FAIRLY EASY TO JUST PICK UP THE PHONE AND CALL AND GET A

20   JOB BACK AT FIDELITY WHEN I WAS READY TO COME BACK TO

21   THE CITY.

22   Q.     AND WHAT JOB DID YOU TAKE AT FIDELITY WHEN YOU

23   CAME BACK?

24   A.     I MOVED INTO THEIR REAL ESTATE LENDING AREA.

25   Q.     OKAY.  AND WHAT DID YOU DO IN THE REAL ESTATE

1    LENDING AREA?

2    A.      AT THAT POINT, I HAD THE TITLE OF A VP.  I MOVED

3    INTO THE REAL ESTATE AREA AS A VP, CALLING ON DEVELOPERS

4    AND INVESTORS WHO WERE INVESTING IN PROJECTS IN THE

5    PHILADELPHIA REGION, REAL ESTATE PROJECTS.  WHAT THAT

6    MEANT WAS THAT I WAS RESPONSIBLE FOR GOING OUT,

7    GENERATING BUSINESS, PROVIDING CONSTRUCTION LOANS,

8    COMMERCIAL MORTGAGE LOANS, VARIOUS TYPES OF REAL ESTATE

9    PROPERTIES IN THE REGION.

10    Q.      TO WHAT EXTENT, IF ANY, DID YOU GET ANY

11    PROMOTIONS WHILE YOU WERE BACK AT FIDELITY?

12    A.      WHEN I WENT BACK TO FIDELITY WITHIN A COUPLE OF

13    YEARS OF GOING BACK I WAS PROMOTED TO VICE-PRESIDENT.

14    Q.      WHAT DID THAT ENTAIL?

15    A.      ADDITIONAL MONEY, ADDITIONAL RESPONSIBILITY.

16    THE THOUGHT WAS YOUR TITLE WAS CONSISTENT WITH YOUR

17    LEVEL OF RESPONSIBILITY, LEVEL OF AUTHORITY.  SO

18    ALTHOUGH I CAN'T REMEMBER THE SPECIFIC AMOUNT, I COULD

19    APPROVE LOANS UP TO A CERTAIN DOLLAR AMOUNT.

20    Q.      NOW, AT WHAT POINT DID YOU LEAVE FIDELITY?

21    A.      I WORKED IN THE REAL ESTATE AREA OF FIDELITY,

22    AND ACTUALLY THE NAME CHANGED ABOUT THE TIME I REJOINED

23    FIDELITY TO FIRST FIDELITY, THEN LATER IT WAS CHANGED

24    THROUGH MERGERS TO WACHOVIA.  I STAYED IN THEIR REAL

25    ESTATE AREA FOR ABOUT FOUR YEARS, THEN DURING THE

1    DOWNTURN, I ENDED UP MOVING INTO THEIR COMMERCIAL

2    LENDING AREA.  AGAIN, AN AREA THAT I WAS FAMILIAR WITH,

3    AND I WAS THERE FOR ABOUT A YEAR.

4    Q.     AND WHY DID YOU LEAVE FIDELITY?

5    A.     AT THAT POINT, OUR SECOND CHILD HAD BEEN BORN,

6    AND I WANTED TO BE IN A WORK ENVIRONMENT THAT I COULD

7    BETTER BALANCE MY FAMILY AND MY CAREER RESPONSIBILITIES.

8    Q.     AND WHAT DID YOU DO IN THAT REGARD?

9    A.     THERE WAS A LOAN FUND CALLED THE DELAWARE VALLEY

10   COMMUNITY REINVESTMENT FUND, NOW CALLED THE REINVESTMENT

11   FUND.  THE LOAN FUND HAD BEEN AROUND FOR PROBABLY THREE

12   OR FOUR YEARS AT THAT POINT, AND I HAD MET A NUMBER OF

13   PEOPLE FROM THE LOAN FUND THROUGH VARIOUS PROFESSIONAL

14   NETWORKING CONTACTS.

15                AT ANY RATE, THEY NEEDED ANOTHER LENDER

16   AND I STARTED TALKING TO THEM ACTUALLY BEFORE OUR SON

17   WAS BORN ABOUT PERHAPS JOINING THE FUND.  AFTER CALVIN,

18   JR., WAS BORN AND I WENT BACK FROM MATERNITY LEAVE, THEY

19   MADE ME AN OFFER THAT WAS EXTREMELY ATTRACTIVE BECAUSE

20   OF THE FLEXIBILITY IN TERMS OF MY SCHEDULE.

21   Q.     AND WHAT WAS YOUR TITLE WHEN YOU WENT THERE?

22   A.     WHEN I INITIALLY WENT TO THE REINVESTMENT FUND,

23   I WAS KIND OF A LOAN OFFICER.  BECAUSE IT WAS NOT A

24   CORPORATE ENVIRONMENT, THEY DID NOT HAVE THE TYPES OF

25   TITLES THAT I HAD HAD IN THE BANKING INDUSTRY.

1              SO I WENT IN AS A LOAN OFFICER, AND WHAT

2     I DID WAS WORK WITH A NUMBER OF NONPROFITS WHO LENT --

3     WHO WERE ENGAGED IN PROJECTS IN ECONOMICALLY BLIGHTED

4     AREAS, PRIMARILY, THE PHILADELPHIA REGION, PHILADELPHIA,

5     FOUR ADJACENT PENNSYLVANIA COUNTIES, AND THEN SEVERAL OF

6     THE COUNTIES IN NEW JERSEY; FOR EXAMPLE, THERE WAS AN

7     OUTFIT -- NONPROFIT CALLED ST. JOE'S HOUSING, THAT

8     DEVELOPS HOUSING IN CAMDEN.  THAT WAS ONE OF MY

9     BORROWERS, WHERE I WOULD LEND MONEY.

10             THERE WAS A LOT OF HANDS-ON WORK, AND

11    THEY WOULD USE THE MONEY TO PURCHASE REHAB HOUSING IN

12    CAMDEN.  ALSO LENT MONEY TO SOCIAL SERVICE ORGANIZATIONS

13    THAT NEEDED LINES OF CREDIT TO BRIDGE STATE FUNDING

14    UNTIL THEIR FUNDING ACTUALLY CAME THROUGH, AND THEN OVER

15    TIME THE FUNDING -- THE LOAN -- THE REINVESTMENT FUND

16    STARTED ATTRACTING MORE INVESTORS, AND WE WERE ABLE TO

17    BROADEN THE TYPE OF LENDING THAT WE WERE GOING TO DO.

18             I WAS ASKED TO WRITE A BUSINESS PLAN SO

19    THAT THE REINVESTMENT FUND COULD GET INTO BUSINESS

20    LENDING, AND I ENDED UP WRITING THAT PLAN.  I ALSO

21    WORKED VERY CLOSELY WITH FACILITIES LENDING, MEANING

22    LENDING MONEY TO PLACES LIKE THE GERMANTOWN YMCA,

23    GERMANTOWN YWCA, AS WELL AS A NUMBER OF DAYCARE

24    PROVIDERS, BOTH NON-PROFIT AND FOR-PROFIT DAYCARE

25    PROVIDERS.

1   Q.      TO WHAT EXTENT DID YOU HAVE SUCCESS IN THAT JOB?

2   A.      IT WAS AN EXTREMELY GRATIFYING, IN THAT, FOR

3   EXAMPLE, THE FEDERAL GOVERNMENT STARTED GIVING OUT WHAT

4   WAS CALLED CDFI FUNDING, AND BECAUSE OF THE WORK THAT I

5   HAD DONE ON FACILITIES LENDING AND WITH THE BUSINESS

6   LENDING, WE WERE ABLE TO GET ONE OF THE FIRST GRANTS FOR

7   WHICH WAS $2 MILLION FROM THE CDFI FUND.  THE LENDING

8   THAT -- IN TERMS OF THE BUSINESS LENDING, FACILITIES

9   LENDING INCREASED DRAMATICALLY AS A RESULT OF MY BEING

10  AT THE REINVESTMENT FUND IN THE WORK THAT WE DID.

11  Q.      DID YOU EVENTUALLY GET A MORE FORMAL TITLE AT

12  THE FUND?

13  A.      I DID.  I WAS GIVEN THE TITLE, DIRECTOR OF

14  LENDING.

15  Q.      DO YOU RECALL OVER HOW MANY LOANS AND HOW LARGE

16  A PORTFOLIO YOU HAD RESPONSIBILITY FOR?

17  A.      YOU KNOW, IT'S INTERESTING, THE DOLLAR AMOUNT

18  WAS NOT NECESSARILY HUGE, BUT THE NUMBER OF LOANS --

19  THERE WERE OVER 100, CLOSE TO 150 DIFFERENT LOANS, BUT,

20  QUITE FRANKLY, THE IMPACT THAT THAT TYPE OF LENDING HAD

21  ON THE COMMUNITY WAS JUST TREMENDOUS, BECAUSE TYPICALLY

22  OUR BORROWERS WERE BORROWERS THAT MOST OF THE BANKS,

23  MORE TRADITIONAL FINANCIAL INSTITUTIONS, WOULD NOT WANT

24  TO LEND TO.

25  Q.      AND WHY DID YOU LEAVE THE REINVESTMENT FUND?

1    A.       I LEFT THE REINVESTMENT FUND IN 1998 FOR

2    ECONOMIC REASONS.  MY HUSBAND ENDED UP NOT WORKING, AND

3    THAT OCCURRED IN ABOUT 1997.

4    Q.       WHY WAS THAT?  SORRY, WHY WAS THAT?

5    A.       HE HAD GOTTEN HURT ON HIS JOB AND WAS NOT ABLE

6    TO CONTINUE TO WORK.

7    Q.       WHAT WAS THE NATURE OF THE INJURY?

8    A.       HE WAS WHAT IS CALLED A STEAMFITTER.  HE WORKED

9    FOR LOCAL 420, AND THAT MEANT THAT HE LAID PIPING FOR --

10   AND IT HAPPENED TO BE AT THE WACHOVIA CENTER SPORTS

11   ARENA.  HE AND A NUMBER OF THE OTHER PEOPLE WORKING

12   INHALED FIRE-PROOFING MATERIAL AND HIS LUNGS GOT

13   AFFECTED, SO HE WAS NOT ABLE TO WORK, AND IT WAS AFTER

14   ABOUT A YEAR AND-A-HALF AFTER THE INCIDENT.

15   Q.       AND SO WHAT DID YOU DO AS A RESULT OF THAT?

16   A.       I STARTED -- I REALIZED -- I SHOULD BACK UP A

17   MINUTE.  PART OF WHAT HAPPENED WHEN I WENT TO THE

18   REINVESTMENT FUND WAS THAT WE, CALVIN AND I, MADE THE

19   DECISION THAT HE WOULD BE THE PRIMARY BREADWINNER, AND I

20   WOULD FOCUS -- I WOULD CONTINUE TO WORK, BUT I WOULD

21   HAVE -- I WOULD HAVE TO BALANCE -- I WOULD HAVE THE

22   PRIMARY RESPONSIBILITY FOR THE CHILDREN.

23                    AFTER CALVIN STOPPED WORKING, WE DIDN'T

24   HAVE HIS INCOME AND WE WERE JUST RELYING ON MY INCOME.

25   WHEN I WENT TO WORK FOR THE REINVESTMENT FUND, I WENT TO

1    WORK AT A LOWER PAY SCALE THAN I HAD AT THE BANK, WHICH

2    WAS FINE BECAUSE, YOU KNOW, IT GAVE ME -- I HAD TO

3    BALANCE.  IT WAS A TRADE OFF.  WE REALIZED THAT WITH HIS

4    INCOME, NOT HAVING HIS INCOME, THAT I NEEDED TO MAKE

5    MORE MONEY SO THAT IS WHEN I DECIDED I WANTED TO GO BACK

6    TO THE FOR-PROFIT ARENA AND BE ABLE TO BE IN A

7    CHALLENGING POSITION, BUT ALSO BE IN A POSITION TO EARN

8    ADDITIONAL INCOME FOR THE FAMILY.

9    Q.     AND HOW DID YOU GO ABOUT TRYING TO FIND ANOTHER

10   JOB?

11   A.     SIMPLY NETWORKING.  I TALKED TO ACTUALLY THE

12   BOARD MEMBERS AND MANY PEOPLE INVOLVED WITH THE

13   REINVESTMENT FUND, AND THROUGH THOSE CONTACTS I STARTED

14   TALKING TO A NUMBER OF EMPLOYERS, INCLUDING FANNIE MAE,

15   AND ONE OF THE PLACES THAT I WAS REFERRED TO WAS GMAC

16   COMMERCIAL MORTGAGE.  SO I WAS GIVEN THE NAME OF

17   SOMEBODY BY THE NAME OF TOM MCMANUS.  I SET UP AN

18   APPOINTMENT AND WENT TO TALK TO HIM AND AFTER SEVERAL

19   INTERVIEWS, I ENDED UP BEING OFFERED A POSITION IN HIS

20   -- IN THE REAL ESTATE AREA.

21   Q.     WHAT POSITION WERE YOU OFFERED?

22   A.     THIS WAS, AGAIN, IN 1998 FOR GMAC COMMERCIAL

23   MORTGAGE.  AT THAT POINT -- WE ARE GOING TO GO WITH

24   ACRONYMS AGAIN -- THERE WAS AN AREA THAT TOM HEADED UP

25   CALLED IFG, INTERMEDIATE FINANCE GROUP, AND THAT WAS AN

1    AREA OF GMAC THAT PROVIDED BRIDGE LOANS OR SHORT-TERM

2    LOANS.

3              THE IDEA WAS THAT WE WOULD LEND MONEY,

4    THIS AREA WOULD LEND MONEY, IT WAS ON THE BALANCE SHEET,

5    USING, AGAIN, GMAC'S MONEY TO DEVELOPERS OR INVESTORS

6    WHO WERE PURCHASING PROJECTS.  THEY MAY HAVE NEEDED SOME

7    MINOR RENOVATIONS OR MINOR REPOSITIONING, AND THEY WOULD

8    GET A PROJECT LEASED UP, AND THEN THEY WOULD PUT A

9    PERMANENT LOAN ON IT.  THE THOUGHT WAS THAT TO THE

10   EXTENT WE PROVIDED SHORT-TERM OR THIS INTERIM FINANCING,

11   THEN WE COULD GET THE LONGER-TERM FINANCING, AND THAT

12   WAS TRULY THE BREAD AND BUTTER OF GMAC'S OPERATION OR

13   ITS SERVICES.

14   Q.     WHAT SORT OF THINGS WOULD YOU HAVE TO DO IN YOUR

15   POSITION IN THE IFG GROUP?

16   A.     SURE.  AS AN UNDERWRITER, I WAS RESPONSIBLE FOR

17   THE FULL SPECTRUM OF AN ANALYSIS, WHICH WOULD MEAN THAT

18   WE HAD PEOPLE CALL PRODUCERS WHO WERE JUST NOTHING MORE

19   THAN PRETTY MUCH SALESPEOPLE.  THEY WOULD GO OUT AND

20   MEET WITH DEVELOPERS.

21              I SHOULD TELL YOU THAT OUR OFFICE IS

22   LOCATED IN HORSHAM, BUT THE PRODUCERS THAT WE SUPPORTED

23   WERE IN OFFICES -- GMAC OFFICES LOCATED THROUGHOUT THE

24   COUNTRY.  I THINK AT ONE POINT THERE WERE PROBABLY CLOSE

25   TO 30 OFFICES LOCATED THROUGHOUT THE COUNTRY FROM NEW

1    YORK, UP THROUGH NEW ENGLAND TO CHICAGO, CALIFORNIA,

2    TEXAS, DOWN WASHINGTON, IN THE CAROLINAS, AND FLORIDA.

3                   THEY WOULD SEND IN A PACKAGE, AND I WOULD

4    GET -- IF IT LOOKED LIKE SOMETHING WE COULD DO AND THE

5    HEAD OF THE UNIT WOULD REVIEW IT, INITIALLY, BUT IF IT

6    LOOKED LIKE SOMETHING WE COULD DO, I WOULD CRUTCH THE

7    NUMBERS OR TAKE A PRELIMINARY SET OF FINANCIAL

8    STATEMENTS, FINANCIAL NUMBERS, AND WHAT WE CALL SIZE A

9    LOAN, MEANING THAT WE WOULD LOOK AT THE NUMBERS, FIGURE

10   OUT HOW MUCH OF A LOAN THE INCOME FROM THE PROPERTY

11   COULD SUPPORT.

12                  AND THESE PROPERTIES VARIED.  THEY COULD

13   BE OFFICE BUILDINGS, THEY COULD BE SHOPPING CENTERS,

14   THEY COULD BE INDUSTRIAL BUILDINGS, WAREHOUSES.  I DON'T

15   KNOW IF I SAID APARTMENT BUILDINGS.  FOR EXAMPLE, IT

16   COULD BE LIKE A BUILDING AT 1500 OR 15TH AND MARKET

17   STREET, AND A BUILDING THAT IF YOU KNEW THAT BUILDING AT

18   ALL, TEN, 15 -- ONE PENN CENTER, THE BUILDING -- IT

19   MIGHT HAVE BEEN BUILT IN THE 1970S, BUT BY LATE 1990S IT

20   NEEDED TO BE RENOVATED.

21                  AND WHAT WE WOULD DO IS WE WOULD PROVIDE

22   A LOAN THAT WOULD PROVIDE CONSTRUCTION OR REHAB

23   FINANCING.  THEY TYPICALLY WHEN THEY WERE DOING THE

24   REHAB WOULD HAVE EVERYONE IN THE BUILDING MOVE OUT, AND

25   THEN START LEASING UP THE BUILDING TO HAVE IT -- GET

1    100 PERCENT LEASED UP OR CLOSE TO 100 PERCENT LEASED UP,

2    THEN THEY WOULD PUT A PERMANENT MORTGAGE ON THE

3    BUILDING.

4                    BUT IT REQUIRED A LOT OF ANALYTICAL WORK.

5    AGAIN, YOU WOULD TAKE FINANCIAL STATEMENTS, YOU WOULD DO

6    A PRELIMINARY ANALYSIS, YOU WOULD ISSUE AN APPLICATION.

7    TO THE EXTENT THE BORROWER OR THE PROSPECTIVE BORROWER

8    ACCEPTED THE APPLICATION, THEY WOULD SIGN IT AND SEND IN

9    A DEPOSIT.

10                   ONCE WE RECEIVED THE DEPOSIT BACK, WE

11   WOULD ORDER WHAT WAS CALLED THIRD-PARTY REPORTS, SO THAT

12   WOULD INCLUDE AN APPRAISAL; IT WOULD INCLUDE AN

13   ENVIRONMENTAL REPORT; IT ALSO WOULD INCLUDE ORDERING AN

14   ENGINEERING REPORT TO MAKE SURE THAT YOU FELT

15   COMFORTABLE THAT FROM A STRUCTURAL STANDPOINT THE

16   BUILDING -- YOU KNOW, IF IT NEEDED SOME TYPE OF REPAIRS,

17   AN ENGINEERING REPORT WOULD IDENTIFY THAT.  THE

18   ENVIRONMENTAL REPORT WOULD IDENTIFY ANY TYPE OF

19   ENVIRONMENTAL PROBLEMS.

20                   SO, FOR EXAMPLE, WHEN THE FIRST LOANS

21   THAT I WORKED ON WAS ON A LARGE MILLION-PLUS SQUARE FOOT

22   RETAIL CENTER OR SHOPPING CENTER LOCATED OUTSIDE OF

23   CLEVELAND, OHIO.  ONE OF THE THINGS THAT WE FOUND WAS

24   THAT THERE WERE ALL SORTS OF OLD STORAGE TANKS

25   UNDERNEATH THE -- OR ADJACENT TO THE PROPERTY FROM WHEN

1    THEY WERE USING THE UNDERGROUND STORAGE TANKS TO HEAT

2    GASOLINE -- TO HEAT PETROLEUM TO HEAT THE BUILDING, ONE

3    OF THE THINGS I HAD TO DO BEFORE I CLOSED THE LOAN WAS

4    MADE SURE THE TANKS WERE REMOVED AND THAT THERE WAS SOME

5    TYPE OF MONITORING BEING DONE TO MAKE SURE THERE WAS NO

6    TYPE OF ENVIRONMENTAL ISSUE.

7              AS I SAID, THIRD-PARTY REPORTS.  I TALKED

8    ABOUT THE ENGINEERING REPORTS, THE ENVIRONMENTAL REPORT,

9    AND THEN THE APPRAISAL.  THE APPRAISAL USUALLY GAVE TWO

10   VALUES.  THEY WOULD GIVE AN AS-IS VALUE, THEN AN

11   AS-COMPLETE VALUE, BECAUSE, AGAIN, THE APPRAISALS, THE

12   PROJECTS THAT WE WERE LENDING WERE PROJECTS THAT WERE

13   BEING REPOSITIONED.  THEY WERE BEING PURCHASED BY A

14   DEVELOPER OR INVESTOR.  OR BECAUSE THEY THOUGHT THE

15   PROPERTY WAS UNDERMANAGED, UNDERUTILIZED, THERE WAS

16   VALUE THERE, THEY WOULD DO THE RENOVATIONS, LEASE IT UP,

17   LEASE IT UP AT HIGHER RENTS THAN HAD BEEN THERE BEFORE,

18   AND THEN USUALLY FLIP THE BUILDING, EITHER SELL IT OR

19   PUT A PERMANENT LOAN ON THE PROPERTY.

20              THE COURT:  WE ARE GOING TO TAKE AN

21   AFTERNOON BREAK NOW.  WE WILL BE IN RECESS FOR 10 OR 15

22   MINUTES.

23              LADY AND GENTLEMEN, PLEASE DO NOT TALK

24   ABOUT THE CASE AMONG YOURSELVES, AND WE WILL GET YOU

25   RIGHT BACK OUT HERE AND PROCEED, ALL RIGHT?

1              YOU ARE EXCUSED.

2              (JURY OUT.)

3              THE COURT:  WE WILL BE IN RECESS FOR AT

4    LEAST TEN MINUTES, COUNSEL.  YOUR CLIENT HAS

5    DEMONSTRATED HER KNOWLEDGE AND ABILITY.  LET'S TRY TO

6    LIMIT THE ANSWERS AND NOT LET THEM GO ON.

7              MR. SALMANSON:  I'M TRYING TO GET IN

8    THERE, YOUR HONOR.

9              THE COURT:  I KNOW YOU ARE GETTING THERE

10   AND --

11             MR. SALMANSON:  I'M TRYING TO GET IN TO

12   KEEP IT MOVING ALONG.

13             THE COURT:  THAT IS ALL RIGHT.

14             MR. SALMANSON:  I WILL TAKE THE

15   OPPORTUNITY DURING THE BREAK.

16             THE COURT:  NO PROBLEM.  WE WILL MOVE IT

17   ALONG, AND WE WILL CONTINUE TO MOVE ON, ALL RIGHT?

18             WE ARE IN RECESS.

19             (BREAK TAKEN.)

20             (JURY IN.)

21             THE COURT:  LADY AND GENTLEMEN, FROM NOW

22   ON WHEN YOU ENTER THE COURTROOM YOU MAY BE SEATED RIGHT

23   AWAY.  EVERYONE ELSE IS TO REMAIN STANDING UNTIL YOU ARE

24   SEATED.  NOW EVERYONE ELSE CAN BE SEATED.  ALL RIGHT.

25   YOU MAY PROCEED COUNSEL.

1    BY MR. SALMANSON:

2    Q.      OKAY.  MISS SPEIGHT, I THINK WHEN WE LEFT OFF

3    YOU WERE IN THE INTERMEDIATE FINANCE GROUP.  AND TO WHAT

4    EXTENT DURING YOUR TIME THERE WERE YOU PERFORMING ASSET

5    MANAGEMENT FUNCTIONS?

6    A.      INITIALLY, I WAS NOT -- I WAS THERE TO DO

7    UNDERWRITING FUNCTIONS AND THEN OVER TIME THE MANAGER,

8    ONE OF THE MANAGERS, JOHN KELLER HAD ME START LOOKING AT

9    PART OF OUR EXISTING PORTFOLIO THAT SEEMED TO NOT BE

10   PERFORMING WELL AND WHAT WOULD HAPPEN IS, HE WOULD SAY,

11   WANDA, CALL SERVICING AND FIND OUT, YOU KNOW, KIND OF

12   WHAT'S GOING ON WITH THIS?  THERE WAS RESERVES SET UP

13   AND CERTAIN THINGS WERE SUPPOSED TO HAPPEN AND THEY WERE

14   NOT HAPPENING SO AS I STARTED DOING THAT MORE OFTEN HE

15   SAID YOU KNOW WE REALLY NEED TO HAVE OUR OWN ASSET

16   MANAGEMENT FUNCTION, AND AT ONE POINT TOM MCMANUS AND

17   JOHN KELLER CAME TO ME AND SAID WANDA WOULD YOU CONSIDER

18   MOVING FROM DOING THE UNDERWRITING FUNCTION TO DOING AN

19   ASSET MANAGEMENT, STARTING UP OUR ASSET MANAGEMENT

20   FUNCTION AND I SAID YES.

21   Q.      HOW DID YOU FEEL ABOUT THAT CHANGE IN POSITION?

22   A.      IT WAS A NEW EXPERIENCE FOR ME AT GMAC SO I

23   THOUGHT THAT WOULD BE A GOOD THING.

24   Q.      AND WHAT DID YOU DO TO START THAT ASSET

25   MANAGEMENT FUNCTION?

1    A.      WELL, QUITE FRANKLY BOTH TOM AND JOHN ARE

2    EXTREMELY SYSTEMATIC AND EFFICIENT PEOPLE AND THEY

3    WANTED TO SET UP SYSTEMS SO THAT WE COULD BETTER TRACK

4    -- SO I COULD BETTER TRACK THE PORTFOLIO SO FIRST OF ALL

5    WE STARTED DOING REPORTS.  WE HAD A PERIODIC DELINQUENCY

6    REPORT, WE STARTED LOOKING AT TRENDS IN THE PORTFOLIO,

7    THINGS LIKE WHETHER OR NOT THE INSURANCE WAS PAID ON A

8    TIMELY BASIS.  WE WOULD LOOK AT INSURANCE POLICIES FOR

9    THE PORTFOLIO.  AND ANY INSURANCE POLICY THAT WAS

10   EXPIRING WITHIN THE NEXT 60 DAYS, WE WOULD START

11   TRACKING IT.  THE SAME THING WITH TAXES.  AND WHAT WE

12   WERE DOING QUITE FRANKLY WAS VERY SIMILAR TO WHAT THE

13   SERVICING AREA WAS DOING BUT AGAIN, WE WERE FINDING THAT

14   THEY WERE NOT DOING THINGS ON AS CONSISTENT A BASIS.

15   FOR EXAMPLE, AT ONE POINT, I THINK THAT THERE MIGHT HAVE

16   BEEN A FIRE AT ONE OF OUR PROPERTIES, TURNED OUT WE

17   DIDN'T HAVE COPIES OF THE INSURANCE POLICIES.  THE GOOD

18   NEWS IS THAT THERE WAS AN INSURANCE POLICY BUT THE

19   INSURANCE HAD EXPIRED AND NO ONE IN SERVICING KNEW THAT

20   SO THERE WERE INSTANCES -- RECURRING INSTANCES LIKE THAT

21   THAT WE REALIZED WE NEEDED TO ESTABLISH OUR OWN UNIQUE

22   AREA TO FOLLOW THE ASSET MANAGEMENT OF OUR PORTFOLIO,

23   THE DIFFERENCE AGAIN BETWEEN SERVICING AND IFG WAS THAT

24   OUR LOANS WERE USING GMAC'S MONEY, SERVICING WAS

25   RESPONSIBLE FOR THIRD PARTY MONEY.

1    Q.      AND TO WHAT EXTENT DID YOU PARTICIPATE IN THE

2    DEVELOPMENT OF THE SYSTEMS FOR THE ASSET MANAGEMENT?

3    A.      I WAS AN INTEGRAL PART OF THINGS IN TERMS OF

4    DEVELOPING THE REPORTS.  THERE WAS ANOTHER TOOL THAT WE

5    DEVELOPED CALLED A SHORT FORM.  IT WAS SOMETHING THAT

6    QUITE FRANKLY JOHN HAD USED AT A PREVIOUS PLACE WHERE HE

7    WORKED, A BANK WHERE HE WORKED, BUT I HELPED TO REFINE

8    IT TO MEET THE NEEDS OF THE TYPE OF LENDING THAT WE WERE

9    DOING.  IT WAS JUST A DOCUMENT THAT CAPTURED ALL OF THE

10   SALIENT POINTS OF A LOAN.  IT INCLUDED LISTING OF SAY

11   THE FIVE LARGEST TENANTS, THE EXPIRATION DATE OF THOSE

12   LEASES.  ALL THE FACTS IN TERMS OF THE INTEREST RATE,

13   THE MATURITY DATE IF THERE WAS A CHANGE IN THE INTEREST

14   RATE OR SOME TYPE OF A TRIGGER, TRIGGER FACTOR THEN THAT

15   WOULD BE CAPTURED ON THE SHORT FORM.

16   Q.      HOW LONG DID YOU STAY IN IFG?

17   A.      IFG AS, WELL, WHAT WE HAVE NOT TALKED ABOUT IS

18   HOW GMAC GREW OVER THE YEARS THAT I WAS THERE.  AGAIN I

19   STARTED IN 1998 AND PROBABLY WHEN I FIRST GOT TO IFG,

20   THE PORTFOLIO WAS SOMEWHERE UNDER A BILLION DOLLARS,

21   THAT WAS JUST KIND OF A COLLECTION OF LOANS THAT HAD

22   BEEN HOUSED AND HAD BEEN MADE OVER THE YEARS, BUT OVER

23   THE YEARS WE KEPT GROWING THE PORTFOLIO BECAUSE WE

24   REALIZED IT WAS A SUCCESSFUL PROGRAM.

25              IN ABOUT 2004, AGAIN I STARTED IN 1998

1    BUT IN ABOUT 2004, WE MERGED THE IFG PORTFOLIO WITH PART

2    OF THE COMPANY CALLED C-2.  AS WE HAVE INDICATED BEFORE,

3    GMAC WAS A SUBSIDIARY OF GM.  JUST LIKE GM WHO HAS ALL

4    THESE SEPARATE CAR COMPANIES, OLDSMOBILES, SATURNS,

5    PONTIAC, BUICK, WE HAD UNITS THAT KIND OF COMPETED

6    AGAINST EACH OTHER.  WE OFFERED BASICALLY THE SAME TYPE

7    OF UNDERWRITING AND LOAN PRODUCTS BUT C-2 WAS BASED IN

8    NEW YORK AND WE WERE BASED IN HORSHAM BUT WE ESSENTIALLY

9    WERE DOING THE SAME TYPE OF THINGS SO IT MADE MORE SENSE

10   FOR US TO COMBINE OPERATIONS FOR EFFICIENCY PURPOSES AND

11   THAT WAS ROUGHLY THE SPRING OF 2004.

12   Q.     AND PRIOR TO THE MERGER, WERE YOU SUPERVISING

13   ANY INDIVIDUALS?

14   A.     I WAS.  WHEN WE FIRST STARTED THE ASSET

15   MANAGEMENT FUNCTION, I WAS ALLOWED TO HIRE INITIALLY ONE

16   ANALYST AND THEN KIND OF EVERY SIX MONTHS AS OUR

17   PORTFOLIO WAS GROWING, I WOULD ADD AN ASSET MANAGER SO

18   AT THE TIME OF THE MERGER WITH IFG AND C-2 I THINK

19   SUPERVISED PROBABLY AROUND 7 OR 8 ASSET MANAGERS AND AT

20   LEAST ONE ANALYST.

21   Q.     AND HOW ABOUT AFTER THE MERGER?

22   A.     AFTER THE MERGER, THERE WAS A TEAM OF ASSET

23   MANAGERS UP IN NEW YORK AND THE PERSON WHO HEADED UP --

24   AND SO WE NEEDED TO MERGE THE TWO TEAMS.  I WAS ASKED TO

25   HEAD UP THE MERGED TEAM WHICH I WAS DELIGHTED TO DO

1    BECAUSE I HAD ALWAYS BEEN IMPRESSED WITH THE C-2 STAFF

2    AND WITH THE TYPE OF LENDING.  THEY QUITE FRANKLY DID

3    MORE SOPHISTICATED, MORE COMPLEX LENDING THAN WE HAD

4    DONE IN IFG SO I WAS HAPPY TO GET THAT ADDITIONAL

5    RESPONSIBILITY TO HAVE THE NEW PEOPLE AND QUITE FRANKLY

6    TO HAVE THE EXPOSURE TO A MORE KIND OF SOPHISTICATED,

7    COMPLEX TYPE OF ENVIRONMENT.

8    Q.     AND TO WHAT EXTENT, IF ANY, DID YOU HAVE

9    CONCERNS ABOUT THE WAYS IN WHICH THE TWO GROUPS WOULD

10   INTEGRATE?

11   A.     NORMAL CONCERNS WHEN YOU ARE MERGING TWO GROUPS

12   THAT HAD OPERATED INDEPENDENTLY.  IT'S LIKE, I THINK

13   SOMEONE HAD SAID LIKE IT IS BEING DIVORCED AND

14   MERGING -- REMARRYING AND MERGING TWO FAMILIES.  I MEAN

15   THAT IS REALLY WHAT IT WAS, MERGING FAMILIES AND EVERY

16   ONE KIND OF HAD THEIR OWN WAYS OF DOING THINGS SO YOU

17   KNOW I DON'T KNOW IF YOU CALL IT CONCERN BUT I WAS

18   DEFINITELY AWARE THAT WE WOULD HAVE TO KIND OF

19   STREAMLINE OUR SYSTEMS AND POLICIES AND OUR PROCEDURES.

20   Q.     AND TO WHAT EXTENT WERE THEIR DIFFERENT TYPES OF

21   POLICIES AND PROCEDURES GOING ON IN NEW YORK?

22   A.     IT HAPPENED -- I WON'T SAY, THEY WERE NOT

23   SIGNIFICANTLY DIFFERENT BUT THERE WERE CLEARLY SOME

24   SUBTLE DIFFERENCES IN THAT SINCE THE HORSHAM AREA, THE

25   HORSHAM ASSET MANAGERS WERE CLOSE TO SERVICING, QUITE

1        FRANKLY MANY OF OUR STAFF WERE HIRED FROM THE SERVICING

2        AREA SO THEY WERE MORE FAMILIAR WITH MCCRACKEN, THE

3        CAPABILITIES OF MCCRACKEN VERSUS C-2 HAD DEVELOPED THEIR

4        OWN SYSTEMS AND THEY HAD THEIR OWN KIND OF WAYS OF

5        TRACKING THINGS SO WE HAD TO KIND OF GENTLY BRING THEM

6        ALONG TO ASSIST, A SYSTEM THAT MET EVERYONE'S NEEDS.

7        Q.      AND YOU SAID THAT YOU WERE ASKED TO HEAD UP THIS

8        COMBINED GROUP?

9        A.      YES, THAT'S CORRECT.

10       Q.      DID THE COMBINED GROUP GET A NAME?

11       A.      THE COMBINED GROUP WAS CALLED PLG, PROPRIETARY

12       LENDING GROUP BECAUSE IT HAD BEEN IFG AND IT HAD BEEN

13       C-2, COMMERCIAL COLLABORATIVE INITIATIVE.

14       Q.      SO IT'S THE PROPRIETARY LENDING GROUP IS WHERE

15       YOU REMAINED UNTIL YOUR TERMINATION?

16       A.      THAT'S CORRECT.

17       Q.      AND APPROXIMATELY HOW LARGE A PORTFOLIO -- LET'S

18       STEP BACK.  YOU ARE IN CHARGE OF THE ASSET MANAGING OF

19       THIS PROPRIETARY LENDING GROUP, CORRECT?

20       A.      THAT'S CORRECT.

21       Q.      HOW LARGE A PORTFOLIO ARE WE TALKING ABOUT?

22       A.      IT WAS ON AVERAGE AROUND $6 BILLION VERSUS IFG

23       HAD BEEN BETWEEN ONE AND-A-HALF AND $2 BILLION SO IT WAS

24       SIGNIFICANT.

25       Q.      APPROXIMATELY HOW MANY ASSETS WERE WE TALKING

1    ABOUT?

2    A.      IT VARIED FROM TIME-TO-TIME BUT ANYWHERE FROM

3    300 TO 400 INDIVIDUAL LOANS AND IN EXCESS OF 500

4    SEPARATE PROPERTIES BECAUSE MANY OF OUR LOANS WERE ON

5    PORTFOLIOS SO FOR EXAMPLE, THERE WAS THE MCNEIL

6    PORTFOLIO WHICH WAS ACTUALLY 25 -- ONE LOAN BUT 25

7    PROPERTIES LOCATED IN TEXAS, ARKANSAS AND FLORIDA AND SO

8    THERE WERE A NUMBER OF EXAMPLES WHERE THERE WERE

9    PORTFOLIOS THAT CONSISTED OF MORE THAN ONE PROPERTY.

10   Q.      AND HOW MANY PEOPLE DID YOU HAVE REPORTING TO

11   YOU?

12   A.      INITIALLY THERE WERE PROBABLY IN EXCESS OF 25

13   BUT AFTER THINGS SETTLED DOWN, THERE WERE AROUND 20.

14   Q.      SO YOU HAD ABOUT 20 PROFESSIONALS AND SOME WERE

15   BETWEEN 350 AND 400 LOANS?

16   A.      THAT'S CORRECT.

17   Q.      AND WHAT WAS YOUR RATIO OF ASSETS TO ASSET

18   MANAGERS?

19   A.      OF LOANS TO ASSET MANAGERS?

20   Q.      YES.

21   A.      THAT VARIED.  THERE ARE SOME PEOPLE WHO MAY HAVE

22   HAD AS LOW AS 20 LOANS.  THERE WERE OTHER PEOPLE WHO HAD

23   BETWEEN 35, 40, SOMETIMES AS MANY AS 45 LOANS THAT THEY

24   WERE RESPONSIBLE FOR AND PARTLY BECAUSE SOME OF THE

25   LOANS WERE ON OUR BALANCE SHEET BUT JUST FOR A SHORT

1    PERIOD OF TIME, AND THEN THEY WOULD GET SECURITIZED AND

2    THEY WOULD BE BUNDLED UP AND PUT IN A SECURITIZATION AND

3    SOLD IN THE MARKET SO THAT MOVED THEM OFF OUR BALANCE

4    SHEET.

5    Q.    WHEN YOU GOT THIS COMBINED ASSET MANAGEMENT

6    FUNCTION, WHY WAS THAT CONSIDERED A PROMOTION?

7    A.    WELL, I MEAN ONE THING THAT I DIDN'T MENTION

8    THAT IS THAT PROBABLY IN -- THAT HAPPENED, THE MERGER OF

9    THE TWO UNITS HAPPENED IN 2004 BUT IN LATE 2001, EARLY

10   2002, I WAS PROMOTED TO SVP WHEN IT WAS STILL PART OF

11   IFG.  THE MERGER OF THE TWO C-2 AND THE IFG PORTFOLIO

12   AND PLG THERE WAS NO TITLE CHANGE BUT FROM A SALARY

13   STANDPOINT AND FROM MORE IMPORTANTLY FROM A BONUS

14   STANDPOINT, I WAS COMPENSATED FOR THE INCREASED

15   RESPONSIBILITY.

16   Q.    AND HOW DID YOU GET BONUSES?

17   A.    BONUSES WERE PAID ON AN ANNUAL BASIS.  THEY

18   GENERALLY WERE PAID -- QUITE FRANKLY, THEY GENERALLY

19   WERE DECIDED UPON IN JANUARY OF EVERY YEAR AND THEN THEY

20   WERE PAID OUT USING THE SECOND, THE FIRST PAY IN

21   FEBRUARY, USUALLY RIGHT BEFORE PRESIDENT'S WEEKEND YOU

22   KNEW WHAT YOUR BONUS WAS GOING TO BE.

23   Q.    SO YOU HAD A BASE SALARY AND A BONUS AND WHAT

24   OTHER TYPES OF COMPENSATION WERE YOU GETTING?

25   A.    THE BONUS, AT LEAST AS PART OF PLG AND AS PART

1    OF IFG HAD TWO COMPONENTS; YOU HAD A COMPONENT THAT WAS

2    PAID OUT IMMEDIATELY AND THEN YOU HAD A DEFERRED PORTION

3    OF YOUR BONUS.  QUITE FRANKLY, MORE SENIOR PEOPLE

4    USUALLY GOT THE DEFERRED BONUS AND THAT WAS TO TIE YOUR

5    PERFORMANCE INTO, FUTURE PERFORMANCE IN THE PORTFOLIO SO

6    THE THOUGHT WAS, YOU KNOW, TO THE EXTENT THAT THERE WAS

7    SOME DETERIORATION IN THE PORTFOLIO THAT THAT WOULD

8    IMPACT YOU GETTING YOUR DEFERRED BONUS.

9    Q.    WERE THERE CIRCUMSTANCES UNDER WHICH YOU COULD

10   LOSE THAT DEFERRED BONUS?

11   A.    IN THEORY, I HAD ALWAYS BEEN TOLD IT WAS A

12   FUNCTION OF WHETHER OR NOT THERE WAS A PROBLEM WITH THE

13   PORTFOLIO SO, FOR EXAMPLE, IF THERE WAS SERIOUS

14   DETERIORATION IN THE PORTFOLIO, THEN YOU WOULD NOT GET

15   YOUR DEFERRED BONUS.

16   Q.    AND DO YOU KNOW WHAT A CONTINGENT AWARD IS?

17   A.    IT'S VERY SIMILAR TO THE DEFERRED COMPENSATION.

18   Q.    AND TO WHAT EXTENT WERE YOU ENTITLED TO A

19   CONTINGENT AWARD?

20   A.    AGAIN, THAT WAS A SUBJECTIVE PERCENTAGE AND IT

21   WAS USED TO DO A NUMBER OF THINGS, AGAIN, MAKE SURE YOU

22   WERE KIND OF KEEPING ON TOP OF WHAT IS HAPPENING WITH

23   THE PORTFOLIO BUT ALSO BECAUSE THEY WANTED PEOPLE TO

24   STAY AROUND.  THEY DIDN'T WANT PEOPLE TO LEAVE THE

25   COMPANY.

1    Q.      AND DID YOU GET CONTINGENT AWARDS DURING YOUR

2    TIME AT CAPMARK?

3    A.      I DID.

4    Q.      AND AS A RESULT OF YOUR TERMINATION, WHAT

5    HAPPENED TO THOSE CONTINGENT AWARDS?

6    A.      I LOST THEM.

7    Q.      AND DO YOU KNOW APPROXIMATELY HOW MUCH YOU LOST?

8    A.      IT WAS 165,000 IN CONTINGENT AWARDS.

9    Q.      SO IF YOU HAD $165,000 WHICH WOULD BE LOST IF

10   YOU WERE TERMINATED FOR A CAUSE, IS THAT CORRECT?

11   A.      THAT'S CORRECT OR IF YOU LEFT THE COMPANY

12   VOLUNTARILY WHICH IS WHY I WOULD NEVER LEAVE THE COMPANY

13   BECAUSE I WOULDN'T WANT TO LOSE THAT CONTINGENT AWARD.

14   I KIND OF EARMARKED IT TOWARDS MY CHILDREN'S COLLEGE

15   EDUCATION.  EACH YEAR I WOULD PUT THAT LUMP SUM AWAY AND

16   THAT IS WHAT WE HAD BEEN PUTTING AWAY TO COVER COLLEGE.

17   Q.      AND HOW DID YOU FIND OUT ABOUT THE SALE OF THE

18   COMPANY?

19   A.      YOU KNOW EVERYONE, NOT EVERYONE BUT MOST PEOPLE

20   WHO READ THE PAPERS AND FOLLOW BUSINESS WERE AWARE THAT

21   THE CAR COMPANIES WERE HAVING PROBLEMS AND QUITE FRANKLY

22   YOU KNOW THROUGH THE EARLY PART OF THIS DECADE ANY OF

23   THE GMAC FINANCE COMPANIES WERE CONSIDERED CASH COWS.

24   WE ALWAYS CONTRIBUTED TO THE POSITIVE TO THE BOTTOM LINE

25   SO PROBABLY IN I WOULD SAY SOMETIME IN 2004, RUMOR

1      STARTED SPREADING THAT THEY MAY WANT TO SELL THE COMPANY

2      AS A WAY OF RAISING MONEY FOR GM.  WE STARTED DOING THAT

3      BY STARTING TO SELL SOME OF OUR ASSETS, ESPECIALLY SOME

4      OF THE LOANS THAT WERE CONSIDERED VERY RISKY TYPE LOANS

5      BUT AGAIN, I BELIEVE IT WAS IN 2004, 2005 WE STARTED

6      MEETING WITH POTENTIAL INVESTOR GROUPS SO, FOR EXAMPLE,

7      I WOULD GET AN E-MAIL SAYING THERE WAS GOING TO BE A

8      MEETING WITH CADILLAC AND THAT WAS THE NICKNAME OR CODE

9      NAME FOR A GROUP OF INVESTORS, AND YOU WOULD HAVE TO GO

10     TO A CERTAIN LOCATION AND BE ABLE TO EXPLAIN -- I WOULD

11     HAVE TO EXPLAIN ABOUT OUR PORTFOLIO, KIND OF WHAT THE

12     PROFILE WAS, WHAT THE RISK RATINGS WERE, WHAT THE

13     TURNOVER WAS, AND TO GIVE THE INVESTORS A SENSE OF THE

14     QUALITY OF OUR ASSETS.

15     Q.     LET'S TALK ABOUT IN MORE DETAIL.  YOU MENTIONED

16     RISK RATING.  CAN YOU DESCRIBE THE PROCESS, WHAT WOULD

17     YOUR GROUP NEED TO DO TO PUT TOGETHER THESE QUARTERLY

18     RISK RATINGS THAT WAS MENTIONED IN THE OPENING?

19     A.     ONE OF THE THINGS THAT I HAD NOT EXPLAINED IN

20     TERMS OF MY TENURE AT GMAC WAS THAT I WORKED VERY

21     CLOSELY WITH OUR CREDIT DEPARTMENT.  PROBABLY STARTING

22     IN 1999, I WORKED WITH THEM ON DEVELOPING A RISK RATING

23     PROCESS THAT WAS MORE REFLECTIVE OF THE REAL RISK

24     PROFILE.

25                    AGAIN, IN THE EARLY PART OF THE DECADE

1       THEY WENT OUT AND USED CONSULTANTS TO HELP DEVELOP A

2       RISK RATING PROCESS THAT WAS BETTER REFLECTIVE OF WHAT

3       THE REAL LOSS EXPECTANCY WAS IN THE PORTFOLIO AND WOULD

4       BE ABLE TO CAPTURE KIND OF THE ECONOMIC CAPITAL NEEDED

5       TO COVER THIS POTENTIAL LOSS.  SO BY 2004, 2005, WE WERE

6       WORKING WITH A GROUP CALLED REES AND THERE WAS AN

7       AFFILIATE OF CAPMARK CALLED REAL POINT THAT HELPED US

8       DEVELOP -- HELPED THE CREDIT DEPARTMENT DEVELOP A PRETTY

9       SOPHISTICATED MODEL TO DETERMINE RISK RATINGS.  IT ENDED

10      UP THE FINAL RISK RATING WAS A 1 THROUGH 12 RATING BUT

11      TO GET TO THAT NUMBER, THERE WAS A HUGE SPREADSHEET THAT

12      WAS USED THAT HAD QUITE FRANKLY I THINK AT LEAST 60

13      DIFFERENT DATA POINTS AND IT WOULD START WITH WHERE A

14      PROPERTY WAS LOCATED, IT WOULD START WITH BASED ON ZIP

15      CODE, THE TYPE OF PROPERTY, AGAIN WHETHER IT WAS AN

16      APARTMENT BUILDING, AN OFFICE BUILDING, WHETHER IT WAS

17      RETAIL, SOME TYPE OF SHOPPING CENTER OR IF IT WAS AN

18      INDUSTRIAL BUILDING AND THEN YOU HAVE THOSE PRODUCT

19      TYPES THAT DON'T FIT INTO ANY OF THESE NEAT CATEGORIES

20      LIKE SELF STORAGE OR MEDICAL OFFICE BUILDINGS THAT YOU

21      HAD A DIFFERENT PROCESS THAT YOU WENT THROUGH.  AT ANY

22      RATE, FROM THE VERY BEGINNING WHEN THE LOAN WAS

23      ORIGINATED THIS MODEL WAS KIND OF SET UP AND THEN ON A

24      QUARTERLY BASIS, BASED ON MARKET DATA THAT WAS PURCHASED

25      BUY -- FROM REES WHICH IS A REAL ESTATE INDUSTRY MARKET,

1   DOES MARKET STUDIES, THEY WOULD INPUT INFORMATION IN

2   TERMS OF WHAT'S GOING ON WITH THE PORTFOLIO.  THEY WOULD

3   LOOK AT WHAT THE CURRENT VACANCY IS IN THE MARKET.  IT

4   WOULD LOOK AT THE RENTS THAT ARE BEING CHARGED AT OUR

5   PROPERTY VERSUS THE RENTS IN THE MARKET TO SEE IF THERE

6   IS ANY UPSIDE FOR ANY OF THE VACANT SPACE.  IT WOULD

7   LOOK AT TRENDS IN THE MARKET.  QUITE FRANKLY, THIS MODEL

8   WOULD GO AND LOOK AT TEN YEARS' WORTH OF CASH FLOW SO TO

9   GET A BETTER SENSE GIVEN ANY LEASE TURNOVER OR ANY

10  POTENTIAL TRENDS IN THE MARKET WITH WHETHER OR NOT THERE

11  COULD BE ANY POTENTIAL LOSS IN THAT PARTICULAR LOAN.  SO

12  THERE WERE QUANTITATIVE ASPECTS OF THIS MODEL AND THEN

13  THERE WAS QUALITATIVE ASPECTS OF THIS MODEL AND THE

14  QUALITATIVE ASPECTS INCLUDED KIND OF FIVE DIFFERENT

15  SEGMENTS.  IT WOULD BE ANYTHING FROM FINANCIAL REPORTING

16  TO SPONSOR GUARANTOR ASSESSMENT.  IT WOULD BE LOOKING AT

17  A LOAN'S PERFORMANCE RELATIVE TO UNDERWRITING.  IT WOULD

18  LOOK AT THE QUALITY OF THE CASH FLOW AND IT WOULD LOOK

19  AT THE STRUCTURE TO SEE IF THERE WERE ANY STRUCTURAL

20  ASPECTS OF THE LOAN THAT WOULD IMPACT HOW IT'S RISK

21  RATED SO THAT AGAIN, THAT WAS KIND OF QUALITATIVE.

22              FINANCIAL STATEMENT REPORTING IS YOU KNOW

23  HOW OFTEN DO YOU GET THE OPERATING STATEMENT?  WHAT IS

24  THE QUALITY OF RENT YOU WILL GET.

25              SPONSOR AND GUARANTOR ANALYSIS IS, IS

1    THIS A SPONSOR THAT HAS ACCESS TO THE CAPITAL MARKETS?

2    DO THEY HAVE ALTERNATIVE SOURCES FOR PURCHASE, FOR

3    OBTAINING LOANS?  DO THEY HAVE A LOT OF OTHER PROPERTIES

4    THAT YOU HAVE UPCOMING MATURITIES ON?  DO THEY HAVE A

5    LARGE AMOUNT OF LAND THAT IS A NONINCOME GENERATING

6    ASSET THAT IS GOING TO REQUIRE SOME OF THEIR CASH FLOW?

7    THE COMPONENT THAT LOOKS AT ACTUAL RESULTS VERSUS

8    UNDERWRITING MEANT THAT ANY ASSET MANAGER WOULD HAVE TO

9    GO IN, SPREAD THE FINANCIALS AND THEN COMPARE IT TO WHEN

10   WE DID THE UNDERWRITING TO SEE IF IT WAS IN LINE.  I

11   SHOULD SAY THOUGH THAT THE CREDIT DEPARTMENT HAD ITS OWN

12   UNIQUE WAY OF DEFINING A REUNDERWRITING THING SO YOU

13   KNOW, FOR EXAMPLE, IF YOU TOOK THE ACTUAL OPERATING

14   STATEMENTS AND NO TAXES HAD BEEN PAID, WE WOULD HAVE TO

15   GO BACK AND RESEARCH TO FIND OUT HOW MUCH TAXES WILL BE

16   PAID SOME TIME LATER IN THE YEAR AND INPUT THAT NUMBER

17   INTO THE MODEL.

18           AGAIN, WE WOULD COMPARE YOUR DEBT SERVICE

19   COVERAGE WITH WHAT WE THOUGHT WAS GOING TO BE

20   UNDERWRITTEN.

21           THEY WOULD ALSO ASK US TO REVALUE EACH

22   PROPERTY SO KIND OF BASED ON EXISTING LEASES IN PLACE,

23   WE WOULD DO AN ANALYSIS OF WHAT THE NOI OR NET OPERATING

24   INCOME WOULD BE, APPLY A CAP RATE BASED ON INDUSTRY DATA

25   THAT WE WOULD GET FROM REES TO COME UP WITH A NEW VALUE

1    AND LOOK AT THE LOAN TO VALUE IF YOU COMPARED TO WHERE

2    WE THOUGHT IT WOULD BE FROM AN UNDERWRITING STANDPOINT.

3    Q.    WHO WAS RESPONSIBLE FOR INPUTTING THE

4    QUALITATIVE ELEMENTS?

5    A.    THE ASSET MANAGERS HAD BEEN.

6    Q.    AND WHAT TYPE OF EXPERIENCE DID THEY NEED TO

7    HAVE IN ORDER TO PERFORM AN ACCURATE QUALITATIVE

8    ASSESSMENT?

9    A.    WE TRIED TO HAVE PEOPLE DO THAT TYPE OF ANALYSIS

10   WHO HAD FAIRLY EXTENSIVE EXPERIENCE BECAUSE A LOT OF

11   TIMES REALLY IDENTIFYING THE RISK WAS NOT JUST BASED ON

12   WHAT YOU SAW ON PAPER, IT WAS ASKING YOUR BORROWER THE

13   RIGHT QUESTIONS.  ASKING THEM -- IF YOU SEE A LEASE,

14   SUBSTANTIAL LEASE IN A BUILDING THAT IS COMING UP IN

15   ANOTHER SIX MONTHS, ASKING THEM OKAY, HAVE YOU HEARD

16   ABOUT WHETHER OR NOT THAT TENANT IS GOING TO RENEW HIS

17   LEASE OR HAVE THEY GIVEN YOU NOTICE ALREADY THAT THEY

18   ARE GOING TO BE VACATING?  AND IF THEY HAVE, WHAT TYPE

19   OF PROSPECTS DO YOU HAVE TO MOVE INTO THAT SPACE OR TO

20   TAKE THAT SPACE SO WE TRY TO HAVE EXPERIENCED PEOPLE WHO

21   KNEW THE RIGHT QUESTIONS TO ASK.

22   Q.    AND HOW DEMANDING WAS THE RISK RATING PROCESS

23   ITSELF?

24   A.    IT WAS AN EXTREMELY RIGOROUS PROCESS.  IT WAS

25   ONE OF THESE THINGS WHERE DURING THAT WEEK, TWO-WEEK OR

1    THREE-WEEK PERIOD, THAT IS ALL WE DID.  YOU WORKED LATE,

2    YOU WORKED ON THE WEEKEND, YOU DID WHATEVER IT TOOK

3    BECAUSE THE CREDIT DEPARTMENT NEEDED TO RELY ON OUR

4    ASSESSMENT OF NOT JUST -- I MEAN THE QUALITATIVE ASPECTS

5    OF IT BUT ALSO WE HAD TO GO BACK AND LOOK AT THE

6    QUANTITATIVE TO MAKE SURE THAT THE DATA THAT WAS PUT IN

7    WAS ACCURATE BECAUSE SOMETIMES YOU WOULD FIND THESE

8    OUTLIERS THAT YOU COULD NOT EXPLAIN.  YOU KNOW YOU WOULD

9    SEE A BUILDING THAT WAS LET'S SAY 90 PERCENT LEASED UP,

10   YOU HAD A GOOD LOAN TO VALUE YET YOU ENDED UP GETTING A

11   DETRIMENTAL NUMBER FROM A RISK RATING STANDPOINT AND

12   THAT IS BECAUSE THE MODEL SAID THAT THERE IS NO -- THERE

13   IS NOT A LOT OF ROOM FOR NEW PEOPLE COMING INTO THAT

14   MARKET, AND SO THE FUTURE POTENTIAL COULD BE BAD IN

15   TERMS OF LEASING UP THE BUILDING SO IT WAS NOT ALWAYS

16   NECESSARILY INTUITIVE.  THERE WAS NOT A LOGICAL PROCESS

17   SO IT WAS -- WHAT I'M TRYING TO SAY, IT RESULTED --

18   ADMIT THAT WE HAD TO HAVE A LOT OF INTERACTION WITH THE

19   CREDIT DEPARTMENT WHICH I HAD BEEN DOING FOR YOU KNOW,

20   FOR 7 OR 8 YEARS THAT I HAD BEEN WORKING WITH THEM.

21   Q.     AND WHAT INDIVIDUALS IN PARTICULAR WOULD YOU

22   WORK WITH TOGETHER IN THE CREDIT DEPARTMENT TO GET YOU

23   ACROSS THE FINISH LINE?

24   A.     THERE IS A -- STARTING WITH AT LEAST AS OF THE

25   FIRST QUARTER OF 2006, IT WAS JOE HOHENLEITNER WHO WAS

1    OUR MAIN SENIOR CREDIT OFFICER.  IT WAS BETH COADY

2    BECAUSE SHE WAS KIND OF A LOW-LEVEL PERSON ON THE CREDIT

3    SIDE WHO WAS RESPONSIBLE FOR A LOT OF THE TECHNICAL

4    ASPECTS THAT WERE INCLUDED IN THE MODEL AND THEN THERE

5    WAS A PERSON BY THE NAME OF MAUREEN MENARDE WHO IS THEIR

6    CHIEF RISK OFFICER WHO WAS THE PERSON WHO HAD THE DIRECT

7    RESPONSIBILITY FOR THE MODEL ITSELF SO AGAIN, JOE HOE

8    HAD GENERAL RESPONSIBILITIES FOR CREDIT FOR OUR

9    PORTFOLIO.  MAUREEN WAS MORE OF THE RISK RATING PERSON

10   THROUGHOUT THE COMPANY AND BETH WAS A PERSON WHO FROM A

11   TECHNICAL SIDE HAD GOOD KNOWLEDGE OF WHAT THE

12   INTRICACIES OF THE MODEL INCLUDED.

13   Q.     HOW LONG WOULD YOU INTERACT WITH, YOU REFERRED

14   TO JOE HOE.  TO BE CLEAR TO THE JURY, THAT IS MR.

15   HOHENLEITNER?

16   A.     YES.  THAT IS HIS NICKNAME.

17   Q.     HOW OFTEN WOULD YOU INTERACT WITH MR.

18   HOHENLEITNER, MISS COADY AND MISS MENARDE DURING THE

19   RISK RATING PROCESS?

20   A.     VERY FREQUENTLY, EITHER THROUGH E-MAILS OR

21   DIRECT MEETINGS.  I HAD MAINTAINED AN OFFICE BOTH IN NEW

22   YORK AS WELL AS IN HORSHAM SO IN HORSHAM THE CREDIT

23   OFFICERS WERE LOCATED, GOSH, NOT THAT FAR FROM WHERE MY

24   OFFICE WAS, SO IT WAS VERY EASY TO GO IN AND OUT OR SEE

25   THEM IN THE CAFETERIA.

1              IN NEW YORK, MY OFFICE WAS I THINK 4 OR 5

2    DOORS DOWN FROM JOE HOE'S SO WHEN I WAS IN NEW YORK 1 TO

3    2 DAYS A WEEK, I WOULD BE MEETING WITH HIM ON A FAIRLY

4    REGULAR BASIS.

5    Q.    WE GOT A LITTLE BIT AWAY FROM THE PURCHASE OF

6    THE COMPANY AND THE CHANGE TO CAPMARK.  AT SOME POINT,

7    DID YOU COME TO LEARN THAT YOUR JOB WOULD BE AFFECTED AS

8    THE RESULT OF THE SELL OF THE COMPANY?

9    A.    YES, PROBABLY BY THE THIRD QUARTER OR FOURTH

10   QUARTER OF 2005, AN ANNOUNCEMENT WAS MADE THAT WE

11   FINALLY HAD FOUND AN INVESTOR BECAUSE THERE WERE A

12   NUMBER OF NEAR MARRIAGES, LET'S SAY, WHERE WE THOUGHT WE

13   HAD INVESTORS WHO WERE GOING TO BE BUYING US AND THE

14   DEALS FELL APART BUT WE HAD HEARD THAT A GROUP OF

15   INVESTORS THAT INCLUDED GOLDMAN SACHS, KKR AND ANOTHER

16   ENTITY WAS GOING TO BE BUYING ABOUT 78 PERCENT OF GMAC

17   COMMERCIAL MORTGAGE.

18   Q.    AND TO WHAT EXTENT DID THAT PRESENT ANY

19   OPPORTUNITIES TO YOU?

20   A.    WELL, I THOUGHT THAT THAT WOULD BE GREAT BECAUSE

21   THERE WERE KIND OF RUMORS FLYING THAT CERTAIN MANAGERS

22   MIGHT BE GIVEN AN OPPORTUNITY TO BUY INTO THE COMPANY.

23   BUY INTO -- WHEN THE INVESTORS BUY THE COMPANY, THEY

24   WOULD ALSO BE GIVING SENIOR MANAGEMENT AN OPPORTUNITY TO

25   BUY INTO THE COMPANY.

1   Q.      AND WERE YOU GIVEN THAT OPPORTUNITY?

2   A.      I WAS.  IN THE EARLY PART OF FEBRUARY OF 2006, I

3   GOT AN E-MAIL, IT WAS JUST FROM GMAC EQUITY INVESTORS

4   TELLING ME THAT I WAS CONSIDERED A KEY EMPLOYEE AND

5   THERE WAS ANOTHER TERM BUT I CAN'T REMEMBER.  AT ANY

6   RATE I WAS TOLD THAT I WOULD BE GIVEN THE OPPORTUNITY TO

7   PURCHASE UP TO I THINK 40,000 SHARES OF STOCK IN THE NEW

8   COMPANY.

9   Q.      AND WHAT DID YOU DO TO DECIDE WHETHER TO MAKE

10  THAT INVESTMENT?

11  A.      I HAD NEVER MADE THAT LARGE OF AN INVESTMENT IN

12  ANYTHING SO -- A SINGLE INVESTMENT SO I LOOKED TO TRY TO

13  IDENTIFY SOMEONE TO HELP ME EVALUATE THE PROS AND CONS

14  OF MAKING THAT TYPE OF INVESTMENT.

15          I SHOULD ALSO SAY THAT WHEN WE GOT THIS

16  NOTICE IT ALSO COINCIDED WITH WHEN WE WERE GIVEN OUR

17  BONUS, WHEN THEY GAVE US THE BONUS AWARDS AND IT TURNED

18  OUT THAT I THINK IT WAS ALMOST THE SAME DAY THAT THEY

19  GAVE US OUR BONUS THAT WE ACTUALLY RECEIVED THE CASH.

20  THEY ALSO TOLD US HOW MUCH WE COULD INVEST IN THE NEW

21  COMPANY SO IT WASN'T -- SO I NEEDED TO FIGURE OUT WHAT

22  TO DO.

23  Q.      AND WHAT WAS YOUR BONUS AT THAT TIME, DO YOU

24  RECALL?

25  A.      I THINK THE PAYOUT WAS 425,000 AND THEN THE

1    CONTINGENT AWARD OR THE DEFERRED PART WAS ANOTHER 75,000

2    AND THE WAY THE CONTINGENT WORKS IS THAT THAT IS PAID ON

3    THE SECOND OR THIRD ANNIVERSARY OF WHEN IT IS ANNOUNCED.

4    Q.    WHAT -- DID YOU IN FACT MAKE AN INVESTMENT IN

5    THE COMPANY?

6    A.    I DID.  I MADE A COUPLE OF PHONE CALLS AND I

7    FOUND A CONSULTANT WHOSE NAME WAS ROBERT JONES.  HE HAS,

8    HE IS AN ATTORNEY, CPA AND WHAT HE DOES, HE HAD WORKED

9    FOR I THINK IT IS CALLED AON CONSULTING BUT HE ADVISED

10   COMPANIES AND INDIVIDUALS ON EMPLOYEE COMPENSATION AND

11   BENEFITS, AND I GOT HIS NAME, I CALLED HIM AND HE SAID,

12   HE WOULD BE HAPPY TO WORK WITH ME ON FIGURING OUT, YOU

13   KNOW, WHETHER IT MADE SENSE TO MAKE THIS INVESTMENT.

14   Q.    AS A RESULT OF YOUR CONVERSATIONS WITH

15   MR. JONES, DID YOU IN FACT MAKE AN INVESTMENT?

16   A.    I DID.  I INVESTED 140,000 IN THE COMPANY, AND I

17   SHOULD SAY THAT IT WAS 140,000 CASH TO PURCHASE STOCK,

18   BUT BY MAKING THAT INVESTMENT I ALSO WAS GIVEN -- I

19   THINK THEY ARE CALLED STOCK OPTIONS, WHICH MEANT THAT

20   ONCE THESE OPTIONS GOT VESTED OVER A FIVE-YEAR PERIOD,

21   THEN YOU COULD POTENTIALLY EXERCISE THOSE OPTIONS AND

22   GET A RETURN ON YOUR INVESTMENT.

23   Q.    AND HOW DID $140,000 INVESTMENT COMPARE TO ANY

24   OTHER SINGLE INVESTMENT THAT YOU HAD MADE IN THE PAST?

25   A.    ASIDE FROM PUTTING $5,000 IN MY IRA ACCOUNT, I

1    HAD NEVER MADE AN INVESTMENT ANYWHERE NEAR THAT LARGE,

2    SO THAT IS WHY I CONSULTED BOB JONES AND WE WENT THROUGH

3    KIND OF THE PROS AND CONS OF MAKING THAT KIND OF

4    INVESTMENT.

5                    THE COURT:  EXCUSE ME FOR A MOMENT.

6                    (OFF THE RECORD.)

7                    THE COURT:  YOU MAY PROCEED.

8    BY MR. SALMANSON:

9    Q.     HAD YOU FINISHED YOUR ANSWER, MISS SPEIGHT?

10   A.     I AM SORRY.  I GOT DISTRACTED.  I WAS NOT SURE.

11   WHAT WAS THE QUESTION?

12                   THE COURT:  READ BACK THE ANSWER.

13                   (REQUESTED PORTION READ BACK.)

14   BY MR. SALMANSON:

15   Q.     AND WHY WERE YOU WILLING TO MAKE SUCH A LARGE

16   INVESTMENT?

17   A.     A, BECAUSE I LOVED MY JOB.  I LOVED THE PEOPLE

18   THAT I WORKED WITH.  I LOVED THE PEOPLE THAT I WORKED

19   FOR.  I WORKED FOR THE COMPANY AGAIN AT THAT POINT FOR

20   ABOUT SEVEN -- ALMOST SEVEN AND-A-HALF YEARS.  I WAS

21   GIVEN A LOT OF AUTHORITY, AND I GREW FROM A CAREER

22   STANDPOINT, FROM A PROFESSIONAL STANDPOINT TREMENDOUSLY

23   AND TO BE ABLE TO SAY THAT I COULD BE A PART OF THIS

24   GROWTH, BECAUSE THE THOUGHT WAS THAT YOU MAKE THIS

25   INVESTMENT AND THEN OVER A FIVE-YEAR PERIOD OF TIME, YOU

1    GROW THE COMPANY IN SUCH A WAY THAT YOU TAKE IT PUBLIC.

2    YOU KNOW, I NEVER -- I DIDN'T THINK I WOULD EVER START

3    MY OWN BUSINESS.  THIS WAS ABOUT AS CLOSE AS I WAS GOING

4    TO GET TO THAT.

5    Q.     WHEN DID YOU APPROXIMATELY MAKE THE ACTUAL

6    COMMITMENT FOR THE $140,000?

7    A.     THEY ASKED FOR A PRETTY QUICK TURNAROUND, SO

8    THEY GAVE US MATERIALS, YOU KNOW, THE PERSPECTIVE AND

9    SOME OTHER THINGS, WHICH I E-MAILED TO BOB.  WE WORKED

10   TOGETHER OVER THE WEEKEND, SENDING E-MAILS BACK AND

11   FORTH, AND I MADE THE INVESTMENT PROBABLY ABOUT A WEEK

12   AFTER THEY GAVE ME THE OPPORTUNITY.

13   Q.     AND HOW DID YOU ACTUALLY DO THAT?

14   A.     THERE WERE TWO THINGS I HAD TO DO.  I HAD TO

15   MAKE ARRANGEMENTS TO WIRE MONEY INTO THE COMPANY, AND

16   THEN I NEEDED TO SIGN A DOCUMENT SAYING THAT I'M MAKING

17   THIS INVESTMENT AND I HANDED THAT DOCUMENT TO JON FOGLE,

18   WHO WAS IN HR, ONE OF THE SVP'S IN THE HUMAN RESOURCES

19   AREA.

20   Q.     NOW, AFTER YOU MADE THE INVESTMENT, DID ANY OF

21   YOUR JOB RESPONSIBILITIES CHANGE?

22   A.     THAT -- AGAIN, BECAUSE WE HAD A GROUP OF NEW --

23   OF INVESTORS COMING IN, THAT SALE CLOSED TOWARDS THE END

24   OF MARCH OF 2006.  YOU KNOW, TO MAKE THIS SUCCESSFUL HE

25   KNEW -- I KNEW -- EVERYONE KNEW THAT WE HAD TO FIGURE

1    OUT A WAY TO CUT EXPENSES.

2                   AS I HAD ALLUDED TO BEFORE, SOME OF WHAT

3    THE ASSET MANAGEMENT FUNCTION -- SOME OF THOSE FUNCTIONS

4    PERFORMED WERE ALSO CLOSE TO WHAT WAS BEING PERFORMED ON

5    THE SERVICING AREA, SO THERE HAD BEEN RUMORS THAT THE

6    ASSET MANAGEMENT -- MY ASSET MANAGEMENT TEAM WOULD BE

7    MOVED INTO SERVICING, AND THAT IS ONE OF THE THINGS THAT

8    HAPPENED AS A RESULT OF THE ACQUISITION.

9    Q.      AND HOW DID YOU FIND OUT THAT THAT WAS GOING TO

10   HAPPEN?

11   A.      I MET WITH ONE OF MY MANAGERS, MARLA BERGER, THE

12   LAST WEDNESDAY IN MARCH OF 2006, AND SHE TOLD ME THAT

13   THERE WAS THIS EFFICIENCY COMMITTEE, IS I THINK WHAT SHE

14   DESCRIBED IT, AND THAT COMMITTEE, AMONGST OTHER THINGS,

15   DECIDED THAT THIS COULD BE ONE WAY OF SAVING MONEY FOR

16   THE COMPANY.

17   Q.      AND WHAT DID SHE TELL YOU THAT SHE WANTED YOU TO

18   DO?

19   A.      SHE TOLD ME THAT I SHOULD SET UP AN APPOINTMENT

20   WITH MIKE LIPSON, AND HE WOULD BE ABLE TO GIVE ME A

21   BETTER IDEA OF WHAT THE TRANSITION -- WHAT FORM THE

22   TRANSITION WOULD TAKE.

23   Q.      AND AT THAT TIME, WERE YOU GIVEN A JOB

24   DESCRIPTION?

25   A.      NO.

1  Q.      WERE YOU TOLD ANY MORE DETAILS, OTHER THAN YOU

2  SHOULD GO TALK TO MR. LIPSON ABOUT WHAT THE JOB

3  DESCRIPTION WOULD BE?

4  A.      THIS IS WHAT MARLA SAID TO ME.  MARLA SAID, SHE

5  SAID, WANDA -- SHE SAID, I DON'T -- I DON'T KNOW HOW YOU

6  ARE GOING TO REACT TO THIS, BUT, YOU KNOW, SERVICING MAY

7  NOT SEEM LIKE THE BEST PLACE TO BE, BUT DON'T WORRY

8  ABOUT YOUR COMPENSATION.  WE WILL FIGURE OUT A WAY TO

9  TAKE CARE OF YOU.

10              AND SHE SAID, WANDA, YOU CAN GO OVER AND

11  YOU CAN BE A STAR OVER THERE.  SHE CALLED ME -- YOU CAN

12  BE THE QUEEN OF SERVICING IF YOU GO TO SERVICING AND

13  HELP THEM PERFORM A HIGHER LEVEL OF SERVICING THAN WHAT

14  THEY WERE PROVIDING -- CURRENTLY PROVIDING.

15  Q.      AND TO WHAT EXTENT DID YOU AGREE OR DISAGREE

16  WITH HER ASSESSMENT?

17  A.      I TOOK HER ON FACE VALUE.  I WAS NOT SURE KIND

18  OF WHAT TO EXPECT.  SO I CALLED MIKE.

19  Q.      AND HAD YOU EVER HAD PROFESSIONAL INTERACTIONS

20  WITH MR. LIPSON BEFORE?

21  A.      VERY LIMITED.  I CAN'T THINK OF -- I KNEW WHO HE

22  WAS.  I WAS NOT SURE IF HE KNEW WHO I WAS.

23  Q.      OKAY.  AND DID YOU FOLLOW UP ON MISS BERGER'S

24  SUGGESTION THAT YOU CALL MR. LIPSON?

25  A.      I DID.  AGAIN, I WAS IN NEW YORK WHEN I MET WITH

1    MARLA.  SHE IS BASED IN NEW YORK.  BUT WHEN I GOT BACK

2    TO HORSHAM, I SENT HIM AN E-MAIL AND SCHEDULED A MEETING

3    FOR THAT FRIDAY, TWO DAYS LATER, THE NEXT DAY.

4    Q.    NOW, YOU MENTIONED THAT MISS BERGER SAID

5    SOMETHING ABOUT YOUR COMPENSATION.

6              TO WHAT EXTENT DID YOU HAVE CONCERNS

7    ABOUT YOUR COMPENSATION IF YOU MOVED OVER?

8    A.    AGAIN, I HAD JUST MADE A $140,000 INVESTMENT IN

9    THE COMPANY.  THERE HAD BEEN RUMORS GOING AROUND OVERALL

10   ONCE THE COMPANY GOT SOLD, THAT OVERALL EVERYONE'S

11   COMPENSATION WAS GOING TO CHANGE.  THE WAY I LOOKED AT

12   MY EMPLOYMENT AND MY INVESTMENT AT CAPMARK WAS THAT I

13   WAS IN IT FOR THE LONG TERM.

14              I REALIZED THAT ON THE SHORT-TERM BASIS,

15   I MIGHT NOT BE MAKING WHAT I HAD MADE PREVIOUSLY, BUT BY

16   MAKING THIS INVESTMENT AND HAVING THE STOCK OPTIONS,

17   THAT FIVE YEARS DOWN THE ROAD I WOULD HAVE THE ABILITY

18   TO REALLY KIND OF GET THE BIG BANG.

19   Q.    DID YOU HAVE ANY UNDERSTANDING OF HOW THE

20   SERVICING DEPARTMENT WAS COMPENSATED, AS OPPOSED TO HOW

21   THE PLG GROUP HAD BEEN COMPENSATED?

22   A.    PLG HAD A REAL DISCRETIONARY BONUS PLAN VERSUS

23   SERVICING.  THEIR BONUS PLAN WAS BASED ON -- I THINK IT

24   IS CALLED PERSONAL SHARES, AND I THINK THERE WAS REALLY

25   A FINITE WAY THE PERSONAL SHARES WORKED; WHEREAS, IF YOU

1    HAVE X NUMBER OF PERSONAL SHARES, YOU AUTOMATICALLY GOT

2    X IN JANUARY OF EVERY YEAR.

3    Q.    NOW, WE ARE BACK TO YOU CALLED MR. LIPSON, AND

4    DID YOU, IN FACT, MEET WITH HIM?

5    A.    I DID.  I WENT TO HIS OFFICE.  AND I SHOULD TELL

6    YOU THAT ALTHOUGH WE BOTH WORKED IN HORSHAM, MIKE IN

7    SERVICING -- MIKE LIPSON IN SERVICING WERE ON THE WELSH

8    ROAD BUILDING, AND I WORKED IN THE WHITMORE BUILDING.

9    IT WAS ABOUT A MILE AWAY TO GET FROM ONE BUILDING TO THE

10   NEXT.  YOU HAD TO DRIVE.

11   Q.    WAS MR. LIPSON SOMEBODY THAT YOU WOULD SEE ON A

12   DAY-TO-DAY BASIS, GENERALLY?

13   A.    DEFINITELY NOT ON A DAY-TO-DAY BASIS.

14   Q.    AND HOW LONG DID THE MEETING LAST?

15   A.    NOT VERY LONG.  I CAN'T REMEMBER, YOU KNOW.  I

16   WOULD SAY MAYBE 15 OR 20 MINUTES.  HE SAID THAT HE

17   WELCOMED MY JOINING HIS GROUP, AND THAT -- HE EXPLAINED

18   KIND OF THE OVERALL PHILOSOPHY OF HOW THE COMPANY WAS

19   CHANGING, AND THIS IS VERY HIGH LEVEL.  HE SAID THERE IS

20   GOING TO BE THE SERVICING AREA, THEN THERE IS GOING TO

21   BE THE INVESTMENT AREA AND IT'S RUN BY SOMEONE ELSE,

22   THEN THERE WAS GOING TO BE THE, I THINK, LENDING AREA,

23   CREDIT AREA THAT WAS BEING RUN BY SOMEONE ELSE.

24   Q.    DID THAT STRUCTURE MAKE SENSE TO YOU?

25   A.    YEAH.  THERE WAS NO REASON TO THINK IT WOULDN'T.

1    Q.      OKAY.  AND DID YOU TALK ABOUT ANYTHING ELSE IN

2    THAT MEETING?

3    A.      HE SAID THAT I SHOULD PLAN A MEETING WITH

4    MICHAEL CARP, WHO IS BASED IN DALLAS, TEXAS, AND MARK

5    MCCOOL WHO WAS IN HORSHAM.  HE SAID I SHOULD WORK WITH

6    THEM.  THE WAY HE REFERRED TO IT WAS SOME KIND OF MEAT

7    ON THE BONES OR SOMETHING TO THAT EFFECT.

8    Q.      AND WHAT DID YOU UNDERSTAND HIM TO MEAN BY THAT

9    EXPRESSION?

10    A.      THAT I WOULD WORK THROUGH THE DETAILS WITH

11    MICHAEL CARP AND MARK MCCOOL.

12    Q.      AT THAT POINT, DID YOU KNOW TO WHOM YOU WOULD

13    ULTIMATELY BE REPORTING?

14    A.      I DIDN'T.  IN FACT, THAT WAS ONE OF THE THINGS

15    THAT MIKE LIPSON ALLUDED TO.

16              HE SAID, WE ARE NOT SURE HOW THIS IS ALL

17    GOING TO WORK OUT YET, SO WHEN YOU MEET -- I WANT YOU TO

18    MEET WITH BOTH OF THEM ALL THE TIME BECAUSE UNTIL WE

19    FIGURE OUT HOW THIS IS GOING TO WORK, IT'S BETTER IF

20    BOTH OF THEM HEAR KIND OF WHAT YOU DO AND HOW YOU

21    CURRENTLY ARE DOING YOUR ASSET MANAGEMENT FUNCTION, AND

22    THAT WAY THEY CAN DECIDE HOW TO STRUCTURE THE GROUP.

23    Q.      AND WHAT WAS YOUR UNDERSTANDING OF THE

24    DIFFERENCES BETWEEN WHAT MR. CARP WAS DOING AND WHAT

25    MR. MCCOOL WAS DOING?

1    A.       SURE.  MICHAEL CARP HEADED UP SOMETHING CALLED

2    RES, REAL ESTATE SOLUTIONS, AND THAT WAS THE AREA THAT

3    HANDLED THE DISTRESS LOANS.  IT ALSO USED TO BE REFERRED

4    TO AS SPECIAL SERVICING.  BUT AT ANY RATE WHAT THEY

5    OFFERED, BOTH FOR GMAC OR CAPMARK, AS WELL AS TO

6    THIRD-PARTY ENTITIES, IS MANAGING PORTFOLIO OF LOANS

7    THAT ARE NONPERFORMING.  THEY ARE LOANS THAT ARE EITHER

8    VACANT, OR THEY ARE LOANS ON PROPERTIES THAT HAVE NOT

9    PERFORMED THAT ARE -- IN THE RISK RATINGS THEY ARE

10   SPECIAL MENTION, A WATCH LIST OF LOANS THAT REQUIRE

11   VERY, VERY HEAVY DETAILED SERVICING OF THE PORTFOLIO.

12   THEY ALSO HANDLED OREO -- OR IF WE HAD TO FORECLOSE ON A

13   LOAN AND TAKE BACK THE REAL ESTATE, THEY WOULD HANDLE

14   THOSE TYPES OF PROPERTIES.

15   Q.       WHAT ABOUT MR. MCCOOL, WHAT KIND OF ASSETS WAS

16   HE HANDLING?

17   A.       MR. MCCOOL HANDLED THE -- THE PERFORMING LOANS

18   FOR THIRD PARTIES.  THOSE WOULD HAVE BEEN LIFE INSURANCE

19   COMPANIES OR OTHER ENTITIES THAT HAD PORTFOLIO LOANS

20   THAT NEEDED TO BE SERVICED, SO THEY WERE KIND OF THE

21   VANILLA LOANS, LOANS WHERE ALL THEY DID WAS COLLECT

22   PRINCIPAL AND INTEREST, THEY MADE SURE TAXES WERE PAID,

23   INSURANCE WAS PAID.  WE DID SERVICING FOR, I THINK,

24   FANNIE MAE AND FREDDY, WHERE WE COLLECTED FINANCIAL

25   STATEMENTS ON AN ANNUAL BASIS, SPREAD THEM BASED ON A

1     CRITERIA SET BY THE CMSA, AND GIVE REPORTS TO THE THIRD

2     PARTY.

3     Q.     AND, TO YOUR KNOWLEDGE, TO WHAT EXTENT DID

4     INDIVIDUALS UNDER MR. CARP'S BAILIWICK PERFORM RISK

5     RATINGS?

6     A.     AGAIN, MOST OF THEIR LOANS -- LET ME BACK UP.

7     THEIR LOANS THAT WERE DONE FOR THIRD PARTIES, THEY DID

8     NOT PERFORM RISK RATING FOR THOSE THIRD PARTIES.  BY THE

9     NATURE OF THEIR LOANS, BECAUSE THEY WERE DISTRESSED

10    PORTFOLIOS.  THOSE WERE LOANS THAT WERE ALREADY RISK

11    RATED, WATCHED LIST, OR SPECIAL MENTION OR OREO, BECAUSE

12    THOSE WERE AUTOMATICALLY HIGHER RISK RATED LOANS.  OREO,

13    OTHER REAL ESTATE OWNED, O-R-E-O, OREO.

14    Q.     WHO WOULD BE RESPONSIBLE OR RISK RATING THE

15    LOANS THAT WERE UNDER MR. CARP'S BAILIWICK?

16    A.     SOMETIMES SOME OF THEIR STAFF WOULD DO THAT.

17    QUITE FRANKLY, LET ME RELATE IT TO LOANS THAT THEY --

18    SPECIAL SERVICING HAD HANDLED FOR THE REAL ESTATE AREA.

19    WE WOULD HAVE OUR ASSET MANAGERS DO SOME OF THOSE RISK

20    RATINGS IN CONJUNCTION WITH THEIR STAFF.

21    Q.     AND WHAT ABOUT MR. MCCOOL, PRIOR TO YOUR

22    ARRIVAL, TO WHAT EXTENT -

23    A.     YEAH.

24    Q.     -- DID HE HAVE PEOPLE UNDER HIS BAILIWICK DOING

25    RISK RATINGS?

1    A.      TO THE BEST OF MY KNOWLEDGE, THEY DID NOT DO

2    RISK RATINGS AT ALL.  AGAIN, THEY WERE NOT DOING -- THEY

3    WERE NOT OVERSEEING LOANS ON OUR BALANCE SHEET.  THOSE

4    WERE THIRD-PARTY ENTITIES, SO THERE WAS NO RISK RATING

5    DONE OF THOSE LOANS.

6    Q.      AND SO, TO YOUR KNOWLEDGE, MR. MCCOOL HAD NOT

7    HAD EXPERIENCE WITH THE RISK RATING PROCESS PRIOR TO

8    YOUR ARRIVAL?

9    A.      THAT'S CORRECT.

10   Q.      NOW, DID YOU DISCUSS, WITH EITHER MISS BERGER OR

11   MR. LIPSON IN THESE INITIAL MEETINGS, YOUR STAFFING?

12   A.      I HAD.  IT STARTED WITH -- ACTUALLY STARTING

13   WITH MARLA.  WHAT HAD HAPPENED WAS, IN FEBRUARY WE HAD

14   AN ASSET MANAGER WHO HAD BEEN A PART-TIME ASSET MANAGER,

15   LISA SPAZIANO.  LISA, WORKED PART TIME.

16           WHEN SHE GOT HER BONUS AND GOT HER SALARY

17   ADJUSTMENT, SHE CAME BACK TO US AND SAID, YOU KNOW, I

18   FEEL LIKE I SHOULD BE MAKING MORE MONEY, EVEN THOUGH I'M

19   JUST PART TIME, I WORK MORE HOURS.  I WORK MORE THAN

20   JUST THE 20 HOURS A WEEK.  I FEEL LIKE I SHOULD BE

21   BETTER COMPENSATED.

22           WHEN I WENT TO TALK TO MARLA BERGER AND

23   LARRY KLIGMAN ABOUT THAT, THEY SAID, WELL, YOU KNOW, SHE

24   DEFINITELY IS A CONTRIBUTOR.  BUT, WANDA, WHY DON'T YOU

25   THINK ABOUT, INSTEAD OF JUST HIRING -- HAVING TO DEAL

1    WITH HER PART-TIME ISSUE, BECAUSE SOMETIMES THAT WAS AN

2    ISSUE, THEY SAID WHY DON'T YOU HIRE SOMEONE FULL TIME,

3    OFFER HER THE ABILITY TO COME AND WORK FOR US FULL TIME.

4    IF SHE DOESN'T WANT TO DO THAT, THEN GO AND HIRE SOMEONE

5    ON A FULL-TIME BASIS.

6              SO WHEN I WENT BACK TO LISA AND ASKED HER

7    IF SHE WOULD BE WILLING TO WORK FULL TIME, SHE SAID NO.

8    AND SO I SAID, WELL, I THINK WE WANT SOMEONE FULL TIME.

9    THIS PART-TIME ARRANGEMENT, YOU KNOW, AS LONG AS YOU

10   WERE WILLING TO DO IT AT THAT SALARY, IT WOULD HAVE BEEN

11   OKAY, BUT WE REALLY DO NEED SOMEONE FULL TIME.  SO SHE

12   ENDED UP LEAVING, AND I STARTED LOOKING FOR A FULL-TIME

13   PERSON.

14             AT THE SAME TIME, ONE OF OUR OTHER ASSET

15   MANAGERS, A GUY BY THE NAME OF GAGAN SURI -- GAGAN,

16   G-A-G-A-N, SURI, S-U-R-I, SAID THAT -- CAME TO ME AND

17   SAID, WANDA, HE SAID, I REALLY WANT TO DO UNDERWRITING.

18   I'M TIRED OF DOING -- NOT TIRED, BUT I WOULD LIKE TO DO

19   SOMETHING THAT IS MORE EXCITING THAN UNDERWRITING, AND I

20   WANT TO MAKE MORE MONEY.  AND HE FELT THAT THE

21   UNDERWRITING SIDE OF THE BUSINESS WOULD ALLOW HIM TO

22   MAKE MORE MONEY THAN THE ASSET MANAGEMENT SIDE OF THE

23   BUSINESS.

24   Q.    AND WAS MR. SURI MANAGING A CERTAIN SET OF

25   LOANS?

1   A.      HE WAS.  HE WAS MANAGING THE CANADIAN LOANS

2   BECAUSE, IN FACT, GAGAN HAD BEEN HIRED IN OUR -- I THINK

3   IT WAS THE TORONTO OFFICE.  WE MOVED HIM TO NEW YORK,

4   AND SO HE WAS DOING -- CONTINUED TO DO THE ASSET MANAGER

5   OF THE CANADIAN LOANS, AND THEN STARTED PICKING UP SOME

6   OF OUR U.S. LOANS ESSENTIALLY.  SO HE HAD A FAIRLY LARGE

7   PORTFOLIO.  I THINK HE HAD CLOSE TO 40 LOANS THAT HE

8   MANAGED, PROBABLY TWO-THIRDS OF THEM WERE CANADIAN AND

9   THE OTHER THIRD WERE U.S. LOANS.

10  Q.      AND WERE YOU ABLE TO HIRE A REPLACEMENT FOR LISA

11  SPAZIANO?

12  A.      I WAS.  I HIRED A GUY BY THE NAME OF PAUL

13  EDWARDS.  HE WAS A FULL-TIME INDIVIDUAL.

14  Q.      AND HOW ABOUT MR. SURI?

15  A.      I WAS IN THE PROCESS OF HIRING SOMEONE TO

16  REPLACE GAGAN.  THERE WAS AN EXCELLENT CANDIDATE WHO

17  WORKED FOR TISHMAN SPEYER -- I THINK IS THE NAME OF THE

18  OUTFIT -- REAL ESTATE OUTFIT BASED IN NEW YORK CITY.

19  SHE HAD FABULOUS ASSET MANAGEMENT EXPERIENCE.  AND WHEN

20  I ASKED MARLA, WHEN I MET WITH HER, WHETHER I COULD

21  PROCEED WITH HIRING THIS PERSON, SHE SAID I SHOULD TALK

22  TO MIKE LIPSON.

23  Q.      AND DID YOU TALK TO MIKE LIPSON ABOUT HIRING A

24  REPLACEMENT FOR MR. SURI?

25  A.      I DID.  I SHARED AT LEAST THE PROFILE OF THE

1    PERSON.  I SAID, I THINK THAT SHE COULD CONTRIBUTE A LOT

2    TO OUR ORGANIZATION.

3                     AND HE SAID, WELL, WANDA, THE PERSON

4    SOUNDS GREAT, BUT, YOU KNOW, I THINK -- WHY DON'T YOU

5    TALK TO TONY LAUERMAN, BECAUSE I THINK THAT HE MIGHT

6    HAVE SOME RESOURCES THAT YOU CAN TAP INTO.

7    Q.     AND WHO IS MR. LAUERMAN?

8    A.     TONY IS AN SVP BASED IN HORSHAM WHO HEADED UP

9    AT LEAST A PORTION OF THE DISTRESSED ASSET AREA.

10   Q.     AND WHO DID MR. LAUERMAN REPORT TO?

11   A.     TONY LAUERMAN REPORTED TO MICHAEL CARP IN

12   DALLAS, WHO HEADED UP ALL OF THE REAL ESTATE SOLUTIONS.

13   Q.     AND MR. CARP REPORTED TO MR. LIPSON?

14   A.     IT TURNED -- AGAIN, THERE WERE LOTS OF

15   ORGANIZATIONAL CHANGES GOING ON, BUT HIS AREA WAS BEING

16   MERGED INTO THE SERVICING AREA.  HE DIDN'T ALWAYS REPORT

17   TO MIKE LIPSON, BUT THAT WAS ONE OF THE THINGS THAT WAS

18   OCCURRING AND THAT WAS ANNOUNCED EARLIER THAN THE

19   ANNOUNCEMENT TO MOVE THE ASSET MANAGEMENT.  SO, AGAIN,

20   IT WAS ALL PART OF THIS EFFICIENCY INITIATIVE.

21   Q.     I THINK YOU PROBABLY HEARD ME IN THE OPENING

22   MENTION YET ANOTHER ACRONYM, WHICH IS SPG PORTFOLIO.

23                     CAN YOU DESCRIBE TO THE MEMBERS OF THE

24   JURY WHAT THE SPG PORTFOLIO WAS?

25   A.     SURE.  FIRST OF ALL, IT WAS AN ACRONYM FOR

1    STRUCTURED PRODUCT GROUP.  IT'S A PORTFOLIO OF LOANS

2    THAT WERE ORIGINATED OUT OF OUR DENVER OFFICE.  THEY

3    WERE MANAGED BY SEVERAL INDIVIDUALS, BUT THE TWO

4    CRITICAL -- TWO KEY PEOPLE WERE A PERSON BY THE NAME OF

5    MARIN STEINBERG AND NATHAN PERRY.  BECAUSE OF ALL OF THE

6    CHANGES GOING ON IN THE ORGANIZATION, MARIN WAS -- I

7    THINK SHE WAS EITHER VP OR SVP MANAGING DIRECTOR.

8              BECAUSE OF THE CHANGES, BECAUSE OF WHAT

9    SOME PEOPLE PERCEIVED AS, YOU KNOW, CERTAINTY, SHE HAD

10   ANNOUNCED IN EITHER LATE FEBRUARY OF 2006 OR EARLY MARCH

11   OF 2006 THAT SHE WAS LEAVING THE COMPANY.  SHE WAS AN

12   EXTREMELY EXPERIENCED, TALENTED INDIVIDUAL WHO DID,

13   AGAIN, BOTH UNDERWRITING AND ASSET MANAGEMENT.  SHE HAD

14   SOME REALLY COMPLEX LOANS, SOME REALLY -- EXCUSE THE

15   EXPRESSION, BUT FUNKY STRUCTURES, IN TERMS OF HOW

16   THINGSES WORKED.  THAT PORTFOLIO, I WOULD DESCRIBE AS

17   UNIQUE, IN THAT MANY OF THE SPONSORS WERE FRIENDS OF THE

18   MANAGEMENT OF -- THEY CALLED THE DENVER OFFICE CAPITAL

19   CORPORATION.  WHEN SHE ANNOUNCED THAT SHE WAS LEAVING, I

20   PLANNED A TRIP TO GO OUT THERE.  I TOOK ONE OF OUR

21   JUNIOR PEOPLE OUT THERE WITH ME, JUST TO GET A BETTER

22   HANDLE ON THE PORTFOLIO AND WHAT WAS GOING ON WITH IT.

23              FROM TAKING A LOOK AT THE PORTFOLIO,

24   SPENDING A COUPLE OF DAYS OUT THERE, LOOKING AT THE

25   FILES, TALKING TO THE OPERATIONAL PEOPLE, TALKING TO

1      MARIN, TALKING TO NATHAN I, QUITE FRANKLY, WAS A LITTLE

2      BIT CONCERNED WITH HOW CLOSE SOME OF OUR MANAGERS WERE

3      WITH HOW -- WITH THE ACTUAL OPERATORS OF THE PORTFOLIO.

4                      IN ADDITION, THERE WERE PARTS OF THEIR

5      PORTFOLIO THAT WERE CLEARLY PROBLEMS.  BUT A LOT OF

6      TIMES WHAT HAPPENS WITH LENDERS IS THAT THE

7      UNDERWRITERS, THE LENDERS CAN BE SO CLOSE TO A PROPERTY

8      OR SO CLOSE TO A PROJECT, THEY DON'T REALIZE THAT IT'S A

9      PROBLEM AND NEEDS TO BE ADDRESSED.

10     Q.     NOW, JUST SO WE ARE CLEAR, SPG PORTFOLIO, HAD

11     YOU HAD RESPONSIBILITY FOR MANAGING IT?

12     A.     YOU KNOW, IF YOU LOOK -- IT MIGHT HAVE BEEN

13     ANNOUNCED THAT IT WAS PART OF MY ASSET MANAGEMENT

14     FUNCTION, BUT, IN FACT, MARIN WAS A COMPLETE FREE AGENT

15     ON HER OWN.  SHE RAN THAT PORTFOLIO, AND SHE PROTECTED

16     THAT PORTFOLIO.  SO UP UNTIL THE TIME THAT SHE LEFT, I

17     DIDN'T HAVE ANY DAY-TO-DAY INTERACTION WITH ANYONE ON

18     THAT PORTFOLIO.

19     Q.     TO WHAT EXTENT HAD YOU BEEN RESPONSIBLE FOR

20     CREATING AND DEFENDING THE RISK RATINGS FOR THAT

21     PORTFOLIO?

22     A.     I HAD NOT HAD ANY RESPONSIBILITY, NOR DID I SIT

23     IN ON ANY OF THOSE MEETINGS.

24     Q.     WHO HAD DONE THAT UP UNTIL THE POINT --

25     A.     MARIN AND NATHAN PERRY.

1   Q.      OKAY.  NOW, AT SOME POINT DID YOU REALIZE THAT

2   YOU WERE GOING TO TAKE OVER THAT PORTFOLIO?

3   A.      YES, I DID.  WITH MARIN LEAVING AND WITH --

4   BECAUSE, AGAIN, MARIN REPORTED TO THE DENVER PEOPLE, AND

5   LIKE SO MANY THINGS IN LIFE, THINGS ARE POLITICAL, SO

6   FROM MY PERSPECTIVE MARIN WAS EXPERIENCED, SHE KNEW WHAT

7   SHE WAS DOING.  IF SHE WAS SIGNING OFF ON THOSE RISK

8   RATINGS AND FELT COMFORTABLE THAT THEY WERE ADEQUATELY

9   RISK RATED, I DEFERRED TO HER EXPERTISE OR COMPETENCE,

10  AFTER SEEING KIND OF WHAT WAS GOING ON OUT THERE, I DID

11  NOT FEEL AS COMFORTABLE AND KNEW THAT I NEEDED SOMEONE

12  WHO COULD SPEND MORE TIME LOOKING AT THE PORTFOLIO AND

13  FIGURING OUT WHETHER OR NOT THE RISK PROFILE WAS

14  ACCURATE.

15          MR. SALMANSON:  THERE IS A WHOLE SET OF

16  DOCUMENTS THAT ARE GOING TO BE INTRODUCED RELATED TO

17  THIS PORTFOLIO, AND I THINK BEFORE WE GET INTO THOSE, IT

18  MIGHT MAKE SENSE TO STOP RIGHT HERE.

19          THE COURT:  EXCELLENT.

20          LADY AND GENTLEMEN, WE ARE GOING TO

21  ADJOURN FOR THE DAY.  WE WILL RESUME TOMORROW MORNING AT

22  9:30.  PLEASE DO NOT TALK ABOUT THE CASE AMONG

23  YOURSELVES OR WITH OTHERS.  SEE YOU BACK AT 9:30

24  TOMORROW MORNING.  HAVE A GOOD EVENING.  YOU ARE

25  EXCUSED.

1                        WE ARE ADJOURNED FOR THE DAY, AND I WILL

2      SEE YOU BACK AND BE ON TIME.  9:30 TOMORROW MORNING, ALL

3      RIGHT.

4                        (COURT ADJOURNED AT 4:25 P.M.)

5

6                        I CERTIFY THAT THE FOREGOING IS A CORRECT

7      TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

8      ABOVE-ENTITLED MATTER.

9

10

11     DATE                         SUZANNE R. WHITE

12                                  OFFICIAL COURT REPORTER

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX

2

3

4     WITNESS                  DIRECT   CROSS    REDIRECT  RECROSS

5

6     WANDA SPEIGHT            39

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$100,000** [1] - 12:14
**$140,000** [3] - 77:23, 79:6, 82:8
**$165,000** [1] - 67:9
**$5,000** [1] - 77:25
**$500** [1] - 42:12
**$500,000** [2] - 12:13, 36:25
**$550** [1] - 46:11
**$600,000** [1] - 31:11

## 0

**07-CV-0890** [1] - 1:6

## 1

**1** [4] - 9:11, 33:5, 69:10, 75:2
**10** [3] - 9:14, 33:16, 56:21
**100** [4] - 44:12, 50:19, 55:1
**11** [2] - 9:9, 33:5
**12** [2] - 37:5, 69:10
**12:30** [1] - 9:10
**140,000** [2] - 77:16, 77:17
**15** [3] - 54:18, 56:21, 83:16
**15-MINUTE** [2] - 9:10, 9:14
**150** [1] - 50:19
**1500** [3] - 2:4, 2:4, 54:16
**15TH** [1] - 54:16
**16** [1] - 40:22
**165,000** [1] - 67:8
**1701** [1] - 2:8
**19102** [1] - 2:5
**19103** [1] - 2:9
**19106** [1] - 1:22
**1970S** [1] - 54:19
**1980S** [1] - 43:3
**1981** [1] - 3:13
**1983** [1] - 43:8
**1988** [1] - 41:7
**1990S** [1] - 54:19
**1997** [1] - 51:3
**1998** [5] - 12:3, 51:1, 52:22, 60:19, 60:25
**1999** [1] - 68:22
**1:00** [1] - 9:11
**1:30** [1] - 9:13
**1ST** [2] - 17:19, 29:9

## 2

**2** [4] - 10:25, 50:7,
63:23, 75:3
**20** [9] - 12:23, 27:4, 28:13, 30:23, 64:13, 64:14, 64:22, 83:16, 87:20
**2001** [1] - 65:9
**2002** [1] - 65:10
**2004** [7] - 60:25, 61:1, 61:11, 65:9, 67:25, 68:5, 69:5
**2005** [4] - 12:12, 68:5, 69:5, 75:10
**2006** [16] - 12:4, 12:9, 14:15, 17:19, 17:24, 27:11, 28:2, 29:9, 30:10, 34:15, 73:25, 76:2, 79:24, 80:12, 91:10, 91:11
**2009** [1] - 1:12
**215)627-1882** [1] - 1:22
**22** [1] - 42:5
**22ND** [1] - 33:19
**23** [2] - 1:12, 42:5
**23RD** [12] - 17:25, 18:13, 18:19, 19:19, 20:10, 21:14, 22:2, 22:12, 30:10, 32:9, 37:18, 38:4
**25** [2] - 64:6, 64:12
**25TH** [1] - 34:15
**26** [1] - 17:24
**26TH** [4] - 17:23, 32:10, 32:13, 38:5

## 3

**3** [1] - 9:14
**30** [1] - 53:25
**300** [1] - 64:3
**35** [2] - 34:16, 64:23
**350** [1] - 64:15
**39** [1] - 95:6

## 4

**4** [1] - 75:1
**40** [2] - 64:23, 89:7
**40,000** [1] - 76:7
**400** [2] - 64:3, 64:15
**42** [1] - 3:12
**420** [1] - 51:9
**425,000** [1] - 76:25
**45** [1] - 64:23
**4:25** [1] - 94:4
**4:30** [1] - 10:5
**4:35** [1] - 9:16

## 5

**5** [3] - 9:16, 31:11,
75:1
**50** [1] - 44:12
**500** [1] - 64:3
**51** [1] - 40:4
**5:00** [1] - 9:16

## 6

**6** [1] - 63:22
**60** [2] - 59:10, 69:12
**601** [1] - 1:21

## 7

**7** [2] - 61:19, 73:20
**75,000** [1] - 77:1
**78** [1] - 75:16

## 8

**8** [3] - 33:16, 61:19, 73:20

## 9

**90** [1] - 73:9
**9:30** [5] - 9:8, 11:1, 93:22, 93:23, 94:2

## A

**ABILITY** [5] - 6:12, 16:8, 57:5, 82:17, 88:3
**ABLE** [12] - 12:19, 20:11, 49:16, 50:6, 51:5, 51:13, 52:6, 68:10, 69:4, 78:23, 80:20, 89:10
**ABOVE-ENTITLED** [1] - 94:8
**ABRUPTLY** [1] - 11:19
**ACCEPTED** [1] - 55:8
**ACCESS** [1] - 71:1
**ACCOMMODATE** [1] - 9:21
**ACCORDING** [1] - 3:24
**ACCOUNT** [1] - 77:25
**ACCOUNTING** [1] - 42:2
**ACCURACY** [3] - 6:11, 13:16, 36:4
**ACCURATE** [4] - 6:25, 72:7, 73:7, 93:14
**ACCUSATION** [3] - 25:13, 25:17, 26:5
**ACCUSATIONS** [2] - 38:19, 38:20
**ACCUSED** [1] - 25:22
**ACQUIRE** [1] - 6:13
**ACQUISITION** [1] -
80:8
**ACRONYM** [5] - 15:5, 15:21, 44:4, 90:22, 90:25
**ACRONYMS** [2] - 12:19, 52:24
**ACTION** [1] - 1:3
**ACTIVE** [1] - 3:15
**ACTS** [1] - 25:20
**ACTUAL** [5] - 42:14, 71:7, 71:13, 79:5, 92:3
**ADD** [1] - 61:17
**ADDED** [1] - 34:24
**ADDITION** [4] - 8:14, 42:7, 42:9, 92:4
**ADDITIONAL** [4] - 47:15, 52:8, 62:4
**ADDITIONALLY** [1] - 44:2
**ADDRESSED** [2] - 10:18, 92:9
**ADEQUATELY** [3] - 22:8, 46:6, 93:8
**ADJACENT** [3] - 10:10, 49:5, 55:25
**ADJOURN** [1] - 93:21
**ADJOURNED** [2] - 94:1, 94:4
**ADJUSTMENT** [1] - 87:17
**ADMINISTRATION** [1] - 3:15
**ADMISSION** [1] - 5:2
**ADMIT** [3] - 20:9, 23:17, 73:18
**ADMITTED** [2] - 4:25, 5:7
**ADVANCE** [2] - 24:23, 33:9
**ADVANTAGE** [1] - 44:9
**ADVISE** [1] - 8:14
**ADVISED** [3] - 14:25, 16:1, 77:9
**AFFECTED** [2] - 51:13, 75:7
**AFFILIATE** [1] - 69:7
**AFFIRMATIVELY** [1] - 28:20
**AFFIRMS** [1] - 39:19
**AFRICAN** [2] - 12:2, 23:20
**AFRICAN-AMERICAN** [2] - 12:2, 23:20
**AFTERNOON** [9] - 3:6, 11:11, 11:22, 24:24, 25:11, 32:13, 39:25, 40:1, 56:21
**AGE** [2] - 40:3, 40:22
**AGENT** [1] - 92:14
**AGREE** [4] - 3:17, 12:1, 13:23, 81:15
**AGREED** [5] - 15:1, 17:1, 22:1, 36:20, 37:7
**AIDED** [1] - 1:25
**AIR** [1] - 17:17
**AIRY** [1] - 40:19
**ALDINGER** [2] - 1:8, 2:10
**ALLEGED** [1] - 19:16
**ALLEGES** [1] - 11:17
**ALLOW** [1] - 88:21
**ALLOWED** [2] - 44:8, 61:15
**ALLUDED** [2] - 80:2, 84:15
**ALMOST** [2] - 76:18, 78:20
**ALONE** [2] - 3:18, 5:19
**ALTERNATIVE** [1] - 71:2
**ALTOGETHER** [1] - 26:18
**AMERICAN** [3] - 12:2, 18:17, 23:20
**AMOUNT** [4] - 47:18, 47:19, 50:17, 71:5
**ANALYSIS** [5] - 53:17, 55:6, 70:25, 71:23, 72:9
**ANALYST** [4] - 41:16, 41:17, 61:16, 61:20
**ANALYSTS** [2] - 41:25, 42:1
**ANALYTICAL** [2] - 41:18, 55:4
**ANALYZE** [1] - 33:4
**ANALYZES** [1] - 41:15
**AND-A-HALF** [5] - 41:18, 44:15, 51:14, 63:23, 78:20
**ANIMOSITY** [1] - 6:6
**ANNIVERSARY** [1] - 77:3
**ANNOUNCED** [5] - 77:3, 90:18, 91:10, 91:19, 92:13
**ANNOUNCEMENT** [1] - 75:10, 90:19
**ANNOYED** [1] - 31:21
**ANNUAL** [2] - 65:17, 85:25
**ANSWER** [5] - 7:20, 37:1, 37:19, 78:9, 78:12
**ANSWERS** [1] - 57:6
**ANTICIPATE** [1] -

17:11
**AON** [1] - 77:9
**APART** [1] - 75:14
**APARTMENT** [2] -
54:15, 69:16
**APPARENT** [1] - 37:18
**APPEARANCES** [1] -
2:1
**APPEARED** [3] -
20:22, 22:13, 22:17
**APPLICATION** [2] -
55:6, 55:8
**APPLIED** [1] - 3:20
**APPLY** [2] - 4:1, 71:24
**APPOINTMENT** [2] -
52:18, 80:19
**APPRAISAL** [3] -
55:12, 56:9
**APPRAISALS** [1] -
56:11
**APPROPRIATE** [1] -
24:11
**APPROVE** [1] - 47:19
**AREA** [32] - 41:15,
42:11, 44:16, 44:19,
44:21, 44:22, 46:24,
47:1, 47:3, 47:21,
47:25, 48:2, 52:20,
52:24, 53:1, 53:4,
59:13, 59:22, 62:24,
63:2, 79:19, 80:5,
83:20, 83:21, 83:22,
83:23, 85:2, 86:18,
90:9, 90:15, 90:16
**AREAS** [2] - 9:18, 49:4
**ARENA** [2] - 51:11,
52:6
**ARGUMENT** [1] - 4:20
**ARGUMENTS** [2] -
4:21, 4:23
**ARKANSAS** [1] - 64:7
**ARMS** [1] - 31:18
**AROSE** [1] - 20:16
**ARRANGEMENT** [1] -
88:9
**ARRANGEMENTS** [1]
- 79:15
**ARRIVAL** [2] - 86:22,
87:8
**AS-COMPLETE** [1] -
56:11
**AS-IS** [1] - 56:10
**ASIDE** [2] - 13:17,
77:25
**ASPECTS** [6] - 70:12,
70:13, 70:14, 70:20,
73:4, 74:4
**ASSESSMENT** [5] -
34:4, 70:16, 72:8,
73:4, 81:16

**ASSET** [53] - 12:24,
13:5, 13:6, 14:21,
15:22, 16:2, 16:5,
17:6, 17:10, 17:12,
17:14, 18:24, 20:23,
21:17, 33:24, 34:5,
34:6, 34:11, 35:11,
58:4, 58:15, 58:19,
58:24, 59:22, 60:2,
61:14, 61:17, 61:19,
61:22, 62:25, 63:18,
64:17, 64:19, 65:5,
71:6, 71:8, 72:5,
80:3, 80:6, 84:21,
86:19, 87:14, 88:14,
88:22, 89:4, 89:19,
90:9, 90:19, 91:13,
92:13
**ASSETS** [6] - 18:18,
63:25, 64:17, 68:3,
68:14, 85:15
**ASSIGNED** [5] -
16:13, 17:9, 19:21,
34:1, 36:4
**ASSIGNMENTS** [1] -
19:22
**ASSIST** [1] - 63:6
**ASSISTANCE** [1] -
10:22
**ASSISTANT** [2] -
41:19, 41:23
**ASSUMED** [1] - 21:6
**ASSURE** [1] - 20:13
**ATTENDED** [2] - 21:2,
40:25
**ATTENDS** [1] - 18:20
**ATTENTION** [2] - 10:8,
24:23
**ATTENTIVE** [1] - 39:6
**ATTENTIVELY** [1] -
8:5
**ATTITUDE** [1] - 18:4
**ATTORNEY** [4] - 4:5,
4:7, 4:14, 77:8
**ATTORNEYS** [3] -
4:20, 4:21, 5:4
**ATTRACTING** [1] -
49:16
**ATTRACTIVE** [1] -
48:19
**AUDITORS** [1] - 13:23
**AUTHORITIES** [1] -
14:11
**AUTHORITY** [2] -
47:17, 78:21
**AUTOMATICALLY** [1]
- 83:1, 86:12
**AVERAGE** [1] - 63:22
**AWARD** [4] - 66:16,
66:19, 67:13, 77:1

**AWARDS** [4] - 67:1,
67:5, 67:8, 76:17
**AWARE** [3] - 36:2,
62:18, 67:20

# B

**BA** [1] - 41:1
**BACKGROUND** [2] -
26:22, 40:16
**BAD** [2] - 17:5, 73:14
**BAILIWICK** [3] - 86:4,
86:15, 86:24
**BALANCE** [10] - 7:3,
13:3, 13:4, 48:7,
51:21, 52:3, 53:4,
64:25, 65:3, 87:3
**BALANCED** [1] - 7:12
**BANG** [1] - 82:18
**BANK** [19] - 14:5,
41:13, 42:11, 42:18,
43:8, 43:9, 43:19,
43:21, 43:22, 43:23,
44:1, 44:6, 44:7,
44:25, 45:20, 46:15,
46:18, 52:1, 60:7
**BANKING** [4] - 41:15,
42:24, 43:19, 48:25
**BANKS** [11] - 2:7,
25:2, 25:4, 25:7,
25:10, 25:11, 39:11,
42:24, 43:3, 43:6,
50:22
**BAR** [8] - 8:21, 8:22
**BASE** [1] - 65:23
**BASED** [17] - 3:10,
22:11, 27:10, 33:6,
61:7, 61:8, 69:14,
69:24, 71:22, 71:24,
72:11, 82:1, 82:23,
84:4, 85:25, 89:18,
90:8
**BASIS** [13] - 11:18,
20:3, 45:21, 59:8,
59:14, 65:17, 69:24,
75:4, 82:14, 83:12,
83:13, 85:25, 88:5
**BAUKED** [1] - 21:12
**BEAR** [1] - 6:4
**BECAME** [3] - 14:7,
27:16, 42:3
**BECOME** [1] - 7:25
**BECOMES** [1] - 5:5
**BEG** [1] - 25:4
**BEGAN** [1] - 35:5
**BEGINNING** [4] -
21:24, 22:4, 38:9,
69:22
**BEGINS** [2] - 35:8,
35:24

**BEHAVIOR** [2] - 6:7,
23:25
**BEHIND** [2] - 26:1,
38:20
**BELIEVABLE** [1] - 6:2
**BENEFITS** [1] - 77:11
**BERGER** [5] - 19:8,
80:11, 82:4, 87:10,
87:22
**BERGER'S** [1] - 81:23
**BEST** [2] - 81:7, 87:1
**BETH** [2] - 74:1, 74:10
**BETTER** [11] - 23:8,
32:9, 48:7, 59:3,
59:4, 69:2, 70:9,
80:21, 84:19, 87:21,
91:21
**BETWEEN** [8] - 24:8,
42:14, 44:12, 59:23,
63:23, 64:15, 64:23,
84:24
**BIAS** [1] - 6:10
**BIG** [5] - 27:25, 28:1,
29:23, 30:9, 82:18
**BILLION** [4] - 27:5,
60:20, 63:22, 63:23
**BIT** [4] - 26:21, 40:16,
75:5, 92:2
**BLIGHTED** [1] - 49:3
**BLOWUP** [1] - 32:16
**BLUE** [2] - 29:22,
31:20
**BOARD** [5] - 29:18,
31:23, 37:14, 45:8,
52:12
**BOB** [2] - 78:2, 79:9
**BOCKIUS** [1] - 2:7
**BOND** [1] - 44:5
**BONDS** [1] - 44:7
**BONES** [1] - 84:7
**BONUS** [6] - 65:13,
65:22, 65:23, 65:25,
66:3, 66:4, 66:8,
66:10, 66:15, 76:17,
76:19, 76:23, 82:22,
82:23, 87:16
**BONUSES** [4] - 12:12,
27:2, 65:16, 65:17
**BORN** [4] - 40:18,
48:5, 48:17, 48:18
**BORROWER** [10] -
13:1, 13:6, 13:9,
13:19, 14:6, 14:13,
34:7, 55:7, 72:12
**BORROWERS** [4] -
13:8, 49:9, 50:22
**BORROWING** [1] -
27:25
**BOSS** [5] - 19:8,
22:16, 22:21, 33:22,

36:18
**BOSSES** [1] - 29:16
**BOTHERED** [2] - 30:7,
31:7
**BOTTOM** [1] - 67:24
**BOULEVARD** [1] - 2:4
**BOX** [1] - 11:1
**BREAD** [1] - 53:12
**BREADWINNER** [1] -
51:19
**BREAK** [8] - 9:10,
9:11, 9:14, 10:2,
56:21, 57:15, 57:19
**BREAKDOWN** [2] -
22:10, 35:3
**BRIDGE** [2] - 49:13,
53:1
**BRING** [4] - 4:17,
10:7, 28:15, 28:20,
31:23, 38:1, 63:5
**BRINGING** [3] - 28:19,
32:5, 45:25
**BROADEN** [1] - 49:17
**BROKE** [1] - 32:14
**BROUGHT** [7] - 28:12,
28:13, 28:25, 31:10,
31:12, 36:19, 36:20
**BUDGET** [4] - 36:22,
42:10, 42:12, 42:15
**BUICK** [1] - 61:5
**BUILDERS** [1] - 32:24
**BUILDING** [19] -
54:16, 54:17, 54:18,
54:24, 54:25, 55:3,
55:16, 56:2, 56:18,
69:16, 69:18, 72:14,
73:9, 73:15, 83:8,
83:9
**BUILDINGS** [4] -
54:13, 54:14, 54:15,
69:20
**BUILT** [1] - 54:19
**BUNDLED** [1] - 65:2
**BURDEN** [2] - 6:19,
6:21
**BUSINESS** [16] -
27:16, 42:18, 42:20,
42:22, 43:20, 45:7,
45:19, 47:7, 49:18,
49:19, 50:5, 50:8,
67:20, 79:3, 88:21,
88:23
**BUSINESSES** [2] -
28:1, 33:13
**BUTTER** [1] - 53:12
**BUY** [5] - 69:25,
75:22, 75:23, 75:25
**BUYING** [2] - 75:13,
75:16

# C

**C-2** [7] - 61:2, 61:7, 61:18, 62:1, 63:3, 63:13, 65:11
**CADILLAC** [1] - 68:8
**CAFETERIA** [1] - 74:25
**CALIFORNIA** [1] - 54:1
**CALM** [2] - 33:23, 34:9
**CALVIN** [5] - 40:10, 40:14, 48:17, 51:18, 51:23
**CAMDEN** [2] - 49:8, 49:12
**CAMEL'S** [1] - 32:14
**CANADA** [2] - 20:24, 33:14
**CANADIAN** [8] - 17:8, 20:17, 33:12, 35:8, 89:1, 89:5, 89:8
**CANDIDATE** [1] - 89:16
**CANNOT** [1] - 36:3
**CAP** [1] - 71:24
**CAPABILITIES** [1] - 63:3
**CAPABLE** [3] - 7:8, 28:17, 31:23
**CAPITAL** [3] - 69:4, 71:1, 91:18
**CAPMARK** [28] - 1:7, 2:10, 3:9, 11:17, 12:18, 14:6, 14:7, 14:8, 14:9, 14:12, 14:17, 25:12, 25:14, 25:18, 25:20, 27:6, 27:16, 27:24, 28:24, 33:13, 35:17, 37:5, 38:18, 67:2, 69:7, 75:6, 82:12, 85:5
**CAPMARK'S** [1] - 14:14
**CAPTURE** [1] - 69:4
**CAPTURED** [2] - 60:9, 60:15
**CAR** [2] - 61:4, 67:21
**CARE** [1] - 81:9
**CAREER** [3] - 11:19, 48:7, 78:21
**CAREFUL** [2] - 13:7, 15:25
**CARLISLE** [1] - 41:1
**CAROLINAS** [1] - 54:2
**CARP** [10] - 15:8, 15:10, 22:20, 34:18, 84:4, 84:11, 84:24, 85:1, 90:11, 90:13
**CARP'S** [3] - 21:18,

86:4, 86:15
**CASE** [16] - 3:7, 4:1, 4:6, 6:6, 6:7, 6:17, 8:8, 8:12, 9:22, 10:20, 11:3, 11:14, 25:17, 45:16, 56:24, 93:22
**CASES** [2] - 6:18, 11:25
**CASH** [7] - 42:23, 67:23, 70:8, 70:18, 71:6, 76:19, 77:17
**CATCH** [1] - 9:20
**CATEGORIES** [1] - 69:19
**CAUSED** [1] - 37:17
**CC** [1] - 34:21
**CC'D** [1] - 22:22
**CDFI** [2] - 50:4, 50:7
**CENTER** [8] - 2:3, 32:23, 43:22, 51:10, 54:18, 55:22, 69:17
**CENTERS** [1] - 54:13
**CERTAIN** [9] - 3:23, 5:7, 8:19, 19:21, 47:19, 58:13, 68:10, 75:21, 88:24
**CERTAINLY** [1] - 25:15
**CERTAINTY** [1] - 91:9
**CERTIFIED** [1] - 1:20
**CERTIFY** [1] - 94:6
**CHALLENGING** [1] - 52:7
**CHAMBERS** [1] - 9:1
**CHANCE** [2] - 20:15, 39:4
**CHANGE** [9] - 27:12, 27:19, 30:1, 58:21, 60:13, 65:12, 75:6, 79:21, 82:11
**CHANGED** [7] - 14:15, 14:17, 24:11, 24:15, 27:11, 47:22, 47:23
**CHANGES** [3] - 90:15, 91:6, 91:8
**CHANGING** [1] - 83:19
**CHARGE** [2] - 12:15, 63:18
**CHARGED** [1] - 70:4
**CHECKING** [1] - 45:14
**CHEMICAL** [9] - 43:8, 43:9, 43:21, 44:6, 44:13, 44:14, 44:25, 46:12, 46:15
**CHICAGO** [1] - 54:1
**CHIEF** [1] - 74:6
**CHILD** [1] - 48:5
**CHILDREN** [2] - 40:12, 51:22

**CHILDREN'S** [1] - 67:14
**CHIP** [1] - 29:22
**CIRCUMSTANCES** [2] - 23:15, 66:9
**CITY** [3] - 43:3, 46:21, 89:18
**CIVIL** [3] - 1:3, 3:7, 6:18
**CIVILIZATION** [1] - 32:16
**CLAIM** [1] - 3:10
**CLAIMED** [1] - 20:1
**CLAIMING** [1] - 23:22
**CLAIMS** [2] - 18:7, 19:9
**CLARE** [3] - 18:21, 22:21, 33:25
**CLASSES** [1] - 42:2
**CLEAR** [5] - 8:6, 21:2, 26:18, 74:14, 92:10
**CLEARLY** [2] - 62:23, 92:5
**CLERK** [3] - 3:1, 10:8, 39:16
**CLEVELAND** [1] - 55:23
**CLIENT** [2] - 20:25, 57:4
**CLIENTS** [7] - 34:22, 34:24, 35:6, 35:7, 35:15, 35:20, 36:2
**CLOSE** [10] - 50:19, 53:24, 55:1, 62:25, 79:3, 80:4, 89:7, 92:2, 92:7, 92:8
**CLOSED** [2] - 56:3, 79:23
**CLOSELY** [1] - 49:21, 68:21
**CLOSING** [1] - 4:20, 39:6
**CM** [4] - 1:20, 13:25, 14:7, 14:16
**CMSA** [1] - 86:1
**CO** [1] - 26:10
**CO-WORKERS** [1] - 26:10
**COADY** [2] - 74:1, 74:18
**CODE** [3] - 3:12, 68:8, 69:15
**COINCIDED** [1] - 76:16
**COLLABORATIVE** [1] - 63:13
**COLLECT** [1] - 85:21
**COLLECTED** [1] - 85:24
**COLLECTING** [3] -

14:10, 45:23, 45:24
**COLLECTION** [1] - 60:21
**COLLEGE** [7] - 40:16, 40:24, 40:25, 41:11, 41:12, 67:14, 67:16
**COLOR** [4] - 6:10, 23:22, 24:20, 26:7
**COLORADO** [1] - 15:24
**COMBINE** [2] - 28:6, 61:10
**COMBINED** [5] - 12:12, 63:8, 63:10, 63:11, 65:5
**COMBINING** [1] - 30:14
**COMFORTABLE** [3] - 55:15, 93:8, 93:11
**COMING** [3] - 72:14, 73:13, 79:23
**COMMENTED** [1] - 31:2
**COMMERCIAL** [10] - 27:15, 28:1, 41:15, 42:10, 47:8, 48:1, 52:16, 52:22, 63:13, 75:17
**COMMITMENT** [3] - 18:4, 19:14, 79:6
**COMMITTED** [3] - 3:14, 19:15, 28:18
**COMMITTEE** [2] - 80:13, 80:14
**COMMUNICATION** [1] - 18:4
**COMMUNICATIONS** [2] - 22:9, 35:3
**COMMUNITY** [2] - 48:10, 50:21
**COMMUTING** [1] - 46:16
**COMPANIES** [9] - 42:23, 43:19, 43:25, 44:8, 61:4, 67:21, 67:23, 77:10, 85:19
**COMPANY** [43] - 12:3, 13:1, 13:4, 13:9, 14:18, 16:7, 18:2, 18:12, 23:13, 23:25, 25:18, 25:20, 25:21, 27:12, 27:14, 29:13, 29:23, 29:24, 46:17, 61:2, 66:25, 67:11, 67:12, 67:18, 68:1, 74:10, 75:6, 75:8, 75:22, 75:23, 75:25, 76:8, 76:21, 77:5, 77:16, 78:19, 79:1, 79:15, 80:16, 82:9,

82:10, 83:18, 91:11
**COMPANY'S** [6] - 12:24, 13:4, 13:5, 13:22, 23:16, 23:22
**COMPARE** [3] - 71:9, 71:18, 77:23
**COMPARED** [2] - 42:15, 72:1
**COMPENSATED** [4] - 65:14, 82:20, 82:21, 87:21
**COMPENSATION** [10] - 26:25, 30:4, 36:21, 65:24, 66:17, 77:10, 81:8, 82:5, 82:7, 82:11
**COMPETED** [1] - 61:5
**COMPETENCE** [1] - 93:9
**COMPLAINING** [1] - 29:11
**COMPLETE** [2] - 56:11, 92:14
**COMPLETED** [1] - 34:3
**COMPLETELY** [1] - 26:5
**COMPLEX** [5] - 15:6, 15:24, 62:3, 62:7, 91:14
**COMPONENT** [2] - 66:1, 71:7
**COMPONENTS** [1] - 66:1
**COMPUTER** [2] - 1:25, 1:25
**COMPUTER-AIDED** [1] - 1:25
**CONCEPT** [1] - 15:1
**CONCERN** [3] - 5:8, 9:3, 62:17
**CONCERNED** [8] - 6:7, 16:8, 18:7, 22:7, 30:6, 30:24, 36:18, 92:2
**CONCERNING** [1] - 6:14
**CONCERNS** [7] - 18:3, 18:12, 19:16, 19:18, 62:9, 62:11, 82:6
**CONCLUDE** [2] - 23:19, 24:17
**CONCLUDED** [3] - 19:23, 24:7, 30:4
**CONCLUDES** [1] - 11:7
**CONCLUSION** [1] - 20:4
**CONDUCT** [2] - 26:17,

37:18
**CONDUCTED** [2] - 3:23, 4:14
**CONDUCTING** [1] - 45:13
**CONFERENCE** [1] - 8:23
**CONFERENCES** [2] - 8:20, 9:4
**CONFIDENT** [3] - 36:3, 37:23, 38:20
**CONFUSED** [2] - 7:25, 22:13
**CONJUNCTION** [1] - 86:20
**CONNECTED** [1] - 8:8
**CONS** [2] - 76:13, 78:3
**CONSEQUENTLY** [2] - 35:10, 43:24
**CONSIDER** [3] - 5:10, 5:21, 58:17
**CONSIDERATION** [2] - 4:24, 5:8
**CONSIDERED** [5] - 5:1, 65:6, 67:23, 68:4, 76:4
**CONSIDERING** [1] - 7:7
**CONSISTED** [1] - 64:9
**CONSISTENCY** [1] - 6:15
**CONSISTENT** [4] - 23:16, 46:2, 47:16, 59:14
**CONSISTENTLY** [1] - 12:7
**CONSTITUTED** [1] - 24:1
**CONSTRUCTION** [3] - 45:21, 47:7, 54:22
**CONSTRUCTIVE** [1] - 33:23
**CONSULTANT** [1] - 77:7
**CONSULTANTS** [1] - 69:1
**CONSULTED** [1] - 78:2
**CONSULTING** [1] - 77:9
**CONTACT** [1] - 16:22
**CONTACTS** [2] - 48:14, 52:13
**CONTEMPORARIES** [1] - 34:19
**CONTEND** [3] - 18:2, 23:6, 23:25
**CONTENTION** [2] - 6:21, 6:23
**CONTENTIONS** [1] -

6:19
**CONTINGENT** [8] - 66:16, 66:19, 67:1, 67:5, 67:8, 67:13, 77:1, 77:2
**CONTINUE** [6] - 34:6, 34:13, 37:13, 51:6, 51:20, 57:17
**CONTINUED** [2] - 17:17, 89:4
**CONTINUES** [1] - 35:10
**CONTRADICTED** [1] - 21:13
**CONTRARY** [1] - 33:18
**CONTRIBUTE** [2] - 31:12, 90:1
**CONTRIBUTED** [1] - 67:24
**CONTRIBUTOR** [1] - 87:24
**CONVERSATIONS** [1] - 77:14
**COOPERATION** [1] - 20:1
**COPIES** [1] - 59:17
**CORPORATE** [2] - 41:13, 48:24
**CORPORATION** [1] - 91:19
**CORPORATIONS** [1] - 43:13
**CORRECT** [9] - 63:9, 63:16, 63:19, 63:20, 64:16, 67:10, 67:11, 87:9, 94:6
**COUNSEL** [12] - 4:15, 7:16, 8:14, 8:18, 8:23, 8:25, 11:2, 11:9, 24:25, 39:9, 57:4, 57:25
**COUNSELING** [1] - 23:17
**COUNT** [1] - 31:19
**COUNTIES** [2] - 49:5, 49:6
**COUNTRY** [3] - 45:22, 53:24, 53:25
**COUNTY** [1] - 9:19
**COUPLE** [5] - 29:20, 30:13, 47:12, 77:6, 91:24
**COURSE** [4] - 3:21, 10:6, 37:21, 38:23
**COURT** [29] - 1:1, 3:2, 3:5, 5:2, 7:18, 8:4, 9:8, 10:11, 10:14, 10:16, 11:12, 24:25, 25:3, 25:5, 25:9,

39:9, 39:13, 56:20, 57:3, 57:9, 57:13, 57:16, 57:21, 78:5, 78:7, 78:12, 93:19, 94:4, 94:12
**COURT'S** [1] - 11:7
**COURTHOUSE** [1] - 1:21
**COURTROOM** [6] - 7:18, 8:21, 8:25, 38:24, 40:7, 57:22
**COVER** [3] - 16:18, 67:16, 69:5
**COVERAGE** [1] - 71:19
**COVERED** [4] - 16:19, 17:4, 20:19, 22:8
**COWS** [1] - 67:23
**CPA** [1] - 77:8
**CREATE** [1] - 8:17
**CREATING** [1] - 92:20
**CREDIBILITY** [1] - 5:25
**CREDIBLE** [1] - 23:24
**CREDIT** [25] - 13:14, 13:15, 13:21, 22:22, 22:25, 36:1, 41:14, 41:16, 41:17, 41:20, 41:24, 42:25, 44:7, 49:13, 68:21, 69:8, 71:11, 73:3, 73:19, 73:22, 74:1, 74:2, 74:8, 74:22, 83:23
**CRITERIA** [1] - 86:1
**CRITICAL** [2] - 13:24, 91:4
**CRITICIZED** [1] - 12:6
**CRM** [1] - 20:24
**CRM'S** [2] - 21:8, 21:10
**CROSS** [2] - 4:15, 95:4
**CROSS-EXAMINED** [1] - 4:15
**CROSSED** [2] - 31:18, 37:9
**CRUTCH** [1] - 54:6
**CURRENT** [1] - 70:3
**CURTIS** [1] - 1:14
**CUT** [2] - 29:25, 80:1

**D**

**DAILY** [1] - 34:7
**DALLAS** [2] - 84:4, 90:12
**DATA** [4] - 69:13, 69:24, 71:24, 73:6
**DATE** [3] - 60:11, 60:13, 94:11
**DELIBERATE** [2] -

**DAUGHTER** [1] - 40:12
**DAY-TO-DAY** [3] - 83:12, 83:13, 92:17
**DAYCARE** [2] - 49:23, 49:24
**DAYS** [9] - 17:24, 17:25, 22:4, 34:10, 38:8, 59:10, 75:3, 82:3, 91:24
**DEAL** [3] - 9:4, 33:9, 87:25
**DEALS** [1] - 75:14
**DEBT** [1] - 71:18
**DECADE** [2] - 67:22, 68:25
**DECIDE** [7] - 4:23, 5:6, 13:16, 30:15, 33:5, 76:9, 84:22
**DECIDED** [7] - 21:2, 27:18, 28:20, 38:1, 52:5, 65:19, 80:15
**DECIDES** [1] - 22:14
**DECISION** [4] - 25:23, 25:24, 28:5, 51:19
**DECISION-MAKERS** [1] - 25:23
**DECISIONS** [1] - 21:14
**DEDICATED** [1] - 28:18
**DEEM** [1] - 5:4
**DEFAULT** [2] - 13:10, 13:18
**DEFAULTED** [1] - 14:13
**DEFEND** [2] - 13:20, 36:5
**DEFENDANT** [8] - 1:9, 2:10, 3:9, 3:10, 4:10, 7:7, 7:11, 7:13
**DEFENDANT'S** [1] - 4:7
**DEFENDING** [1] - 92:20
**DEFENSE** [1] - 4:8
**DEFERRED** [8] - 66:2, 66:4, 66:8, 66:10, 66:15, 66:17, 77:1, 93:9
**DEFINING** [1] - 71:12
**DEFINITELY** [3] - 62:18, 83:13, 87:24
**DEGREE** [3] - 7:9, 41:6, 41:7
**DEGREES** [1] - 41:3
**DELAWARE** [5] - 43:4, 43:6, 44:25, 46:15, 48:9

7:16, 7:24
**DELIBERATELY** [2] - 34:23, 37:2
**DELIBERATIONS** [1] - 8:11
**DELIGHTED** [1] - 61:25
**DELINQUENCIES** [1] - 45:5
**DELINQUENCY** [1] - 59:5
**DEMANDING** [1] - 72:22
**DEMEANOR** [1] - 6:9
**DEMONSTRATE** [1] - 20:2
**DEMONSTRATED** [1] - 57:5
**DENOMINATED** [1] - 16:15
**DENVER** [5] - 15:22, 16:9, 91:2, 91:18, 93:4
**DEPARTMENT** [20] - 13:15, 13:22, 14:3, 14:22, 22:23, 22:25, 28:3, 28:4, 29:2, 31:10, 36:1, 41:20, 68:21, 69:8, 71:11, 73:3, 73:19, 73:22, 82:20
**DEPARTMENT'S** [1] - 13:21
**DEPARTMENTS** [4] - 12:25, 13:25, 14:2, 32:6
**DEPOSIT** [2] - 55:9, 55:10
**DEPUTY** [1] - 10:8
**DESCRIBE** [4] - 42:6, 68:16, 90:23, 91:16
**DESCRIBED** [1] - 80:14
**DESCRIPTION** [2] - 80:24, 81:3
**DESPITE** [1] - 34:10
**DETAIL** [1] - 68:15
**DETAILED** [2] - 30:13, 85:11
**DETAILS** [2] - 81:1, 84:10
**DETECTORS** [1] - 10:25
**DETERIORATION** [3] - 45:8, 66:7, 66:14
**DETERMINATION** [2] - 6:3, 6:4
**DETERMINE** [4] - 3:18, 5:17, 11:23, 69:9

**DETERMINING** [1] -
5:1
**DETRIMENTAL** [1] -
73:11
**DEVELOP** [4] - 3:16,
69:1, 69:8
**DEVELOPED** [3] -
4:17, 60:5, 63:3
**DEVELOPER** [1] -
56:14
**DEVELOPERS** [4] -
32:24, 47:3, 53:5,
53:20
**DEVELOPING** [2] -
60:4, 68:22
**DEVELOPMENT** [1] -
60:2
**DEVELOPS** [1] - 49:8
**DIARY** [1] - 18:11
**DICKINSON** [1] -
40:25
**DIFFERENCE** [1] -
59:23
**DIFFERENCES** [2] -
62:24, 84:24
**DIFFERENT** [9] -
18:23, 24:4, 28:4,
50:19, 62:20, 62:23,
69:13, 69:21, 70:14
**DIRE** [2] - 11:13, 14:7
**DIRECT** [5] - 4:13,
39:23, 74:6, 74:21,
95:4
**DIRECTLY** [2] - 19:7,
27:25
**DIRECTOR** [2] -
50:13, 91:7
**DIRECTORS** [1] - 45:8
**DISAGREE** [1] - 81:15
**DISCIPLINE** [2] - 32:1,
38:5
**DISCIPLINED** [2] -
12:6, 20:11
**DISCREPANCIES** [1] -
42:14
**DISCRETIONARY** [1]
- 82:22
**DISCRIMINATED** [1] -
11:18
**DISCRIMINATION** [3]
- 3:11, 25:13, 25:22
**DISCUSS** [3] - 8:7,
8:12, 87:10
**DISCUSSION** [1] -
33:16
**DISMAYED** [1] - 30:24
**DISPUTE** [1] - 32:8
**DISTRACTED** [1] -
78:10
**DISTRESS** [2] - 16:12,

85:3
**DISTRESSED** [2] -
86:9, 90:9
**DISTRICT** [2] - 1:1, 1:2
**DIVIDING** [1] - 30:16
**DIVORCED** [1] - 62:13
**DOCUMENT** [5] -
18:9, 19:16, 60:9,
79:16, 79:17
**DOCUMENTED** [1] -
24:3
**DOCUMENTS** [1] -
93:16
**DOLLAR** [2] - 47:19,
50:17
**DOLLARS** [4] - 27:3,
27:5, 32:23, 60:20
**DONE** [11] - 13:24,
22:3, 24:6, 33:24,
34:12, 50:5, 56:5,
62:4, 86:7, 87:5,
92:24
**DOOLEY** [3] - 18:21,
22:21, 34:18
**DOOR** [1] - 9:2
**DOORS** [1] - 75:2
**DOWN** [10] - 20:12,
25:5, 35:5, 37:11,
39:1, 43:6, 54:2,
64:13, 75:2, 82:17
**DOWNSTAIRS** [1] -
10:25
**DOWNTURN** [1] - 48:1
**DRAMATICALLY** [1] -
50:9
**DRESSING** [1] - 35:5
**DREXEL** [1] - 41:4
**DRIVE** [1] - 83:10
**DUE** [1] - 4:24
**DUMB** [1] - 32:18
**DURING** [14] - 3:19,
4:25, 5:4, 10:2, 10:6,
18:8, 38:23, 45:11,
47:25, 57:15, 58:4,
67:1, 72:25, 74:18
**DUTIES** [1] - 4:4
**DUTY** [3] - 3:17, 3:22,
5:6

---

**E**

**E-MAIL** [31] - 11:20,
11:21, 11:24, 18:10,
21:15, 21:24, 22:14,
22:15, 23:2, 23:4,
23:6, 23:8, 23:9,
23:12, 26:15, 32:16,
33:14, 33:23, 34:17,
34:19, 34:25, 35:1,
36:12, 36:17, 36:24,

37:7, 37:17, 68:7,
76:3, 82:2
**E-MAILED** [1] - 79:9
**E-MAILS** [10] - 20:22,
21:22, 29:8, 30:2,
31:3, 33:16, 37:22,
38:13, 74:20, 79:10
**EAGLES** [1] - 2:8
**EARLY** [7] - 14:15,
43:3, 65:9, 67:22,
68:25, 76:2, 91:10
**EARMARKED** [1] -
67:14
**EARN** [2] - 32:6, 52:7
**EARNED** [1] - 27:2
**EASEL** [1] - 26:1
**EASTERN** [1] - 1:2
**EASY** [2] - 46:19,
74:24
**ECONOMIC** [2] - 51:2,
69:4
**ECONOMICALLY** [1] -
49:3
**ECONOMICS** [1] -
41:2
**ED** [1] - 18:21
**EDUCATION** [1] -
67:15
**EDWARDS** [1] - 89:13
**EFFECT** [1] - 84:7
**EFFICIENCY** [3] -
61:10, 80:13, 90:20
**EFFICIENT** [4] -
15:16, 27:19, 28:7,
59:2
**EFFICIENTLY** [2] -
10:21, 14:19
**EGREGIOUS** [3] -
23:15, 24:1, 24:7
**EIGHT** [4] - 26:24,
27:7, 28:24, 35:7
**EITHER** [9] - 16:6,
21:17, 29:16, 56:18,
74:20, 85:7, 87:10,
91:7, 91:10
**ELEMENTARY** [1] -
40:20
**ELEMENTS** [1] - 72:4
**ELEVATOR** [1] - 39:1
**EMBARRASS** [1] -
34:23
**EMPLOY** [1] - 37:13
**EMPLOYEE** [3] -
26:25, 76:4, 77:10
**EMPLOYEES** [2] -
23:14, 27:4
**EMPLOYERS** [1] -
52:14
**EMPLOYMENT** [8] -
3:12, 25:24, 27:2,

37:6, 37:15, 38:6,
41:10, 82:12
**END** [10] - 4:19, 9:15,
10:3, 14:24, 23:10,
24:16, 27:9, 31:8,
38:16, 79:23
**ENDEAVORED** [1] -
9:23
**ENDED** [13] - 11:19,
15:18, 37:15, 43:8,
44:23, 44:25, 48:1,
49:20, 51:2, 52:19,
69:9, 73:10, 88:12
**ENGAGED** [2] - 16:25,
49:3
**ENGINEERING** [3] -
55:14, 55:17, 56:8
**ENGLAND** [1] - 54:1
**ENTAIL** [1] - 47:14
**ENTER** [1] - 57:22
**ENTIRE** [3] - 16:8,
18:17, 28:3
**ENTIRELY** [1] - 15:22
**ENTITIES** [4] - 43:14,
85:6, 85:19, 87:4
**ENTITLE** [1] - 6:20
**ENTITLED** [3] - 5:23,
66:18, 94:8
**ENTITY** [2] - 14:5,
75:16
**ENTRY** [2] - 18:11,
41:14
**ENVIRONMENT** [3] -
48:6, 48:24, 62:7
**ENVIRONMENTAL** [5]
- 55:13, 55:18,
55:19, 56:6, 56:8
**EQUALLY** [1] - 7:12
**EQUITY** [1] - 76:3
**ESCROW** [1] - 14:11
**ESPECIALLY** [2] -
23:12, 68:3
**ESQUIRE** [4] - 2:2,
2:3, 2:7, 2:8
**ESSENTIALLY** [4] -
15:15, 44:4, 61:8,
89:6
**ESTABLISH** [1] -
59:21
**ESTABLISHED** [1] -
6:22
**ESTABLISHES** [2] -
6:23, 24:18
**ESTATE** [28] - 15:4,
17:22, 18:24, 21:18,
22:19, 44:16, 44:17,
44:18, 44:21, 44:22,
44:24, 45:1, 45:3,
46:24, 46:25, 47:3,
47:5, 47:8, 47:21,

47:25, 52:20, 69:25,
85:2, 85:13, 86:13,
86:18, 89:18, 90:12
**EVALUATE** [1] - 76:13
**EVALUATION** [1] -
35:12
**EVENING** [1] - 93:24
**EVENT** [1] - 13:18
**EVENTUALLY** [1] -
50:11
**EVIDENCE** [27] - 3:19,
3:25, 4:9, 4:11, 4:12,
4:19, 4:22, 4:24,
4:25, 5:2, 5:7, 6:17,
6:23, 6:24, 7:5, 7:6,
7:8, 8:9, 19:2, 19:21,
20:6, 20:7, 21:9,
24:19, 31:24, 38:9
**EXAMINATION** [2] -
4:13, 39:23
**EXAMINED** [1] - 4:15
**EXAMPLE** [11] - 12:2,
23:24, 49:6, 50:3,
54:15, 55:20, 59:15,
64:5, 66:13, 68:6,
71:13
**EXAMPLES** [1] - 64:8
**EXCELLED** [1] - 41:18
**EXCELLENT** [2] -
89:16, 93:19
**EXCEPT** [2] - 23:15,
38:24
**EXCESS** [3] - 12:14,
64:3, 64:12
**EXCITING** [1] - 88:19
**EXCUSE** [2] - 78:5,
91:14
**EXCUSED** [2] - 57:1,
93:25
**EXERCISE** [1] - 77:21
**EXHIBITS** [1] - 5:10
**EXIST** [1] - 20:1
**EXISTING** [3] - 42:16,
58:9, 71:22
**EXPECT** [3] - 11:2,
23:24, 81:18
**EXPECTANCY** [1] -
69:3
**EXPECTED** [1] - 36:4
**EXPENSES** [1] - 80:1
**EXPENSIVE** [1] -
28:17
**EXPERIENCE** [9] -
10:12, 36:6, 41:22,
42:17, 58:22, 72:6,
72:10, 87:7, 89:19
**EXPERIENCED** [4] -
28:18, 72:20, 91:12,
93:6
**EXPERTISE** [1] - 93:9

**EXPIRATION** [1] - 60:11
**EXPIRED** [1] - 59:19
**EXPIRING** [1] - 59:10
**EXPLAIN** [4] - 45:12, 68:10, 68:11, 73:8
**EXPLAINED** [2] - 68:19, 83:17
**EXPLANATIONS** [1] - 24:13
**EXPOSE** [1] - 41:15
**EXPOSURE** [2] - 44:17, 62:6
**EXPRESSION** [2] - 84:9, 91:15
**EXTENSIVE** [1] - 72:10
**EXTENT** [16] - 47:10, 50:1, 53:10, 55:7, 58:4, 60:1, 62:8, 62:20, 66:6, 66:18, 75:18, 81:15, 82:6, 86:3, 86:22, 92:19
**EXTREMELY** [6] - 22:7, 48:19, 50:2, 59:2, 72:24, 91:12

## F

**FABULOUS** [1] - 89:19
**FACE** [1] - 81:17
**FACILITIES** [3] - 49:21, 50:5, 50:8
**FACT** [13] - 17:1, 18:6, 18:14, 20:4, 21:12, 21:19, 24:4, 77:4, 77:15, 83:4, 84:14, 89:2, 92:14
**FACTOR** [3] - 27:9, 60:14
**FACTORS** [1] - 6:3
**FACTS** [14] - 3:16, 3:18, 3:20, 4:17, 5:1, 5:17, 5:18, 5:20, 25:16, 38:19, 38:21, 39:7, 60:12
**FAIL** [1] - 7:20
**FAIR** [3] - 6:22, 6:24, 39:7
**FAIRLY** [5] - 5:23, 46:19, 72:10, 75:3, 89:6
**FALLS** [1] - 34:15
**FAMILIAR** [3] - 46:4, 48:2, 63:2
**FAMILIES** [2] - 62:14, 62:15
**FAMILY** [3] - 40:18, 48:7, 52:8

**FANNIE** [2] - 52:14, 85:24
**FAR** [3] - 9:18, 32:16, 74:23
**FAVOR** [3] - 7:9, 7:11, 38:18
**FAVORABLE** [2] - 7:5, 7:7
**FAX** [1] - 18:11
**FEBRUARY** [5] - 1:12, 65:21, 76:2, 87:13, 91:10
**FEDERAL** [2] - 1:20, 50:3
**FEE** [1] - 14:12
**FELDMAN** [1] - 10:12
**FELL** [1] - 75:14
**FELT** [4] - 19:14, 55:14, 88:20, 93:8
**FEW** [5] - 16:12, 16:14, 22:4, 34:10, 38:8
**FIDELITY** [14] - 41:13, 42:11, 43:1, 43:2, 46:18, 46:20, 46:22, 47:11, 47:12, 47:20, 47:21, 47:23, 48:4
**FIGURE** [8] - 17:20, 18:25, 20:12, 54:9, 76:21, 79:25, 81:8, 84:19
**FIGURING** [2] - 77:12, 93:13
**FILES** [2] - 24:4, 91:25
**FINAL** [2] - 8:10, 69:10
**FINALLY** [2] - 18:14, 75:11
**FINANCE** [4] - 1:7, 2:10, 41:5, 52:25, 58:3, 67:23
**FINANCIAL** [13] - 3:9, 33:5, 43:13, 45:23, 45:25, 50:23, 54:7, 54:8, 55:5, 70:15, 70:22, 85:24
**FINANCIALS** [1] - 71:9
**FINANCING** [6] - 44:2, 44:5, 44:7, 53:10, 53:11, 54:23
**FINDERS** [1] - 5:19
**FINDINGS** [1] - 5:14
**FINE** [1] - 52:2
**FINISH** [1] - 73:23
**FINISHED** [2] - 4:10, 78:9
**FINITE** [1] - 82:25
**FINKENSTAEDT** [6] - 18:21, 21:1, 21:11, 22:11, 22:16, 34:17

**FINKENSTAEDT'S** [1] - 33:20
**FIRE** [3] - 32:9, 51:12, 59:16
**FIRE-PROOFING** [1] - 51:12
**FIRED** [6] - 11:25, 23:2, 23:5, 23:9, 23:13, 23:21
**FIRES** [1] - 34:16
**FIRST** [24] - 1:21, 4:5, 4:10, 15:3, 30:17, 32:20, 33:1, 36:15, 38:10, 39:10, 40:18, 41:10, 41:12, 41:22, 42:3, 47:23, 50:6, 55:20, 59:4, 60:19, 61:14, 65:20, 73:25, 90:25
**FIT** [1] - 69:19
**FIVE** [7] - 43:2, 44:14, 60:11, 70:14, 77:20, 78:25, 82:17
**FIVE-YEAR** [2] - 77:20, 78:25
**FLAWLESS** [1] - 12:5
**FLEXIBILITY** [1] - 48:20
**FLIGHT** [1] - 28:17
**FLIP** [1] - 56:18
**FLOOR** [1] - 1:21
**FLORIDA** [2] - 54:2, 64:7
**FLOW** [3] - 70:8, 70:18, 71:6
**FLYING** [1] - 75:21
**FOCUS** [1] - 51:20
**FOGLE** [2] - 32:11, 79:17
**FOLKS** [1] - 15:2
**FOLLOW** [4] - 3:9, 19:21, 59:22, 67:20, 81:23
**FOLLOW-UP** [1] - 19:21
**FOLLOWED** [1] - 43:7
**FOOT** [1] - 55:21
**FOR-PROFIT** [2] - 49:24, 52:6
**FORECLOSE** [1] - 85:12
**FOREGOING** [1] - 94:6
**FORM** [3] - 60:5, 60:15, 80:21
**FORMAL** [2] - 16:1, 50:11
**FORMALLY** [3] - 17:18, 17:24, 18:15
**FORMED** [2] - 15:3,

15:6
**FORMER** [2] - 19:8, 35:10
**FORTH** [2] - 33:21, 79:11
**FORWARD** [1] - 17:17
**FOUR** [8] - 18:22, 30:12, 33:2, 33:15, 44:15, 47:25, 48:12, 49:5
**FOURTH** [1] - 75:9
**FRANKLY** [15] - 41:21, 50:20, 59:1, 59:12, 60:6, 62:2, 62:5, 63:1, 65:18, 66:3, 67:21, 69:12, 70:7, 86:17, 92:1
**FREDDY** [1] - 85:24
**FREE** [2] - 44:4, 92:14
**FREQUENTLY** [1] - 74:20
**FRESHMAN** [1] - 40:14
**FRIDAY** [1] - 82:3
**FRIENDS** [1] - 91:17
**FRIENDSHIP** [1] - 6:6
**FRONT** [4] - 27:22, 30:19, 35:6, 37:20
**FULL** [12] - 27:1, 39:16, 41:8, 53:17, 88:2, 88:3, 88:5, 88:7, 88:8, 88:11, 88:12, 89:13
**FULL-TIME** [3] - 88:5, 88:12, 89:13
**FULLY** [3] - 4:17, 12:9, 16:25
**FUNCTION** [12] - 17:11, 17:15, 58:16, 58:18, 58:20, 58:25, 61:15, 65:6, 66:12, 80:3, 84:21, 92:14
**FUNCTIONALITIES** [1] - 34:1
**FUNCTIONS** [9] - 12:16, 14:1, 15:14, 17:12, 42:6, 42:8, 58:5, 58:7, 80:3
**FUND** [17] - 48:9, 48:10, 48:11, 48:13, 48:17, 48:22, 49:15, 49:19, 50:7, 50:10, 50:12, 50:25, 51:1, 51:18, 51:25, 52:13
**FUNDING** [4] - 49:13, 49:14, 49:15, 50:4
**FUNKY** [1] - 91:15
**FUTURE** [2] - 66:5, 73:14

## G

**GAGAN** [6] - 17:6, 88:15, 88:16, 89:2, 89:16
**GAINING** [1] - 42:18
**GASKET** [1] - 31:20
**GASOLINE** [1] - 56:2
**GENERAL** [3] - 4:2, 14:3, 74:8
**GENERALLY** [4] - 14:8, 65:18, 83:12
**GENERATING** [2] - 47:7, 71:5
**GENEROUS** [1] - 30:5
**GENTLEMEN** [10] - 3:6, 5:21, 7:3, 9:7, 10:19, 11:12, 56:23, 57:21, 93:20
**GENTLY** [1] - 63:5
**GERMANTOWN** [3] - 40:21, 49:22, 49:23
**GIRLS** [1] - 40:23
**GIVEN** [14] - 4:23, 32:18, 36:5, 50:13, 52:16, 70:9, 72:17, 75:22, 76:1, 76:6, 76:16, 77:18, 78:21, 80:23
**GLOBAL** [4] - 14:2, 15:1, 15:4, 16:17
**GM** [6] - 14:12, 27:14, 27:15, 61:3, 68:2
**GMAC** [17] - 11:19, 13:25, 14:7, 14:16, 27:15, 52:15, 52:22, 53:1, 53:23, 58:22, 60:18, 61:3, 67:23, 68:20, 75:16, 76:3, 85:5
**GMAC'S** [3] - 53:5, 53:12, 59:24
**GOLDMAN** [1] - 75:15
**GOLDSHAW** [3] - 2:2, 2:3, 11:15
**GOSH** [1] - 74:23
**GOVERN** [1] - 5:2
**GOVERNMENT** [1] - 50:3
**GR0UP** [1] - 15:14
**GRADUATED** [2] - 40:22, 41:12
**GRANTS** [1] - 50:6
**GRATIFYING** [1] - 50:2
**GREAT** [3] - 29:4, 75:20, 90:4
**GREW** [3] - 40:15, 60:18, 78:21
**GROUP** [66] - 12:17,

12:21, 12:22, 12:23, 12:24, 14:21, 15:3, 15:10, 15:18, 15:22, 16:12, 16:13, 17:7, 17:18, 17:21, 19:5, 19:7, 21:4, 21:6, 21:17, 21:18, 21:19, 21:22, 22:3, 27:24, 28:3, 28:12, 28:13, 28:16, 29:1, 29:8, 30:22, 31:3, 31:6, 32:5, 33:3, 33:18, 33:20, 33:24, 34:11, 34:20, 35:9, 36:7, 36:20, 37:1, 38:2, 45:16, 52:25, 53:15, 58:3, 63:8, 63:10, 63:11, 63:12, 63:14, 63:19, 68:9, 68:17, 69:6, 75:14, 79:22, 82:21, 83:17, 84:22, 91:1

**GROUPS** [5] - 28:6, 34:2, 62:9, 62:11, 68:6

**GROW** [1] - 79:1

**GROWING** [2] - 60:23, 61:17

**GROWTH** [1] - 78:24

**GUARANTOR** [2] - 70:16, 70:25

**GUY** [5] - 28:9, 32:11, 36:19, 88:15, 89:12

# H

**HALF** [7] - 27:3, 34:15, 41:18, 44:15, 51:14, 63:23, 78:20

**HALL** [1] - 9:2

**HAND** [2] - 7:21, 22:1

**HANDED** [1] - 79:17

**HANDLE** [3] - 15:6, 85:13, 91:22

**HANDLED** [5] - 15:7, 85:3, 85:12, 85:17, 86:18

**HANDLING** [4] - 21:23, 21:25, 22:10, 85:16

**HANDS** [1] - 49:10

**HANDS-ON** [1] - 49:10

**HANDSOMELY** [1] - 12:10

**HAPPY** [2] - 62:4, 77:12

**HARD** [1] - 12:9

**HEAD** [12] - 12:20, 15:1, 15:7, 16:17, 22:25, 28:9, 35:25, 37:3, 39:1, 54:5,

61:25, 63:7

**HEADED** [5] - 52:24, 61:23, 85:1, 90:8, 90:12

**HEADHUNTERS** [1] - 43:5

**HEAR** [24] - 7:20, 12:18, 13:2, 13:13, 14:3, 15:5, 16:15, 18:6, 26:3, 26:9, 26:10, 26:11, 26:13, 26:15, 27:21, 28:8, 28:10, 28:22, 29:7, 30:3, 35:25, 38:11, 38:12, 84:20

**HEARD** [4] - 14:7, 72:15, 75:14, 90:21

**HEARING** [3] - 8:19, 8:23, 9:5

**HEAT** [3] - 56:1, 56:2

**HEAVY** [1] - 85:11

**HELD** [1] - 13:2

**HELP** [14] - 8:4, 10:22, 17:2, 17:10, 20:21, 29:2, 32:3, 32:5, 38:4, 44:1, 69:1, 76:13, 81:13

**HELPED** [4] - 42:1, 60:7, 69:7, 69:8

**HIGH** [7] - 29:15, 29:16, 40:13, 40:14, 40:21, 40:23, 83:19

**HIGHER** [3] - 56:17, 81:13, 86:12

**HIGHEST** [1] - 37:5

**HIGHLY** [1] - 19:3

**HIMSELF** [1] - 21:23

**HINT** [1] - 18:1

**HIRE** [5] - 16:18, 61:15, 88:2, 88:4, 89:10

**HIRED** [5] - 14:6, 14:9, 63:1, 89:2, 89:12

**HIRING** [4] - 87:25, 89:15, 89:21, 89:23

**HISTORY** [3] - 23:12, 26:23, 41:10

**HOE** [2] - 74:7, 74:14

**HOE'S** [1] - 75:2

**HOHENLEITNER** [5] - 22:24, 35:25, 73:25, 74:15, 74:18

**HOLDING** [1] - 43:19

**HOLDUP** [1] - 24:15

**HOME** [1] - 9:20

**HONOR** [2] - 39:12, 57:8

**HONORABLE** [1] - 1:14

**HOPE** [8] - 12:10,

25:15, 35:16, 38:10, 38:11, 38:12, 38:14, 39:3

**HOPEFULLY** [1] - 12:19

**HORSHAM** [10] - 53:22, 61:8, 62:24, 62:25, 74:22, 82:2, 83:6, 84:5, 90:8

**HOTEL** [1] - 32:24

**HOUR** [2] - 9:12, 34:15

**HOURS** [3] - 30:13, 87:19, 87:20

**HOUSED** [1] - 60:22

**HOUSING** [3] - 49:7, 49:8, 49:11

**HR** [1] - 79:18

**HUGE** [2] - 50:18, 69:11

**HUMAN** [7] - 20:5, 32:2, 32:11, 37:4, 37:11, 38:3, 79:18

**HUMILIATE** [1] - 34:24

**HURT** [1] - 51:5

**HUSBAND** [2] - 40:7, 51:2

# I

**I.E** [1] - 21:18

**IDEA** [3] - 29:5, 53:3, 80:21

**IDEAS** [2] - 14:19, 31:12

**IDENTIFY** [3] - 55:17, 55:18, 76:13

**IDENTIFYING** [2] - 34:1, 72:11

**IFG** [14] - 52:25, 53:15, 59:23, 60:16, 60:17, 60:19, 61:1, 61:18, 62:4, 63:12, 63:22, 65:11, 66:1

**III** [2] - 1:8, 2:10

**IMMEDIATELY** [5] - 4:7, 7:21, 19:22, 36:16, 66:2

**IMPACT** [3] - 50:20, 66:8, 70:20

**IMPORTANT** [3] - 5:19, 28:9, 36:10

**IMPORTANTLY** [2] - 45:19, 65:13

**IMPRESSED** [1] - 62:1

**IMPROPER** [1] - 35:22

**INAPPROPRIATE** [1] - 23:7

**INC** [3] - 1:7, 2:10, 3:9

**INCIDENT** [2] - 12:5,

51:14

**INCLUDE** [3] - 55:12, 55:13

**INCLUDED** [6] - 43:15, 60:10, 70:14, 74:4, 74:12, 75:15

**INCLUDING** [4] - 35:6, 35:7, 35:15, 52:14

**INCOME** [7] - 51:24, 52:4, 52:8, 54:10, 71:24

**INCONSISTENCY** [1] - 6:15

**INCONVENIENCE** [1] - 11:4

**INCREASED** [2] - 50:9, 65:14

**INCREASES** [1] - 27:8

**INCREDIBLY** [1] - 23:7

**INDEED** [2] - 21:21, 21:23

**INDEPENDENTLY** [1] - 62:12

**INDEX** [1] - 95:1

**INDIANA** [1] - 43:15

**INDICATED** [2] - 33:6, 61:2

**INDICATION** [2] - 5:14, 5:16

**INDIFFERENT** [3] - 29:12, 29:19

**INDIVIDUAL** [8] - 15:8, 15:11, 16:22, 17:6, 21:5, 64:3, 89:13, 91:12

**INDIVIDUALS** [12] - 12:23, 17:10, 18:21, 19:7, 20:24, 35:11, 41:22, 61:13, 73:21, 77:10, 86:4, 91:3

**INDUSTRIAL** [2] - 54:14, 69:18

**INDUSTRY** [3] - 48:25, 69:25, 71:24

**INFORMATION** [3] - 4:17, 27:22, 70:1

**INHALED** [1] - 51:12

**INITIAL** [3] - 36:12, 44:16, 87:11

**INITIATIVE** [2] - 63:13, 90:20

**INJURY** [1] - 51:7

**INNOCENTLY** [1] - 8:16

**INPUT** [3] - 20:14, 70:1, 71:16

**INPUTTING** [1] - 72:3

**INSTANCES** [2] - 59:20

**INSTANT** [1] - 18:10

**INSTANTLY** [1] - 19:23

**INSTEAD** [2] - 16:22, 87:25

**INSTITUTIONS** [2] - 43:13, 50:23

**INSTRUCT** [1] - 3:24

**INSTRUCTION** [2] - 11:8, 38:17

**INSTRUCTIONS** [1] - 8:10

**INSUBORDINATE** [3] - 23:7, 37:2, 37:20

**INSUBORDINATION** [1] - 24:1

**INSURANCE** [9] - 42:23, 59:7, 59:8, 59:9, 59:17, 59:18, 59:19, 85:18, 85:23

**INTEGRAL** [1] - 60:3

**INTEGRATE** [1] - 62:10

**INTEGRATION** [1] - 16:1

**INTERACT** [2] - 74:13, 74:17

**INTERACTION** [3] - 34:7, 73:18, 92:17

**INTERACTIONS** [1] - 81:19

**INTEREST** [7] - 6:5, 14:18, 44:9, 45:4, 60:12, 60:13, 85:22

**INTERESTED** [1] - 43:5

**INTERESTING** [1] - 50:17

**INTERIM** [1] - 53:10

**INTERMEDIATE** [2] - 52:25, 58:3

**INTERNALLY** [1] - 13:22

**INTERRUPT** [1] - 10:5

**INTERVIEWS** [1] - 52:19

**INTRICACIES** [1] - 74:12

**INTRODUCED** [1] - 93:16

**INTRODUCES** [1] - 4:9

**INTUITIVE** [1] - 73:16

**INVEST** [1] - 76:20

**INVESTED** [1] - 77:16

**INVESTING** [1] - 47:4

**INVESTMENT** [23] - 31:22, 76:10, 76:11, 76:12, 76:14, 77:4, 77:13, 77:15, 77:18,

77:22, 77:23, 77:24, 78:1, 78:4, 78:16, 78:25, 79:11, 79:17, 79:20, 82:8, 82:12, 82:16, 83:21
**INVESTOR** [3] - 56:14, 68:6, 75:11
**INVESTORS** [12] - 14:16, 14:17, 47:4, 49:16, 53:5, 68:9, 68:13, 75:13, 75:15, 75:23, 76:3, 79:23
**INVOLVED** [2] - 27:2, 52:12
**IRA** [1] - 77:25
**IRB'S** [1] - 44:3
**IRRELEVANT** [9] - 28:23, 28:24, 28:25, 37:24, 37:25, 38:1, 38:2, 38:5
**ISSUE** [10] - 6:21, 6:22, 15:9, 15:12, 26:17, 44:6, 55:6, 56:6, 88:1, 88:2
**ISSUES** [3] - 5:17, 9:4, 37:6
**ITSELF** [2] - 72:23, 74:7

## J

**J-A-M-E-S** [1] - 39:21
**JAMES** [3] - 1:3, 3:8, 39:21
**JANUARY** [2] - 65:19, 83:2
**JERSEY** [1] - 49:6
**JOB** [19] - 11:23, 26:23, 41:10, 41:13, 41:25, 42:6, 43:18, 46:14, 46:16, 46:20, 46:22, 50:1, 51:5, 52:10, 75:7, 78:17, 79:21, 80:23, 81:2
**JOBS** [1] - 15:13
**JOE** [8] - 35:24, 36:2, 73:25, 74:7, 74:14, 75:2
**JOE'S** [1] - 49:7
**JOHN** [5] - 2:4, 58:8, 58:17, 59:1, 60:6
**JOINED** [2] - 12:3, 43:10, 43:11
**JOINING** [4] - 43:6, 43:8, 48:17, 83:17
**JON** [2] - 32:11, 79:17
**JONES** [3] - 77:7, 77:15, 78:2
**JOYNER** [2] - 1:14, 38:22

**JR** [2] - 40:14, 48:18
**JUDGE** [6] - 3:22, 25:15, 38:16, 38:22, 39:7
**JUDGED** [1] - 27:10
**JUDGMENT** [1] - 5:23
**JUNE** [1] - 41:7
**JUNIOR** [2] - 40:21, 91:21
**JUNK** [1] - 36:9
**JURISDICTION** [1] - 21:1
**JUROR** [1] - 3:14
**JURORS** [2] - 3:18, 11:23
**JURY** [19] - 1:16, 3:3, 3:4, 3:7, 7:14, 7:23, 8:7, 8:11, 8:24, 10:10, 11:1, 11:12, 25:11, 39:8, 45:12, 57:2, 57:20, 74:14, 90:24
**JUSTICE** [1] - 3:16

## K

**KEEP** [3] - 12:19, 32:25, 57:12
**KEEPING** [2] - 13:7, 66:22
**KELLER** [2] - 58:8, 58:17
**KENNEDY** [1] - 2:4
**KENTUCKY** [1] - 43:15
**KEPT** [1] - 60:23
**KEY** [3] - 17:6, 76:4, 91:4
**KIDS** [3] - 40:11, 45:16
**KIND** [36] - 8:4, 42:15, 43:18, 45:14, 45:15, 48:23, 58:11, 60:21, 61:5, 61:16, 62:6, 62:16, 62:18, 63:4, 63:5, 66:22, 67:14, 68:11, 69:4, 69:23, 70:14, 70:21, 71:22, 74:2, 75:21, 78:3, 81:17, 82:18, 83:18, 84:6, 84:20, 85:15, 85:20, 93:10
**KINDS** [1] - 28:4
**KKR** [1] - 75:15
**KLIGMAN** [1] - 87:23
**KNOWING** [2] - 31:3, 42:23
**KNOWLEDGE** [8] - 6:13, 35:19, 36:5, 57:5, 74:11, 86:3,

87:1, 87:6
**KNOWN** [8] - 8:19, 8:21, 12:23, 14:2, 15:4, 17:8, 20:24, 27:15

## L

**LACK** [1] - 36:5
**LADIES** [1] - 3:5
**LADY** [9] - 3:6, 5:21, 7:2, 9:7, 10:19, 11:12, 56:23, 57:21, 93:20
**LAID** [1] - 51:9
**LANCASTER** [1] - 9:19
**LAND** [1] - 71:5
**LANE** [1] - 40:22
**LARGE** [11] - 45:1, 46:8, 50:15, 55:21, 63:17, 63:21, 71:5, 76:11, 78:1, 78:15, 89:6
**LARGER** [2] - 43:22, 43:25
**LARGEST** [2] - 32:15, 60:11
**LARRY** [1] - 87:23
**LAST** [6] - 12:12, 27:1, 35:22, 39:21, 80:12, 83:14
**LASTED** [1] - 30:13
**LATE** [4] - 54:19, 65:9, 73:1, 91:10
**LAUERMAN** [14] - 16:23, 17:1, 17:9, 20:20, 21:3, 21:23, 22:10, 22:18, 33:19, 34:18, 90:5, 90:7, 90:10, 90:11
**LAUERMAN'S** [6] - 16:25, 20:19, 21:19, 21:22, 22:21, 33:18
**LAW** [5] - 3:20, 3:24, 3:25, 5:3, 9:5
**LAWSUIT** [2] - 11:16, 24:3
**LEAD** [2] - 32:5, 36:1
**LEADERSHIP** [1] - 37:14
**LEADING** [1] - 40:16
**LEARN** [1] - 75:7
**LEARNED** [1] - 15:17
**LEARNING** [1] - 24:2
**LEASE** [6] - 56:16, 56:17, 70:9, 72:13, 72:14, 72:17
**LEASED** [4] - 53:8, 55:1, 73:9

**LEASES** [2] - 60:12, 71:22
**LEASING** [2] - 54:25, 73:15
**LEAST** [10] - 17:3, 23:17, 24:20, 57:4, 61:20, 65:25, 69:12, 73:24, 89:25, 90:9
**LEAVE** [7] - 46:12, 47:20, 48:4, 48:18, 50:25, 66:24, 67:12
**LEAVING** [4] - 88:12, 91:11, 91:19, 93:3
**LEFT** [8] - 17:6, 46:7, 46:17, 46:18, 51:1, 58:2, 67:11, 92:16
**LEFTOVER** [1] - 16:14
**LEGAL** [1] - 43:22
**LEND** [6] - 16:23, 43:24, 49:9, 50:24, 53:3, 53:4
**LENDER** [2] - 44:23, 48:15
**LENDERS** [3] - 14:4, 92:6, 92:7
**LENDING** [31] - 12:17, 12:22, 14:5, 27:23, 42:11, 42:19, 43:12, 43:22, 44:17, 46:24, 47:1, 48:2, 49:17, 49:20, 49:21, 49:22, 50:5, 50:6, 50:7, 50:8, 50:9, 50:14, 50:20, 56:12, 60:8, 62:2, 62:3, 63:12, 63:14, 63:19, 83:22
**LENGTHY** [1] - 33:14
**LENT** [3] - 13:1, 49:2, 49:12
**LESS** [2] - 29:21, 30:7
**LETTER** [1] - 44:6
**LETTING** [1] - 10:8
**LEVEL** [8] - 19:25, 37:5, 41:14, 47:17, 74:2, 81:13, 83:19
**LEWIS** [1] - 2:7
**LIE** [1] - 24:17
**LIFE** [3] - 11:5, 85:18, 93:5
**LIGHT** [1] - 6:16
**LIMIT** [2] - 43:22, 57:6
**LIMITED** [1] - 81:21
**LINDA** [2] - 25:25, 32:12
**LINE** [4] - 37:9, 67:24, 71:10, 73:23
**LINES** [1] - 49:13
**LIPSON** [37] - 14:25, 16:16, 16:21, 18:3, 18:7, 23:3, 26:1,

26:2, 26:3, 28:10, 28:11, 28:15, 28:25, 29:4, 29:14, 31:11, 35:22, 36:18, 36:19, 36:23, 37:3, 38:1, 82:20, 80:20, 81:2, 81:20, 81:24, 83:3, 83:7, 83:11, 84:15, 87:11, 89:22, 89:23, 90:13, 90:17
**LIPSON'S** [1] - 24:13
**LISA** [4] - 87:15, 88:6, 89:10
**LIST** [4] - 9:24, 30:14, 85:10, 86:11
**LISTED** [2] - 10:1, 10:4
**LISTEN** [2] - 8:4, 38:11
**LISTING** [1] - 60:10
**LLP** [1] - 2:7
**LOAN** [31] - 15:20, 16:9, 16:10, 20:18, 33:1, 33:4, 33:7, 44:1, 45:13, 46:2, 48:9, 48:11, 48:13, 48:23, 49:1, 49:15, 53:9, 54:9, 54:10, 54:22, 56:3, 56:19, 60:10, 61:7, 64:6, 69:22, 70:11, 70:20, 72:1, 73:10, 85:13
**LOAN'S** [1] - 70:17
**LOANING** [1] - 32:23
**LOANS** [113] - 12:25, 13:2, 13:3, 13:14, 13:19, 14:4, 15:6, 15:19, 15:21, 15:24, 16:9, 16:12, 16:14, 16:15, 16:16, 16:18, 16:19, 17:2, 17:4, 17:7, 17:13, 18:17, 20:23, 21:3, 21:5, 21:6, 21:20, 21:23, 21:25, 22:8, 22:11, 22:13, 22:18, 22:20, 22:24, 27:5, 27:24, 28:1, 28:4, 28:5, 28:6, 29:24, 30:24, 32:25, 33:12, 33:13, 34:12, 35:8, 35:9, 35:18, 36:3, 42:21, 42:25, 43:20, 44:9, 45:1, 45:3, 45:17, 45:18, 45:21, 45:22, 46:5, 47:7, 47:8, 47:19, 50:15, 50:18, 50:19, 53:1, 53:2, 55:20, 59:24, 60:21, 64:3, 64:4, 64:15,

64:19, 64:22, 64:23, 64:25, 68:4, 71:3, 85:3, 85:6, 85:7, 85:8, 85:10, 85:17, 85:19, 85:21, 86:6, 86:7, 86:9, 86:10, 86:12, 86:15, 86:17, 87:3, 87:5, 88:25, 89:1, 89:5, 89:6, 89:7, 89:9, 91:1, 91:14
**LOCAL** [1] - 51:9
**LOCATED** [10] - 9:1, 10:10, 45:22, 53:22, 53:23, 53:25, 55:22, 64:7, 69:14, 74:23
**LOCATION** [1] - 68:10
**LOGICAL** [1] - 73:16
**LONGER-TERM** [1] - 53:11
**LOOK** [15] - 33:4, 38:18, 46:1, 54:9, 59:8, 70:3, 70:4, 70:7, 70:8, 70:18, 72:1, 73:5, 91:23, 92:12
**LOOKED** [7] - 9:17, 36:23, 42:13, 54:4, 54:6, 76:12, 82:11
**LOOKING** [6] - 58:8, 59:6, 70:16, 88:12, 91:24, 93:12
**LOOKS** [1] - 71:7
**LOSE** [2] - 66:10, 67:13
**LOSS** [3] - 69:3, 69:5, 70:11
**LOST** [6] - 14:14, 16:5, 16:20, 67:6, 67:7, 67:9
**LOVED** [3] - 78:17, 78:18
**LOVES** [1] - 12:18
**LOW** [3] - 44:9, 64:22, 74:2
**LOW-LEVEL** [1] - 74:2
**LOWER** [1] - 52:1
**LUMP** [1] - 67:15
**LUNCH** [5] - 9:11, 9:12, 10:2, 25:19
**LUNGS** [1] - 51:12
**LUXURY** [1] - 9:25

## M

**MAE** [2] - 52:14, 85:24
**MAIL** [31] - 11:20, 11:21, 11:24, 18:10, 21:15, 21:24, 22:14, 22:15, 23:2, 23:4,

23:6, 23:8, 23:9, 23:12, 26:15, 32:16, 33:14, 33:23, 34:17, 34:19, 34:25, 35:1, 36:12, 36:17, 36:24, 37:7, 37:17, 68:7, 76:3, 82:2
**MAILED** [1] - 79:9
**MAILS** [10] - 20:22, 21:22, 29:8, 30:2, 31:3, 33:16, 37:22, 38:13, 74:20, 79:10
**MAIN** [1] - 74:1
**MAINTAINED** [1] - 74:21
**MAJORED** [1] - 41:4
**MAKERS** [1] - 25:23
**MANAGE** [1] - 17:2
**MANAGED** [9] - 12:24, 15:22, 17:7, 27:6, 27:24, 28:4, 35:9, 89:8, 91:3
**MANAGEMENT** [40] - 12:16, 15:25, 16:3, 17:10, 17:12, 17:14, 18:11, 21:17, 29:13, 33:24, 34:5, 34:6, 34:11, 35:11, 35:17, 42:7, 42:9, 42:12, 42:24, 45:2, 58:5, 58:16, 58:19, 58:25, 59:22, 60:2, 61:15, 65:5, 75:24, 80:3, 80:6, 84:21, 88:22, 89:19, 90:19, 91:13, 91:18, 92:13
**MANAGER** [16] - 17:6, 26:12, 28:17, 28:18, 31:11, 41:24, 42:4, 43:13, 44:23, 44:24, 58:7, 61:17, 71:8, 87:14, 89:4
**MANAGERS** [22] - 12:24, 13:7, 14:21, 16:6, 18:24, 20:24, 20:25, 24:20, 41:19, 41:23, 58:8, 61:19, 61:23, 62:25, 64:18, 64:19, 72:5, 75:21, 80:11, 86:19, 88:15, 92:2
**MANAGING** [10] - 27:4, 28:6, 36:7, 41:22, 63:18, 85:6, 88:24, 89:1, 91:7, 92:11
**MANNER** [1] - 6:9
**MARCH** [4] - 14:24, 79:24, 80:12, 91:10
**MARIN** [8] - 91:5,

91:6, 92:1, 92:14, 92:25, 93:3, 93:4, 93:6
**MARK** [8] - 15:12, 26:11, 28:11, 35:2, 38:2, 38:12, 84:4, 84:11
**MARKET** [13] - 1:21, 2:8, 43:25, 54:16, 65:3, 69:24, 69:25, 70:1, 70:3, 70:5, 70:7, 70:10, 73:14
**MARKETS** [1] - 71:1
**MARLA** [8] - 19:8, 80:11, 81:4, 82:1, 87:13, 87:22, 89:20
**MARRIAGES** [1] - 75:12
**MARRIED** [2] - 40:5, 46:13
**MATERIAL** [1] - 51:12
**MATERIALS** [1] - 79:8
**MATERNITY** [1] - 48:18
**MATTER** [4] - 5:25, 19:12, 25:14, 94:8
**MATTERS** [4] - 6:14, 8:19, 9:5, 11:5
**MATURITIES** [1] - 71:4
**MATURITY** [1] - 60:13
**MAUREEN** [2] - 74:5, 74:9
**MBA** [1] - 41:4
**MCCOOL** [45] - 15:12, 17:19, 17:25, 18:2, 18:20, 19:4, 19:13, 19:18, 19:23, 20:3, 20:7, 20:9, 21:25, 22:16, 24:7, 26:11, 28:11, 29:14, 30:10, 30:20, 31:4, 31:5, 31:9, 31:20, 31:24, 32:11, 33:22, 34:17, 34:24, 35:2, 35:5, 35:13, 35:21, 36:9, 36:11, 37:11, 38:3, 38:12, 84:5, 84:11, 84:25, 85:15, 85:17, 86:21, 87:6
**MCCOOL'S** [2] - 34:16, 37:19
**MCCRACKEN** [2] - 63:2, 63:3
**MCMANUS** [2] - 52:17, 58:16
**MCNEIL** [1] - 64:5
**MEAN** [7] - 43:17, 45:13, 53:17, 62:14, 65:7, 73:4, 84:8

**MEANING** [3] - 21:17, 49:21, 54:9
**MEANT** [5] - 45:3, 47:6, 51:9, 71:8, 77:19
**MEANTIME** [1] - 15:17
**MEASURED** [3] - 33:23, 34:9, 36:11
**MEAT** [1] - 84:6
**MEDICAL** [1] - 69:20
**MEET** [8] - 20:12, 32:12, 36:14, 53:20, 60:8, 83:4, 84:17, 84:18
**MEETING** [37] - 14:25, 18:20, 18:22, 18:23, 19:2, 19:4, 19:13, 19:19, 19:20, 19:24, 20:10, 20:15, 21:2, 21:14, 22:2, 22:12, 22:17, 24:5, 30:11, 30:12, 30:17, 31:9, 31:21, 32:10, 37:10, 37:21, 38:4, 45:7, 45:18, 68:6, 68:8, 75:3, 82:2, 83:14, 84:2, 84:3
**MEETINGS** [3] - 74:21, 87:11, 92:23
**MEGAN** [1] - 40:13
**MEMBER** [1] - 32:4
**MEMBERS** [7] - 7:14, 8:7, 25:11, 30:23, 39:7, 52:12, 90:23
**MEMO** [7] - 18:10, 19:16, 19:17, 19:18, 20:4, 25:6, 34:16
**MEMORIES** [1] - 7:17
**MEMORY** [1] - 6:12
**MENARDE** [2] - 74:5, 74:18
**MENTION** [5] - 6:3, 65:7, 85:10, 86:11, 90:22
**MENTIONED** [4] - 22:5, 68:15, 68:18, 82:4
**MERELY** [1] - 19:24
**MERGE** [1] - 61:24
**MERGED** [3] - 61:1, 61:25, 90:16
**MERGER** [6] - 61:12, 61:18, 61:21, 61:22, 65:8, 65:11
**MERGERS** [1] - 47:24
**MERGING** [4] - 62:11, 62:14, 62:15
**MESSAGE** [1] - 18:10
**MET** [7] - 10:23, 17:19, 48:12, 63:6, 80:11,

81:25, 89:20
**METAL** [1] - 10:24
**MICHAEL** [12] - 2:2, 2:7, 2:8, 15:8, 15:10, 21:18, 22:20, 25:11, 84:4, 84:11, 85:1, 90:11
**MICHIGAN** [1] - 43:15
**MICKIE** [2] - 3:2, 10:9
**MID** [2] - 18:15, 43:8
**MIDDLE** [1] - 43:24
**MIDWEST** [2] - 43:14, 43:23
**MIGHT** [9] - 6:4, 6:10, 54:19, 59:15, 75:22, 82:15, 90:5, 92:12, 93:18
**MIKE** [16] - 11:14, 14:25, 26:1, 28:10, 28:11, 36:18, 38:12, 80:20, 81:18, 83:6, 83:7, 84:15, 89:22, 89:23, 90:17
**MIKES** [1] - 11:14
**MILE** [1] - 83:9
**MILLION** [7] - 27:3, 42:12, 44:12, 46:11, 50:7, 55:21
**MILLION-PLUS** [1] - 55:21
**MILLIONS** [1] - 32:23
**MIND** [1] - 37:8
**MINDS** [1] - 8:6
**MINOR** [2] - 53:7
**MINUTE** [1] - 51:17
**MINUTES** [4] - 34:16, 56:22, 57:4, 83:16
**MISINTERPRETED** [1] - 8:17
**MISS** [91] - 3:2, 10:9, 10:12, 10:13, 11:17, 12:1, 12:3, 12:15, 12:22, 13:11, 13:20, 14:21, 14:24, 15:9, 15:17, 15:25, 16:5, 16:10, 16:21, 17:1, 17:3, 17:7, 17:19, 17:23, 18:3, 18:8, 18:13, 18:14, 18:20, 19:5, 19:6, 19:10, 19:14, 19:19, 19:20, 19:24, 20:10, 20:18, 21:5, 22:7, 23:4, 23:12, 23:18, 23:20, 23:25, 24:3, 24:19, 25:24, 26:6, 26:11, 26:12, 26:13, 26:19, 26:25, 27:22, 28:2, 28:13, 28:15, 28:21, 28:22, 29:2, 29:6,

29:11, 30:3, 30:11,
30:20, 30:25, 31:22,
32:4, 32:13, 32:20,
33:3, 33:22, 34:23,
35:14, 37:3, 37:8,
37:12, 37:22, 38:4,
38:6, 38:10, 38:14,
39:25, 58:2, 74:18,
78:9, 81:23, 82:4,
87:10

**MISSED** [1] - 7:22

**MODEL** [10] - 69:9,
69:23, 70:7, 70:12,
70:13, 71:17, 73:12,
74:4, 74:7, 74:12

**MOMENT** [1] - 78:5

**MONDAY** [1] - 1:12

**MONEY** [28] - 13:1,
13:5, 13:6, 13:17,
14:6, 14:14, 29:23,
30:7, 30:8, 43:22,
43:24, 47:15, 49:9,
49:11, 49:12, 49:22,
52:5, 53:3, 53:4,
53:5, 59:24, 59:25,
68:2, 79:15, 80:15,
87:18, 88:20, 88:22

**MONITORING** [1] -
56:5

**MONTH** [1] - 41:16

**MONTHLY** [1] - 45:5

**MONTHS** [2] - 61:16,
72:15

**MORALE** [2] - 19:5,
30:22

**MORGAN** [1] - 2:7

**MORNING** [9] - 9:8,
10:2, 11:1, 11:13,
27:14, 36:16, 93:21,
93:24, 94:2

**MORNING/
AFTERNOON** [1] -
10:13

**MORTGAGE** [8] -
13:2, 14:10, 27:15,
47:8, 52:16, 52:23,
55:2, 75:17

**MOST** [9] - 14:4,
15:23, 23:15, 24:22,
26:12, 26:13, 50:22,
67:19, 86:6

**MOTIONS** [1] - 19:25

**MOUNT** [1] - 40:19

**MOVE** [13] - 10:20,
11:3, 11:6, 15:2,
17:17, 26:25, 30:23,
39:11, 54:24, 57:16,
57:17, 72:19, 90:19

**MOVED** [12] - 28:3,
29:8, 40:18, 40:19,

42:19, 44:15, 46:24,
47:2, 65:3, 80:7,
82:7, 89:3

**MOVING** [3] - 48:1,
57:12, 58:18

**MUST** [6] - 5:8, 5:9,
5:21, 6:22, 7:10,
7:12

## N

**NAME** [20] - 11:13,
14:17, 15:8, 18:11,
28:10, 39:17, 39:20,
39:21, 47:22, 52:16,
52:17, 63:10, 68:9,
74:5, 77:7, 77:11,
88:15, 89:12, 89:17,
91:4

**NAMED** [4] - 15:12,
16:22, 17:6, 32:11

**NAMES** [1] - 27:21

**NATHAN** [3] - 91:5,
92:1, 92:25

**NATURALLY** [1] -
16:13

**NATURE** [2] - 51:7,
86:9

**NEAR** [2] - 75:12, 78:1

**NEAT** [1] - 69:19

**NECESSARILY** [2] -
50:18, 73:16

**NECESSARY** [1] - 5:5

**NED** [1] - 33:25

**NEED** [14] - 9:19, 10:7,
10:17, 10:21, 16:2,
24:17, 32:25, 36:13,
36:25, 43:25, 58:15,
68:17, 72:6, 88:11

**NEEDED** [17] - 13:17,
37:13, 45:19, 48:15,
49:13, 52:4, 53:6,
54:20, 55:16, 59:21,
61:24, 69:4, 73:3,
76:21, 79:16, 85:20,
93:11

**NEEDS** [3] - 60:8,
63:6, 92:9

**NERVOUS** [1] - 40:2

**NET** [1] - 71:23

**NETWORKING** [2] -
48:14, 52:11

**NEVER** [9] - 12:5,
23:13, 23:18, 27:9,
38:6, 67:12, 76:11,
78:1, 79:2

**NEVERTHELESS** [1] -
19:23

**NEW** [31] - 13:18,
14:17, 15:3, 15:19,

16:18, 20:16, 22:16,
27:16, 27:18, 29:13,
43:3, 49:6, 53:25,
54:1, 58:22, 61:8,
61:23, 62:5, 62:21,
71:25, 73:13, 74:21,
75:1, 75:2, 76:7,
76:20, 79:22, 81:25,
82:1, 89:3, 89:18

**NEWS** [1] - 59:18

**NEXT** [6] - 15:2, 31:8,
36:16, 59:10, 82:3,
83:10

**NICE** [1] - 26:23

**NICKNAME** [2] - 68:8,
74:16

**NINE** [1] - 41:16

**NINE-MONTH** [1] -
41:16

**NO** [1] - 83:25

**NOI** [1] - 71:23

**NON** [2] - 42:21, 49:24

**NON-PROFIT** [2] -
42:21, 49:24

**NONE** [1] - 5:13

**NONINCOME** [1] -
71:5

**NONPAYMENT** [1] -
13:10

**NONPERFORMING**
[1] - 85:7

**NONPROFIT** [1] - 49:7

**NONPROFITS** [1] -
49:2

**NORMAL** [1] - 62:11

**NORMALLY** [2] - 9:7,
9:15

**NORTH** [2] - 18:17,
40:18

**NOTES** [1] - 7:15

**NOTHING** [5] - 19:17,
23:23, 26:7, 26:19,
53:18

**NOTICE** [2] - 72:17,
76:16

**NOVEMBER** [1] - 12:3

**NUMBER** [14] - 43:3,
48:12, 49:2, 49:23,
50:18, 51:11, 52:14,
64:8, 66:21, 69:11,
71:16, 73:11, 75:12,
83:1

**NUMBERS** [3] - 54:7,
54:8, 54:9

## O

**O'CLOCK** [2] - 9:9,
9:14

**OAK** [1] - 40:21

**OATH** [1] - 3:14

**OBJECTION** [2] - 5:5,
5:11

**OBJECTIONS** [2] -
5:6, 5:9

**OBJECTIVE** [1] - 20:6

**OBSERVE** [1] - 6:13

**OBTAIN** [3] - 4:16,
41:6, 43:20

**OBTAINED** [1] - 41:1

**OBTAINING** [2] - 45:1,
71:3

**OCCUR** [2] - 3:21,
8:13

**OCCURRED** [1] - 51:3

**OCCURRING** [1] -
90:18

**OFFENSIVE** [1] -
23:15

**OFFER** [2] - 48:19,
88:3

**OFFERED** [4] - 52:19,
52:21, 61:6, 85:5

**OFFERING** [1] - 42:25

**OFFICE** [12] - 10:9,
53:21, 54:13, 69:16,
69:20, 74:21, 74:24,
75:1, 83:5, 89:3,
91:2, 91:18

**OFFICER** [4] - 48:23,
49:1, 74:1, 74:6

**OFFICER/
RELATIONSHIP** [1] -
43:12

**OFFICERS** [2] - 43:19,
74:23

**OFFICES** [3] - 53:23,
53:25

**OFFICIAL** [1] - 12:16

**OFTEN** [3] - 58:14,
70:23, 74:17

**OHIO** [2] - 43:16,
55:23

**OLD** [2] - 42:3, 55:24

**OLDSMOBILES** [1] -
61:4

**ON-THE-JOB** [1] -
41:25

**ONCE** [5] - 30:25,
33:2, 55:10, 77:20,
82:10

**ONE** [51] - 1:17, 6:18,
7:4, 9:25, 11:14,
12:17, 14:1, 14:20,
15:9, 15:14, 21:1,
23:12, 25:14, 28:17,
29:5, 29:21, 30:20,
30:21, 41:19, 42:2,

43:6, 49:8, 50:6,
52:15, 53:24, 54:18,
55:23, 56:2, 58:8,
58:16, 59:15, 59:16,
59:19, 61:15, 61:20,
62:16, 63:23, 64:6,
64:9, 65:7, 68:19,
72:25, 79:18, 80:7,
80:11, 80:15, 83:9,
84:14, 88:14, 90:17,
91:20

**OPEN** [2] - 11:10,
24:25

**OPENING** [5] - 4:6,
4:8, 11:8, 68:18,
90:21

**OPERATED** [2] -
27:20, 62:12

**OPERATING** [5] -
42:10, 46:1, 70:23,
71:13, 71:23

**OPERATION** [1] -
53:12

**OPERATIONAL** [1] -
91:25

**OPERATIONS** [1] -
61:10

**OPERATORS** [1] -
92:3

**OPINION** [8] - 5:14,
5:16, 5:17, 19:11,
29:6, 29:15, 29:16

**OPINIONS** [2] - 31:17,
31:19

**OPPORTUNITIES** [1] -
75:19

**OPPORTUNITY** [11] -
6:13, 9:20, 26:3,
30:17, 43:7, 57:15,
75:22, 75:24, 76:1,
76:6, 79:12

**OPPOSED** [1] - 82:20

**OPPOSING** [1] - 4:15

**OPTIONS** [4] - 77:19,
77:20, 77:21, 82:16

**ORDER** [3] - 4:16,
55:11, 72:7

**ORDERED** [1] - 5:11

**ORDERING** [1] - 55:13

**ORDINARY** [1] - 7:3

**OREO** [5] - 85:12,
86:11, 86:12, 86:13

**ORGANIZATION** [4] -
29:22, 32:3, 90:2,
91:6

**ORGANIZATIONAL**
[1] - 90:15

**ORGANIZATIONS** [5]
- 28:19, 30:15,
42:21, 42:22, 49:12

**ORIGINALLY** [1] - 40:17

**ORIGINATED** [2] - 69:23, 91:2

**ORPHAN** [5] - 16:15, 16:16, 16:18, 17:2, 17:3

**OUGHT** [1] - 8:3

**OUTCOME** [1] - 6:6

**OUTFIT** [3] - 49:7, 89:18

**OUTLIERS** [1] - 73:8

**OUTLINING** [2] - 4:6, 4:8

**OUTSIDE** [2] - 13:22, 55:22

**OVERALL** [3] - 82:9, 82:10, 83:18

**OVERSAW** [2] - 12:23, 13:14

**OVERSEEING** [3] - 27:5, 30:24, 87:3

**OVERSIGHT** [1] - 44:10

**OVERTLY** [1] - 37:2

**OWN** [17] - 7:17, 12:24, 13:5, 14:14, 16:11, 18:16, 24:1, 24:3, 29:8, 58:15, 59:21, 62:16, 63:4, 71:11, 79:3, 92:15

**OWNED** [1] - 86:13

**OWNERS** [2] - 27:17, 27:18

---

**P**

**P.C** [1] - 2:2

**P.M** [1] - 94:4

**PACKAGE** [1] - 54:3

**PAGE** [2] - 30:14, 34:4

**PAGES** [1] - 33:15

**PAID** [12] - 12:10, 45:20, 59:7, 65:17, 65:18, 65:20, 66:2, 71:14, 71:16, 77:2, 85:22, 85:23

**PAN** [1] - 7:4

**PAPER** [2] - 18:9, 72:12

**PAPERS** [1] - 67:20

**PARAGRAPH** [1] - 35:22

**PARCEL** [1] - 17:14

**PARDON** [1] - 25:4

**PARLANCE** [1] - 8:21

**PART** [30] - 6:2, 14:4, 14:16, 15:9, 15:20, 17:14, 19:3, 24:20, 27:14, 29:22, 36:21,

51:17, 58:9, 60:3, 61:1, 65:10, 65:25, 67:22, 68:25, 76:2, 77:1, 78:23, 87:14, 87:15, 87:19, 88:1, 88:9, 90:20, 92:13

**PART-TIME** [3] - 87:14, 88:1, 88:9

**PARTICIPANT** [2] - 3:15, 22:22

**PARTICIPATE** [3] - 11:5, 44:1, 60:1

**PARTICIPATED** [1] - 25:23

**PARTICIPATING** [1] - 43:20

**PARTICULAR** [4] - 6:21, 7:25, 70:11, 73:21

**PARTICULARLY** [1] - 24:13

**PARTIES** [7] - 3:17, 8:15, 11:2, 12:1, 85:18, 86:7, 86:8

**PARTLY** [1] - 64:24

**PARTNER** [1] - 11:15

**PARTS** [1] - 92:4

**PARTY** [7] - 6:20, 55:11, 56:7, 59:25, 85:6, 86:2, 87:4

**PAST** [1] - 77:24

**PASTORIUS** [1] - 40:20

**PAUL** [1] - 89:12

**PAY** [6] - 13:6, 27:8, 29:25, 37:25, 52:1, 65:20

**PAYING** [3] - 14:10, 14:12, 32:6

**PAYMENTS** [3] - 14:10, 14:11, 45:3

**PAYOUT** [1] - 76:25

**PENN** [2] - 2:3, 54:18

**PENNSYLVANIA** [4] - 1:2, 1:11, 41:1, 49:5

**PEOPLE** [56] - 16:5, 16:18, 16:24, 16:25, 17:2, 17:21, 18:22, 20:19, 20:25, 21:1, 21:11, 22:22, 22:23, 25:20, 25:21, 25:23, 25:25, 27:25, 28:13, 30:12, 30:19, 30:22, 30:23, 31:3, 33:2, 34:18, 34:20, 35:6, 35:7, 45:23, 48:13, 51:11, 52:12, 53:18, 59:2, 62:5, 64:10, 64:21, 64:22, 66:3, 66:23, 66:24, 67:19,

72:9, 72:20, 73:13, 78:17, 78:18, 86:24, 91:4, 91:9, 91:21, 91:25, 93:4

**PERCEIVED** [1] - 91:9

**PERCENT** [4] - 55:1, 73:9, 75:16

**PERCENTAGE** [1] - 66:20

**PERFORM** [6] - 4:4, 35:12, 72:7, 81:13, 86:4, 86:8

**PERFORMANCE** [6] - 12:4, 12:13, 27:10, 66:5, 70:17

**PERFORMED** [7] - 14:1, 17:21, 18:24, 19:22, 80:4, 85:9

**PERFORMING** [6] - 13:12, 19:1, 42:7, 58:4, 58:10, 85:17

**PERHAPS** [1] - 48:17

**PERIOD** [6] - 18:8, 41:17, 65:1, 73:1, 77:20, 78:25

**PERIODIC** [1] - 59:5

**PERMANENT** [3] - 53:9, 55:2, 56:19

**PERMIT** [2] - 8:2, 8:12

**PERMITTED** [1] - 7:15

**PERRY** [1] - 91:5, 92:25

**PERSON** [18] - 11:24, 23:11, 29:5, 36:25, 37:4, 37:6, 37:11, 61:23, 74:2, 74:5, 74:6, 74:9, 74:10, 88:13, 89:21, 90:1, 90:3, 91:4

**PERSONAL** [3] - 82:24, 82:25, 83:1

**PERSONS** [1] - 6:7

**PERSPECTIVE** [2] - 79:8, 93:6

**PERSUADED** [1] - 6:25

**PETROLEUM** [1] - 56:2

**PHILADELPHIA** [14] - 1:11, 1:22, 2:5, 2:9, 40:17, 40:18, 40:20, 40:22, 46:14, 46:16, 46:17, 47:5, 49:4

**PHILOSOPHY** [1] - 83:18

**PHONE** [3] - 18:10, 46:19, 77:6

**PICK** [3] - 16:8, 22:5, 46:19

**PICKING** [1] - 89:5

**PICKLES** [4] - 25:25, 32:12, 37:3, 38:15

**PIPING** [1] - 51:9

**PLACE** [5] - 7:5, 7:6, 60:6, 71:22, 81:7

**PLACED** [1] - 21:20

**PLACES** [2] - 49:22, 52:15

**PLAINTIFF** [9] - 1:5, 2:6, 3:8, 4:9, 6:19, 7:6, 7:10, 7:11, 39:14

**PLAINTIFF'S** [3] - 4:5, 4:6, 39:18

**PLAN** [8] - 31:25, 32:1, 45:19, 49:18, 49:20, 82:22, 82:23, 84:3

**PLANNED** [1] - 91:20

**PLANS** [1] - 45:7

**PLAY** [1] - 39:4

**PLEASURE** [1] - 10:12

**PLG** [14] - 12:17, 12:22, 14:21, 15:13, 27:23, 29:21, 30:5, 33:12, 35:10, 63:11, 65:12, 65:25, 82:21, 82:22

**PLUS** [1] - 55:21

**POINT** [22] - 25:8, 26:25, 27:4, 40:9, 42:13, 43:11, 43:21, 46:10, 47:2, 47:20, 48:5, 48:12, 52:23, 53:24, 58:16, 59:15, 69:7, 75:6, 78:19, 84:12, 92:24, 93:1

**POINTS** [2] - 60:10, 69:13

**POLICIES** [5] - 23:16, 59:8, 59:17, 62:19, 62:21

**POLICY** [2] - 59:9, 59:18

**POLITICAL** [1] - 93:5

**PONTIAC** [1] - 61:5

**PORTFOLIO** [65] - 15:21, 15:23, 16:3, 16:9, 16:11, 17:8, 18:16, 18:17, 20:18, 35:18, 36:6, 42:20, 44:10, 44:11, 44:25, 45:1, 45:2, 45:9, 45:16, 45:17, 46:8, 50:16, 58:9, 59:4, 59:6, 59:9, 59:22, 60:20, 60:23, 61:1, 61:17, 63:17, 63:21, 64:6, 65:11, 66:5, 66:7, 66:13, 66:14,

66:23, 68:11, 69:3, 70:2, 74:9, 85:6, 85:11, 85:19, 89:7, 90:22, 90:24, 91:1, 91:16, 91:22, 91:23, 92:3, 92:5, 92:10, 92:15, 92:16, 92:18, 92:21, 93:2, 93:12, 93:17

**PORTFOLIOS** [3] - 64:5, 64:9, 86:10

**PORTION** [3] - 66:2, 78:13, 90:9

**POSITION** [12] - 11:25, 18:15, 35:11, 41:14, 42:19, 43:10, 52:7, 52:19, 52:21, 53:15, 58:21

**POSITIVE** [1] - 67:24

**POSSIBLE** [2] - 10:21, 14:19

**POSTPONE** [1] - 4:9

**POTENTIAL** [5] - 68:6, 69:5, 70:10, 70:11, 73:14

**POTENTIALLY** [1] - 77:21

**POWER** [2] - 9:24, 10:20

**PREJUDGED** [1] - 24:19

**PREJUDICE** [1] - 6:10

**PRELIMINARY** [2] - 54:7, 55:6

**PREPONDERANCE** [3] - 6:22, 6:24, 24:18

**PRESENCE** [1] - 8:13

**PRESENT** [2] - 4:11, 75:18

**PRESENTED** [1] - 3:19

**PRESIDENT** [1] - 47:13

**PRESIDENT'S** [1] - 65:21

**PRESTIGIOUS** [1] - 29:21

**PRETEND** [1] - 29:17

**PRETTY** [3] - 53:19, 69:8, 79:7

**PREVIOUS** [2] - 42:15, 60:6

**PREVIOUSLY** [1] - 82:15

**PRIMARILY** [1] - 49:4

**PRIMARY** [4] - 18:22, 41:23, 51:19, 51:22

**PRINCIPAL** [1] - 59:18

**PRINCIPLE** [1] - 45:4

**PRINTING** [1] - 36:16

**PRIVATE** [1] - 14:16
**PRIVILEGE** [1] - 11:16
**PROBLEM** [6] - 18:1, 20:16, 33:8, 57:16, 66:12, 92:9
**PROBLEMS** [4] - 8:17, 55:19, 67:21, 92:5
**PROCEDURE** [2] - 3:20, 4:3
**PROCEDURES** [2] - 62:19, 62:21
**PROCEED** [6] - 9:8, 9:10, 56:25, 57:25, 78:7, 89:21
**PROCEEDING** [1] - 33:15
**PROCEEDINGS** [3] - 1:25, 10:7, 94:7
**PROCESS** [15] - 22:3, 25:19, 33:25, 34:8, 46:4, 68:16, 68:23, 69:2, 69:21, 72:22, 72:24, 73:16, 74:19, 87:7, 89:15
**PRODUCED** [1] - 1:25
**PRODUCERS** [2] - 53:18, 53:22
**PRODUCT** [3] - 42:1, 69:18, 91:1
**PRODUCTS** [2] - 42:24, 61:7
**PROFESSIONAL** [3] - 48:13, 78:22, 81:19
**PROFESSIONALS** [1] - 64:14
**PROFILE** [4] - 68:12, 68:24, 89:25, 93:13
**PROFIT** [4] - 42:21, 49:24, 52:6
**PROGRAM** [2] - 41:14, 60:24
**PROJECT** [2] - 53:8, 92:8
**PROJECTS** [8] - 45:6, 45:22, 47:4, 47:5, 49:3, 53:6, 56:12
**PROMOTED** [4] - 27:3, 41:17, 47:13, 65:10
**PROMOTION** [1] - 65:6
**PROMOTIONS** [4] - 12:7, 27:8, 37:25, 47:11
**PROMPTLY** [1] - 8:14
**PROOF** [2] - 6:21, 12:11
**PROOFING** [1] - 51:12
**PROPERLY** [1] - 3:23
**PROPERTIES** [12] -

13:8, 15:23, 15:24, 45:6, 47:9, 54:12, 59:16, 64:4, 64:7, 71:3, 85:8, 85:14
**PROPERTY** [10] - 54:10, 55:25, 56:15, 56:19, 64:9, 69:14, 69:15, 70:5, 71:22, 92:7
**PROPRIETARY** [6] - 12:17, 12:21, 27:23, 63:11, 63:14, 63:19
**PROS** [2] - 76:13, 78:3
**PROSPECTIVE** [1] - 55:7
**PROSPECTS** [1] - 72:19
**PROTECTED** [1] - 92:15
**PROVE** [1] - 23:11
**PROVES** [1] - 47:2
**PROVIDE** [4] - 17:2, 35:17, 54:21, 54:22
**PROVIDED** [3] - 19:9, 53:1, 53:10
**PROVIDERS** [2] - 49:24, 49:25
**PROVIDING** [3] - 47:7, 81:14
**PROVING** [1] - 6:19
**PUBLIC** [2] - 43:14, 79:1
**PUBLICLY** [1] - 29:17
**PURCHASE** [5] - 49:11, 71:2, 75:5, 76:7, 77:17
**PURCHASED** [2] - 56:13, 69:24
**PURCHASING** [1] - 53:6
**PURPOSE** [1] - 18:22
**PURPOSES** [2] - 35:12, 61:10
**PURSUANT** [1] - 3:11
**PUSHED** [1] - 35:22
**PUT** [14] - 7:2, 13:17, 14:20, 25:7, 26:17, 27:22, 39:1, 53:8, 55:2, 56:19, 65:2, 67:15, 68:17, 73:6
**PUTTING** [2] - 67:16, 77:25

## Q

**QUALITATIVE** [6] - 70:13, 70:14, 70:21, 72:4, 72:7, 73:4
**QUALITY** [3] - 68:14, 70:18, 70:24

**QUANTITATIVE** [2] - 70:12, 73:6
**QUARTER** [8] - 9:11, 9:16, 10:23, 10:25, 33:2, 73:25, 75:9, 75:10
**QUARTERLY** [3] - 45:7, 68:17, 69:24
**QUARTERS** [2] - 42:15, 42:16
**QUEEN** [1] - 81:12
**QUESTIONS** [10] - 3:16, 3:19, 4:16, 4:22, 5:15, 30:20, 30:21, 37:1, 72:13, 72:21
**QUICK** [1] - 79:7
**QUICKLY** [3] - 10:20, 11:6, 34:17
**QUITE** [16] - 12:10, 41:21, 50:20, 59:1, 59:12, 60:6, 62:2, 62:5, 62:25, 65:18, 66:3, 67:21, 69:12, 70:7, 86:17, 92:1

## R

**RACE** [8] - 3:10, 11:18, 25:13, 25:22, 26:19, 27:8, 28:23, 37:24
**RAISE** [1] - 7:21
**RAISING** [1] - 68:2
**RAN** [1] - 92:15
**RATE** [10] - 36:3, 44:6, 44:9, 48:15, 60:12, 60:14, 69:22, 71:24, 76:6, 85:4
**RATED** [5] - 46:6, 70:21, 86:11, 86:12, 93:9
**RATHER** [1] - 38:4
**RATING** [21] - 13:21, 22:3, 22:18, 32:22, 33:4, 34:8, 35:12, 46:4, 68:16, 68:22, 69:2, 69:10, 72:22, 73:11, 74:9, 74:19, 86:8, 86:14, 87:4, 87:7
**RATINGS** [30] - 13:12, 13:13, 13:16, 13:24, 17:13, 21:7, 21:10, 21:16, 22:2, 22:24, 23:1, 33:11, 33:17, 33:24, 34:12, 34:13, 35:18, 36:4, 36:5, 36:10, 68:12, 68:18, 69:9, 85:9, 86:5, 86:20, 86:25, 87:2,

92:20, 93:8
**RATIO** [1] - 64:17
**REACH** [1] - 8:11
**REACHING** [1] - 20:3
**REACT** [1] - 81:6
**READ** [6] - 7:22, 8:2, 37:6, 67:20, 78:12, 78:13
**READING** [1] - 9:19
**READY** [2] - 11:3, 46:20
**REAL** [33] - 15:4, 17:21, 18:24, 20:3, 21:18, 22:19, 44:16, 44:17, 44:18, 44:21, 44:22, 44:24, 45:1, 45:2, 46:24, 46:25, 47:3, 47:5, 47:8, 47:21, 47:24, 52:20, 68:23, 69:3, 69:7, 69:25, 82:22, 85:2, 85:13, 86:13, 86:18, 89:18, 90:12
**REALITY** [1] - 29:18
**REALIZE** [2] - 92:8, 93:1
**REALIZED** [5] - 51:16, 52:3, 59:21, 60:24, 82:14
**REALLY** [15] - 12:6, 20:1, 25:21, 26:17, 30:17, 31:9, 58:15, 62:15, 72:11, 82:18, 82:24, 88:11, 88:17, 91:14
**REALTIME** [1] - 1:20
**REASON** [2] - 24:17, 83:25
**REASONABLE** [1] - 9:21
**REASONABLENESS** [1] - 6:16
**REASONS** [6] - 5:9, 13:25, 23:22, 24:11, 29:20, 51:2
**REASSIGNED** [5] - 15:14, 20:23, 21:3, 21:7
**REASSIGNMENT** [1] - 21:13
**REBUTTAL** [1] - 4:13
**RECEIVE** [1] - 5:24
**RECEIVED** [4] - 8:9, 12:7, 55:10, 76:19
**RECESS** [3] - 56:21, 57:3, 57:18
**RECOGNIZED** [1] - 22:9
**RECOLLECTION** [2] - 6:12, 7:25

**RECORD** [5] - 5:12, 7:19, 39:17, 78:6, 94:7
**RECORDED** [1] - 1:25
**RECROSS** [1] - 95:4
**RECURRING** [1] - 59:20
**REDIRECT** [1] - 95:4
**REES** [3] - 69:6, 69:25, 71:25
**REFER** [1] - 14:8
**REFERRED** [5] - 30:12, 52:15, 74:13, 84:6, 85:3
**REFINE** [1] - 60:7
**REFLECTIVE** [2] - 68:23, 69:2
**REFUSED** [1] - 37:19
**REGARD** [4] - 10:21, 19:3, 39:2, 48:8
**REGARDED** [1] - 5:13
**REGION** [3] - 47:5, 47:9, 49:4
**REGIONAL** [1] - 43:23
**REGULAR** [2] - 10:14, 75:4
**REHAB** [3] - 49:11, 54:22, 54:24
**REINVESTMENT** [11] - 48:10, 48:22, 49:15, 49:19, 50:10, 50:25, 51:1, 51:18, 51:25, 52:13
**REJOINED** [1] - 47:22
**RELATE** [1] - 86:17
**RELATED** [1] - 93:16
**RELATION** [1] - 20:25
**RELATIONSHIP** [1] - 44:23
**RELATIVE** [1] - 70:17
**RELIED** [1] - 13:15
**RELIEF** [1] - 6:20
**RELOCATED** [1] - 43:3
**RELOCATING** [1] - 43:6
**RELY** [3] - 7:17, 8:3, 73:3
**RELYING** [1] - 51:24
**REMAIN** [1] - 57:23
**REMAINED** [1] - 63:15
**REMARRYING** [1] - 62:14
**REMEMBER** [8] - 16:17, 20:17, 20:20, 43:11, 44:3, 47:18, 76:5, 83:15
**REMOVED** [1] - 56:4
**RENDER** [1] - 38:17
**RENEW** [1] - 72:16

**RENOVATED** [1] - 54:20

**RENOVATIONS** [2] - 53:7, 56:16

**RENT** [1] - 70:24

**RENTS** [3] - 56:17, 70:4, 70:5

**REORGANIZED** [1] - 16:7

**REPAID** [2] - 33:1, 33:7

**REPAIRS** [1] - 55:16

**REPEAT** [1] - 8:1

**REPLACE** [1] - 89:16

**REPLACEMENT** [2] - 89:10, 89:24

**REPORT** [11] - 15:11, 22:23, 23:1, 55:13, 55:14, 55:17, 55:18, 56:8, 59:6, 90:10, 90:16

**REPORTED** [7] - 13:14, 32:12, 42:12, 45:7, 90:11, 90:13, 93:4

**REPORTER** [8] - 1:20, 7:19, 7:22, 8:2, 8:4, 10:11, 10:15, 94:12

**REPORTERS** [1] - 10:17

**REPORTING** [7] - 17:24, 24:21, 45:24, 64:10, 70:15, 70:22, 84:13

**REPORTS** [6] - 55:11, 56:7, 56:8, 59:5, 60:4, 86:1

**REPOSITIONED** [1] - 56:13

**REPOSITIONING** [1] - 53:7

**REPRESENT** [1] - 25:12

**REPRESENTING** [3] - 2:6, 2:10, 11:16

**REPRIMANDED** [1] - 12:6

**REQUEST** [1] - 8:2

**REQUESTED** [1] - 78:13

**REQUIRE** [3] - 15:25, 71:6, 85:10

**REQUIRED** [4] - 8:18, 13:20, 42:23, 55:4

**RES** [8] - 15:5, 15:7, 15:10, 15:12, 16:13, 16:23, 85:2

**RESEARCH** [1] - 71:15

**RESERVES** [3] -

13:17, 35:17, 58:12

**RESIGNATION** [1] - 16:6

**RESOURCES** [8] - 20:5, 32:2, 32:11, 37:4, 37:11, 38:3, 79:18, 90:6

**RESPONDED** [3] - 19:6, 19:10, 35:15

**RESPONSE** [2] - 19:9, 36:13

**RESPONSIBILITIES** [5] - 44:24, 45:11, 48:7, 74:8, 79:21

**RESPONSIBILITY** [15] - 12:8, 17:13, 18:18, 21:5, 21:16, 46:9, 47:15, 47:17, 50:16, 51:22, 62:5, 65:15, 74:7, 92:11, 92:22

**RESPONSIBLE** [18] - 13:7, 34:7, 37:6, 41:24, 42:10, 42:20, 45:2, 45:17, 45:23, 45:24, 47:6, 53:16, 59:25, 64:24, 72:3, 74:3, 86:14, 92:19

**REST** [1] - 38:25

**RESULT** [8] - 16:7, 19:20, 50:9, 51:15, 67:4, 75:8, 77:14, 80:8

**RESULTED** [1] - 73:17

**RESULTS** [3] - 42:14, 46:1, 71:7

**RESUME** [2] - 9:12, 93:21

**RETAIL** [2] - 55:22, 69:17

**RETIRED** [1] - 8:10

**RETURN** [2] - 8:24, 77:22

**REUNDERWRITING** [1] - 71:12

**REVALUE** [1] - 71:21

**REVIEW** [1] - 54:5

**REVIEWED** [2] - 33:6, 41:25

**RIGOROUS** [1] - 72:24

**RISE** [1] - 3:1

**RISK** [62] - 13:5, 13:9, 13:12, 13:13, 13:21, 13:24, 17:13, 21:7, 21:10, 21:16, 22:2, 22:3, 22:18, 22:24, 23:1, 32:22, 33:4, 33:5, 33:7, 33:8, 33:11, 33:17, 33:24, 34:8, 34:12, 34:13,

35:12, 35:18, 36:3, 36:10, 46:4, 46:6, 68:12, 68:16, 68:18, 68:22, 68:23, 69:2, 69:9, 69:10, 70:20, 72:11, 72:22, 73:11, 74:6, 74:9, 74:19, 85:9, 86:4, 86:8, 86:10, 86:12, 86:14, 86:19, 86:25, 87:2, 87:4, 87:7, 92:20, 93:7, 93:9, 93:13

**RISKY** [1] - 68:4

**ROAD** [2] - 82:17, 83:8

**ROBERT** [1] - 77:7

**ROOM** [6] - 7:23, 8:11, 8:24, 10:10, 38:25, 73:13

**ROUGHLY** [2] - 42:11, 61:11

**ROUTINE** [1] - 14:9

**RUDE** [1] - 39:3

**RULE** [1] - 5:6

**RULES** [3] - 3:24, 5:2, 39:4

**RULINGS** [2] - 5:9, 5:13

**RUMOR** [1] - 67:25

**RUMORS** [3] - 75:21, 80:5, 82:9

**RUN** [3] - 19:1, 83:21, 83:23

---

# S

**S-P-E-I-G-H-T** [1] - 39:22

**SACHS** [1] - 75:15

**SALARY** [5] - 12:14, 65:12, 65:23, 87:16, 88:10

**SALE** [2] - 67:17, 79:23

**SALES** [1] - 43:18

**SALESPEOPLE** [1] - 53:19

**SALIENT** [1] - 60:10

**SALMANSON** [21] - 2:2, 2:2, 11:11, 11:14, 26:22, 27:13, 30:11, 32:21, 33:10, 33:18, 34:14, 37:16, 39:14, 39:24, 57:7, 57:11, 57:14, 58:1, 78:8, 78:14, 93:15

**SARCASTIC** [1] - 35:7

**SAT** [2] - 31:18, 37:11

**SATURNS** [1] - 61:4

**SAVING** [1] - 80:15

**SAW** [2] - 36:15, 72:12

**SCALE** [3] - 7:4, 7:5, 52:1

**SCALES** [2] - 7:8, 7:11

**SCENARIOS** [1] - 9:3

**SCHEDULE** [2] - 9:17, 48:20

**SCHEDULED** [4] - 9:24, 10:1, 32:10, 82:2

**SCHOOL** [6] - 40:13, 40:14, 40:19, 40:21, 40:23, 41:8

**SCOTT** [2] - 2:3, 11:15

**SCREW** [1] - 34:14

**SCRUTINY** [1] - 24:15

**SEATED** [4] - 3:5, 57:22, 57:24

**SECOND** [3] - 48:5, 65:20, 77:3

**SECTION** [2] - 3:13, 40:20

**SECTOR** [1] - 43:14

**SECURITIZATION** [1] - 65:2

**SECURITIZED** [1] - 65:1

**SEE** [28] - 16:23, 19:17, 20:12, 25:25, 26:14, 26:15, 29:7, 31:9, 32:17, 35:13, 36:13, 36:17, 37:21, 37:23, 38:13, 38:21, 38:25, 45:14, 70:5, 70:19, 71:10, 72:13, 73:9, 74:24, 83:11, 93:23, 94:2

**SEEING** [1] - 93:10

**SEEM** [1] - 81:7

**SEGMENTS** [1] - 70:15

**SELF** [1] - 69:20

**SELL** [4] - 56:18, 68:1, 68:3, 75:8

**SELLING** [1] - 42:24

**SEND** [3] - 23:8, 54:3, 55:8

**SENDING** [1] - 79:10

**SENIOR** [6] - 40:13, 41:17, 42:12, 66:3, 74:1, 75:24

**SENSE** [6] - 61:9, 68:13, 70:9, 77:13, 83:24, 93:18

**SENT** [5] - 11:21, 23:4, 23:9, 36:17, 82:2

**SEPARATE** [2] - 61:4, 64:4

**SERIES** [1] - 20:22

**SERIOUS** [6] - 8:17, 22:6, 25:13, 26:4,

38:19, 66:13

**SERIOUSLY** [1] - 25:14

**SERVICE** [2] - 49:12, 71:18

**SERVICED** [2] - 14:4, 85:20

**SERVICES** [2] - 42:22, 53:13

**SERVICING** [41] - 14:2, 14:3, 14:22, 14:23, 15:1, 15:4, 15:7, 16:17, 17:18, 28:3, 28:4, 28:9, 28:14, 29:2, 29:9, 29:21, 29:24, 30:4, 58:11, 59:13, 59:19, 59:23, 59:24, 62:25, 63:1, 80:5, 80:7, 81:6, 81:12, 81:13, 82:20, 82:23, 83:7, 83:20, 85:4, 85:11, 85:23, 86:18, 90:16

**SET** [10] - 15:19, 52:17, 54:7, 58:12, 59:3, 69:23, 80:19, 86:1, 88:24, 93:15

**SETTLED** [1] - 64:13

**SEVEN** [4] - 11:19, 35:6, 78:20

**SEVEN-YEAR** [1] - 11:19

**SEVERAL** [9] - 15:2, 15:3, 16:5, 24:21, 27:5, 49:5, 52:18, 91:3

**SHARED** [2] - 20:4, 89:25

**SHARES** [4] - 76:7, 82:24, 82:25, 83:1

**SHEET** [5] - 13:3, 53:4, 64:25, 65:4, 87:3

**SHEETS** [1] - 13:4

**SHOCKED** [1] - 12:11

**SHOPPING** [4] - 32:23, 54:13, 55:22, 69:17

**SHORT** [6] - 53:1, 53:10, 60:5, 60:15, 64:25, 82:14

**SHORT-TERM** [3] - 53:1, 53:10, 82:14

**SHOW** [14] - 11:21, 19:2, 19:22, 19:25, 20:7, 21:9, 23:14, 23:21, 24:10, 24:14, 25:16, 26:4, 26:6, 31:25

**SHOWED** [1] - 30:9

**SHOWN** [1] - 36:12
**SHOWS** [1] - 6:10
**SIDE** [9] - 7:4, 8:20, 8:22, 9:1, 74:3, 74:11, 88:21, 88:22
**SIDEBAR** [2] - 8:20, 9:4
**SIGN** [3] - 35:17, 55:8, 79:16
**SIGNED** [1] - 16:11
**SIGNIFICANT** [2] - 27:12, 63:24
**SIGNIFICANTLY** [1] - 62:23
**SIGNING** [1] - 93:7
**SIMILAR** [4] - 19:7, 19:9, 59:12, 66:17
**SIMILARLY** [1] - 23:14
**SIMPLE** [1] - 30:21
**SIMPLY** [2] - 23:23, 52:11
**SINGLE** [7] - 11:20, 18:9, 18:10, 37:17, 76:12, 77:24
**SIT** [2] - 20:12, 92:22
**SITUATED** [1] - 23:14
**SIX** [3] - 30:14, 61:16, 72:15
**SIX-PAGE** [1] - 30:14
**SIZABLE** [1] - 37:25
**SIZE** [2] - 32:18, 54:8
**SKILLS** [2] - 37:14, 42:24
**SKIN** [3] - 23:22, 24:20, 26:7
**SKIP** [1] - 34:2
**SLIDE** [1] - 25:10
**SLIGHTEST** [1] - 7:9
**SLIGHTLY** [1] - 7:9
**SMALL** [2] - 19:3, 42:20
**SOCIAL** [2] - 42:21, 49:12
**SOLD** [5] - 14:16, 27:15, 27:16, 65:3, 82:10
**SOLE** [1] - 5:19
**SOLELY** [1] - 6:2
**SOLICITED** [1] - 19:11
**SOLUTIONS** [7] - 15:4, 17:22, 18:25, 21:18, 22:19, 85:2, 90:12
**SOMEONE** [11] - 37:14, 62:13, 76:13, 83:21, 83:23, 88:2, 88:4, 88:8, 88:11, 89:15, 93:11
**SOMETIME** [1] - 67:25
**SOMETIMES** [4] -

64:23, 73:7, 86:16, 88:1
**SOMEWHERE** [2] - 44:12, 60:20
**SON** [2] - 40:14, 48:16
**SOPHISTICATED** [3] - 62:3, 62:6, 69:9
**SORRY** [3] - 35:3, 51:4, 78:10
**SORT** [2] - 32:18, 53:14
**SORTS** [2] - 15:13, 55:24
**SOUNDED** [1] - 29:25
**SOUNDS** [1] - 90:4
**SOURCES** [1] - 71:2
**SPACE** [3] - 70:6, 72:19, 72:20
**SPAZIANO** [1] - 87:15
**SPAZIANO** [1] - 89:11
**SPECIAL** [4] - 85:4, 85:10, 86:11, 86:18
**SPECIFIC** [2] - 34:1, 47:18
**SPECIFICALLY** [2] - 20:5, 24:5
**SPECTRUM** [1] - 53:17
**SPEIGHT** [75] - 1:3, 3:8, 11:9, 11:16, 11:17, 12:1, 12:3, 12:15, 12:22, 13:20, 14:24, 15:17, 15:25, 16:5, 16:10, 16:21, 17:1, 17:3, 17:8, 17:19, 17:23, 18:8, 18:13, 18:14, 18:20, 19:5, 19:6, 19:10, 19:19, 19:20, 19:24, 20:10, 20:18, 22:7, 23:4, 23:18, 23:20, 24:19, 26:6, 26:11, 26:12, 26:13, 27:22, 28:12, 28:15, 28:21, 29:2, 29:6, 29:11, 30:3, 30:11, 30:20, 30:25, 31:10, 31:22, 32:4, 32:13, 32:20, 34:16, 34:23, 35:14, 36:19, 37:8, 37:12, 37:22, 38:2, 38:4, 38:10, 39:15, 39:18, 39:21, 39:25, 58:2, 78:9, 95:6
**SPEIGHT'S** [21] - 13:11, 14:21, 15:10, 17:7, 17:18, 18:3, 19:14, 21:6, 23:12, 23:25, 24:3, 25:24, 26:19, 26:23, 28:2,

28:13, 28:22, 33:3, 33:22, 34:11, 38:6
**SPELL** [1] - 39:16
**SPEND** [1] - 93:12
**SPENDING** [1] - 91:24
**SPEYER** [1] - 89:17
**SPG** [8] - 15:20, 16:8, 16:10, 16:16, 35:8, 90:22, 90:24, 92:10
**SPONSOR** [3] - 70:16, 70:25, 71:1
**SPONSORS** [1] - 91:17
**SPORTS** [1] - 51:10
**SPREAD** [2] - 71:9, 85:25
**SPREADING** [1] - 68:1
**SPREADSHEET** [1] - 69:11
**SPRING** [3] - 27:11, 28:2, 61:11
**SQUARE** [1] - 55:21
**ST** [1] - 49:7
**STAFF** [5] - 35:18, 62:1, 63:1, 86:16, 86:20
**STAFFING** [1] - 87:11
**STAND** [3] - 6:8, 26:14, 39:15
**STANDARDS** [1] - 10:24
**STANDING** [1] - 57:23
**STANDPOINT** [7] - 55:15, 65:13, 65:14, 72:2, 73:11, 78:22
**STAR** [1] - 81:11
**START** [12] - 9:7, 10:1, 11:1, 18:19, 25:12, 54:25, 58:8, 58:24, 59:10, 69:13, 69:14, 79:2
**STARTED** [23] - 17:24, 21:15, 29:10, 41:16, 43:4, 44:22, 48:16, 49:16, 50:3, 51:16, 52:13, 58:14, 59:5, 59:6, 60:19, 60:25, 61:14, 68:1, 68:2, 68:5, 87:12, 88:12, 89:5
**STARTING** [6] - 41:10, 58:19, 68:3, 68:21, 73:24, 87:12
**STATE** [3] - 39:16, 49:13
**STATEMENT** [4] - 4:6, 4:8, 70:22, 70:23
**STATEMENTS** [8] - 24:2, 33:5, 45:25, 54:8, 55:5, 71:14,

85:25
**STATES** [2] - 1:1, 3:12
**STAY** [5] - 43:1, 44:13, 44:18, 60:16, 66:24
**STAYED** [1] - 47:24
**STEAMFITTER** [1] - 51:8
**STEINBERG** [1] - 91:5
**STELLAR** [1] - 11:19
**STENOTYPE** [1] - 1:25
**STENOTYPE-COMPUTER** [1] - 1:25
**STEP** [1] - 63:18
**STILL** [4] - 17:16, 31:21, 65:10
**STOCK** [4] - 76:7, 77:17, 77:19, 82:16
**STOP** [2] - 21:15, 93:18
**STOPPED** [1] - 51:23
**STORAGE** [3] - 55:24, 56:1, 69:20
**STRAIGHT** [1] - 12:20
**STRAW** [1] - 32:14
**STREAMLINE** [1] - 62:19
**STREET** [3] - 1:21, 2:8, 54:17
**STRICKEN** [1] - 5:11
**STRING** [1] - 21:24
**STRUCTURAL** [2] - 55:15, 70:19
**STRUCTURE** [4] - 30:4, 70:19, 83:24, 84:22
**STRUCTURED** [1] - 91:1
**STRUCTURES** [1] - 91:15
**STUDIES** [1] - 70:1
**SUBJECT** [1] - 8:15
**SUBJECTIVE** [2] - 20:4, 66:20
**SUBMITTED** [1] - 3:25
**SUBORDINATES** [2] - 16:20, 23:2
**SUBSIDIARY** [1] - 61:3
**SUBSTANTIAL** [2] - 36:21, 72:14
**SUBTLE** [1] - 62:24
**SUCCEED** [1] - 29:3
**SUCCESS** [1] - 50:1
**SUCCESSFUL** [2] - 19:3, 60:24, 79:24
**SUEING** [1] - 3:10
**SUGGEST** [2] - 18:12, 19:18

**SUGGESTED** [1] - 16:22
**SUGGESTING** [1] - 35:20
**SUGGESTION** [1] - 81:24
**SUITE** [1] - 2:4
**SUM** [1] - 67:15
**SUMMATION** [1] - 4:20
**SUPERVISED** [3] - 26:12, 28:11, 61:19
**SUPERVISING** [1] - 61:12
**SUPPORT** [1] - 54:11
**SUPPORTED** [1] - 53:22
**SUPPOSED** [2] - 22:12, 58:13
**SURI** [9] - 17:6, 17:7, 20:18, 88:15, 88:16, 88:24, 89:14, 89:24
**SURPRISE** [1] - 12:2
**SURPRISINGLY** [1] - 14:18
**SURVEILLANCE** [4] - 45:5, 45:10, 45:13, 45:14
**SUSTAINED** [1] - 5:10
**SUZANNE** [2] - 1:20, 94:11
**SVP** [3] - 65:10, 90:8, 91:7
**SVP'S** [1] - 79:18
**SWEAR** [1] - 3:2
**SWORE** [1] - 10:9
**SWORN** [2] - 3:4, 3:7
**SYSTEM** [1] - 63:6
**SYSTEMATIC** [1] - 59:2
**SYSTEMS** [4] - 59:3, 60:2, 62:19, 63:4

---

# T

**TABLE** [1] - 14:20
**TAKING** [2] - 44:23, 91:23
**TALENTED** [1] - 91:12
**TANKS** [3] - 55:24, 56:1, 56:4
**TAP** [1] - 90:6
**TASK** [3] - 15:15, 22:5, 22:6
**TASKS** [7] - 14:10, 17:20, 18:23, 19:1, 19:21, 30:14, 30:16
**TAX** [1] - 44:4
**TAX-FREE** [1] - 44:4
**TAXES** [5] - 14:12,

59:11, 71:14, 71:15, 85:22

**TAXING** [1] - 14:11
**TEACH** [1] - 42:2
**TEACHER** [1] - 45:15
**TEAM** [17] - 13:11, 27:4, 28:12, 30:24, 32:5, 34:5, 34:6, 34:11, 35:10, 35:14, 36:20, 37:15, 41:24, 61:22, 61:25, 80:6
**TEAMS** [1] - 61:24
**TECHNICAL** [2] - 74:3, 74:11
**TEN** [4] - 9:9, 54:18, 57:4, 70:8
**TENANT** [1] - 72:16
**TENANTS** [1] - 60:11
**TENURE** [1] - 68:20
**TERM** [6] - 53:1, 53:10, 53:11, 76:5, 82:13, 82:14
**TERMINATE** [2] - 25:24, 31:25
**TERMINATED** [8] - 12:4, 17:23, 24:5, 24:22, 26:6, 27:1, 38:6, 67:10
**TERMINATION** [9] - 3:11, 12:9, 18:1, 23:23, 24:11, 24:14, 26:20, 63:15, 67:4
**TERMS** [11] - 42:18, 44:5, 46:18, 48:20, 50:8, 60:3, 60:12, 68:20, 70:2, 73:15, 91:15
**TERRITORY** [1] - 43:15
**TESTIFIED** [1] - 30:6
**TESTIFIES** [2] - 6:14, 38:15
**TESTIFY** [5] - 16:21, 21:12, 23:3, 26:2, 36:23
**TESTIFYING** [2] - 6:9, 7:21
**TESTIMONY** [14] - 4:18, 5:10, 5:22, 6:1, 6:11, 6:15, 7:15, 7:19, 7:25, 8:2, 8:5, 17:11, 29:7, 30:3
**TEXAS** [3] - 54:2, 64:7, 84:4
**THEORY** [1] - 66:11
**THERE** [105] - 11:25, 13:25, 16:12, 16:13, 17:16, 18:1, 18:8, 19:17, 22:9, 25:21, 27:12, 29:1, 29:5,

29:10, 31:18, 31:25, 32:8, 33:7, 33:8, 33:10, 33:15, 33:16, 34:21, 37:8, 37:10, 38:24, 44:2, 45:4, 46:3, 48:3, 48:9, 48:21, 49:6, 49:10, 50:19, 52:24, 53:24, 55:24, 56:4, 56:5, 56:15, 56:16, 56:17, 57:8, 57:9, 58:4, 58:6, 58:12, 59:15, 59:18, 59:20, 60:4, 60:13, 60:18, 61:22, 62:23, 64:5, 64:8, 64:12, 64:13, 64:21, 64:22, 65:12, 66:6, 66:9, 66:12, 66:13, 68:7, 69:6, 69:11, 70:5, 70:10, 70:12, 70:13, 70:19, 73:12, 73:16, 73:24, 74:4, 75:11, 75:21, 76:5, 79:14, 80:5, 80:13, 81:11, 82:9, 82:24, 83:19, 83:20, 83:22, 83:25, 87:4, 89:16, 90:14, 91:20, 91:21, 91:24, 92:4, 93:10, 93:15
**THEREAFTER** [1] - 4:7
**THEREFORE** [1] - 24:12
**THEY'RE** [1] - 34:18
**THINGSES** [1] - 91:16
**THIRD** [12] - 55:11, 56:7, 59:25, 75:9, 77:3, 85:6, 85:18, 86:1, 86:7, 86:8, 87:4, 89:9
**THIRD-PARTY** [4] - 55:11, 56:7, 85:6, 87:4
**THIRDS** [1] - 89:8
**THOUGHTS** [1] - 31:16
**THREE** [7] - 17:25, 22:22, 30:19, 30:25, 44:15, 48:11, 73:1
**THREE-WEEK** [1] - 73:1
**THROUGHOUT** [4] - 45:22, 53:23, 53:25, 74:10
**TIE** [1] - 66:4
**TIME-TO-TIME** [1] - 64:2
**TIMELY** [2] - 45:21, 59:8

**TIP** [2] - 7:9, 7:11
**TIRED** [2] - 88:18
**TISHMAN** [1] - 89:17
**TITLE** [9] - 3:12, 30:1, 43:12, 47:2, 47:16, 48:21, 50:11, 50:13, 65:12
**TITLES** [1] - 48:25
**TODAY** [5] - 10:4, 10:11, 10:15, 10:23, 21:24
**TOGETHER** [6] - 28:19, 32:6, 36:14, 68:17, 73:22, 79:10
**TOM** [1] - 52:17, 52:24, 58:16, 59:1
**TOMORROW** [4] - 11:1, 93:21, 93:24, 94:2
**TONY** [5] - 16:23, 21:19, 90:5, 90:8, 90:11
**TOOK** [5] - 12:8, 71:13, 73:2, 81:17, 91:20
**TOOL** [1] - 60:4
**TOP** [5] - 12:13, 28:16, 35:23, 36:12, 66:22
**TORONTO** [1] - 89:3
**TOTAL** [1] - 44:14
**TOTALLY** [2] - 26:5, 28:25
**TOWARD** [1] - 6:7
**TOWARDS** [3] - 31:8, 67:14, 79:23
**TRACK** [4] - 32:25, 45:3, 59:3, 59:4
**TRACKING** [2] - 59:11, 63:5
**TRADE** [1] - 52:3
**TRADITIONAL** [1] - 50:23
**TRADITIONALLY** [1] - 15:7
**TRAIL** [3] - 18:9, 33:14, 35:1
**TRAIN** [1] - 9:20
**TRAINED** [1] - 21:10
**TRAINING** [2] - 41:14, 41:25
**TRANSCRIPT** [2] - 1:25, 94:7
**TRANSCRIPTION** [1] - 1:25
**TRANSFER** [1] - 16:6
**TRANSFERRED** [2] - 14:22, 17:18
**TRANSITION** [6] - 17:17, 18:5, 19:15, 30:18, 80:21, 80:22

**TRANSPORTATION** [1] - 9:17
**TREMENDOUS** [1] - 50:21
**TREMENDOUSLY** [1] - 78:22
**TRENDS** [3] - 59:6, 70:7, 70:10
**TRIAL** [12] - 1:16, 3:16, 3:19, 3:21, 3:22, 3:23, 4:25, 5:4, 10:5, 10:16, 37:21, 38:23
**TRIED** [3] - 32:8, 34:23, 72:9
**TRIGGER** [3] - 37:18, 60:14
**TRIP** [1] - 91:20
**TRUE** [1] - 6:25
**TRULY** [1] - 53:12
**TRUTH** [1] - 24:18
**TRY** [8] - 3:7, 17:20, 35:3, 38:4, 43:19, 57:5, 72:20, 76:12
**TRYING** [4] - 52:9, 57:7, 57:11, 73:17
**TUNE** [1] - 24:15
**TURNAROUND** [1] - 79:7
**TURNED** [3] - 59:16, 76:17, 90:14
**TURNOVER** [2] - 68:13, 70:9
**TWICE** [1] - 30:25
**TWO** [28] - 2:3, 10:23, 18:20, 22:20, 23:1, 24:9, 25:21, 25:22, 25:23, 25:25, 28:5, 30:11, 40:12, 41:23, 56:9, 61:24, 62:9, 62:11, 62:14, 65:9, 65:11, 66:1, 72:25, 79:14, 82:3, 89:8, 91:3, 91:4
**TWO-THIRDS** [1] - 89:8
**TWO-WEEK** [1] - 72:25
**TYPE** [19] - 49:17, 50:20, 55:16, 55:18, 56:5, 56:6, 60:8, 60:14, 61:6, 61:9, 62:2, 62:7, 68:4, 69:15, 69:17, 72:6, 72:9, 72:18, 76:14
**TYPES** [6] - 47:8, 48:24, 62:20, 65:24, 69:19, 85:14
**TYPICALLY** [2] - 50:21, 54:23

**U**

**U.S** [2] - 89:6, 89:9
**ULTIMATE** [1] - 22:25
**ULTIMATELY** [2] - 11:20, 84:13
**UNCERTAIN** [1] - 8:1
**UNDER** [9] - 9:2, 15:10, 20:25, 60:20, 66:9, 86:4, 86:15, 86:24
**UNDERGROUND** [1] - 56:1
**UNDERMANAGED** [1] - 56:15
**UNDERMINED** [1] - 37:1
**UNDERNEATH** [1] - 55:25
**UNDERSTOOD** [2] - 9:6, 11:6
**UNDERUTILIZED** [1] - 56:15
**UNDERWRITER** [1] - 53:16
**UNDERWRITERS** [1] - 92:7
**UNDERWRITING** [11] - 58:7, 58:18, 61:7, 70:17, 71:8, 71:10, 72:2, 88:17, 88:19, 88:21, 91:13
**UNDERWRITTEN** [2] - 46:3, 71:20
**UNEQUIVOCALLY** [1] - 23:5
**UNFORTUNATELY** [3] - 16:4, 27:11, 30:8
**UNHAPPINESS** [1] - 30:9
**UNHAPPY** [3] - 20:13, 30:23, 31:4
**UNIQUE** [3] - 59:21, 71:12, 91:17
**UNIT** [1] - 54:5
**UNITED** [2] - 1:1, 3:12
**UNITS** [2] - 61:5, 65:9
**UNLESS** [1] - 39:12
**UNLIKE** [1] - 11:25, 12:25
**UNREASONABLENE SS** [1] - 6:16
**UNTRUE** [1] - 26:5
**UP** [61] - 8:18, 15:18, 16:8, 17:16, 19:16, 19:21, 20:7, 22:5, 22:19, 25:8, 26:25, 30:16, 40:15, 40:16, 43:7, 43:8, 44:23, 45:1, 45:11, 46:19,

47:19, 48:1, 49:20, 51:2, 51:16, 52:17, 52:19, 52:24, 53:8, 54:1, 54:25, 55:1, 56:16, 56:17, 58:12, 58:19, 59:3, 61:23, 61:25, 63:7, 65:2, 69:10, 69:23, 71:25, 72:14, 73:9, 73:10, 73:15, 76:7, 80:19, 81:23, 85:1, 86:6, 88:12, 89:5, 90:8, 90:12, 92:16, 92:24
**UPCOMING** [1] - 71:4
**UPSET** [1] - 29:20
**UPSIDE** [1] - 70:6
**USES** [1] - 29:12
**UTILIZE** [1] - 46:5
**UTTERLY** [1] - 37:24

## V

**VACANCY** [1] - 70:3
**VACANT** [2] - 70:6, 85:8
**VACATING** [1] - 72:18
**VALLEY** [1] - 48:9
**VALUABLE** [1] - 32:4
**VALUE** [7] - 56:10, 56:11, 56:16, 71:25, 72:1, 73:10, 81:17
**VALUED** [1] - 20:14
**VALUES** [1] - 56:10
**VANILLA** [1] - 85:21
**VARIANCE** [1] - 42:13
**VARIED** [3] - 54:12, 64:2, 64:21
**VARIOUS** [3] - 34:2, 47:8, 48:13
**VEHICLE** [3] - 44:3, 44:5, 44:8
**VERDICT** [6] - 7:10, 7:12, 7:17, 7:24, 8:11, 38:17
**VERSUS** [6] - 3:8, 63:3, 63:22, 70:5, 71:7, 82:22
**VESTED** [1] - 77:20
**VICE** [1] - 47:13
**VICE-PRESIDENT** [1] - 47:13
**VIEWS** [2] - 4:22, 31:16
**VIOLATION** [1] - 3:12
**VOIR** [2] - 11:13, 14:7
**VOLUNTARILY** [1] - 67:12
**VP** [3] - 47:2, 47:3, 91:7
**VS** [1] - 1:6

## W

**WACHOVIA** [2] - 47:24, 51:10
**WAGNER** [1] - 40:21
**WAIT** [3] - 38:11, 38:13, 38:14
**WALK** [1] - 39:1
**WALKED** [1] - 19:13
**WALKING** [2] - 19:24, 38:25
**WANDA** [25] - 1:3, 3:8, 11:16, 21:21, 23:7, 28:11, 31:10, 31:15, 33:25, 34:11, 36:13, 36:19, 38:2, 39:14, 39:18, 39:20, 39:21, 58:11, 58:17, 81:5, 81:10, 87:24, 88:17, 90:3, 95:6
**WANDA'S** [4] - 21:17, 22:3, 34:5, 35:14
**WAREHOUSES** [1] - 54:14
**WARNING** [3] - 11:20, 23:17, 23:18
**WASHINGTON** [1] - 54:2
**WATCH** [2] - 13:7, 85:10
**WATCHED** [1] - 86:11
**WAYS** [3] - 62:9, 62:16, 63:4
**WEDNESDAY** [1] - 80:12
**WEEK** [8] - 9:25, 42:2, 72:25, 73:1, 75:3, 79:11, 87:20
**WEEKEND** [3] - 65:21, 73:2, 79:10
**WEEKS** [3] - 15:2, 18:7, 24:21
**WEIGH** [1] - 5:22
**WEIGHT** [2] - 5:23, 7:8
**WELCOMED** [1] - 83:17
**WELSH** [1] - 83:7
**WEST** [1] - 40:21
**WESTERN** [1] - 32:16
**WHATSOEVER** [1] - 18:2
**WHEREAS** [1] - 82:25
**WHEREVER** [1] - 15:18
**WHITE** [7] - 1:20, 10:14, 11:24, 23:11, 23:14, 23:20, 94:11
**WHITMORE** [1] - 83:8
**WHOLE** [4] - 6:2, 8:25, 15:19, 93:15

**WHOLLY** [1] - 20:3
**WILLIAM** [2] - 1:8, 2:10
**WILLING** [3] - 78:15, 88:7, 88:10
**WILMINGTON** [3] - 43:4, 43:9, 46:15
**WIRE** [1] - 79:15
**WISHES** [1] - 11:9
**WITNESS** [14] - 4:14, 4:16, 5:22, 6:1, 6:5, 6:8, 7:20, 8:5, 26:14, 39:10, 39:18, 39:20, 95:4
**WITNESS'** [4] - 6:9, 6:11, 6:12, 6:15
**WITNESSES** [7] - 4:12, 4:13, 4:15, 5:16, 8:15, 11:2, 39:5
**WORD** [2] - 29:12, 45:10
**WORDS** [4] - 12:25, 14:5, 26:16
**WORKERS** [1] - 26:10
**WORKPLACE** [1] - 26:8
**WORKS** [1] - 77:2
**WORRIED** [1] - 30:1
**WORRY** [1] - 81:7
**WORTH** [2] - 27:5, 70:8
**WORTHLESS** [1] - 36:11
**WRITE** [2] - 22:14, 49:18
**WRITING** [1] - 49:20
**WRITTEN** [1] - 23:11
**WROTE** [14] - 19:16, 21:15, 22:15, 26:15, 29:11, 29:17, 30:5, 32:19, 32:20, 33:22, 35:2, 37:22

## Y

**YEAR** [16] - 11:19, 12:12, 27:1, 31:11, 33:2, 36:25, 41:18, 44:20, 48:3, 51:14, 65:19, 67:15, 71:16, 77:20, 78:25, 83:2
**YEARS** [16] - 26:24, 27:7, 28:24, 37:5, 43:2, 44:14, 44:15, 47:13, 47:25, 48:12, 60:18, 60:22, 60:23, 73:20, 78:20, 82:17
**YEARS'** [1] - 70:8
**YMCA** [1] - 49:22

**YORK** [12] - 43:3, 54:1, 61:8, 61:23, 62:21, 74:22, 75:1, 75:2, 81:25, 82:1, 89:3, 89:18
**YOURSELF** [3] - 5:8, 9:3, 31:6
**YOURSELVES** [3] - 8:8, 56:24, 93:23
**YWCA** [1] - 49:23

## Z

**ZIP** [1] - 69:14